**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| NEAL MILLER and DONNA MILLER, | : | |
| Individually and as Administrators of the Estate of | : | |
| RYAN MILLER, a Minor, Deceased | : | |
|                         Plaintiffs | : | |
|       v. | : | |
| | : | NO. 2:20-cv-06301-ER |
| CITY OF PHILADELPHIA, CITY OF | : | |
| PHILADELPHIA POLICE DEPARTMENT, | : | |
| POLICE OFFICER JOSEPH WOLK , Individually | : | |
| and in his Official Capacity and GARY BOVE | : | |

**AMENDED CIVIL ACTION COMPLAINT**

Plaintiffs, Neal & Donna Miller, h/w, Administrators of the Estate of Ryan Miller, a Minor, Deceased (hereinafter "Plaintiffs"), by and through their undersigned counsel, hereby bring this action against Defendants City of Philadelphia, City of Philadelphia Police Department, Police Officer Joseph Wolk and Gary Bove.

**INTRODUCTORY STATEMENT**

1.      This is a civil rights action for money damages brought under 42 U.S.C. §§ 1983, 1985 and 1988 as well as the Fourth and Fourteenth Amendments to the United States Constitution, which also raises supplemental state law claims against the above-captioned defendants.

2.      The case revolves around the needless and tragic death of 15-year old Ryan Miller, Plaintiff's Decedent, who was pursued to his death for an alleged non-violent traffic offense while riding a motorbike by Philadelphia police officers, as well as by a rogue civilian who took it upon himself, without any right or legal privilege, to join in with uniformed police in an illegal, improper and unlawful high-speed chase, which culminated in the death of the minor Decedent.

**THE PARTIES**

3.      Plaintiffs, Neal & Donna Miller, h/w, are adult individuals, and citizens and residents of the Commonwealth of Pennsylvania, residing therein at 5723 Charles Street, Philadelphia, PA 19135.

4.      Plaintiffs are co-administrators of the Estate of Ryan Miller, a Minor, Deceased (hereinafter "Decedent" or "Plaintiffs' Decedent"), who died on May 7, 2019, at age 15, and are the parents of the Decedent.

5.      Defendant, City of Philadelphia (hereinafter referred to as "City"), is a municipal corporation of the First Class of the Commonwealth of Pennsylvania, with its principal office located at 1515 Arch Street, Philadelphia, Pennsylvania.

6.      Defendant, City of Philadelphia Police Department is a department of the City of Philadelphia responsible for law enforcement and investigations within the City of Philadelphia, Pennsylvania, and is the direct employer of all police officers in the City, including Police Officer Joseph Wolk.

7.      Defendant, Police Office Joseph Wolk, individually and in his official capacity, was at all times relevant hereto a police officer employed by the City of Philadelphia and/or Philadelphia Police Department and was, at all times relevant, acting within the course and scope of his employment as a Philadelphia Police Officer.

8.      Defendant, Gary Bove is an adult individual and citizen and resident of the Commonwealth of Pennsylvania, residing therein at 4574 Melrose Street, Philadelphia, PA 19124.

9.      Police Officer Joseph Wolk was at all times relevant a duly appointed and acting officer of the City of Philadelphia Police Department and/or the City of Philadelphia, acting under the color of law and under the statutes, ordinances, regulations, policies, customs and usages of the City of Philadelphia.

10.     Defendant, Police Officer Joseph Wolk is being sued in his individual and official capacities.

11.     At all times relevant, Police Officer Joseph Wolk was acting within the course and scope of their employment with the City of Philadelphia Police Department.

12.     At all times relevant, Defendants City of Philadelphia and City of Philadelphia Police Department had responsibility over the policies, procedures, practices and training of police officers under the employ of the City of Philadelphia Police Department, including but not limited to Police Officer Joseph Wolk.

13.     At all times relevant hereto, Defendants City of Philadelphia and City of Philadelphia Police Department had responsibility for hiring, supervising, retaining, disciplining and terminating police officers under the employ of the City of Philadelphia Police Department, including but not limited to Police Officer Joseph Wolk.

14.     At all relevant times, the unconstitutional actions of Police Officer Joseph Wolk, as well as other Philadelphia Police Officers within the Department who persistently engaged in the aggressive pursuit of dirt bikes, ATVs and motor scooters contrary to stated official policy were the result of the policies, practices, customs and/or procedures of the City of Philadelphia and/or City of Philadelphia Police Department, which were implemented, overseen, approved, ratified and/or controlled by the City and the Police Department.

15.     Defendant, the City of Philadelphia, is a municipality that operates, manages, controls and/or is otherwise responsible for the City of Philadelphia Police Department, including the employment, supervision and retention of Police Officer Joseph Wolk and others within the Department who engage in the unlawful and unconstitutional practices described herein.

16.     Defendant City of Philadelphia funds and maintains the City of Philadelphia Police Department, which operates under and administers a set of law enforcement policies, procedures, practices and customs involving the hiring, training, supervision, retention and termination of its

officers, employees, agents, servants and ostensible agents, including but not limited to Police

Officer Joseph Wolk and others within the Department who engage in the unlawful and

unconstitutional practices described herein.

17.    These policies, practices, and customs include training in traffic encounters with

civilians, the use of force, vehicular pursuits and the safe operation of police vehicles.

18.    The policies, procedures, practices and protocols include written directives that are

created, implemented, drafted, revised, ratified and/or approved by Defendants, City of Philadelphia

and/or City of Philadelphia Police Department, and include Directive 9.4, relating to vehicular

pursuits.

19.    The City of Philadelphia is being sued individually and under the theory of *espondeat*

*superior*.

## STATEMENT OF JURISDICTION

20.    The Court has federal subject matter jurisdiction in this Action pursuant to 28 U.S.C.

§ 1331 because Plaintiffs' claims under 42 U.S.C. §§ 1983, 1985 and 1988 arise under the laws of

the United States.

## FACTUAL BACKGROUND

21.    The primary and most fundamental purpose of a police department, and the core of

the job of being a police officer, is the protection of the safety and welfare of the general public

through the enforcement of laws.

22.    At all times relevant hereto, it was known in and throughout the law enforcement

community, including by all of the Police Defendants named herein, that vehicular pursuits are

amongst the most dangerous of all police activities.

23.     Police vehicular pursuits are responsible for hundreds of deaths annually, and in the period from 1996 through 2015, an average of 355 persons were killed annually in police pursuit-related crashes.[1]

24.     The City of Philadelphia and City of Philadelphia Police Department know that the safety of residents is and must be a primary consideration for Philadelphia Police Officers participating in any vehicular pursuit.

25.     Defendants also know that vehicular pursuits in urban population centers are dangerous and may result in unintentional deaths and/or serious injuries to suspects, police and bystanders.

26.     In what has been held out to the public as an effort to protect innocent citizens and bystanders from the dangers posed by unnecessary and unreasonably dangerous police vehicular pursuits, as well as to insulate itself from legal liability, the Philadelphia Police Department promulgated and implemented a policy, designated as Directive 9.4 ("the Directive"), which governs vehicular pursuits by Philadelphia Police Officers. See Exhibit "A".

27.     The Directive limits vehicular pursuits to select circumstances to avoid unnecessary risk to health and life. See Exhibit "A."

28.     By its express terms, Directive 9.4 allows Philadelphia police officers to engage in vehicular pursuit only under specifically enumerated and limited circumstances.

29.     Specifically, Directive 9.4 provides that in order to initiate a pursuit, the pursuit must be "necessary to effect the arrest or prevent escape, AND…the officer has probable cause to believe that the person being pursued has committed or attempted a forcible felony…or possesses a deadly weapon…" See Exhibit "A."

---

[1] U.S. Dept. of Justice Special Report, "Police Vehicle Pursuits, 2012-2013" NCJ 250545 (May, 2017), available at: https://www.bjs.gov/content/pub/pdf/pvp1213.pdf

30.    Despite its public-facing pursuit "policy" as embodied by Directive 9.4, the actual policy observed and pursued by the Philadelphia Police Department is extremely different, and almost affirmatively contradicts and disregards the dictates of the Directive.

31.    In actual practice, it is the policy, practice and custom of the Philadelphia Police Department to initiate highly dangerous police pursuits under circumstances where those pursuits would not only be unlawful under Directive 9.4, but where the substantial likelihood of death or bodily injury to both fleeing suspects and the public at large is clearly present and utterly disregarded.

32.    In particular, and as relevant to this action, police officers employed by the City of Philadelphia and/or City of Philadelphia Police Department have persistently and as a matter of practice rising to the level of unofficial policy, aggressively engaged in highly dangerous vehicular pursuits of dirt bikes, ATVs and other off-road vehicles when operated on the streets of Philadelphia.

33.    Through a consistent pattern and practice of condoning its police officers' pervasive misconduct and abuse of authority evidenced by these unlawful vehicular pursuits, while simultaneously relying on the public-facing provisions of Directive 9.4 as a cover for their actual policies and practices, the Defendant City and Defendant Police Department have engaged in deliberate, systematic and ongoing attempts to cover up the dangerous policy, practice and custom of pursuing individuals for riding dirt bikes, ATVs and other off-road vehicles on the streets of Philadelphia.

34.    The City of Philadelphia and Philadelphia Police Department further this "cover-up" of its ongoing knowingly reckless conduct by creating the impression through statements to the media that their police officers do not chase riders of dirt bikes, ATVs and other off-road vehicles, even though such representations were knowingly false and/or misleading at the time they were made.

35    To cite but one example, on or about April 30, 2013, Philadelphia Police spokesperson Lieutenant John Stanford told news outlets that "[Philadelphia Police Officers] don't get involved in chasing [dirt bike riders] because you have to look at the danger you can cause potentially to innocent motorists or even them for that matter."

36    In actual practice, as described below, Directive 9.4 does little more than provide a means of plausible deniability for the Police Department to rely upon when confronted with its officers' repeated, persistent and systematic vehicular pursuits of dirt bikes and similar vehicles not principally intended for highway use.   Indeed, while Lt. Stanford's above-referenced statement clearly demonstrates the Police Department's conscious and subjective awareness of the extreme risk to life involved in such pursuits, the actual conduct of police officers manifests a conscious and willful disregard of that risk.

37    Despite the known dangers to the public involved, the defendants have continued the admittedly dangerous policy, practice and custom of initiating vehicular pursuits of dirt bikes and ATVs on Philadelphia streets, including on May 7, 2019 when Defendant, Police Officer Joseph Wolk, initiated an unlawful high speed pursuit of Plaintiffs' Decedent for riding a motorbike, during the course of which he attempted to use his vehicle as an offensive weapon to take the Decedent off his bike, before the Decedent ultimately crashed into a truck trying to evade the unlawful pursuit, sustaining fatal injuries.

38    In practice, the City of Philadelphia and City of Philadelphia Police Department habitually and consistently ignore their own written Directive, and instead engage in a significant number of knowingly improper and illegal pursuits, putting life and property at substantial risk.

39    The number of improper pursuits has increased substantially in recent years, according to the Police Department's own statistics, but the City of Philadelphia and City of Philadelphia Police Department ratify and condone these illegal actions by failing to provide appropriate discipline, and "circling the wagons" around officers who engage in such pursuits.

40.     The increased incidence of unfounded and unjustified vehicle pursuits by Philadelphia police officers is borne out by the police department's own statistics, which show that the number of unjustified pursuits has not only risen year over year, but also that unjustified pursuits outnumber lawful justified pursuits by more than a 2:1 margin consistently.  See Exhibit "B."

41.     Defendants City of Philadelphia and City of Philadelphia Police Department exacerbate this dangerous policy by creating and fostering a culture within the Philadelphia Police Department whereby rank-and-file officers are indoctrinated into the belief that "aggressive" on-duty behavior is the primary means to advancement through the ranks of the Department, and where unduly aggressive and even rogue and unlawful behavior is not only unpunished, but affirmatively encouraged, covered for and condoned by the Department and its supervisors.

42.     Defendant Police Officer Joseph Wolk in particular has a demonstrable history of engaging in high-speed, dangerous and reckless vehicular pursuits of persons operating motorcycles, ATVs, dirt bikes and/or motorized scooters, while acting in his official capacity as a Philadelphia Police Officer.

44. Indeed, Defendant Wolk is currently a named defendant in *another* case pending before this court, in which he is alleged to have improperly used his police vehicle as a weapon during the pursuit of an ATV rider, which resulted in catastrophic injury and the ultimate death of that ATV rider after months in a coma.

45.     Tellingly, Defendant Wolk was set to testify in his deposition in that similar case the very day after he engaged in the pursuit that resulted in the death of Plaintiffs' Decedent, and was subjectively aware of his potential legal liability as a result of a substantially similar prior incident at the time when he decided to completely abandon the stated pursuit policy and engage in a high speed pursuit of a motor scooter rider over no more than a suspected traffic violation.

46.     Additionally, a reasonable police officer similarly situated to Defendant Wolk would have realized that the Third Circuit Court of Appeals had, at the time, recently held in *Sauers v.*

*Borough of Nesquehoning* that engaging in a vehicular pursuit in response to a mere traffic violation could result in constitutional liability and be deemed conduct sufficient to "shock the conscience", but nonetheless affirmatively decided to engage in such facially unconstitutional conduct at the time when he initiated pursuit of Miller.

46.     Separately from and in addition to Wolk's ill-advised personal decisions in this instance, the Philadelphia Police Department had repeatedly failed to sufficiently discipline officers engaging in unjustified pursuits of riders of similar off-road oriented vehicles, even following the decision disapproving of such pursuits in *Sauers*, *supra*.

47.     Indeed, the inaction of the Philadelphia Police Department and its misconduct with respect to vehicular pursuits and other misconduct in response to traffic offenses was such a pervasive and toxic practice that the Philadelphia City Council and the Mayor of Philadelphia were ultimately forced to take legislative action to ameliorate the harm caused by the PPD's unlawful practices, by enacting the "Driving Equity Act", which made Philadelphia the first major city in the entire nation to ban low-level traffic stops, and also requires PPD to gather and publicly release data on traffic stops.

48.     The policy, practice and custom of engaging in vehicular pursuits for non-violent traffic offenses violates the prohibition on excessive use of force arising under the Fourth Amendment to the United States Constitution, which is made applicable to state and municipal actors under the Fourteenth Amendment.

49.     Although Defendants City of Philadelphia and City of Philadelphia Police Department are subjectively aware of the Constitutional harms which are caused by such improper vehicular pursuits, they have tacitly and/or expressly condoned these serious violations of their vehicular pursuit Directive so uniformly that the practice of engaging in vehicular pursuits for non-violent traffic offenses has proliferated and risen to the level of an affirmative de facto policy,

practice and custom which is grounds for imposition of liability pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

50.     The fact that such unlawful and dangerously reckless pursuits of ATV and motor bike riders rises to the level of a policy is demonstrated by the disturbing frequency with which such incidents not only occur, but result in the loss of human life, without any meaningful consequences for the officers engaging in those pursuits, even when they cause serious bodily harm or death.

51.     By way of example, on March 13, 2012, Philadelphia Police officers pursued a 14-year-old for riding a dirt bike on the streets of Philadelphia, resulting in the minor being fatally injured in a collision with another motorist, an incident extremely similar to the incident involved in this case.

52.     On November 14, 2016, Philadelphia Police officers including Defendant Wolk, engaged in a high-speed pursuit of an ATV rider on Torresdale Avenue which culminated in Defendant Wolk turning his Police SUV directly into the path of the ATV, causing the ATV to collide with his vehicle, and causing catastrophic and ultimately fatal injuries to the 18-year-old rider, Bailey McKenna, whose estate has brought an action against Wolk and the Police Department currently pending before this Court.

53.     Numerous other incidents of Philadelphia Police officers engaging in vehicular pursuits of motorbike and ATV riders have been documented, including one in March of 2018, and such pursuits are so common (despite directives purporting to forbid them) that compilations of such pursuits are freely available on the video streaming platform, YouTube.[2]

54.     The Philadelphia Police Department maintains a separate directive specific to ATVs designated Directive 3.21 which specifically forbids police officers from pursuing ATVs with motor vehicles, without exception. As discussed herein that Directive, like directive 9.4, is more honored in

---

[2] One such compilation is available at Video available at: https://www.youtube.com/watch?v=9_iTfWpNOBw (accessed 11/25/2020)

the breach than the observance, although the blanket prohibition on pursuits of these vehicles reflects the Police Department's subjective awareness that pursuing such vehicles is highly likely to lead to serious injury or death.

55.     The department's unlawful and recklessly indifferent policies continue to the present, with a "crackdown" on such vehicles being announced by the department as recently as July of 2021.

56.     At all relevant times, the City of Philadelphia and City of Philadelphia Police Department knew, or reasonably should have known that their ongoing policy, practice and/or custom of pursuing ATV and motorbike riders for non-violent traffic offenses was substantially certain to result in death or serious bodily injury, but they recklessly continued to allow such pursuits to occur with regularity, without meaningful repercussions for officers who engage in them, even when actual harm ensued.

57.     Additionally, the aforesaid policy is actionable under *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978) and its progeny, in that at all relevant times, the City of Philadelphia and City of Philadelphia Police Department knew, or reasonably should have known that their ongoing policy, practice and/or custom of pursuing ATV and motorbike riders for non-violent traffic offenses was substantially certain to result in death or serious bodily injury, but they recklessly continued to allow such pursuits to occur with regularity, without meaningful repercussions for officers who engage in them, even when actual harm ensued.

## FACTS RELATING TO PLAINTIFFS' INCIDENT

58.     On or about May 7, 2019, Decedent, Ryan Miller, who was 15 at the time, was operating an electric scooter/motorcycle northbound on Tacony Street near Bridge Street in Philadelphia, PA.

59.     Upon seeing Decedent on the scooter, Defendant Wolk initiated an improper and illegal high speed pursuit.

60.     The pursuit was improper according to the Directive as no forcible felony had taken place.

61.     No probable cause existed for an alleged forcible felony committed by Decedent, Decedent was not in possession of a deadly weapon, and Decedent had a clearly-established constitutional right to be free from excessive force.

62.     Once he initiated pursuit, and throughout the entirety of the same, Officer Wolk failed to call in the pursuit to his superiors or the police station, which was also in violation of the provisions of Directive 9.4.

63.     During the course of the pursuit, Officer Wolk failed to engage his sirens and emergency lights, both of which were in violation of Directive 9.4 and other police policies and procedures.

64.     Defendant Wolk failed to use his loud speaker in his pursuit vehicle to identify the nature of any alleged violations committed by the Decedent or the reason for the pursuit.

65.     During the course of the pursuit, Defendant Bove, a private citizen with no legal authority to initiate or participate in a police pursuit, observed the pursuit of the Decedent by Defendant Wolk, and began to operate his vehicle in a tandem pursuit of the Decedent with Defendant Wolk.

66.     Defendant Bove is not a Philadelphia Police Officer, nor any other type of law enforcement officer authorized to make arrests, engage in vehicular pursuits or any other related law enforcement activity.

67.     Despite that, Defendant Bove operated his vehicle at a high rate of speed, ignoring and/or disregarding numerous traffic laws to improperly and/or illegally participate in an already improper and/or illegal vehicular pursuit with Defendant Wolk.

68.     At no time was Defendant Bove deputized or authorized to participate in this vehicular pursuit.

69.     At no time did Defendants Bove or Wolk have any factual basis, reasonable suspicion or probable cause to believe that Decedent had committed a forcible felony or had a deadly weapon, and the vehicle he was operating was not considered a deadly weapon under the relevant written policy.

70.     Despite the complete absence of legal justification to initiate or engage in a pursuit, Defendants Wolk and Bove pursued Decedent in tandem throughout the neighborhood, traversing Tacony Street, Eadom Street, Fraley Street, James Street and Scattergood Street, among others.

71.     During the pursuit, Defendants Wolk and Bove drove erratically, violated the posted speed limit signs, swerved and committed numerous other violations of the motor vehicle code, Philadelphia code and the Directive.

72.     During the course of the pursuit, Defendant Wolk also attempted to use his vehicle as an offensive weapon, trying to knock the Decedent off the bike, despite knowing that his actions in doing so had already resulted in catastrophic injuries to another individual previously.

73.     Defendants Wolk and Bove continued to improperly and/or illegally chase Decedent, when, while attempting to get away from them, Decedent collided with a tractor-trailer truck, which led to Decedent's death at the scene.

74.     Although for most of the pursuit Defendant Wolk was in the lead, at the time of the crash Defendant Bove was closest to Decedent and was at that time leading the pursuit.

75.     At no time did Defendant Wolk make any attempt to disengage the pursuit or attempt to have Defendant Bove disengage, and instead allowed and condoned Defendant Bove's improper and unlawful vigilante conduct.

76.     But for the fact of the improper and/or illegal pursuit, Decedent would not have collided with the trailer, and would not have died as a result of the same.

77.     The pursuit initiated by Defendant Wolk and the ensuing death of Plaintiffs' Decedent was a direct result of the flagrant violation of Philadelphia Police Department Directive 9.4 prohibiting vehicular pursuits, and in contravention of the Decedent's Fourth and Fourteenth Amendment Rights.

78.     The actions of Police Officer Joseph Wolk were due to Philadelphia Police Department policies which encouraged and condoned the aggressive vehicular pursuit of dirt bike, ATV and off-road vehicles in the City notwithstanding the provisions of Directive 9.4, and also condoned and/or encouraged physically aggressive policing as a means to advancement within the ranks of the Philadelphia Police Department.

79.     Additionally, at all times relevant, the Philadelphia Police Department knew or reasonably should have known that Wolk's violent propensities were so extreme that he was, in effect, a "killer cop" – and yet the department and the City continue to condone, protect and enable his violent and lawless conduct as his body count continues to rise.

80.     The actions of Police Officer Joseph Wolk were the direct result of the policies, practices, customs and/or deliberate indifference on the part of Defendants City of Philadelphia and City of Philadelphia Police Department to the dangers of initiating pursuit and chasing citizens through the City and County of Philadelphia for non-violent traffic offenses.

81.     The actions of Defendants Police Officer Joseph Wolk were the direct result of the policies, practices, customs and/or deliberate indifference on the part of defendants City of

Philadelphia and City of Philadelphia Police Department to the dangers of using unlawful and excessive force to apprehend citizens for the commission of non-violent traffic offenses.

82.    Defendants City of Philadelphia, City of Philadelphia Police Department and  Police Officer Joseph Wolk clearly violated federal law, including the United States Constitution, because the Police Defendants individually and collectively were on notice that their conduct was not only in direct violation of applicable police department policies, but because the Third Circuit Court of Appeals had expressly given police notice that vehicular pursuits for traffic offenses only could rise to the level of conduct "shocking to the conscience" and therefore in violation of the Fourteenth Amendment by virtue of its opinion in *Sauers v. Borough of Nesquehoning.*

83.    Contrary to the expressly stated position of the Defendants, a 15-year-old boy did not deserve to die for a mere traffic violation merely because he fled the police.  The City's position to the contrary is not only morally repugnant, but reflects the truth that the public's worst fears about the practices and tactics of the Philadelphia Police Department are more than amply justified, and that there exists no greater danger to the City's citizens than its own police force, who recklessly kill and maim not only with impunity, but with legal privilege which puts them nauseatingly beyond the reach of justice or any type of accountability.

84.    As a result of the actions, conduct and omissions of the Defendants named herein, the Decedent was caused to suffer catastrophic injuries that led to his death at the scene of the collision aforesaid.

85.    As a direct result of the aforesaid acts, conduct and/or omissions of the Defendants, the Plaintiffs have sustained damages and losses compensable pursuant to the Pennsylvania Wrongful Death Act, including, but not limited to, the loss of companionship of the Plaintiffs' Decedent, the loss of services of the Plaintiffs' Decedent, as well as various and diverse sums of money for funeral, burial and related expenses.

**COUNT I**
**CIVIL RIGHTS VIOLATION PURSUANT TO 42 U.S.C. § 1983**
**PLAINTIFFS v. JOSEPH WOLK**

86.     Plaintiffs hereby incorporate by reference the averments set forth in the foregoing paragraphs of this Complaint as though the same were fully set forth at length herein.

87.     At all times relevant herein, Defendants City of Philadelphia, City of Philadelphia Police Department and Police Officer Joseph Wolk were "persons" within the meaning of 42 U.S.C. § 1983.

88.     At all times relevant herein, said Defendants were acting "under color of state law" pursuant to 42 U.S.C. § 1983.

89.     On May 7, 2019, the Police Defendants herein initiated, continued and failed to supervise, discontinue and/or terminate an unlawful vehicular pursuit of Plaintiffs' Decedent.

90.     Defendant Wolk intentionally and maliciously initiated and continued the pursuit, which included efforts to use his police vehicle to unseat Plaintiffs' Decedent, and failed to break off the pursuit until Plaintiffs' Decedent suffered catastrophic and fatal injuries.

91.     Defendant Wolk's conduct violated Ryan Miller's constitutional rights to substantive and procedural due process as guaranteed by the Fourteenth Amendment to the United States Constitution and as remediable pursuant to 42 U.S.C. §1983, as set forth elsewhere in the Complaint and in the following respects:

a.     Disregarding the safety and welfare of Ryan Miller and other members of the public;

b.     Ignoring considerations militating against the initiation of vehicular pursuit, including knowledge of Ryan Miller's identification and address, thereby eliminating any exigent need to engage in pursuit;

c.     Initiating an unlawful vehicular pursuit of Ryan Miller in and throughout the streets of Philadelphia knowing that vehicular pursuit was not necessary to prevent the death or serious bodily injury of another person;

d.     Initiating an unlawful pursuit of Ryan Miller in and throughout the streets of Philadelphia knowing that the pursuit was not necessary to effect his arrest or

apprehension, and without holding the belief that Ryan Miller had committed or attempted to commit a forcible felony;

e.  Initiating an unlawful pursuit of Ryan Miller in and throughout the streets of Philadelphia knowing that the pursuit was not necessary to effect his arrest or apprehension, and without holding the belief that Ryan Miller possessed a deadly weapon;

f.  Pursuing Ryan Miller at an unsafe following distance in which a deadly crash was virtually certain to result given the speed of the pursuit, local road conditions and the traffic conditions in the area;

g.  Allowing and/or condoning a private citizen to engage and assist in the unlawful pursuit initiated by Wolk, despite a lack of any reasonable basis for the belief that the individual in question, Defendant Gary Bove, was legally privileged or adequately trained to do so, thereby further endangering the life of Ryan Miller for a non-violent traffic offense.

h.  Consciously disregarding the safety of Ryan Miller, members of the public and others by failing to self-terminate the pursuit after having initiated the pursuit;

i.  Deliberately, intentionally and purposefully attempting to use his police SUV as an offensive weapon by trying to bump and/or ram Ryan Miller while he rode on the motorbike, despite the knowledge that serious bodily injury or death was virtually certain to result; and

j.  Failing and refusing to terminate the pursuit until Ryan Miller had sustained fatal injuries as a direct result of Wolk's unlawful and unjustified pursuit.

92.  Alternatively or in addition to the foregoing, Defendant Wolk used clearly unlawful, excessive and deadly force to apprehend Plaintiffs' Decedent who at most was suspected of having committed a non-violent traffic offense.

93.  Defendant Wolk's conduct and/or inaction violated Ryan Miller's constitutional rights to substantive and procedural due process, and freedoms from unreasonable seizure and the use of excessive force as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution.

94.  Defendant Wolk's conduct was directly attributable to the City of Philadelphia Police Department's persistent, pervasive and ongoing unofficial policy of aggressively pursuing dirt bike,

motor scooter and ATV riders through Philadelphia streets, in contravention of the Department's publicly stated policy.

95.    Defendant Wolk's conduct constituted the reckless operation of a police vehicle in contravention of his common law duty to operate his police vehicle in a safe and reasonable manner on the roads of Pennsylvania, and in violation of Ryan Miller's constitutional rights to substantive and procedural due process as guaranteed by the Fourteenth Amendment to the United States Constitution, and as remediable pursuant to 42 U.S.C. § 1983 as set forth in the foregoing paragraphs of this Complaint.

96.    As a direct result of the reckless disregard and the willful and intentional misconduct of Defendant Wolk, Plaintiffs' Decedent sustained catastrophic and fatal injuries, and the Administrators of his Estate hereby bring this action against said Defendant pursuant to the provisions of the Pennsylvania Wrongful Death statute, 42 Pa.C.S.A. § 8301 to recover all damages available at law, including loss of companionship, loss of support, and all other damages available at law.

WHEREFORE, Plaintiffs Neal Miller and Donna Miller, individually and as co-Administrators of the Estate of Ryan Miller, a Minor, Deceased, demands judgment against all Defendants individually and/or jointly and severally, for compensatory and punitive damages in excess of $150,000, together with interest and costs thereon.

## COUNT II
## CIVIL RIGHTS VIOLATION PURSUANT TO 42 U.S.C. § 1983
## PLAINTIFFS v. CITY OF PHILADELPHIA
## AND CITY OF PHILADELPHIA POLICE DEPT.

97.    Plaintiffs hereby incorporate by reference the preceding paragraphs as though the same were set forth at length herein.

98.    Defendants, City of Philadelphia and City of Philadelphia Police Department, acting under the color of law, established, mandated, approved, condoned and/or ratified the policy of

engaging in aggressive pursuits of dirt bike, motor scooter and ATV riders on city streets in knowing and direct contravention of the Police Department's stated public-facing policies of not engaging in vehicular pursuits where no forcible felony has been committed, and not engaging off-road vehicles in vehicular pursuit more broadly.

99.     The Defendant City and Defendant Police Department were, at all times relevant, aware that police officers in their employ and under their supervision and control (including but not limited to Officer Wolk) were engaging in what both the Defendant City and Defendant Police Department publicly asserted to be unlawful vehicular pursuits in contravention of stated policy, but allowed, condoned and approved such pursuits by failing to take disciplinary action, defending police officers engaged in the same from legal liability, and failing and/or refusing to retrain police officers engaging in such unlawful and unconstitutional vehicular pursuits.

100.    Both the Defendant City and the Defendant Police Department were aware that such unlawful pursuits needlessly put lives at risk, and had resulted in loss of life and limb, but refused to take any actions whatsoever to prevent officers from systematically and continuously engaging in such pursuits despite widespread community concerns expressed by lawyers, civil rights advocates, community advocates and the public at large.

101.    The Defendants' habitual and continual allowance and tacit and/or express approval of these unlawful and unconstitutionally dangerous vehicular pursuits of dirt bike and ATV riders caused such pursuits to become a matter of official policy, since both the Defendant City and the Defendant Police Department habitually allowed officers to engage in such pursuits without consequences or discipline, even in cases which resulted in serious injury and/or death, leading to the incidence of such vehicular pursuits consistently increasing year after year, according to the Defendants' own statistics.

102.    Both the Defendant City and the Defendant Police Department, as well as their employees, have been sued before for excessive force used during unlawful vehicular pursuits but

both Defendants have failed to investigate or take corrective action to prevent these excessive force violations from happening again, resulting in police officers concluding that it is acceptable to engage in such unlawful pursuits as a matter of policy.

103.    Defendants' actions deprived Plaintiffs' Decedent of his right to be free from excessive force, and they were motivated by an unconstitutional enforced policy, pattern of practice or custom by the Defendants, City of Philadelphia and City of Philadelphia Police Department.

104.    Defendants City of Philadelphia and City of Philadelphia Police Department do not enforce their excessive force policies, do not properly document incidents of unlawful vehicle pursuits, do not investigate allegations of excessive force in unlawful vehicular pursuits and they engage in a policy, pattern of practice or custom of failing to reprimand or discipline any office for engaging in unlawful vehicular pursuits.

105.    Defendants' failure to address these ongoing incidents of unlawful vehicle pursuits by Philadelphia Police officers amounted to tacit approval of the practice of engaging in unlawful vehicle pursuits, even when excessive force is involved.

106.    Additionally, Defendants City of Philadelphia and Philadelphia Police Department maintain a series of policies and incentives which lead police officers, including all the police officer defendants named herein and particularly those assigned to Highway Patrol, to conclude that the more aggressive their tactics, the greater their likelihood of advancement within the police department is.

WHEREFORE, Plaintiffs Neal Miller and Donna Miller, individually and as co-Administrators of the Estate of Ryan Miller, a Minor, Deceased, demands judgment against all Defendants individually and/or jointly and severally, for compensatory and punitive damages in excess of $150,000, together with interest and costs thereon.

**COUNT III**
**NEGLIGENCE**
**PLAINTIFFS v. GARY BOVE**

107.    Plaintiffs hereby incorporate by reference the preceding paragraphs as though the same were set forth at length herein.

108.    The catastrophic and fatal injuries sustained by Plaintiff's Decedent were caused by the negligence, carelessness and/or recklessness of Defendant, Gary Bove.

109.    The negligence, carelessness and/or recklessness of Defendant Bove consisted of, but is not limited to, the following:

(a) failure to properly operate and control his motor vehicle;

(b) failure to observe and/or yield to Decedent's vehicle;

(c) failure to stop his motor vehicle in a safe manner;

(d) failure to maintain control over his vehicle;

(e) failure to maintain an assured clear distance;

(f) failure to properly and adequately observe traffic conditions;

(g) failure to properly and adequately operate his vehicle at an acceptable and/or controllable rate of speed;

(h) failing to take proper action to avoid a collision;

(i) failing to use due care for the safety of Decedent under the circumstances;

(j) following too closely;

(k) improperly, illegally, carelessly, negligently and recklessly pursuing Decedent, despite no apparent or explicit authority to do so;

(l) improperly engaging in a police vehicular pursuit;

(m) impersonating a police officer;

(n) engaging in unlawful vigilante conduct

(o) operating the motor vehicle at a speed which was excessive under the circumstances;

(p) failing to properly and adequately operate said motor vehicle in accordance with the statutes and regulations of the Commonwealth of Pennsylvania with respect to the proper operation of motor vehicles on public thoroughfares.

110.    As a result of Defendant Bove's negligence and/or recklessness, Plaintiffs' Decedent sustained catastrophic and fatal injuries Plaintiffs sustained damages as set forth in the foregoing paragraphs of this Complaint, and claim all damages available pursuant to the provisions of the Pennsylvania Wrongful Death Act, 42 Pa. C.S.A. §8301.

111.    Pennsylvania Courts have adopted Restatement (Second) of Torts § 908 for the law of punitive damages.

112.    The Restatement allows for an award of punitive damages for conduct that is "outrageous because of the defendant's evil motive or his reckless indifference to the rights of others."

113.    At the time of Decedent's fatal injury, Defendant Bove was recklessly engaging in a police vehicular pursuit, and had actually taken the lead in that pursuit, bearing down on the Decedent's motorbike while utterly and knowingly disregarding the clear risk of bodily injury or death, and actively placing the Decedent in mortal fear for his life with the aggressiveness of his inexplicable pursuit, which Bove lacked any legal authority to engage in.

114.    The facts and circumstances of this incident, combined with Bove's absolute lack of legal authority to engage in the aforesaid conduct, clearly exhibit a reckless indifference to the safety of others upon the roadway which rises to the level necessary to impose punitive damages pursuant to section 908(2) of the Restatement (Second) of Torts, and represents a factual scenario where the

circumstances of the incident itself are sufficient to establish recklessness or wanton misconduct without any showing of specific intent to injure.

115.    The conduct of Defendant Bove in this regard, such conduct having caused injuries to the Plaintiffs' Decedent as set forth herein, constitutes conduct that was malicious, wanton, reckless, willful, outrageous and oppressive and with reckless indifference to the rights, interests and safety of Plaintiffs' Decedent.

WHEREFORE, Plaintiffs Neal Miller and Donna Miller, individually and as co-Administrators of the Estate of Ryan Miller, a Minor, Deceased, demands judgment against all Defendants individually and/or jointly and severally, for compensatory and punitive damages in excess of $150,000, together with interest and costs thereon.

Respectfully submitted,

FLAGER & ASSOCIATES, P.C.


By:    /s/ Michael S. Levin
       Attorney ID No. 78463
       1210 Northbrook Drive, Suite 280
       Trevose, PA 19053
       Tel: 215.953.5200
       michael@flagerlaw.com

EXHIBIT "A"

 **PHILADELPHIA POLICE DEPARTMENT     DIRECTIVE 9.4**

| Issued Date: 12-31-08 | Effective Date: 12-31-08 | Updated Date: 06-16-16 |
|---|---|---|

SUBJECT:   VEHICULAR PURSUITS
PLEAC 4.2.1, 4.2.2

---

1.  **POLICY AND PURSUIT JUSTIFICATION**

    A. Policy

    1.  The primary consideration when participating in or supervising any pursuit is the safety and welfare of the public, other officers, as well as the suspect(s). Every officer and supervisor must always weigh the benefits of immediate capture with the risks inherent to the pursuit itself.

    B. Justification for Initiating a Vehicular Pursuit

    1.  An officer is justified in initiating a vehicular pursuit only when they are:

        a.  In close proximity to a suspect vehicle and believes a pursuit is necessary to prevent the death or serious bodily injury of another person, or

        b.  In close proximity to a suspect vehicle and believes BOTH:

            1)  The pursuit is necessary to effect the arrest or prevent escape, <u>AND</u>

*1          2)  The officer has <u>probable cause</u> to believe that the person being pursued has committed or attempted a forcible felony OR, has <u>probable cause</u> to believe that the person being pursued possesses a deadly weapon, other than the vehicle itself.

    | REDACTED - LAW ENFORCEMENT SENSITIVE |
    |---|

2.  **DEFINITIONS**

    A. <u>Vehicular Pursuit</u> -  The use of a motor vehicle to chase, follow, or go after a vehicle that has refused to stop.

**DIRECTIVE 9.4 - 1**

B. <u>Forcible Felony</u> - A felony involving actual or threatened serious bodily injury, which include:

Definitions Continued:

1. Murder,
2. Voluntary Manslaughter,
3. Arson Endangering Persons, and
4. Aggravated Assault Causing Serious Bodily Injury

The following felonies shall also be classified as "Forcible" when their commission includes actual or threatened force. These include:

1. Rape,
2. Involuntary Deviate Sexual Intercourse,
3. Robbery, and
4. Kidnapping.

C. <u>Deadly Weapon</u> - Any firearm, whether loaded or unloaded, or any device designed as a weapon and capable of producing death or serious bodily injury, or any other device or instrumentality which, in the manner in which it is used or intended to be used, is calculated or likely to produce death or serious bodily injury [18 Pa. C.S. 2301].

*5      **NOTE:** For the purposes of this directive, the suspect vehicle is excluded as a deadly weapon regardless of crime committed.

D. <u>Serious Bodily Injury</u> - Bodily injury, which creates a substantial risk of death, or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ [18 Pa. C.S. §2301].

E. <u>Marked Radio Patrol Sedan</u> – Standard four door marked police vehicle equipped with sirens and overhead lights, such as but not limited to District Patrol Vehicles (RPC), Highway Patrol Vehicle, Narcotics Vehicle, etc.

---

## 3.   GENERAL PURSUIT PROCEDURES AND GUIDELINES

A. Acknowledgment of a pursuit must be made by the District Patrol Supervisor or Police Radio.

B. If no District Patrol Supervisor acknowledges, Police Radio will assign a Supervisor to monitor and control the pursuit. If the assigned Supervisor fails to acknowledge Police Radio, the Police Radio Room Supervisor will terminate the pursuit.

**DIRECTIVE 9.4 - 2**

C. If a pursuit is initiated by a Special Unit and a Special Unit Supervisor is not available, Police Radio will assign the pursuit to a District Patrol Supervisor wherein the pursuit is happening.

D. If no justification for the pursuit is given by the initiating unit over Police Radio, it shall be the responsibility of all supervisors on the specific radio band, including the Police Radio Room Supervisor, to immediately terminate the pursuit. Also, any Supervisor is responsible for terminating a pursuit if they believe it has become too dangerous. The decision to terminate shall be final and not be subject to being countermanded.

E. A District Patrol Supervisor assigned to the area in which the pursuit is happening may, based upon his or her knowledge of the District, override any other outside supervisor monitoring and controlling the pursuit.

   NOTE: An "outside supervisor" is any supervisor not assigned to the district wherein the pursuit is happening.

F. During a pursuit, no more than two (2) marked radio patrol sedans will pursue a suspect vehicle (i.e. only the Primary and Secondary Units are permitted to engage in a pursuit and that no other vehicles will "caravan" behind the Secondary Unit).

G. Only sworn personnel may engage in a pursuit.

H. All other available sworn personnel (i.e. other than the Primary Unit, Secondary Unit, and Assigned Pursuit Supervisor) should be monitoring police radio and be prepared to stop or divert pedestrian or vehicular traffic that may be in the path of an oncoming pursuit in the areas of assignment. (e.g. Stopping cross traffic at a major intersection in the oncoming direction of a pursuit, etc.)

I. To lessen the possibility of a collision should the fleeing vehicle suddenly stop or change direction, a "safe distance" should always be maintained between the pursued vehicle, the Primary Unit, and Secondary Unit. A minimum of five (5) car lengths should always be maintained during any pursuit. However, a greater distance may be necessary based upon the speed of the pursuit, road and weather conditions, the suspect vehicle's behavior (i.e. how the vehicle is being operated, etc.), the Department's vehicle characteristics, officer's driving experience/capabilities, or any other circumstances that may exist.

J. All marked radio patrol sedans engaged in a pursuit must have, and will operate the police vehicle with emergency equipment activated continuously throughout the pursuit. This includes both light bars and red/blue lights and sirens.

   NOTE: Sworn personnel are reminded to use extreme caution when approaching any intersection during a pursuit and only proceed if clear of both vehicles and pedestrians.

**DIRECTIVE 9.4 - 3**

K. During a pursuit, sworn personnel involved will not switch to another radio band should the pursuit enter another division or jurisdiction. If radio contact is lost for any reason, the pursuit shall be terminated.

L. Once the Secondary Unit arrives to assist, the main function of the Primary Unit is the apprehension of the fleeing suspect(s). The Secondary Unit's main functions are as communications for and backup to the Primary Unit.

M. Only the Primary Unit, Secondary Unit, and the Directing Supervisor may leave their assigned area in response to the pursuit unless ordered not to do so by a higher-ranking officer. No other units may leave their assigned area unless ordered to do so.

*3      N. In all inter-jurisdictional pursuits, the following actions will be taken by all Philadelphia Police personnel: (PLEAC 4.2.1)

1. Sworn personnel in fresh and continuous pursuit may NOT pursue outside of the boundaries of Philadelphia unless permission is granted by a higher ranking supervisor.

2. The initial pursuing officer will notify Police Radio when it is likely that a pursuit will continue into a neighboring jurisdiction. The exception is when the secondary unit arrives and takes over communications.

3. Police Radio will notify the neighboring jurisdiction of the pursuit as soon as possible.

4. When a pursuit is initiated by a law enforcement agency of another jurisdiction, Police Radio will notify the Patrol Supervisor who will immediately inquire into the circumstances surrounding the pursuit and what assistance is required by the pursuing agency,

5. Sworn personnel will not engage in pursuits initiated by other law enforcement agencies unless in accordance with all provisions of this directive. In the districts wherein a pursuit has been initiated by another law enforcement agency, Police Radio will assign the relevant District Patrol Supervisor to monitor and control Philadelphia Police Department personnel.

6. If an arrest is made outside of Philadelphia, but within the Commonwealth of Pennsylvania, the officer will transport the suspect(s) back to the Divisional Detective Headquarters. If an arrest occurs across any state line, the suspect(s) must go through the extradition procedures before being returned to Philadelphia.

**DIRECTIVE 9.4 - 4**

O. Fleeing vehicles will not be stopped under any circumstances by the following techniques:

    1. Boxing-In – Surrounding the fleeing vehicles with police vehicles, which are then slowed to a stop with the fleeing vehicle.

    2. Ramming – The deliberate act of hitting a fleeing vehicle with a police vehicle for the purpose of forcing the fleeing vehicle off the road or into a fixed object.

    3. Roadblocks - The use of barricades, vehicles or other obstructions across a roadway to stop a fleeing vehicle.

    *3    4. Pursuit Termination Devices – The use of any pursuit termination or vehicle immobilization device (i.e, stop sticks, spike strips, etc.). (PLEAC 4.22)

*3    P. Vehicles, other than a marked Radio Patrol Car (i.e., unmarked cars, EPW, SUV, Motorcycle, etc.) shall not, barring exigent circumstances, initiate a vehicle pursuit. However, if a pursuit is initiated based upon exigent circumstances, the operators of these types of vehicles shall relinquish the position as Primary Vehicle to the first responding marked RPC and withdraw from the pursuit immediately.

Q. Police vehicles being used to transport any non-sworn personnel, including but not limited to, prisoners, witnesses, recruits, police explorers, or any "ride-along" shall not engage in a pursuit. Additionally, any unit containing a canine shall not engage in a pursuit.

R. Sworn personnel will immediately terminate any pursuit if the suspect vehicle enters an interstate highway or divided roadway in the wrong direction.

| REDACTED - LAW ENFORCEMENT SENSITIVE |
| --- |

T. Barring extenuating circumstances, all sworn personnel involved in a pursuit in any manner will complete and submit the relevant portion of both Pursuit Memoranda (city and state) found in Appendix "A" of this directive within three (3) days.

## 4   SPECIFIC RESPONSIBILITES

A. Initiating/Primary Unit

    1. Determine the necessity of commencing or terminating a pursuit by considering:

        a. Whether justification to initiate the pursuit exists (refer to Section 1-B),
        b. Whether the suspect's identification and address are known, thereby making available an alternate means of arrest (e.g. via an arrest warrant),

**DIRECTIVE 9.4 - 5**

    c.  The weather and road conditions,

    d.  Location and population density (vehicular and pedestrian),

    e.  The capabilities and characteristics of the department vehicle,

    f.  The officer's own driving capabilities,

    g.  The officer's familiarity with the pursuit area,

    h.  Any other extraordinary circumstances or conditions (e.g. the proximity to school zones, playgrounds, shopping centers, etc.) and

    i.  The speed and control of the suspect vehicle.

2. If a pursuit is initiated, immediately inform the radio dispatcher of:

    a.  The fact that a pursuit has been initiated, along with the justification,

    b.  The initial location, direction, and estimated distance to the suspect vehicle,

    c.  The approximate speed of both the suspect and police vehicles,

    d.  The vehicle description and, if possible, license information and a physical and clothing description of the occupants along with approximate ages,

    e.  The continuous progress of the pursuit and if headed towards another district, division, or jurisdiction,

    f.  Upon arrival of a Secondary Unit, relinquish communication responsibilities to the Secondary Unit.

3. Continuously evaluate the benefits of an immediate capture against the safety of the public, other officers and the suspect. An officer can self-terminate a pursuit at any time.

4. If ordered by a supervisor to relinquish the Primary Unit duties to another radio patrol sedan, immediately withdraw from the pursuit, return to area of assignment, and prepare to complete the relevant portion of the Pursuit Memoranda found in Appendix "A" of this directive.

5. Apprehend the suspect(s), or by ensuring that only the proper amount of force is used to make any arrests consistent with the guidelines in directive 10.2, "Use of Moderate/Limited Force". If the vehicle is stopped and the occupant(s) appear to barricade themselves inside the vehicle, ensure the provisions found in Directive 10.7, "Crisis Response/Critical Incident Negotiations," regarding barricaded persons are implemented.

6. If the Initiating/Primary Unit loses sight of the suspect vehicle, terminate the pursuit immediately and notify Police Radio. Begin a search of the area where suspect vehicle was last seen as directed by the responding supervisor.

7. If any supervisor terminates the pursuit, disengage from the pursuit immediately, safely stop and park the vehicle, notify police radio of location and odometer mileage, update patrol log, and await the arrival of a supervisor.

**DIRECTIVE 9.4 - 6**

> REDACTED - LAW ENFORCEMENT SENSITIVE

    a. Return to a safer driving speed,

    b. Move out of sight of the fleeing vehicle,

    c. Continuously monitor Police radio as to the direction of the fleeing vehicle,

    d. Not renew pursuit of the fleeing vehicle if they should make subsequent visual contact and are in close proximity with it, and

    e. Be prepared for any reports by the flight crew that the fleeing vehicle has stopped and the suspect(s) have fled on foot.

9. If a pursued vehicle is found unattended it should be guarded for prints in an attempt to identify and apprehend the driver and the occupants.

B. Secondary Unit

1. Upon joining the Primary Unit, acknowledge to Police Radio as the "Secondary Unit".

2. Maintain visual contact with the primary unit and assume all communication responsibilities such as, reporting the continuous progress of the as indicated in Section 4-A-2, c through f of this directive.

3. If ordered by a supervisor, relinquish the Secondary Unit duties to another vehicle, immediately withdraw from the pursuit, and return to area of assignment.

4. Do not pass the Primary Unit unless requested to do so by that Unit or if other conditions exist, such as mechanical malfunction, etc.

5. Back-up and support the Primary Unit officer(s) consistent with Section 4-A-5 of this directive.

6. If either the primary unit or any supervisor/commander terminates the pursuit, immediately cease the pursuit.

> REDACTED - LAW ENFORCEMENT SENSITIVE

8. If a pursued vehicle is found unattended it should be guarded for prints in an attempt to identify and apprehend the driver and the occupants.

C. Assigned Pursuit Supervisor shall:

1. Direct and control the pursuit and apprehension efforts by:

**DIRECTIVE 9.4 - 7**

    a. Evaluating the Primary/Initiating Unit's justification for commencing and continuing the pursuit,

    b. Immediately terminating the pursuit, if necessary, considering all the facts and circumstances including, but not limited to, those factors identified in Section 4-A-1 of this directive,

| REDACTED - LAW ENFORCEMENT SENSITIVE |
|---|

    d. Ensuring the Primary Unit and the Secondary Unit withdraw from the pursuit if Aviation Unit assumes the pursuit and that pursuit and that they comply with the provisions of Section 4-A-8 and 4-B-7 of this directive respectively.

    e. Monitoring all radio transmissions, and ensuring Police Radio is kept informed of location, direction, speed, weather and road conditions, vehicle and pedestrian traffic, etc.

    f. Limiting the involvement and radio use by other units.

    g. Coordinating other units to respond to strategic locations to possibly apprehend the suspects,

    h. Arriving at the scene of any apprehension as soon as possible to ensure the provisions of Directive 10.2, regarding the use of force and, if necessary, Directive 10.7 regarding barricaded persons are strictly observed.

2. If the pursuit was terminated by any supervisor, meet the Primary Unit and Secondary Units and inspect the vehicle odometers, sign officer's log noting location, odometer mileage, and mileage recorded by Police Radio.

3. After any pursuit, if appropriate, make sure officers have sufficient time to calm down and regain their composure before returning to patrol.

4. Supervisors must be proactive at the end of the pursuit to ensure that arrests are made in accordance with departmental policy. Supervisors will be held accountable if they fail to take appropriate action.

5. If a pursued vehicle is found unattended it should be guarded for prints in an attempt to identify and apprehend the driver and the occupants.

D. Police Radio Responsibilities

    1. Police Radio Dispatcher

        a. When a Police Radio Dispatcher is notified that an officer is involved in a vehicular pursuit, the dispatcher will:

**DIRECTIVE 9.4 - 8**

1) Immediately notify a Radio Room Supervisor and 'J' band of the pursuit,

2) Contact and assign the initiating officer's direct supervisor or an available district supervisor to the pursuit, who shall then direct and control the pursuit and any apprehension efforts,

REDACTED - LAW ENFORCEMENT SENSITIVE

4) Monitor and broadcast the relevant information received from the Initiating/Primary Unit,

5) Once a Secondary Unit has joined in the pursuit, use the Secondary Unit as the communications vehicle unless the Primary Unit is a two-officer vehicle,

6) If the pursuit is terminated by any supervisor, request the location and odometer mileage from the terminated unit and dispatch a supervisor to that location,

7) Assign a separate District Control Number for every pursuit.

2. Radio Room Supervisor Responsibilities

   a. Upon being notified by a Police Dispatcher of a pursuit, the Radio Room Supervisor:

      1) Will physically respond to the involved console and begin monitoring the pursuit ensuring all responsibilities of the Police Dispatcher in Section 4-D-1 are completed,

      2) If no justification for the pursuit is given by the initiating unit or if the initiating unit's supervisor or available district supervisor fails to respond to Police Radio, will immediately terminate the pursuit,

         **NOTE:** If a pursuit is terminated because the initiating unit's supervisor or available District Supervisor failed to respond, the appropriate supervisor's Commanding Officer, Divisional Inspector and the Regional Operations Command will be notified via a Blackberry message.

      3) Ensure the notification of Aviation Unit and their availability.

**DIRECTIVE 9.4 - 9**

4)  When the pursuit results in an auto accident or injury to police or the suspect vehicle, the Pursuit Broadcast Tapes will be forwarded to the appropriate Commanding Officer.

5)  Will generate a daily report of all pursuits, along with a printed copy of all radio transmissions of the pursuit, to the appropriate Commanding Officer for immediate action.

REDACTED - LAW ENFORCEMENT SENSITIVE

F.  District/Unit Commanders

1.  Will continuously assess the decisions of the assigned supervisor and take control/action if necessary considering all the facts and circumstances including, but not limited to, the factors identified in Section 4-C-1-b of this directive.

2.  Shall ensure that copies of the Pursuit Memoranda (city and state) found in Appendix "A" of this directive, the Pursuit Report generated by Police Radio and the radio transmissions are forwarded to the appropriate Deputy Commissioner and the Commanding Officer of the Police Academy, Accident Prevention Section within five (5) calendar days of the pursuit date.

*6    3.  The District/Unit Commanders should ensure a copy of the Pennsylvania Police Pursuit Report is forwarded to the Research and Analysis Unit, on the first business day after the pursuit. The original PSP Report will be submitted with the pursuit packet through the chain of command. This is further detailed in Appendix "A" page 6, of this directive.

**DIRECTIVE 9.4 - 10**

4.  Shall ensure the appropriate actions, up to and including formal disciplinary recommendations (75-18s), are taken against any subordinate who has violated any provision of this directive.

G.  Appropriate Deputy Commissioner

1.  Shall review the Pursuit Memoranda, the Pursuit Report generated by Police Radio and the radio transmissions to ensure that officers and supervisors comply with the procedures and policies set forth in this directive.

| **RELATED PROCEDURES:** | Directive 9.7, | Safe Operation of Police Vehicles |
|---|---|---|
| | Directive 10.2, | Use of Moderate/Limited Force |
| | Directive 10.7, | Crisis Response/Critical Incident Negotiations |
| | Disciplinary Code | |

## BY COMMAND OF THE POLICE COMMISSIONER

| **FOOTNOTE #** | **GENERAL #** | **DATE SENT** | **REVISION** |
|---|---|---|---|
| *1 | 2450 | 01-14-09 | Clarification |
| *2 | 4193 | 01-16-09 | Deletion of 1-B-1-b-3 |
| *3 | 4830 | 08-18-15 | Additions/Changes |
| *4 | 1141 | 09-01-15 | Change |
| *5 | 1023 | 04-29-16 | Changes |
| *6 | 4131 | 06-16-16 | Addition |

**DIRECTIVE 9.4 - 11**

 **PHILADELPHIA POLICE DEPARTMENT    DIRECTIVE 9.4**

**APPENDIX "A"**

| Issued Date: 12-31-08 | Effective Date: 12-31-08 | Updated Date: 04-29-16 |

### SUBJECT:  POLICE VEHICLE PURSUIT MEMORANDUM

This memorandum is to be completed regardless of whether or not the violator is apprehended, the length, or duration of the pursuit, or whether or not an accident had taken place.

A copy of the Complaint or Incident Report (75-48) will be included with this memorandum. When available and appropriate, a copy of Accident Report (AA-500 or 75-48C) will accompany it.  It is very important that any vehicle accident involving a police vehicle, the fleeing vehicle, any other civilian or city-owned vehicle or any combination thereof ,be described not only in the AA-500 or 75-48C and the 75-48, but also in this Pursuit Memorandum and the Pennsylvania Police Pursuit Report.

*3/*4   This memorandum must be submitted through the chain of command for review to the Police
*5   Academy, Accident Prevention Section within thirty days.  The Police Academy will retain copies of all State Police Pursuit Reports and AA-500 or 75-48Cs.  The Commanding Officer of the initiating district/unit must ensure that the State Police Pursuit Report is sent to the Research and Analysis Unit.

MEMORANDUM

TO        : CHIEF INSPECTOR, TRAINING BUREAU
FROM    :
SUBJECT: PHILADELPHIA POLICE DEPARTMENT PURSUIT MEMORANDUM

DATE OR OCCURRENCE   TIME OF OCCURRENCE_____DAY_____

DISTRICT OF OCCURRENCE ____DIST. CONTROL NUMBER_____

LOCATION PURSUIT INITIATED_____

LOCATION PURSUIT TERMINATED_____

NUMBER OF POLICE UNITS INVOLVED_____

DURATION OF PURSUIT (MINUTES)____DISTANCE (CITY BLOCKS)_____

JUSTIFICATION FOR PURSUIT AND SPECIFIC VIOLATIONS_____

_____

VIOLATIONS DURING PURSUIT_____

TRAFFIC CONDITIONS (CIRCLE ONE):  HEAVY  MEDIUM  LIGHT  NONE

PEDESTRIAN TRAFFIC (CIRCLE ONE):  HEAVY  MEDIUM  LIGHT  NONE

WEATHER CONDITIONS (CIRCLE ONE):

1 - NO ADVERSE CONDITIONS
2 - RAINING
3 - SLEET, HAIL, FREEZING RAIN
4 - SNOWING
5 - FOG AND SMOKE
6 - RAIN AND FOG

ROAD CONDITIONS (CIRCLE ONE): DRY WET SNOW COVERED ICE COVERED

PRIMARY UNIT  NAME AND RANK OF OFFICER_____

BADGE #_____PAYROLL #--------------------------

DISTRICT OR UNIT/SQUAD AND GROUP___APPOINTMENT DATE___/___/___

RECORDER'S NAME_____BADGE #_____PAYROLL #_____

DISTRICT OR UNIT/SQUAD AND GROUP_____

VEHICLE NUMBER_____TYPE OF POLICE VEHICLE_____

SECONDARY UNIT:  NAME AND RANK OF OFFICER_____

BADGE#_____PAYROLL #_____

DISTRICT OR UNIT/SQUAD AND GROUP_____APPOINMENT DATE___/___/___

RECORDER'S NAME_____BADGE #_____ PAYROLL #_____

DISTRICT OR UNIT/SQUAD AND GROUP_____

VEHICLE NUMBER_____TYPE OF POLICE VEHICLE

**DIRECTIVE 9.4 - 2**
**APPENDIX "A"**

VIOLATOR'S VEHICLE: MAKE____MODEL_____YEAR_____

COLOR___TAG_____OPERATOR'S NAME_____
DATE OF BIRTH_____ADDRESS_____

CITY/STATE_____

VIOLATOR'S CHARGES_____

OWNER OF VEHICLE_____

PRIMARY OFFICER'S NARRATIVE: Outline the specifics of the pursuit, including justification. (Use 8" x 11" sheet of white paper should additional space be required.)

_____

_____

_____

_____

_____

_____

OFFICER'S SIGNATURE_____DATE_____

SECONDARY OFFICER'S NARRATIVE: Outline the specifics of your involvement in the pursuit. (Use 8" x 11" sheet of paper should additional space be required.)

_____

_____

_____

_____

_____

OFFICER'S SIGNATURE_____DATE_____

SUPERVISOR MONITORING PURSUIT: NAME/RANK_____

**DIRECTIVE 9.4 - 3**
**APPENDIX "A"**

DISPOSITION OF PURSUIT: PURSUIT TERMINATED  YES___  NO___

 (IF YES BY WHOM) NAME/RANK_____

REASON FOR TERMINATION: EXPLAIN_____

_____

_____


ANY MOTOR VEHICLE ACCIDENTS AS A RESULT OF THIS PURSUIT? YES__ NO__

(THIS INCLUDES ALL POLICE VEHICLES, THE FLEEING VEHICLE, AND OTHER
CIVILIAN OR CITY-OWNED VEHICLES THAT MAY HAVE BECOME INVOLVED IN
AN ACCIDENT AS A DIRECT OR INDIRECT RESULT OF THE POLICE PURSUIT.)
(IF YES, EXPLAIN AND ATTACH COPY OF THE 75-48, AND WHEN AVAILABLE, AN
AA-500 OR 75-48C)

_____

_____


ANY POLICE OR CIVILIANS INJURED IN A VEHICULAR ACCIDENT AS A RESULT OF
THIS PURSUIT?  YES__ NO__  (IF YES, EXPLAIN AND GIVE EXTENT OF INJURIES.)
_____

_____


ANY POLICE OR CIVILIAN DEATHS AS A RESULT OF THIS PURSUIT?
YES__  NO _____

IF YES, EXPLAIN_____

_____

_____


ANY VIOLATIONS OF DIRECTIVE 41?  YES___   NO___

 (IF YES, EXPLAIN)_____

_____

**DIRECTIVE 9.4 - 4**
**APPENDIX "A"**

SUPERVISOR'S NARRATIVE: PER DEPARTMENT POLICY, WAS THIS PURSUIT JUSTIFIED? YES___ NO___ EXPLAIN AND INCLUDE RECOMMENDATIONS

_____

_____

_____

_____

SUPERVISOR'S SIGNATURE_____BADGE #_____DATE_____

DISTRICT COMMANDING OR COMMAND INSPECTIONS BUREAU COMMENTS: (Per Department policy, was this pursuit justified?) YES__ NO__

RECOMMENDATIONS_____

_____

_____

_____

COMMANDING OFFICER'S SIGNATURE_____ DATE_____

*5    INSPECTOR'S
RECOMMENDATIONS_____

_____

_____

_____

INSPECTOR'S SIGNATURE_____ DATE_____

*5    CHIEF INSPECTOR'S
RECOMMENDATIONS_____

_____

_____

_____

CHIEF INSPECTOR'S SIGNATURE_____ DATE_____

**DIRECTIVE 9.4 - 5**
**APPENDIX "A"**

*5    DEPUTY COMMISSIONER'S
      RECOMMENDATIONS_____

      _____

      _____

      _____

      DEPUTY COMMISSIONER'S SIGNATURE_____ DATE_____

      ACCIDENT PREVENTION SECTION:

      DATE RECEIVED_____BY WHOM_____

      RECOMMENDATIONS:_____

      _____

      _____

      TRAINING BUREAU CHIEF'S ACKNOWLEDGEMENT:
      (Per Department policy, was this pursuit justified?) YES___ NO___

                              _____
                              CHIEF INSPECTOR'S SIGNATURE

                              DATE_____

### PENNSYLVANIA POLICE PURSUIT REPORT

Act 154 of 1994 requires police departments in Pennsylvania to make a record of all vehicle pursuits and to report them to the Pennsylvania State Police. The Pennsylvania State Police is required to collect these reports, and to compile an annual summary of information to be reported to various entities. Completion and submission of this form for all pursuits, which occur on or after January 1, 1996, will ensure compliance with the reporting requirements of Act 154.

The detailed information collected through the use of this form will be used to help identify both positive and negative factors influencing the outcome of vehicular pursuits, validate or refute the merits of pursuit policies and apprehension techniques, and to recognize training successes and deficiencies. It is intended that this will enable police departments throughout the Commonwealth to enhance the safety of their officers and the public they serve.

**DIRECTIVE 9.4 - 6**
**APPENDIX "A"**

The form should be completed by either the primary pursuing police officer or their supervisor, at the discretion of the individual police department. It has been designed to be completed and read without the need for code sheets or overlays. The form may also be completed by agencies assisting the primary pursuing agency. Forms completed by assisting agencies shall not be submitted to the Pennsylvania State Police.

*3/*4   The Commanding Officer of the initiating district/unit shall ensure that original, completed forms are submitted directly to the Research and Analysis Unit as soon as possible. The Research and Analysis Unit shall submit it to the Pennsylvania State Police, upon receipt from the Commanding Officer of the initiating district/unit. Blank forms may be duplicated as necessary. Only original, completed forms shall be submitted to the Pennsylvania State Police. Copies should be made for your records.

Questions concerning the completion of this report should be directed to:

Pennsylvania State Police
Bureau of Research and Development
1800 Elmerton Avenue
Harrisburg, PA 17110
ATTN: Pursuit Reporting Coordinator
(717) XXX-XXXX

## BLOCK INSTRUCTIONS

1. REPORTING AGENCY:  Enter the name of the reporting agency. For agencies having stations at multiple locations, also list the location.

2. REPORTING OFFICER:  Enter the full name of the individual preparing the report.

3. SIGNATURE:  Self-explanatory.

4. INCIDENT NUMBER:  Enter the Incident Number (or case number, etc.) your agency assigns the incident. If an additional vehicle(s) is actively pursued as part of the same incident, that pursuit shall be reported on a separate form, with a supplemental incident number, e.g., A01123456A.

   PSP: Enter the Incident Number as follows: A01123456, S13123456

5. PURSUIT DATE: Enter the date the pursuit began in the following format:

   010296 for January 2, 1996

6. PURSUIT TIME: Enter the time (24 hour clock) the pursuit began.

7. SUPERVISOR'S INITIALS AND BADGE NO.: Self-explanatory.

**DIRECTIVE 9.4 - 7**
**APPENDIX "A"**

8. JURIS NUMBER:  Enter the Juris Number assigned by the Pennsylvania State Police in the five boxes of the block.  If your department has not been assigned a Juris Number, contact the Pennsylvania State Police, Bureau of Research and Development, Management Information and Uniform Crime Reporting Section, at (717) XXX-XXXX.

   PSP:   Use the appropriate Station Code, preceded by the number 9 (i.e., 91110 would be entered for Greensburg, Station Code 1110).

9. REASON INITIATED:  Mark the choice which best describes the offense or suspected offense for which the officer INITIALLY decided to pursue the vehicle.  If more than one choice applies, mark the most serious.  Use only an offense known or suspected at the time the attempt to stop was initiated.

   EXAMPLE:   If a violator is pursued for a speeding violation, and it is later determined that the vehicle is stolen, then OTHER TRAFFIC should be marked.  If, before attempting to stop the speeder, the officer learns that the vehicle has been reported stolen, then STOLEN OR SUSPECTED should be marked.

   DUI OR SUSPECTED - The driver was known to be or suspected of Driving Under the Influence.

   OTHER TRAFFIC - Any other traffic violation.

   SUMMARY CRIMINAL - Any known or suspected summary criminal offense.

   MISDEMEANOR CRIMINAL - Any known or suspected misdemeanor criminal offens

   FELONY CRIMINAL - Any known or suspected felony criminal offense, except those relating to the vehicle known to be or suspected of being stolen.

   STOLEN OR SUSPECTED - The vehicle is known or suspected to be stolen.

10. TYPE VEHICLE PURSUED:  Mark the choice, which best described the vehicle pursued.

   AUTOMOBILE - Passenger cars and mini-vans regardless of the manner in which they are registered.

   VAN/PICK-UP/SUV - Full size vans, all pick-up trucks, and sport utility vehicles, even though they may be registered as station wagons.

   MOTORCYCLE - All two-wheeled motorcycles, mopeds, motor-driven pedacycles.

**DIRECTIVE 9.4 - 8**
**APPENDIX "A"**

OTHER - All other vehicles.

11. APPREHENSION: Mark the choice which best describes the apprehension, if any, of the violator.

NONE - VIOLATOR SUCCESSFULLY ELUDED POLICE - Self-explanatory.

NONE - DECISION MADE TO TERMINATE - The pursuit was terminated due to a decision made by the pursuing officer(s) or a supervisor, even though officer(s) were able to continue the pursuit.

NONE - STOPPED, BUT ESCAPED ON FOOT - The pursuit resulted in the violator vehicle being stopped, but the violator escaped on foot.

APPREHENDED DURING PURSUIT - The violator was apprehended during pursuit. This includes during any foot pursuit or search conducted as an immediate continuation of the original pursuit.

DELAYED - AFTER TERMINATION OF PURSUIT - The violator is apprehended after the pursuit is terminated. This includes cases in which the violator is identified through investigation, or if the violator is identified during the pursuit, the decision is made to terminate the pursuit and apprehend the violator at a later time.

12. REASON TERMINATED - Mark the choice which best describes the reason for termination of the pursuit.

PURSUIT DISCONTINUED - Use if the pursuit was terminated by a decision to discontinue.

POLICE ACCIDENT - The pursuit was terminated because the pursuing police vehicle was involved in an accident.

POLICE VEHICLE DISABLED - The pursuit was terminated because the pursuing police vehicle suffered a mechanical failure other than that caused by an accident or collision.

VIOLATOR STOPPED VOLUNTARILY - The violator stopped voluntarily, without the use of road spikes, roadblocks, induced stops, or other apprehension techniques, and surrendered.

VIOLATOR ABANDONED VEHICLE - The violator stopped voluntarily, without the use of road spikes, roadblocks, induced stops, or other apprehension techniques, then fled on foot.

VIOLATOR STOPPED BY COLLISION OR ACCIDENT - The violator was involved in a collision or accident, which terminated the pursuit.

**DIRECTIVE 9.4 - 9**
**APPENDIX "A"**

VIOLATOR VEHICLE DISABLED - The pursuit was terminated because the violator vehicle suffered a mechanical failure other than that caused by an accident or other police action.

STOPPED BY OTHER POLICE ACTION - The violator was stopped by apprehension techniques other than trailing pursuit, e.g., roadblock, induced stop, etc.

13. COLLISION TYPE: Mark the choices, which describe any collisions occurring during the pursuit.

NO COLLISION – Self-explanatory.

VIOLATOR ACCIDENT - If an accident occurs involving only the violator vehicle.

POLICE ACCIDENT - If an accident occurs involving only a pursuing police vehicle.

UNINVOLVED ACCIDENT - If an accident occurs involving only a vehicle or vehicles not involved in the pursuit, and the accident is a result of the actions of either the violator or police vehicles, e.g., the violator forces an uninvolved vehicle off the road.

VIOLATOR - POLICE ACCIDENT - If an accident occurs involving the violator and pursuing police vehicles.

VIOLATOR - UNINVOLVED ACCIDENT - If an accident occurs involving the violator vehicle and an occupied vehicle not involved in the pursuit.

UNINVOLVED - POLICE ACCIDENT - If an accident occurs involving an occupied vehicle not involved in the pursuit and a pursuing police vehicle.

VIOLATOR - POLICE DEL. INT. (Deliberate intent) - If the violator vehicle was deliberately driven into a police vehicle.

VIOLATOR - UNINVOLVED DEL. INT. - (Deliberate intent) - If the violator vehicle was deliberately driven into an uninvolved vehicle.

POLICE - VIOLATOR LEGAL INTER. (Legal Intervention) - If a police vehicle was deliberately driven into the violator vehicle as an act of legal intervention.

14. APPREHENSION TECHNIQUES:

USED: Mark each apprehension technique used during the pursuit.

END PURSUIT:  Mark one technique most responsible for ending the pursuit, if the violator vehicle was stopped.

**DIRECTIVE 9.4 - 10**
**APPENDIX "A"**

TRAILING PURSUIT - Following the violator vehicle in an attempt to stop it.

ROAD SPIKES - Road Fangs, Spike Strips, Stop Sticks, or other devices designed to deflate the tires of a pursued vehicle.

PARTIAL ROADBLOCK - A roadblock intended to stop or slow the pursued vehicle while allowing the vehicle to pass through or around the roadblock.

TOTAL ROADBLOCK - A roadblock, which completely blocks the pursued vehicle's path, preventing the vehicle from passing through or around the roadblock without striking the roadblock.

ROLLING ROADBLOCK - One or more police vehicles being driven in front of, and in the same direction as, the pursued vehicle. The police vehicles are then slowed to force the violator vehicle to stop.

OTHER INDUCED STOP - One or more police vehicles being used to force the pursued vehicle to stop. For the purposes of this report, in an induced stop, there is no attempt to make contact with the pursued vehicle.

LEGAL INTERVENTION - For the purposes of this report, deliberately driving a police vehicle into the violator vehicle in an attempt to stop the vehicle.

FIREARMS - Firearms or long guns discharged at the pursued vehicle or driver.

| REDACTED - LAW ENFORCEMENT SENSITIVE |
| --- |

15. NONPURSUIT RELATED CHARGES: List the charges filed against the operator and occupants of the pursued vehicle, which are not a result of their conduct during the pursuit, if they are apprehended during the pursuit. This includes charges previously filed if the violator is fleeing to avoid their capture or the capture of any occupant of the pursued vehicle and the charge for the offense marked in Block 9. If there are more than four, list the four most serious charges here. Charges filed in another state should be entered as if they were filed in Pennsylvania. Check the appropriate space if there are additional non-pursuit-related charges and list them in the continuation/synopsis.

    EXAMPLE:    A violator is the subject of an outstanding warrant for burglary and criminal trespass. During the pursuit, the violator attempts to ram a pursuing police vehicle. The violator is apprehended during the pursuit, and a search of the vehicle, incident to the violator's arrest, reveals illegal drugs. CC3502 and CC3503 would be entered in this block (CC2702, aggravated assault, would be entered under Pursuit Related Charges, and the drug violations would be listed under Other Pursuit Related Charges.)

**DIRECTIVE 9.4 - 11**
**APPENDIX "A"**

In the first two blocks, enter one of the following codes:

CC - Crimes Code
CS - Controlled Substance, Drug, Device and Cosmetic Act
FW - Fireworks Law
GM - Game Law
LL - Liquor Law
VC - Vehicle Code

In the next four blocks, enter the section number. For violations of the Controlled Substance, Drug, Device, and Cosmetic Act, delete the (a). Section 13(a)30 would be coded as 1330.

16. ROAD SURFACE:  Mark the choice which best described the condition of the road surface during the pursuit.

17. VISIBILITY:  Mark the choice which best described the visibility conditions during the pursuit.

DAY/CLR - Daylight, with no atmospheric obscurement, such as fog, rain, snow, etc.

DAY/OBSC - Daylight, with atmospheric obscurement, such as fog, rain, snow, etc.

DUSK/DAWN/CLR - Dusk or dawn, with no atmospheric obscurement, such as fog, rain, snow, etc.

DUSK/DAWN/OBSC - Dusk or dawn, with atmospheric obscurement, such as fog, rain, snow, etc.

DARK/CLR - Dark, with no atmospheric obscurement, such as fog, rain, snow, etc.

DARK/OBSC - Dark with atmospheric obscurement, such as fog, rain, snow, etc.

18. MISC:

PRIMARY PURSUING AGENCY - Mark this if your agency was the primary pursuing agency during the pursuit.

ASSISTING AGENCY - Mark this if your agency was assisting the primary pursuing agency. Only the primary pursuing agency is required to forward this report to the Pennsylvania State Police.

PSP - This report shall be forwarded in accordance with applicable directives regardless of the status of the Pennsylvania State Police as either the primary pursuing agency or an assisting agency.

**DIRECTIVE 9.4 - 12**
**APPENDIX "A"**

PROBABLE USE DRUGS/ALCOHOL - Mark this if it is suspected that the violator is suspected of being under the influence of drugs or alcohol, regardless of whether charges relating to the use of drugs or alcohol are filed.

PURSUED VEH. OPPOSE TRAFFIC - Mark if the pursued vehicle was driven on a one-way roadway against the normal flow of traffic.

POLICE VEH. OPPOSE TRAFFIC - Mark if any police vehicle actively pursuing the violator was driven on a one-way roadway against the normal flow of traffic.

NOTE: If a police vehicle were driven on a one-way roadway against the normal flow of traffic while not actively pursuing the violator, such as to take a position at a roadblock, this block would not be completed.

19. PURSUIT-RELATED CHARGES:   Mark all the charges resulting from the violator's operation of the pursued vehicle during the pursuit.

20. OTHER PURSUIT RELATED CHARGES:   Enter any other charges resulting from the violator's operation of the pursued vehicle during the pursuit.

21. HIGHWAY:   Mark the type of highway(s) on which the pursuit started, traveled on during the pursuit, and on which the pursuit ended.

22. AREA: Mark the type of area(s) in which the pursuit started, traveled through, and ended.

| | |
|---|---|
| URBAN/BUS | -Urban area or business district |
| SUBURBAN | -Self-explanatory |
| RESIDENTIAL | -Self-explanatory |
| RURAL | -Self-explanatory |

BLOCKS 23 THROUGH 37 - Enter three digits, e.g., enter three as 003, ten as 010, etc.

23. MARKED VEHICLES DIRECTLY INVOLVED:   Enter the number of marked police vehicles directly involved in the pursuit.  Do not include vehicles, which were only utilized in a support role, e.g., roadblocks, etc.

24. UNMARKED VEHICLES DIRECTLY INVOLVED:   Enter the number of unmarked police vehicles directly involved in the pursuit.  Do not include vehicles, which were only utilized in a support role, e.g., roadblocks, etc.

25. VIOLATOR INJURIES:   Enter the number of persons in the violator vehicle who received injuries resulting from vehicular operation during the pursuit.

**DIRECTIVE 9.4 - 13**
**APPENDIX "A"**

26. POLICE INJURIES:  Enter the number of persons in police vehicles who received injuries resulting from vehicular operation during the pursuit.

27. UNINVOLVED INJURIES:  Enter the number of uninvolved persons who received injuries resulting from vehicular operation during the pursuit.

28. VIOLATOR DEATHS:  Enter the number of persons in the violator vehicle who were killed as a result of vehicular operation during the pursuit.

29. POLICE DEATHS:  Enter the number of persons in police vehicles who were killed as a result of vehicular operation during the pursuit.

30. UNINVOLVED DEATHS:  Enter the number of uninvolved persons who were killed as a result of vehicular operation during the pursuit.

31. VIOLATOR PROPERTY DAMAGE:  Enter the estimated amount of property damage to the violator's vehicle resulting from the pursuit.

32. POLICE PROPERTY DAMAGE:  Enter the estimated amount of property damage to police vehicles resulting from the pursuit.

33. UNINVOLVED PROPERTY DAMAGE:  Enter the estimated amount of property damage to uninvolved property resulting from vehicular operation during the pursuit.

34. NUMBER OF PERSONS IN PURSUED VEHICLE: Self-explanatory.

35. PERSONS IN PURSUED VEHICLE ARRESTED: Self-explanatory.

36. LENGTH OF PURSUIT (MILES): Self-explanatory.

37. TIME ELAPSED DURING PURSUIT (MINUTES): Self-explanatory.

38. VEHICLE: Enter the pertinent information concerning the pursued vehicle.

39. VIOLATOR: Enter the pertinent information concerning the pursued subject.

40. CONTINUATION/SYNOPSIS: Self-explanatory.

PENNSYLVANIA POLICE PURSUIT REPORTING SYSTEM
COMMON REPORTING ERRORS

Block 8  (JURIS NUMBER)

**DIRECTIVE 9.4 - 14**
**APPENDIX "A"**

This block must be completed. If you don't know this number, you can obtain it from the person in your department who submits Uniform Crime Report information to the Pennsylvania State Police, or call the number listed below.

Block 9 (REASON INITIATED)
Mark ONLY ONE selection. If two or more selections could be made, mark only the most serious. For example, if a violator is pursued for a speeding violation, and it is later determined that the vehicle is stolen, then OTHER TRAFFIC should be marked. If, before attempting to stop the speeder, the officer learns that the vehicle has been reported stolen, then STOLEN OR SUSPECTED should be marked. Selection should usually agree with non-pursuit-related charges in block 15.

Blocks 10(TYPE VEHICLE PURSUED), 11 (APPREHENSION), 12 (REASON TERMINATED)
       Mark only one selection in each block.

Block 13 (COLLISION TYPE)
       More than one selection may be marked.

Blocks 11(APPREHENSION), 39 (VIOLATOR)
If a violator is identified in Block 39, some type of apprehension should be indicated in Block 11.

Block 14 (APPREHENSION TECHNIQUES)
There may be more than one selection made under USED. No more than one selection may be made under END PURSUIT.

One selection under END PURSUIT must be marked, unless NONE-VIOLATOR SUCCESSFULLY ELUDED POLICE or NONE-DECISION MADE TO TERMINATE or DELAYED - AFTER TERMINATION OF PURSUIT are marked in block 11 (APPREHENSION).

Also, OTHER INDUCED STOP refers to one or more police vehicles being used to force the pursued vehicle to stop. It does not include TOTAL ROADBLOCK, ROLLING ROADBLOCK, and LEGAL INTERVENTION (in legal intervention, a police vehicle is deliberately driven into the pursued vehicle.

Block 15 (NONPURSUIT-RELATED CHARGES), 20 (PURSUIT-RELATED CHARGES)
       Listing charges:

       RIGHT      WRONG
       VC 1543    75 1543

Blocks 15, 19, 20 (NONPURSUIT AND PURSUIT-RELATED CHARGES)
If suspect was not apprehended, no charges should be indicated in Blocks 15, 19, or 20.

**DIRECTIVE 9.4 - 15**
**APPENDIX "A"**

Include charges previously filed if the violator is fleeing to avoid their capture or the capture of any occupant of the pursued vehicle and the charge for the offense marked in Block 9.

For example, a violator is the subject of an outstanding warrant for burglary and criminal trespass. During the pursuit, the violator attempts to ram a pursuing police vehicle. The violator is apprehended during the pursuit, cocaine is found in his vehicle. CC3502 (burglary), CC3503 (criminal trespass, and CS1316 (possession of a controlled substance) would be entered in Block 15 (NONPURSUIT-RELATED CHARGES), CC2702 (aggravated assault) would be entered in Block 19 (PURSUIT-RELATED CHARGES). (The example in the original instructions indicated the drug charges would be considered pursuit-related. This was incorrect.)

NEW FOR 1997 Also include charges exceptionally cleared. For example, if a suspect is killed in the course of the pursuit or other police action related to the pursuit, but otherwise would have been charged with fleeing and eluding, recklessly endangering another person, and aggravated assault, then these charges should be listed in the appropriate blocks.

Block 19, 20 (PURSUIT-RELATED CHARGES)
Charges listed in Block 15 may be listed here also, but only if they are the result of a different incident. For example, aggravated assault is listed in Block 15 because of an outstanding warrant, then the suspect, during the pursuit, rams a pursuing vehicle, resulting in another aggravated assault charge, which would then be listed in Block 20

Blocks 23 through 37
      Enter only whole numbers, in three-digit format

      001    RIGHT
      1.0     WRONG

Blocks 31 through 33 (PROPERTY DAMAGE)
      These amounts must be reported in multiples of $100.

      For example:    005    $500.00
                    050    $5,000.00
                    500    $50,000.00

---

## BY COMMAND OF THE POLICE COMMISSIONER

---

# EXHIBIT "B"

PURSUIT STATISTICS

Legend:
- Justified (green)
- Not Justified (purple)
- Total (orange)

Y-axis: PURSUITS (0, 50, 100)
X-axis: YEARS

2017: Total 72, Not Justified 39, Justified 33
2016: Total 78, Not Justified 47, Justified 31
2015: Total 62, Not Justified 33, Justified 29
2014: Total 58, Not Justified 40, Justified 18

EXHIBIT
APD-4
5x1171720
tabbies.