**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

NEAL MILLER and DONNA MILLER,                  :
Individually and as Administrators of the Estate of     :
RYAN MILLER, a Minor, Deceased                 :
                            Plaintiffs        :
        v.                                      :
                                 :        NO. 2:20-cv-06301-ER
POLICE OFFICER JOSEPH WOLK,                     :
and in his Individual Capacity and GARY BOVE     :

**SECOND AMENDED CIVIL ACTION COMPLAINT**

Plaintiffs, Neal & Donna Miller, h/w, Administrators of the Estate of Ryan Miller, a Minor, Deceased (hereinafter "Plaintiffs"), by and through their undersigned counsel, hereby bring this action against Defendants, Police Officer Joseph Wolk and Gary Bove.

**INTRODUCTORY STATEMENT**

1.      This is a civil rights action for money damages brought under 42 U.S.C. §§ 1983 and 1988 as well as the Fourth and Fourteenth Amendments to the United States Constitution.

2.      The case revolves around the needless and tragic death of 15-year old Ryan Miller, (hereinafter "Miller" or "Plaintiffs' Decedent"), who was pursued to his death for an alleged non-violent traffic offense while riding a motorized scooter by a Philadelphia police officer, as well as by a rogue civilian who took it upon himself, without any right or legal privilege, to join in with a uniformed police officer in an illegal, improper and unlawful high-speed chase, which culminated in the death of the minor Decedent.

**THE PARTIES**

3.      Plaintiffs, Neal & Donna Miller, h/w, are adult individuals, and citizens and residents of the Commonwealth of Pennsylvania, residing therein at 5723 Charles Street, Philadelphia, PA 19135.

4.      Plaintiffs are co-administrators of the Estate of Ryan Miller, a Minor, Deceased, who died on May 7, 2019, at age 15, and are the parents of the Decedent.

5.      Defendant, Police Office Joseph Wolk, individually and in his official capacity, was at all times relevant hereto a police officer employed by the City of Philadelphia and/or Philadelphia Police Department and was, at all times relevant, acting within the course and scope of his employment as a Philadelphia Police Officer.

6.      Defendant, Gary Bove is an adult individual and citizen and resident of the Commonwealth of Pennsylvania, residing therein at 4574 Melrose Street, Philadelphia, PA 19124.

7.      Police Officer Joseph Wolk was at all times relevant a duly appointed and acting officer of the City of Philadelphia Police Department and/or the City of Philadelphia, acting under the color of law and under the statutes, ordinances, regulations, policies, customs and usages of the City of Philadelphia.

8.      Defendant, Police Officer Joseph Wolk is being sued in his individual capacity only.

9.      At all times relevant, Defendant, Officer Joseph Wolk, was obligated as a condition of his employment to comply with all of the policies, procedures and practices of the City of Philadelphia Police Department.

10.     As discussed hereinafter, at all relevant times, the unconstitutional actions of Police Officer Joseph Wolk were not only contrary to the stated policies and directives of the City of Philadelphia Police Department, but were so improper as to rise to the level of a constitutional violation evidencing intent to injure and/or extreme recklessness sufficient to shock the conscience, as discussed in more particularity herein.

11.     The policies and directives which Officer Wolk intentionally and/or recklessly violated specifically pertain to the use of force, and vehicular pursuits, and those directives are specifically intended to safeguard the public from the violation of their constitutional rights in the

form of the excessive use of force and/or the arbitrary and malicious exercise of law enforcement authority.

## STATEMENT OF JURISDICTION

12.    The Court has federal subject matter jurisdiction in this Action pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims under 42 U.S.C. §§ 1983 and 1988 arise under the laws of the United States.  The state-law negligence claim asserted against Defendant Gary Bove is properly before the court under the court's supplemental jurisdiction as set forth at 28 U.S.C. §1367.

## BACKGROUND AND FACTS

13.    The primary and most fundamental purpose of a police department, and the core of the job of being a police officer, is the protection of the safety and welfare of the general public through the enforcement of laws.

14.    At all times relevant hereto, Defendant, Police Officer Joseph Wolk was aware, and had been trained to be aware, that vehicular pursuits are amongst the most dangerous of all police activities.

15.    Police vehicular pursuits are responsible for hundreds of deaths annually, and in the period from 1996 through 2015, an average of 355 persons were killed annually in police pursuit-related crashes.[1]  Those injured and killed, often needlessly, include not only the fleeing persons but also police officers and innocent bystanders.

16.    Today, most law enforcement agencies have policies limiting the circumstances under which a vehicle pursuit may occur, how it will be monitored by management, and when it will be called off to avoid undue risks to the officers and the public.

---

[1] U.S. Dept. of Justice Special Report, "Police Vehicle Pursuits, 2012-2013" NCJ 250545 (May, 2017), available at: https://www.bjs.gov/content/pub/pdf/pvp1213.pdf

17.     Additionally, anti-pursuit technologies have become common and widely available, such as devices used to deflate the tires of suspects' vehicles.

18.     As an officer of the City of Philadelphia Police Department, Defendant Officer Joseph Wolk was, at all times relevant, subjectively aware by virtue of his training and his knowledge of the directives of the Department, that safety is and must be a primary consideration for Philadelphia Police Officers initiating or participating in any vehicular pursuit.

19.     Defendant Wolk also knew that vehicular pursuits in urban population centers are dangerous and may result in unintentional deaths and/or serious injuries to suspects, police and bystanders.

20.     Consistent with national trends attempting to limit police vehicle pursuits, and in an effort to both protect innocent citizens and bystanders from the dangers posed by unnecessary and unreasonably dangerous police vehicular pursuits as well as to insulate itself from legal liability, the Philadelphia Police Department promulgated and implemented a policy, designated as Directive 9.4, which governs vehicular pursuits by Philadelphia Police Officers. See Exhibit "A".

21.     By its express terms, Directive 9.4 allows Philadelphia police officers to engage in vehicular pursuit only under specifically enumerated and limited circumstances. See Exhibit "A."

22.     Specifically, Directive 9.4 provides that in order to initiate a pursuit, the pursuit must be "necessary to effect the arrest or prevent escape, AND…the officer has probable cause to believe that the person being pursued has committed or attempted a forcible felony…or possesses a deadly weapon…" See Exhibit "A."

23.     Despite the known dangers to the public involved, defendant Wolk has, on at least two occasions, unlawfully initiated and/or engaged in vehicular pursuits of civilians which have culminated in the death of the person pursued, the most recent of which known to plaintiffs occurred on May 7, 2019 when Defendant Wolk, initiated an unlawful high speed pursuit of Plaintiffs'

Decedent for riding a motorized scooter in violation of Directive 9.4, and with such recklessness and/or intent to injure as to shock the conscience.

24.     On May 7, 2019, at some time between 7:15 p.m. and 7:25 p.m., the decedent, Ryan Miller, was operating a motorized scooter on Tacony Street, heading northbound, when defendant Wolk, occupying a police SUV alone, observed him doing so and noticed that the scooter was being operated without a license plate.

25.     Pennsylvania law, specifically 75 Pa.C.S. §1332, requires vehicles to display their license plates at all times on public highways, and a violation of that statute is punishable as a summary offense pursuant to 75 Pa.C.S. §1332(c), with the sole penalty being a $100 fine.

26.     Despite the fact that only a summary offense had been committed where custody is not authorized under the statute, defendant Wolk determined to initiate a pursuit of the vehicle, when at all times relevant he was subjectively aware that the offense in question was not a permissible basis to do so under Directive 9.4.

27.     Defendant Wolk took off after the scooter, but did so without activating his siren, and although he initially activated his emergency lights briefly, video evidence and witness statements (discussed below) clearly and unequivocally demonstrate that he intentionally ***deactivated*** his emergency lights as the pursuit proceeded through a residential neighborhood.  Both lights and sirens are required for any vehicular pursuit under Directive 9.4.

28.     Defendant Wolk also knowingly violated mandatory police procedure by failing to notify Police Radio that a pursuit had been initiated, when the terms of Directive 9.4 specifically required him to do so, and to also state the justification for the pursuit along with other information.

29.     Wolk's decision to initiate an improper pursuit which he knew was legally prohibited and to neither activate emergency signals or notify Police Radio of the fact and "justification" for the pursuit all clearly indicate Wolk's subjective knowledge that his pursuit would not have been

authorized, that his conduct was improper, and that his actions were expressly prohibited by binding directives.

30. Additionally, Wolk's decision to disregard mandatory procedures indicate that he intended to make his pursuit of the decedent a solo venture free from oversight or interference, effectively "claiming" Ryan Miller as his own to pursue – to whatever end.

31. Ryan Miller, for reasons unknown, did not stop as Wolk's vehicle took off after him, but instead turned the scooter around, heading into the adjacent residential neighborhood on the other side of the I-95 overpass with Wolk's vehicle in hot pursuit.

32. Much of the pursuit is able to be reconstructed through a combination of witness statements and security camera footage obtained from neighboring properties. In the first relevant video, taken from a parking lot along Fraley Street, Miller can be seen coming from under the I-95 highway overpass, turning left onto James Street with Wolk's SUV in close pursuit, at 19:24:08, and he then turns right onto Simon Street.

34. From there, the next portion of the pursuit visible on security footage shows Miller traveling on Eadom Street.

35. An eyewitness, Steven Mattos of the 5300 block of Eadom Street witnessed Miller coming down the street southbound on the scooter pursued by Wolk's police SUV which was traveling at a "high rate of speed" without its roof emergency lights on. See Mattos statement, Exhibit "B".

36. Mattos goes on to describe the vehicles going through the stop sign at Eadom and Kennedy Streets, after which the scooter slowed near Brill Street, at which point Mattos describes the police SUV coming alongside the left side of the scooter attempting to "stop" the scooter, which avoided Wolk's SUV only by turning into the driveway of a parking lot, where it turned around and headed back out onto the street. See Exhibit "B".

37.     This sequence appears in video footage, and shows Wolk engaging in an attempt to use his police SUV to knock the scooter down:



*Fig. 2- Wolk turns sharply right to try to knock Miller off the scooter.  The sharp rightward lean of the scooter is visible as Miller attempts to avoid being run over.*

38.     Miller avoided contact with Wolk's police SUV by making a very sharp right turn into a parking lot, which he traveled through back towards Eadom Street.  Wolk continued his pursuit.

39.     The pursuit from this point is next picked up on video cameras located at NET Steps, a rehabilitation and addiction treatment center, and things take a bizarre turn.

40.     Footage looking down Scattergood Street in the direction of James Street shows a silver Ford, later learned to have been operated by defendant Gary Bove, turning right from James Street onto Scattergood at 07:27:12, at which point he pulls over to the far right side of the street – and waits.

41.     At 07:27:19, Miller's scooter can be seen coming from behind the building line of the house at the corner of Eadom and Scattergood and turning right, with Wolk close on his tail.

42.     Wolk then began to overtake Miller as they traveled down Scattergood and, as he did so, defendant Bove's vehicle began to edge forward, in what appears to be an effort to assist Wolk.

43.     At that point, Wolk managed to pass the decedent and cut him off, once again coming perilously close to striking Miller with his SUV, and then got out of his police vehicle to physically grab and restrain Miller, only to have Miller wrest himself from Wolk's grasp and pull away on the scooter.  Miller's shirt was ripped in the process.

44.     Even as Miller was escaping Wolk's grasp, Bove turned the corner and began pursuing Miller, now taking the lead, as Wolk ran back to his police vehicle to continue his pursuit. At one point, Wolk was directly in front of Bove's vehicle, and appears to let him proceed after Miller.



*Figs. 4-7:  Bove pulls onto Scattergood and pulls to the side to allow Wolk to overtake Miller.*



*Figs. 8-11: As Wolk attempts to restrain Miller unsuccessfully, Bove edges up to take the lead..*



*Figs. 12-14: As Wolk runs back to his car, Bove comes to the corner to continue the pursuit, Wolk following behind at this point.*

45.     From Scattergood Street, Miller then turned right and proceeded northbound on Eadom Street.   Video obtained from the resident of 5537 Eadom Street, and timestamped 7:25:40 shows Miller driving the scooter quickly down Eadom Street, which the pursuit had found its way back onto, and by this time the first car in pursuit, at 7:25:45, is a grey Ford Fusion driven by defendant Gary Bove, followed at 7:25:49 by Wolk's police SUV.



*Fig. 3.  The vehicles involved in the pursuit as seen from the security camera at 5537 Eadom Street*

46.     As the chase continued, Wolk continued to act in concert with Bove in pursuit of Miller, who at this point has almost been run over by a police SUV twice, and had been physically restrained, all of which was completely unlawful under the governing police pursuit directive.

47.     Interestingly, in a witness statement he was later asked to provide in connection with the initial police accident report, Gary Bove gratuitously volunteers, without being asked, that he "was not involved" in the pursuit.  See Bove Statement, Exhibit "C".   It would not be discovered until later on that Wolk and Bove knew each other.

48.     Ultimately, the chase proceeded down Fraley Street, with Bove taking the lead and Bove following, until Miller, by now likely panicked, entered Fraley Street's intersection with Tacony Street against a red light as a tractor-trailer was crossing through, resulting in Miller colliding with the trailer portion and suffering fatal injuries and near-decapitation.


**INITIAL POLICE REPORT AND INVESTIGATION**

49.     In the immediate aftermath of the incident, the Philadelphia Police Department prepared an incident report, which included an Accident Investigation Division (AID) report, a more typical Commonwealth of Pennsylvania Crash Reporting form, and various witness interview forms, which are collectively attached hereto and made a part hereof as Exhibit "D".

50.     The initial police report made no mention of the pursuit, but instead merely focused on the collision between the decedent and the truck.   *Id.*

51.     Notably, Gary Bove is the sole witness listed on the police report, and he is quoted therein as merely stating that "while on Tacony Street, he observed Operator #1 (Miller) traveling EB on Fraley Street at a high speed and he did drive through a steady red light at intersection (sic) before striking the tractor trailer."   *Id.*   Bove did not reference or mention the preceding pursuit, in which he was an active participant, at all.

52.     As noted previously above, Bove also completed a written statement in connection with that report, separately attached as Exhibit "C" but also included in Exhibit "D", which did not mention the pursuit, and also – completely falsely - stated "I was not involved."

53.     Despite Bove's glaring omission of the fact that he had been involved in the pursuit immediately preceding Miller's death, other witness statements, which began to be taken in the days following the incident, made it clear that a police pursuit had taken place leading up to Miller's death.  See  Exhibit "D".

54.     One witness, Jennifer Scheffield, who was outside Fibber McGee's Bar on Eadom near Scattergood, witnessed the portion of the pursuit where Wolk exited the vehicle and grabbed Miller, describing Wolk's demeanor as "very angry and pissed."  *Id.*


### INTERNAL AFFAIRS INVESTIGATION AND FINDINGS

55.     On May 8, 2019, the day after the incident, the Internal Affairs Division of the Philadelphia Police Department was notified of the incident resulting in Miller's death.

56.     Additional information received by police personnel monitoring social media postings indicated that Miller's collision with the truck was immediately preceded by a police pursuit of Miller.  Based on this information, an Internal Affairs investigation was opened under case number IAD #19-1066, and IAD personnel immediately responded to the area of Tacony and Fraley Street, the site of the crash, with the goal of recovering surveillance video from local residents and/or businesses, which were in fact obtained, and showed various portion of the pursuit of the motorized scooter by a police vehicle designated at RPC H-14.

57.     A check of the police department's computerized personnel database determined that the vehicle was being operated by defendant Wolk, and Lt. James Clough was assigned to investigate on behalf of IAD.

58.     The evening before the IAD investigation was opened, defendant Wolk, who was identified at the scene of the incident, reported to Accident Investigation Division (AID) headquarters and provided a witness statement to Police Officer Mark Eib, Badge #1568.   A copy of the statement provided by Wolk is attached hereto and made a part hereof as Exhibit "E".

59.     In his statement, Wolk made numerous statements later confirmed to be objectively false, in an apparent attempt to conceal what had actually occurred.

60.     In Wolk's initial telling, he witnessed Miller riding a scooter which was not displaying a license plate, so he activated his lights and sirens to conduct a traffic stop, only to have Miller refuse to stop, instead speeding up and entering opposing lanes of traffic on Tacony Street, a busy thoroughfare, on the basis of which Wolk stated that he concluded that the operator was "suicidal or DUI".   He further stated his intent was merely to "alert oncoming traffic of the scooter approaching the bend in the wrong travel lane."  See  Exhibit "E".

61.     In Wolk's initial telling, much of the pursuit was omitted, including his attempt to knock Miller off the scooter discussed above, and instead only acknowledged his attempt to grab Miller at Scattergood and Eadom Streets.  Id.  He stated that he lost the scooter at that point and didn't catch up until he saw Miller's lifeless body on Tacony Street.  Id.  His statement made no mention of Bove.

62.     That same evening, other AID personnel conducted witness interviews, including an interview with Gary Bove, discussed above.   These witness interviews are summarized in an Internal Affairs Division Memorandum regarding IAD's investigation which is attached hereto and made a part hereof as Exhibit "F".

63.     Also interviewed by AID was Jennifer Scheffield, who gave a statement by telephone to Police Officer Ronald Jackson, Badge #5962.

64.     Ms. Scheffield stated that she was outside Fibber Magee's bar, at Bridge and Scattergood, in a vehicle when she saw the kid on the "dirt bike" run into the rear of a patrol car and

take off. The officer got out of his car and tried to grab the kid, but got back into his car when the kid took off. She stated that the officer then took off in pursuit, without lights or sirens, and saw another car following behind the police officer.

65. Robert Mattos of the 5300 block of Eadom Street, was interviewed by IAD personnel on May 23, 2019.

66. Mattos stated he was outside his house working on his car when, sometime between 7:20 and 7:25 pm on May 7, 2019, he saw a motor scooter being chased by a police SUV, both vehicles traveling south on Eadom. He believed that the scooter had slowed down to a near stop and the police officer was trying to get over in front of the scooter. He stated that the kid on the motor scooter went over the sidewalk into a driveway and over a grassy island at a storage facility, then continued eastbound on Kennedy, with the police officer continuing to pursue. He then lost sight of the vehicles. This is believed to be the sequence discussed and depicted in ¶¶ 36-37 above.

67. Approximately two minutes later, Mattos told officers, he heard the motor scooter approaching again, at which point he looked and saw the motor scooter being chased by a silver vehicle (Bove) and, about 10 seconds later, the police SUV passed Mattos. All three vehicles went through the stop sign at Kennedy and continued down Eadom to Fraley, turning right toward Tacony Street.

68. Mattos added that he did not see any emergency lights activated, nor was the siren activated on the vehicle. Additionally, the silver vehicle (which Mattos apparently believed to be an unmarked police car, as opposed to a citizen playing vigilante) was not displaying lights, not using any sirens or beeping its horn. Mattos stated he believed the silver vehicle to be involved in the pursuit.

69. Mattos also estimated that the motor scooter was traveling about 35-40 mph when it passed the second time and that the silver car was perhaps 45 feet behind it, with the police vehicle perhaps 150-160 feet behind the sliver car. Relevantly, Mattos had the impression from his

observations that the police SUV had "given up the chase" and let the silver car take the lead. He believed the silver car to be traveling faster than Wolk's vehicle at that point and noted that it was driving aggressively, "like he was a police officer."

70.     Video evidence was also collected from area residents and businesses, which in combination with the witness accounts, cast considerable doubt on the veracity and completeness of Wolk's original statement to AID investigators, resulting in him being interviewed at IAD headquarters by Lt. Clough, the lead investigator, on September 4, 2019.

71.     Although portions of Wolk's statement to IAD mirrored his initial statement, this time his version contained significantly more detail.

72.     Wolk continued to state to IAD that he initiated the pursuit because the scooter had no tag and that it crossed into opposing traffic when he tried to initiate a traffic stop. He stated that as he approached what was essentially a blind curve on Tacony Street north of Fraley Street, the operator of the scooter made a U-turn to proceed southbound on Tacony. Wolk made a U-turn as well, and claimed he attempted to use his air horn to get the scooter to stop.

73.     From there, the scooter turned right on Fraley before heading south on James Street. Throughout this time, Wolk claimed to be repeatedly using his air horn, although no witness corroborated this. The scooter then turned onto a small street, which Wolk tentatively identified as Simon Street, before turning south on Eadom.

74.     Wolk then stated to IAD that the scooter went through a parking lot and doubled back onto Eadom, now traveling north. Wolk did not disclose his attempt to unseat the rider from the scooter by bumping it with his SUV to the IAD officer in his statement.

75.     Wolk claims to have briefly lost sight of the scooter but reacquired it on a "small street" and followed it onto southbound James Street. Wolk claimed that he was repeatedly using his air horn to try to get the scooter to stop throughout, although there is nothing to corroborate this.

76.     From James Street, Wolk stated that the scooter turned west onto Scattergood Street, where he pulled alongside the scooter and got out, grabbing the male rider by his shirt and allegedly telling him to "stop before he had gotten himself hurt", in contrast to Scheffield's statement which described his demeanor as "very angry and pissed."

77.     Wolk stated that the rider was able to get away and accelerate down northbound Eadom Street.  At this point, Wolk disclosed for the first time, he stated that he saw a male "familiar to him" named Gary (Bove), who was a tow truck operator.  Thus, for the first time, there was an indication that Bove not only involved himself in the chase, taking up common cause with Wolk, but that the two men knew each other.

78.     Wolk claimed he could not recall whether he had first seen Wolk on Scattergood or Eadom, although the video evidence from NETSteps suggests that Bove had first acquired sight of the pursuit on James Street before turning onto Scattergood, since he pulled over to take up position as soon as he turned onto Scattergood.

79.      Wolk stated that Gary started driving his vehicle in the same direction the scooter had gone, and at that point he lost visual contact with the scooter.

80.     Wolk states he was able to see Bove's vehicle and followed it, turning right (eastbound) on Fraley towards Tacony Street and began to turn onto James Street, but at that point he noticed the motor scooter on the ground at Tacony and Fraley with the decedent lying on the ground.

81.     Wolk's statement is silent as to the whereabouts of Bove's vehicle at this time, but video evidence from a business on Fraley showed him following the scooter down Fraley past James Street, and therefore it would almost certainly have still been visible to Wolk, since the light on Fraley at Tacony was red at that time, and a tractor-trailer was still occupying the intersection, having come to a stop immediately after impact.

82.     Wolk stated that in all, the pursuit lasted approximately two minutes. He conceded that he had not notified Police Radio of the incident until the collision occurred, and that no other police personnel had participated in any portion of the pursuit.

83.     Wolk also claimed to IAD that he didn't request any assistance from Gary Bove, and claimed to have no knowledge of where he came from or how he became involved. He also denied having any interaction or communication with Bove during the pursuit - all of which leaves unanswered, but for rumor and hearsay, how and why Bove came to get ahead of the pursuit, lay in wait, and take the lead position when Wolk failed to physically restrain the decedent.

84.     IAD compared the route described by Wolk and confirmed through obtained surveillance videos to distance as shown on Google Maps, determining that the pursuit route covered slightly over a half mile.

85.     Ultimately, the IAD investigation sustained no fewer than five separate violations of Philadelphia Police Department Directive 9.4 by Wolk in connection with his conduct during the subject incident.

86.     First, Wolk was found to have violated section 1-B-2 of the Directive, which specifically and strictly prohibits vehicular pursuit for traffic violations.

87.     The IAD report goes on to note that despite Wolk's statement to IAD that his emergency equipment had been activated the entire time he was pursuing the scooter, numerous videos and witness statements confirmed that no emergency equipment was activated, a violation of section 3-J of the Directive, which states that all "marked radio patrol sedans engaged in pursuit must have….emergency equipment activated continuously throughout the pursuit. This includes both light bars and red/blue lights and sirens."

88.     Since the Wolk vehicle was a Chevrolet Tahoe SUV and not a sedan, Wolk was determined to have violated section 3-P of Directive 9.4, which prohibits all police vehicles other

than marked radio patrol cars from engaging in *any* vehicular pursuit absent exigent circumstances, which were not present here.

89.     Wolk also violated section 4-A-2 of Directive 9.4, which requires officers initiating a pursuit to immediately inform the radio dispatcher of:

   a.   The fact that a pursuit has been initiated, along with the justification;
   b.   The initial location, direction and estimated distance to the suspect vehicle;
   c.   The approximate speeds of the police and suspect vehicles;
   d.   The vehicle description, license plate if possible as well as physical and clothing descriptions of the occupants and approximate ages;
   e.   The continuous progress of the pursuit and if headed toward another district, division or jurisdiction;
   f.   Upon arrival of a secondary Unit, relinquish communication responsibilities to the Secondary Unit.

90.     As noted above, Wolk did none of the above, and also failed to submit a pursuit memorandum as required by Section 3-T of Directive 9.4, another violation of mandatory procedure on his part.

91.     Wolk's actions on May 7, 2019 cannot be fully understood or appreciated without examining them in the context of his training and prior personal experience, which reasonably should have dictated a completely contrary course of action on the date in question.

92.     Defendant Wolk has, through his actions as a Philadelphia Police Officer, evidenced at least some demonstrable prior history of engaging in similar unauthorized and reckless pursuits.

93.     Indeed, Defendant Wolk is currently a named defendant in *another* case pending before this court, in which he is alleged to have improperly used his police vehicle as a weapon during the pursuit of a dirt bike rider, which resulted in catastrophic injury and the ultimate death of that rider after months in a coma, bearing the caption *McKenna v. Wolk,* No. 18-cv-3746.

94.     In the similar *McKenna* case, Wolk likewise engaged in an unauthorized vehicle pursuit of a dirt bike rider, Bailey McKenna, which culminated when Wolk, traveling *against* traffic on Torresdale Avenue, sharply cut his vehicle directly into the path of McKenna in a manner which

allowed the rider no opportunity to avoid collision, causing the rider to sustain critical injuries when his vehicle collided with Wolk's.

95.     In connection with that incident, Wolk falsely stated that he had not been engaged in a pursuit and was merely making a turn to go to a nearby restaurant for something to eat when struck, despite video evidence which clearly showed him driving in the wrong lane of traffic on a busy street and making an aggressive turn to cut off the rider.

96.     The McKenna incident should have been fresh in Officer Wolk's mind at the time of his pursuit of Ryan Miller, in that Wolk's deposition in the *McKenna* matter had been scheduled for May 8, 2019, the very next day.

97.     Additionally, at the time that the incident involving Ryan Miller occurred, a reasonable police officer similarly situated to Defendant Wolk would have realized that the Third Circuit Court of Appeals had, at the time, just recently held in *Sauers v. Borough of Nesquehoning,* 905 F.3d 711 (2018)*,* that engaging in a non-emergency vehicular pursuit in response to a mere traffic violation could result in constitutional liability and be deemed conduct sufficient to "shock the conscience".

98.     The *Sauers* case, although based upon distinguishable facts, nevertheless included in its central holding that engaging in a vehicular pursuit for a traffic violation could constitute recklessness, and further held that in a non-emergency situation, such recklessness could "shock the conscience", which had long been established as the standard for liability in section 1983 liability police chase cases.

99.     Traditionally, in emergency situations, litigants have had to prove that a police officer had to have an "intent to injure" unconnected to any legitimate police objective in order for liability to attach for a 14th amendment violation in a section 1983 claim.  See *Lewis v. County of Sacramento,*  523 U.S. 833 (1998).

100.     Here, the manner in which Wolk conducted himself and the tactics he employed, standing alone, are sufficient to demonstrate that Wolk at a minimum acted recklessly, by disregarding almost every aspect of the Police Department's mandatory pursuit directive, and engaging in a chase in and throughout a high-density residential neighborhood at speeds significantly in excess of posted speed limits, for a mere traffic violation punishable only by issuance of a ticket, and by attempting to use his vehicle to unseat the rider of the scooter when he knew, from his personal experience, that successfully doing so was likely to result in death or serious bodily injury.   This conscious disregard of a known risk of substantial harm is the *sine qua non* of recklessness.

101.     In this case, however, there are far more disturbing factors which are sufficient to give rise to the inference that Wolk was or may have been acting for purposes completely unrelated to any legitimate law enforcement objective, and harbored an intent to cause injury to Miller.

102.     Indeed, Wolk's individual choices both during the pursuit and at later points indicate there was more at play than he has conceded on the record to date.

103.     Specifically, there is no video evidence or witness testimony to corroborate what exactly happened when the pursuit first began. Therefore, Wolk's facially implausible statement that he initiated a pursuit that could have resulted in death and actually did in order to "save" someone he deemed potentially suicidal has never been seriously questioned.

104.     Based on the content of Wolk's statement, the only conceivable basis for the belief that Miller harbored any suicidal intent was his bare act of briefly crossing over a center line in the roadway, which he apparently did without any close call with oncoming traffic. Indeed, Wolk's statements acknowledge the absence of oncoming traffic, since he stated that he

raced ahead of the motor scooter to warn drivers of oncoming vehicles who obviously had not yet approached closely enough to pose an imminent threat to Miller. It is a quantum leap to assume that this conduct indicated suicidal intentions.

105.     Even assuming, arguendo, the veracity of Wolk's stated basis for initiating pursuit, that justification evaporated immediately when Miller turned the scooter around and drove in the proper direction.  Notwithstanding that fact, Wolk engaged in an aggressive high speed chase for two or more minutes, employing tactics which clearly posed a risk of injury or death in the course of doing so, contradicting his professed altruistic motive.

106.     It is also notable that Wolk, in his statements to AID and IAD, omitted any mention of him attempting to bump or take down the rider of the scooter on Kennedy Street, which was the point in the pursuit when Wolk was most likely to maim or kill the rider. Wolk knew this risk existed from his prior conduct in the incident giving rise to the *McKenna* litigation.

107.     The purposeful omission of this piece of information is highly illuminating, in that Wolk knew that similar conduct had caused someone's death before, and therefore concealing the fact he had made a similar attempt in this pursuit reflects his conscious knowledge that he had engaged in improper conduct which was likely to have negative consequences for him if discovered.

108.     It is not irrelevant, in this connection, that Wolk had similarly provided a complete fabrication about the traffic maneuver resulting in Bailey McKenna's death when that incident was subsequently investigated.

109.     The fact that  Wolk has lied or omitted key information when speaking to Police Department investigators on both known occasions when he has engaged in unauthorized

pursuits indicates that these are not innocent mishaps, but wrongful conduct which Wolk knowingly and intentionally engaged in while in the course of duty.

110.    The most disturbing factor in the Miller pursuit, however, is the fact that Wolk personally knew Gary Bove, the civilian who joined in the chase, although Wolk omitted *any* mention of either his presence or his participation in the pursuit in his statement to AID, acknowledging those facts only when confronted with IAD's knowledge that he had been involved.

111.    As demonstrated in video footage, Gary Bove's vehicle somehow got *ahead* of the pursuit as it was occurring, and that same footage clearly shows Bove pulling to the side of the roadway and laying in wait for the pursuit to come his way, immediately after which he took a lead role in the pursuit.

112.    These actions on Bove's part seem to indicate some degree of communication and coordination with Wolk, and not merely a random happenstance, to such a degree that Wolk was specifically asked by the IAD investigator if he had requested Bove's assistance or communicated with him in any way during the pursuit.

113.    Upon information and belief, Gary Bove had some relationship (as either a family member or family friend) to a girl several years younger than Ryan Miller who, at the time, had been recently discovered to have engaged in a sexual act with Miller.

114.    If Bove was related to the female in question, it places his participation in the pursuit in a more sinister light, and suggests that he may have been acting in an attempt to seek retribution or retaliation against Miller for the perceived wrong.

115.    Given Wolk's apparent acceptance or ratification of Bove's conduct, his attempt to conceal Bove's participation initially, and his later attempt to deny or obfuscate any

appearance of coordination with Bove, it is entirely possible that Wolk and Bove were acting together with an improper purpose in their joint pursuit of the decedent, and were acting with a malicious intent to harass or injure Miller.

116.    Moreover, the description of Wolk as "extremely angry and pissed" by witness Jennifer Scheffield is more consistent with malicious intent, or at least uncontrolled anger issues, than with Wolk's professed intent to prevent Miller from engaging in "self harm."

117.    Taking the totality of the circumstances into consideration, Wolk engaged in an unauthorized pursuit despite knowing better. He tried to bump a scooter rider with his SUV when he knew doing so was likely to cause serious injury or death. He concealed that attempt after the fact. He also engaged in the joint pursuit of a minor for a traffic violation in concert with a vigilante who he knew. He knowingly concealed that from AID. And he departed from pursuit directives in a manner calculated to ensure that no other police officer would interfere with or witness what he was doing, and to potentially conceal the fact that a pursuit had ever occurred. But for the fact that eyewitnesses spoke up, he may have succeeded.

118.    The totality of the circumstances, including Bove's potential vendetta against Miller, and Wolk's denials, fabrications and obfuscations after the fact all point to improper motive and malicious intent sufficient to meet the more rigorous "intent to harm" standard that applies in emergency pursuits, even though a recklessness standard is properly applied in cases which do not involve any emergency or any threat to the public such as this.

119.    Under applicable law in the Third Circuit, Wolk's conduct was objectively unreasonable, reckless and unjustifiable. Not only was the pursuit of Miller completely prohibited under applicable guidelines, but it completely ran afoul of standards established by jurisprudence arising under section 1983 in this Circuit.

120.    Specifically, Miller committed no more than a traffic offense and there is not a single articulable fact which suggests he posed any threat to Wolk or others.  Indeed, even Wolk's asserted justification that he deemed Miller "suicidal" based on a ***lane change*** beggars the imagination and was clearly a fabrication on his part in his misguided effort to offer a *post hoc* justification for his blatantly outrageous conduct.

121.    Absent an actual emergency where a police officer could reasonably believe himself or a member of the public is imperiled, a high-speed pursuit through a dense residential neighborhood for a traffic violation is *per se* reckless, and there is absolutely no justification for use of tactics which could result in death or injury in such situations, such as Wolk's attempt to unseat Miller from the scooter.

122.    Prior case law establishes that Wolk's conduct completely blew past recognized limitations on police conduct in this pursuit, including those discussed in *O'Donnell v. Tinicum Twp.*, 110 F. Supp. 3d 571, 578-79 (E.D. Pa. 2015) (using police vehicle to knock a suspect off a motorcycle improper when no threat to police or others was present; officer not entitled to qualified immunity).

123.    Indeed, Wolk himself was found not entitled to qualified immunity in the *McKenna* case, where the court held "Wolk is not entitled to qualified immunity because it was clearly established at the time of the alleged wrongdoing that striking a dirt bike rider with an SUV to address a traffic infraction was excessive."

124.    Since it was clearly established at the time of Wolk's deadly pursuit of Bailey McKenna that his hyper-aggressive tactics were proscribed, it necessarily follows that his substantially identical conduct in this incident, which clearly contributed to the tragic outcome of

his unlawful and unjustified pursuit, was similarly unlawful and violated clearly established constitutional rights.

125.    But for the fact of the improper and/or illegal pursuit, Decedent would not have collided with the trailer, and would not have died as a result of the same.

126.    The pursuit initiated by Defendant Wolk and the ensuing death of Plaintiffs' Decedent was a direct result of the flagrant violation of Philadelphia Police Department Directive 9.4 prohibiting vehicular pursuits, and in contravention of the Decedent's Fourth and Fourteenth Amendment Rights.

127.    As a result of the actions, conduct and omissions of the Defendants named herein, the Decedent was caused to suffer catastrophic injuries that led to his death at the scene of the collision aforesaid.

128.    As a direct result of the aforesaid acts, conduct and/or omissions of the Defendants, the Plaintiffs have sustained damages and losses compensable pursuant to the Pennsylvania Wrongful Death Act, including, but not limited to, the loss of companionship of the Plaintiffs' Decedent, the loss of services of the Plaintiffs' Decedent, as well as various and diverse sums of money for funeral, burial and related expenses.

**COUNT I**
**CIVIL RIGHTS VIOLATION PURSUANT TO 42 U.S.C. § 1983**
**PLAINTIFFS v. JOSEPH WOLK**

129.    Plaintiffs hereby incorporate by reference the averments set forth in the foregoing paragraphs of this Complaint as though the same were fully set forth at length herein.

130.    At all times relevant herein, Defendant Wolk was a "person" within the meaning of 42 U.S.C. § 1983.

131. At all times relevant herein, said Defendant was acting "under color of state law" pursuant to 42 U.S.C. § 1983.

132. Defendant Wolk intentionally and maliciously initiated and continued the pursuit, which included efforts to use his police vehicle to unseat Plaintiffs' Decedent, and failed and refused to break off the pursuit until Plaintiffs' Decedent suffered catastrophic and fatal injuries.

133. Defendant Wolk's conduct violated Ryan Miller's constitutional rights to substantive and procedural due process as guaranteed by the Fourteenth Amendment to the United States Constitution and as remediable pursuant to 42 U.S.C. §1983, as set forth elsewhere in the Complaint and in the following respects:

    a. Disregarding the safety and welfare of Ryan Miller and other members of the public;

    b. Ignoring considerations militating against the initiation of vehicular pursuit, including knowledge of Ryan Miller's identification and address, thereby eliminating any exigent need to engage in pursuit;

    c. Initiating an unlawful vehicular pursuit of Ryan Miller in and throughout the streets of Philadelphia knowing that vehicular pursuit was not necessary to prevent the death or serious bodily injury of another person;

    d. Initiating an unlawful pursuit of Ryan Miller in and throughout the streets of Philadelphia knowing that the pursuit was not necessary to effect his arrest or apprehension, and without holding the belief that Ryan Miller had committed or attempted to commit a forcible felony;

    e. Initiating an unlawful pursuit of Ryan Miller in and throughout the streets of Philadelphia knowing that the pursuit was not necessary to effect his arrest or apprehension, and without holding the belief that Ryan Miller possessed a deadly weapon;

    f. Pursuing Ryan Miller at an unsafe following distance in which a deadly crash was virtually certain to result given the speed of the pursuit, local road conditions and the traffic conditions in the area;

    g. Allowing and/or condoning a private citizen to engage and assist in the unlawful pursuit initiated by Wolk, despite a lack of any reasonable basis for the belief that the individual in question, Defendant Gary Bove, was legally privileged or adequately trained to do so, thereby further endangering the life of Ryan Miller for a non-violent traffic offense.

h.   Consciously disregarding the safety of Ryan Miller, members of the public and others by failing to self-terminate the pursuit after having initiated the pursuit;

i.   Deliberately, intentionally and purposefully attempting to use his police SUV as an offensive weapon by trying to bump and/or ram Ryan Miller while he rode on the motorbike, despite the knowledge that serious bodily injury or death was virtually certain to result; and

j.   Failing and refusing to terminate the pursuit until Ryan Miller had sustained fatal injuries as a direct result of Wolk's unlawful and unjustified pursuit.

134.   Alternatively or in addition to the foregoing, Defendant Wolk used clearly unlawful, excessive and deadly force to apprehend Plaintiffs' Decedent who at most was suspected of having committed a non-violent traffic offense, and did so either recklessly or with an intent to harm Plaintiff's Decedent which was unconnected to any legitimate law enforcement objective.

135.   Defendant Wolk's conduct and/or inaction violated Ryan Miller's constitutional rights to substantive and procedural due process, and freedoms from unreasonable seizure and the use of excessive force as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution.

136.   As a direct result of Wolk's intentional and/or reckless misconduct, Plaintiffs' Decedent sustained catastrophic and fatal injuries, and the Administrators of his Estate hereby bring this action against said Defendant pursuant to the provisions of the Pennsylvania Wrongful Death statute, 42 Pa.C.S.A. § 8301 to recover all damages available at law, including loss of companionship, loss of support, and all other damages available at law.

WHEREFORE, Plaintiffs Neal Miller and Donna Miller, individually and as co-Administrators of the Estate of Ryan Miller, a Minor, Deceased, demands judgment against all Defendants individually and/or jointly and severally, for compensatory and punitive damages in excess of $150,000, together with interest and costs thereon.

**COUNT II**
**NEGLIGENCE**
**PLAINTIFFS v. GARY BOVE**

137.    Plaintiffs hereby incorporate by reference the preceding paragraphs as though the same were set forth at length herein.

138.    The catastrophic and fatal injuries sustained by Plaintiffs' Decedent were caused by the negligence, carelessness and/or recklessness of Defendant, Gary Bove.

139.    The negligence, carelessness and/or recklessness of Defendant Bove consisted of, but is not limited to, the following:

(a) failure to properly operate and control his motor vehicle;

(b) failure to observe and/or yield to Decedent's vehicle;

(c) failure to stop his motor vehicle in a safe manner;

(d) failure to maintain control over his vehicle;

(e) failure to maintain an assured clear distance;

(f) failure to properly and adequately observe traffic conditions;

(g) failure to properly and adequately operate his vehicle at an acceptable and/or controllable rate of speed;

(h) failing to take proper action to avoid a collision;

(i) failing to use due care for the safety of Decedent under the circumstances;

(j) following too closely;

(k) improperly, illegally, carelessly, negligently and recklessly pursuing Decedent, despite no apparent or explicit authority to do so;

(l) improperly engaging in a police vehicular pursuit;

(m) impersonating a police officer;

(n)  engaging in unlawful vigilante conduct;

(o)  operating the motor vehicle at a speed which was excessive under
       the circumstances;

(p) failing to properly and adequately operate said motor vehicle in accordance with the statutes and regulations of the Commonwealth of Pennsylvania with respect to the proper operation of motor vehicles on public thoroughfares.

140.    As a result of Defendant Bove's negligence and/or recklessness, Plaintiffs' Decedent sustained catastrophic and fatal injuries Plaintiffs sustained damages as set forth in the foregoing paragraphs of this Complaint, and claim all damages available pursuant to the provisions of the Pennsylvania Wrongful Death Act, 42 Pa. C.S.A. §8301.

141.    Pennsylvania Courts have adopted Restatement (Second) of Torts § 908 for the law of punitive damages.

142.    The Restatement allows for an award of punitive damages for conduct that is "outrageous because of the defendant's evil motive or his reckless indifference to the rights of others."

143.    At the time of Decedent's fatal injury, Defendant Bove was recklessly engaging in a police vehicular pursuit, and had actually taken the lead in that pursuit, bearing down on the Decedent's motorbike while utterly and knowingly disregarding the clear risk of bodily injury or death, and actively placing the Decedent in mortal fear for his life with the aggressiveness of his inexplicable pursuit, which Bove lacked any legal authority to engage in.

144.    The facts and circumstances of this incident, combined with Bove's absolute lack of legal authority to engage in the aforesaid conduct, clearly exhibit a reckless indifference to the safety of others upon the roadway which rises to the level necessary to impose punitive damages pursuant to section 908(2) of the Restatement (Second) of Torts, and represents a factual scenario where the circumstances of the incident itself are sufficient to establish recklessness or wanton misconduct without any showing of specific intent to injure.

145. The conduct of Defendant Bove in this regard, such conduct having caused injuries to the Plaintiffs' Decedent as set forth herein, constitutes conduct that was malicious, wanton, reckless, willful, outrageous and oppressive and with reckless indifference to the rights, interests and safety of Plaintiffs' Decedent.

WHEREFORE, Plaintiffs Neal Miller and Donna Miller, individually and as co-Administrators of the Estate of Ryan Miller, a Minor, Deceased, demands judgment against all Defendants individually and/or jointly and severally, for compensatory and punitive damages in excess of $150,000, together with interest and costs thereon.

Respectfully submitted,

FLAGER & ASSOCIATES, P.C.


By:    /s/ Michael S. Levin
       Attorney ID No. 78463
       1210 Northbrook Drive, Suite 280
       Trevose, PA 19053
       Tel: 215.953.5200
       michael@flagerlaw.com