1        IN THE UNITED STATES DISTRICT COURT
2      FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3                    -   -   -

4  NEAL MILLER and DONNA        :
   MILLER, individually and     :
5  as Administrators of the     :
   Estate of RYAN MILLER        :
6                               :
                                :
7           Plaintiffs          :
                                :
8         -v-                   :
                                :
9                               :
   CITY OF PHILADELPHIA,        :
10 et al.                       :
                                :
11                              :
                                :
12                              :
           Defendants          : No. 2:20-cv-06301-ER
13                    -   -   -

14           Friday, May 12, 2023

15                    -   -   -

16      Oral Deposition of OFFICER JOSEPH WOLK,

17 via Zoom Videoconference, at 10:11 a.m. on the above

18 date, before Julie A. Damiani, Professional Reporter

19 and Notary Public for the Commonwealth of

20 Pennsylvania.

21

22

23

24

```
 1    A P P E A R A N C E S   V I A   Z O O M:

 2

 3

 4         FLAGER & ASSOCIATES, P.C.
           BY:  MICHAEL S. LEVIN, ESQUIRE
 5         One Northbrook Corporate Center
           1210 Northbrook Drive, Suite 280
 6         Trevose, Pennsylvania  19053
           215.953.5200
 7         michael@flagerlaw.com

 8         Representing the Plaintiffs

 9

10

11

           CITY OF PHILADELPHIA
12         LAW DEPARTMENT
           BY:  DEREK R. KANE, ESQUIRE
13         One Parkway, 14th Floor
           1515 Arch Street
14         Philadelphia, Pennsylvania  19102
           215.686.1774
15         derek.kane@phila.gov

16         Representing the Defendant,
           City of Philadelphia
17

18

19

20                   -   -   -

21

22

23

24
```

```
 1                    I N D E X

 2                      -   -   -

 3   Testimony of:  Officer Joseph Wolk

 4

 5                                      PAGE

 6   By Mr. Levin                         4

 7   By Mr. Kane                        138

 8

 9

10

11                   -   -   -

12            E X H I B I T S

13                   -   -   -

14   NUMBER           DESCRIPTION        MARKED

15   WOLK-1           Documents          46

16   WOLK-2           Conclusion         60

17   WOLK-3           Statement          92

18   WOLK-4           Statement          92

19   WOLK-5           Statement          97

20   WOLK-6          Directive 9.4       109

21   WOLK-7      Performance Reviews     115

22   WOLK-8       Transfer Requests      121

23                   -   -   -

24
```

Deposition of Officer Joseph Wolk                    Neal Miller and Donna Miller v. City of Philadelphia, et al.

Page 4

1     (It is hereby stipulated and
2 agreed by and between counsel for
3 respective parties that reading, signing,
4 sealing, certification and filing are
5 waived and that all objections, except as
6 to the form of the question, be reserved
7 until the time of trial.)
8     - - -
9     OFFICER JOSEPH WOLK, after having
10 been first duly sworn, was examined and
11 testified as follows:
12     - - -
13 BY MR. LEVIN:
14     Q.    Good morning, Officer.  My name is
15 Michael Levin.  We had a very brief opportunity
16 to meet before going on the record, but I'm the
17 attorney for the plaintiffs in this case.  I've
18 asked you to come in for your deposition because
19 you were involved in the incident which forms the
20 basis for this case.
21     Before we begin -- I know you've
22 given depositions in the past, but I just want to
23 go over a couple brief instructions.  First, I
24 don't know if the last one you gave was by this

Page 5

1 platform, but we're doing this by Zoom.  Even in
2 a regular deposition, one of the things that you
3 want to do is only have one person speaking at a
4 time so the court reporter can take down
5 everything that's said.
6     Even more important here when
7 we're sort of relying on technology which goes a
8 little wonky from time to time as well.  So,
9 please let me finish my question before giving
10 your answer.  Conversationally, we sort of step
11 on each other all the time.  But for Julie to do
12 her job, we need to each stay in our lane while
13 the other is speaking.
14     A.    I understand.
15     Q.    If for any reason I ask you a
16 question and you don't understand it -- I mean, I
17 think most of this stuff is kind of
18 straightforward, but I'll be glad to repeat it or
19 rephrase it.  I don't want you to answer anything
20 that you don't understand.
21     All right?
22     A.    Yes, sir.
23     Q.    If for any reason you need to take
24 a break -- I'm going to make a concerted effort

Page 6

1 to be as direct and as quick as I can.  That
2 being said, we have some ground to cover.  So, if
3 you need to take a break, I'd be glad to
4 accommodate that at any time.  The only thing I'd
5 ask is, don't leave a question hanging.  If I've
6 asked a question, answer that, and we can take a
7 break.
8     All right?
9     A.    Yes, sir.
10     Q.    Thanks very much, sir.
11     Can you, please, state your full
12 name for the record?
13     A.    Police Officer Joseph Wolk; Badge
14 6734.
15     Q.    And you are a police officer with
16 the Philadelphia Police Department?
17     A.    That's correct.
18     Q.    And is Philadelphia the only
19 police department you've worked in
20 professionally?
21     A.    Yes.
22     Q.    Could you take me through your
23 history in the department, starting with when you
24 went to the police academy?

Page 7

1     A.    I went to the police academy in
2 March 26, 1990.  Graduated in August of '90.  For
3 two months, I was assigned to Center City
4 District, worked the foot beat for approximately
5 two months.  Then I was transferred --
6     Q.    I don't mean to jump in, but did
7 you say you were on foot beat?
8     A.    Foot beat for two months, that's
9 correct, in Center City.
10     Q.    Okay.  Go ahead.
11     A.    After that, I went to the 25th
12 District for a few weeks, and then I switched
13 with another officer and went to the 26th
14 District shortly after there up until December of
15 1997, I was in the 26th District.  From 1997
16 until currently, I'm in the Highway Patrol.
17     Q.    Okay.  What do your duties as a
18 Highway Patrol officer generally entail?
19     A.    Originally when I was there --
20 when I originally was there, it was 95 and the
21 Schuylkill was covered by us.  Then we also had
22 what's called the line squad, which we had a
23 squad of guys which I was in to work in high
24 crime areas, to try to deter crimes, make arrests

Page 8

when warranted, and do traffic violations.

I only worked interstates when the senior guys were on vacation, so it wasn't a whole lot of time on 95 or the Schuylkill. We were also, Highway Patrol, we do a lot of dignitary protection when the president comes in or the vice president on our motorcycles. And kind of authority person comes in, we do like an escort service. We also do police officer or fireman's funerals, and also retired officer's funerals, also. I do a lot of that now.

Q.    Have you ever been a motorcycle officer during the time that you've been on Highway Patrol?

A.    Almost the entire time being there, that's correct.

Q.    In this particular incident, -- and I know one other that was recently litigated -- you were driving SUVs though?

A.    Yes.  We're assigned a police motorcycle, and we have a radio patrol car, also.  The motorcycle is used for details to and from work, to and from court.  We don't use the motorcycle to patrol.

Page 9

Q.    Okay.  So, on a normal day-to-day basis when you're doing patrols, what are you usually occupying?

A.    The radio patrol car.

Q.    Okay.  In anticipation of your testimony today, have you reviewed any of the documents associated with the case?

A.    I have.

Q.    What have you reviewed?

A.    The AID Report and the Internal Affairs Report.

Q.    When you're referring to the Internal Affairs Report, I know there's a narrative section and a whole bunch of attachments.

Did you review the attachments as well or just sort of the narrative section through the conclusion?

MR. KANE:  Objection to form.  You can answer.

THE WITNESS:  Are you trying to say the whole entire report, did I read it?

MR. LEVIN:  Yes.

Page 10

THE WITNESS:  Yes, I read the whole report.

BY MR. LEVIN:

Q.    All right.  And have you given testimony in civil matters previously?

A.    Yes.

Q.    About how many times?

A.    Twice.

Q.    Not including this?

A.    Yes.

Q.    One of those was the McKenna matter that recently resolved?

A.    Yes.

Q.    And what was the other?

A.    It was an arrest I made; impounded the car.  The male, through court, was found not guilty.  The case was thrown out, and his car was never returned; it was sold at auction.  He wanted to be repaid for his car, his losses.

Q.    And around when did that occur?

MR. KANE:  You mean the lawsuit, Michael?

MR. LEVIN:  Yes, yes.

MR. KANE:  You can estimate.

Page 11

THE WITNESS:  I would say it was approximately about five years ago, maybe.

BY MR. LEVIN:

Q.    Do you remember the name of the plaintiff in that case?

A.    I don't.

Q.    Fair enough.  I'm assuming in connection with your duties, you've probably given testimony in a bunch of criminal cases, correct?

A.    Yes.

Q.    And testimony in any of those cases, have any of those cases also involved vehicular pursuits?

A.    Vehicular pursuits?  If there were cases like that, where I made an arrest?

Q.    Yeah.  Cases where there was a vehicular pursuit, there was an arrest and charges, and there was later testimony in regard to that?

A.    I would say yes.

Q.    Okay.  Could you estimate, maybe, how many times that's occurred?

Page 12

1    A.    I couldn't estimate that, no.
2    Q.    Okay.  Do you have any type of
3  estimate of how many vehicular pursuits you've
4  been involved in as a police officer over the
5  years?
6    A.    I do not, no.
7    Q.    Do you think it's more or less
8  than ten?
9    A.    Thirty-three years on the job, I
10 would say around ten, maybe.
11   Q.    Okay.  Fair enough.  Again, these
12 are all sort of estimates.  I'm just trying to
13 get a sense.
14   A.    I understand.
15   Q.    Now, this case is Section 1983
16 case, which I'm assuming you know what that is,
17 and I know that the McKenna case was as well.
18         I saw that there was also another
19 case filed over the past couple of years;
20 plaintiff's name was Ward.  It also appears to
21 have been a civil rights case.
22         Do you recall that matter?
23   A.    Ward?
24   Q.    W-A-R-D.

Page 13

1    A.    I don't recall.
2    Q.    Maybe just to refresh your
3  recollection, I looked over the complaint.  The
4  allegation was basically malicious prosecution,
5  fabrication of evidence.  The person ended up
6  doing some time for a narcotics conviction.
7         Do you recall something like that?
8    A.    I do not know that one, no.
9    Q.    Okay.  Now, more recently, and I
10 guess, overlapping with when this incident
11 happened, you were named in another Section 1983
12 case where it concerned an individual named
13 Bailey McKenna.
14         Do you recall that case?
15   A.    Yes.
16   Q.    Just broadly speaking, there was
17 the pursuit of some, I guess, dirt bike or ATV
18 riders along Torresdale Avenue or thereabouts,
19 and eventually there was a collision between
20 Bailey McKenna's dirt bike and your vehicle?
21         MR. KANE:  Objection to form.  You
22    can answer.
23         THE WITNESS:  Yes.  It was not
24    involving the one pursuing.  It was after

Page 14

1  the fact.  When I was making a turn,
2  Bailey McKenna's dirt bike hit the side
3  of my vehicle while he was doing a
4  wheelie.
5  BY MR. LEVIN:
6    Q.    Do you know if there was an
7  Internal Affairs investigation connected to that
8  incident?
9    A.    Yes.
10   Q.    And did Internal Affairs find that
11 there was any type of violation of department
12 policy that you had committed in connection with
13 that incident?
14   A.    Yeah.  I think it was -- I believe
15 the original job was the pursuit of the
16 motorcycle operator, and I did not go over the
17 police radio with that pursuit.
18   Q.    And was there any type of finding
19 that the pursuit was itself a violation of
20 policy; it wasn't justified or anything of that
21 nature?
22   A.    I don't recall.
23   Q.    What you do recall is they found
24 that the policy was violated, and that you were

Page 15

1  supposed to call in the pursuit and didn't; is
2  that correct?
3    A.    Yes.
4    Q.    Was that, in fact, the case?  It
5  wasn't called in?
6    A.    This was not called in, that's
7  correct.
8    Q.    Now, just briefly -- and I
9  understand your contention is that you were
10 disengaged from the pursuit and were making a
11 left turn afterwards when the collision with the
12 McKenna vehicle happened, correct?
13   A.    It was minutes after the original
14 pursuit.  I was back on patrol making a left-hand
15 turn.
16   Q.    Okay.  And leading up to that
17 left-hand turn, hadn't your vehicle been
18 traveling northbound in the southbound travel
19 lane on Torresdale?
20         MR. KANE:  Objection to form.  You
21    can answer if you can.
22         THE WITNESS:  Can you repeat the
23    question?
24

Page 16

BY MR. LEVIN:

Q.    Immediately prior to when you initiated that turn, when you said you were making the turn, you said you were getting something to eat?  Is that what your plan was?

A.    Yeah.  We were back on patrol, and my statement was to my partner, Let's get something to eat.  We were driving down the street, we made a left-hand turn eastbound onto Howell Street, and then --

Q.    Leading up to the point where you made that turn, hadn't your police vehicle been traveling northbound in the southbound travel lane of Torresdale Avenue?

A.    No.  I was traveling southbound on Torresdale Avenue and made a left turn eastbound onto, I believe it was Howell Street.

Q.    And that's at the point where the McKenna vehicle collided with you, correct?

A.    That's correct.

Q.    Is it fair to say had it not been for that turn, that vehicle probably wouldn't have collided with you?

        MR. KANE:  Objection to form.  You

Page 17

can answer.  It's speculative, but you can answer.

        THE WITNESS:  Repeat the question again?  I'm sorry.

BY MR. LEVIN:

Q.    Well, my understanding is you made a turn, and his path of travel took him right into the side of your vehicle; is that correct?

A.    I made my turn and he was in the bike lane.  I was almost immediately through the intersection into the crosswalk area where he, on video, was on a wheelie and struck the side of my vehicle.  That's correct.

Q.    What I was asking is, but for the fact of that turn, the collision likely would not have occurred, right?  If you hadn't made the turn, your vehicle wouldn't have been where it was and he wouldn't have struck it, correct?

        MR. KANE:  Objection to form.

        THE WITNESS:  I guess so.

BY MR. LEVIN:

Q.    And the allegation in the lawsuit -- and I know you disputed it -- was that that was an intentional maneuver on your part,

Page 18

correct?

        MR. KANE:  Objection to form.  You can answer.

        THE WITNESS:  Repeat the question again?  I'm sorry.

BY MR. LEVIN:

Q.    The allegation the plaintiffs were making in that lawsuit -- and I know it's not your position, but the allegation was that the maneuver that resulted in that collision was an intentional one, correct?

        MR. KANE:  Objection to form.  You can answer.

        THE WITNESS:  Yes.

        MR. LEVIN:  I'm trying to sanitize it as much as I can.

        THE WITNESS:  I understand.

BY MR. LEVIN:

Q.    I don't want to re-litigate that case.  You know, it's not the same situation here, but there is a couple superficial or maybe more than superficial similarities, so I wanted to touch base.  Again, I'm not re-litigating that case.  I'm trying to keep this to what we can

Page 19

agree on, you know?

A.    I understand.

Q.    Very good.

        And that case was recently resolved some time in the past year?

A.    Yes.

Q.    And you have no recollection of being named in this other thing, the Ward case?

A.    I do not know.

        MR. KANE:  I don't want to participate, but I think that could be the prior case he mentioned.

        MR. LEVIN:  I'm going to bring up the document.  I'm going to try and share my screen.  Bear with me for just a moment.  I may have to do this on the Cloud or off the Cloud.  We'll see.

        MR. KANE:  Off the record.

        (At this time, a discussion was held off the record.)

BY MR. LEVIN:

Q.    Can you see the document I have up on the screen or no?

        MR. KANE:  No.  You have your File

Page 20

1  Explorer open right now.  We see a list
2  of documents.  We can see it now.
3  BY MR. LEVIN:
4      Q.    So, what I'm showing is just the
5  first page that contains the caption, and it
6  looks like this was filed in November of 2021.
7      So the plaintiff's name is Joseph
8  Ward, and the listed defendants are Police
9  Officer Stanley Davis and you.
10      Would you agree with that?
11     A.    If I can cut in, I did receive a
12  copy of that.  On that report, Stanley Davis was
13  assigned to narcotics, asked us to stop somebody,
14  and he was arrested.  We just transported him.
15  That's probably why I was never called for this.
16  I made the arrest for Officer Davis.  I was never
17  brought up in this.  I seen the copy was served
18  to me, but I never was called to court or
19  testified or anything like this.
20      MR. KANE:  Just wait for a
21  question, Officer.
22      THE WITNESS:  Okay.
23  BY MR. LEVIN:
24      Q.    The allegations at least in the

Page 21

1  case seem to be that there was some type of
2  malicious prostitution or fabrication of evidence
3  that led to Mr. Ward being convicted and
4  basically alleged that it was a wrongful
5  conviction.
6      One of the other allegations in
7  the complaint, and I wanted to ask you, indicates
8  that the codefendant, Stanley Davis, was himself
9  arrested and charged with possession of heroin
10  and some other related stuff.
11      Do you have any knowledge of that?
12     A.    Yes.
13     Q.    Is that accurate?
14     A.    I believe so.
15      MR. KANE:  Objection to form.  You
16  can answer.
17      THE WITNESS:  Yes.
18  BY MR. LEVIN:
19     Q.    The other allegation is that --
20  well, that concerns him.  I don't want to get too
21  deep into the weeds with that.
22      But you didn't have to appear in
23  court or for a deposition or anything of that
24  nature?

Page 22

1      A.    No.
2      Q.    Did you ever have to go as far as
3  answering written questions like interrogatories?
4      A.    Nothing like this, no.
5      Q.    Do you know if this was eventually
6  settled or dismissed?
7      A.    No knowledge of that whatsoever.
8      Q.    Fair enough.  I'll take that down.
9      So, fair to say the McKenna matter
10  was resolved.  You don't know as far as the Ward
11  case because other than service of process,
12  nothing on your end, correct?
13     A.    That's correct.
14     Q.    And then there's this case, so
15  that's three separate 1983 cases in the past six
16  years.
17      Have any of those cases resulted
18  in professional discipline being imposed on you
19  in any way?
20      MR. KANE:  Objection to form.  You
21  can answer.
22      THE WITNESS:  To Ward, nothing on
23  that.  It had nothing to do with me.
24  McKenna was -- I think it was two day's

Page 23

1  suspension for McKenna, I think it was.
2  BY MR. LEVIN:
3      Q.    And who imposes that?  Is that the
4  Police Board of Inquiry?
5      A.    Yeah, I believe it's Internal
6  Affairs and goes up the chain of command.  It's
7  something that they decide.
8      Q.    Since the date of the McKenna
9  incident until today, has your duty status being
10  affected at all as a result of any of these
11  incidents?
12     A.    No.
13     Q.    After graduating the police
14  academy way back when, have you had any ongoing
15  continuing education?  Like lawyers do continuing
16  legal education.  Do you have anything of that
17  nature?
18     A.    No.  We have only our
19  state-mandated classes every year, through the
20  state, legal updates, which are First Aid, CPR,
21  and the shooting range.
22     Q.    Have you attended any type of
23  seminars for professional development, anything
24  of that nature, additional training of that sort?

Deposition of Officer Joseph Wolk                    Neal Miller and Donna Miller v. City of Philadelphia, et al.

Page 24

1    A.    Not off the top of my head right
2  now.  There's a few classes I went to:  Drug
3  addiction way back when, outlaw motorcycle
4  training and all that stuff, but through the
5  years.
6    Q.    Okay.  Let's turn to this
7  incident, which I believe was May 7, 2019.  At
8  some point during the early part of your shift
9  that evening, you encountered Ryan Miller on his
10 scooter, correct?
11   A.    That's correct.
12   Q.    When did you first see Ryan
13 Miller?
14   A.    I was traveling eastbound on
15 Bridge Street, and Mr. Miller was traveling
16 westbound on Bridge Street towards Tacony Street.
17   Q.    So, he was going westbound and
18 heading towards Tacony Street, so that's, like,
19 right by The Arsenal, right?
20   A.    Yes, sir.
21   Q.    And you said you were westbound on
22 Bridge Street, where westbound on Bridge Street?
23   A.    I was eastbound; he was westbound.
24   Q.    Oh, I'm sorry.

Page 25

1    A.    That's okay.
2    Q.    Where eastbound?
3    A.    Just passing Tacony Street.
4    Q.    So, you're sort of both on the
5  same side of Tacony at that point, correct?
6    A.    We were both on the east side of
7  Tacony Street, that's correct.  He's in the
8  westbound lanes; I'm in the eastbound lanes.
9    Q.    Okay.  Do you know if he was in a
10 right turning lane at the first time you saw him?
11   A.    I don't recall.  He went past.  I
12 just caught a blur of the motor scooter going by.
13 I looked in my mirror and seen there was no tag
14 assigned to it; he wasn't wearing a helmet.  I
15 made a U-turn with lights and sirens.
16   Q.    Is a helmet mandatory for those?
17   A.    Yes.
18   Q.    You made the U-turn, activated
19 lights and sirens.  I assume by the time that you
20 had done that, he had already gone onto Tacony,
21 turned north to go onto Tacony; is that correct?
22   A.    That's correct.
23   Q.    After you made the U-turn, you
24 followed as well, correct?

Page 26

1    A.    Yes.
2    Q.    Now, from what I understand from
3  at least your initial statement, at some point
4  after you did that, you're on Tacony, lights and
5  sirens activated; he fails to pull over, correct?
6    A.    That's correct.
7    Q.    You stated -- I think this is post
8  statements that you made -- that he had gone into
9  the opposing lanes of travel, the southbound
10 lanes, on Tacony?
11   A.    He did.  He drove going northbound
12 into southbound lanes.
13   Q.    Now, when he did that, was he
14 going around traffic that was ahead of him in the
15 northbound lanes?
16   A.    No.  There was no one in front of
17 him.
18   Q.    Do you have any sense of why he
19 did that?  Was it just to evade you?
20     MR. KANE:  Objection to form.  You
21 can answer.
22     THE WITNESS:  I have no idea.
23 BY MR. LEVIN:
24   Q.    You seem to indicate in your

Page 27

1  initial statement, I think to AID, that you
2  thought he might have either been suicidal or
3  intoxicated.
4    What specifically, other than just
5  the aggressive maneuver, made you think that?
6    A.    It wasn't an aggressive movement;
7  he just -- with no cars in front of him, the
8  reason why he traveled in a wrong path of
9  traffic, which traffic goes 45, 50 miles an hour,
10 I had no idea what he was doing.  Was he under
11 the influence?  Was he suicidal?  I couldn't wrap
12 my head around why he was traveling in them
13 lanes.
14   So, really when you're talking
15 about those two things, it's sort of speculation,
16 but what you were really doing is, why is he
17 doing that?  That's what's going through your
18 mind?
19     MR. KANE:  Objection to form.  You
20 can answer.
21     THE WITNESS:  Yes.
22 BY MR. LEVIN:
23   Q.    Now, when he did that, was he
24 headed directly towards any oncoming traffic or

Deposition of Officer Joseph Wolk                    Neal Miller and Donna Miller v. City of Philadelphia, et al.

Page 28

1  was traffic a little ways further down the road?
2      A.     Well, when he's traveling
3  northbound in the southbound lanes, there's a
4  curve past Fraley Street, a blind curve on State
5  Road -- State Road comes around.  State Road and
6  Tacony, they change the name several times.
7          But anyway, there was no one
8  traveling towards him, but I know he was
9  traveling up into that blind spot.  So, with
10  that, I accelerated and put my lights and sirens
11  on to warn the traffic to try to get to that turn
12  before he did to avoid a collision.  Maybe they
13  would see me and slow up before a collision might
14  occur.
15      Q.     Okay.  Now, the curve that you're
16  referring to, -- I'm kind of familiar with the
17  area -- is that where the Dietz & Watson plant is
18  located now?
19      A.     Yes.  It would be south of there,
20  yes, just shortly south of there.
21      Q.     But close by to where that is as
22  opposed to the turn around near the Tacony
23  Bridge?
24      A.     Oh, yes.

Page 29

1      Q.     Because I knew that you had made a
2  reference to a blind turn, so I wasn't sure
3  exactly which one.  So, he's going northbound in
4  the southbound lanes.
5          Does he ever get back into the
6  correct lanes of travel before the chase goes
7  sort of down Fraley Street?
8      A.     No.
9      Q.     You had managed to get your
10  vehicle ahead of where his was at some point?
11      A.     Yes, I did.
12      Q.     Approximately where in the roadway
13  were you?  Your best estimation when that
14  occurred.
15      A.     I was almost at the curve.  I
16  could see oncoming traffic, and I looked in my
17  mirror and seen Mr. Miller making the U-turn and
18  then going in the right path of traffic being
19  southbound.
20      Q.     And when you were able to see
21  oncoming traffic, was that traffic still a ways
22  away or was it difficult for you to execute the
23  U-turn?
24      A.     It had to be a ways away because I

Page 30

1  made the U-turn no problem.  I didn't have to
2  wait for cars to go by.
3      Q.     Okay.  So, now you're both
4  traveling southbound again in the southbound
5  lanes on Tacony, correct?
6      A.     That's correct.
7      Q.     Which street did he depart from
8  Tacony on?
9      A.     He was a little ahead of me, and
10  he made a right turn onto Fraley Street from
11  Tacony.
12      Q.     Okay.  And you pursued him,
13  correct?
14      A.     I caught up to him.  He made a
15  left onto southbound James Street, which is the
16  first street.  He made a left there.  I caught up
17  to him then and had lights and sirens on.
18      Q.     Okay.  So, when you turn onto
19  Fraley Street, there's an overpass kind of bridge
20  that you pass under?
21      A.     Yes, that's I-95.  That's correct.
22      Q.     And the first street that you come
23  to when you come out on the other side of that is
24  James Street, right?

Page 31

1      A.     That's correct.
2      Q.     And am I correct that at that
3  point, that's like a T-intersection?  Like James
4  Street doesn't go across on both sides?
5      A.     That's correct.
6      Q.     In fact, the neighborhood that
7  this pursuit sort of occurred in, it sort of
8  encapsulated in a small area; wouldn't that be
9  fair to say?
10          MR. KANE:  Objection to form.
11          THE WITNESS:  Yes, it's real small
12      and narrow back there.  The streets are
13      real small; the blocks are real small.
14  BY MR. LEVIN:
15      Q.     And it doesn't really connect up
16  with the larger grid, right?  There's only a
17  couple ways in or out?
18      A.     Yes.  I think from Fraley and I
19  think from Beasley Street to get back there, yes.
20  It's a little pocket back there, a square pocket.
21      Q.     Does Scattergood cut through to
22  Tacony?
23      A.     No.
24      Q.     No.  Okay.

Page 32

So, in any event, we've gotten to the point now where both vehicles go up Fraley; he makes a left turn onto James Street.

How close or how far are you traveling behind him at that point?

MR. KANE:  At which point, Michael?

MR. LEVIN:  At the point where you're turning onto James Street.

THE WITNESS:  When I turn onto James Street, he's probably about, I would say, 25 feet in front of me, 30 feet, estimating.

BY MR. LEVIN:

Q.    And then, if I'm correct, not long after, you both get onto James Street, he makes another turn, a right turn down one of the smaller streets that come off of James?

A.    Yes.  When you make a turn off of Fraley onto James, it's another quick right turn onto Simon Street, that's correct.

Q.    That's Simon?

A.    Yes.

Q.    And is that the street that he

Page 33

turned onto?

A.    Yes, sir.

Q.    Do you know, as he went down Simon Street, is that a one or a two-way street?

A.    I believe all the streets on there are two-way.  It's a one lane path street, but I think they're all two-way.  I'm not a hundred percent sure.

Q.    All right.  They're all small streets, that's why I'm asking.

A.    Yes.

Q.    I think we have video -- well, it depicts both from James and Fraley, both sort of this segment of the pursuit as well as right before the end.  So, I'm going to try and bring that up.  Bear with me.

I'm going to preface this --

MR. KANE:  We can't see the video, Michael.  We're seeing the File Explorer; we're not seeing the video.  Off the record.

(At this time, a discussion was held off the record.)

Page 34

BY MR. LEVIN:

Q.    I'm going to preface this, as you can probably see from the still that we're looking at, this is video shot of the video playing on a monitor.  There's some chatter of people talking in the beginning, but that's not anything that you're going to be questioned about.  Just try to remember that.

A.    Okay.

(At this time, the video is being played.)

MR. KANE:  Just for the record, the video appeared to me to be a little bit choppier, I think, than how it appeared to you, Michael.

MR. LEVIN:  Oh, okay.  Let me see if I can go back.  Maybe it was just the way it was playing back.

BY MR. LEVIN:

Q.    Were you able to see that?

A.    Yes, but it was in fragments.  It's a little choppy.

Q.    The motion of it looks choppy as you're watching it?

Page 35

A.    Yes.

Q.    But were you able to basically see the vehicles and the progress through the area depicted in the screen?

A.    Yes.

Q.    Would you agree that's the portion of the pursuit that we've been talking about for the past couple of minutes?

MR. KANE:  Objection to form.  You can answer.

THE WITNESS:  When I was trying to stop him, that's correct.  That's Fraley and turning onto James Street.

BY MR. LEVIN:

Q.    Okay.  So, that's right after the vehicles had exited off of Tacony and before it sort of goes through that neighborhood, right?

A.    That's correct, sir.

Q.    Okay.  Now, as you were turning onto, I believe you said it was Simon, it seems you were pretty close up behind the rear of the scooter; less than the 25 feet you mentioned before; is that fair to say?

MR. KANE:  Objection to form.  You

Deposition of Officer Joseph Wolk                                    Neal Miller and Donna Miller v. City of Philadelphia, et al.

Page 36

1   can answer.
2          THE WITNESS:  From the angle of
3   the camera, maybe a little shorter.
4   BY MR. LEVIN:
5      Q.    Okay.  At any point during that
6   sequence of events -- and when I say that
7   sequence of events, from the turn onto James
8   Street and up Simon, were you trying to get up
9   beside Ryan's scooter?
10      A.    No.
11          MR. LEVIN:  I'm going to take this
12   down.  We'll come back to that later.
13   BY MR. LEVIN:
14      Q.    So, two vehicles, from where we
15   see the video cutoff on that segment, both head
16   westbound down Simon.
17          That leads straight up to Eadom;
18   is that correct?
19      A.    It does.
20      Q.    Which way did the scooter turn
21   onto Eadom?
22      A.    Left, which would be southbound.
23      Q.    Now, a little bit further down on
24   Eadom, is there a self-storage facility located

Page 37

1   there?
2      A.    I believe so.
3      Q.    And there's, like, a lot outside
4   that?
5      A.    I believe so.
6      Q.    Now, the vehicles both went down
7   that far on Eadom, at some point, when you were
8   heading down at that point, correct?
9      A.    Yes.
10      Q.    Now, as you're going down Eadom,
11   did you manage to bring your vehicle up beside
12   Ryan's scooter?
13      A.    On the video, it shows he's next
14   to my vehicle, that's correct.
15      Q.    Okay.  And at that point, you seem
16   to execute a move, like a turn or, you know,
17   veering off to the right in the direction of the
18   scooter.
19          Do you recall doing that?
20          MR. KANE:  Objection to form.  You
21   can answer.
22          THE WITNESS:  No, I don't remember
23   that.
24

Page 38

1   BY MR. LEVIN:
2      Q.    The scooter goes into that parking
3   lot?
4      A.    That's correct.
5      Q.    And it had to turn pretty sharp
6   right to do that from where it was in the
7   roadway?
8      A.    I don't recall that.
9      Q.    You followed into the parking lot
10   as well?
11      A.    I'm not sure if I turned in or he
12   turned in, or I turned into the parking lot
13   somewhere.
14      Q.    But you did turn into the parking
15   lot at some point though, correct?
16      A.    Yes.
17      Q.    And he had turned around to go
18   basically out of the parking lot down the other
19   way, northbound down Eadom?
20      A.    The video shows that, but I did
21   not see him coming back out of it.  I lost sight
22   of him for a few seconds until I noticed him
23   coming back out.
24      Q.    Okay.  And he was on a scooter,

Page 39

1   which is probably a little bit more maneuverable
2   than your SUV, right?
3      A.    Yes.
4      Q.    So, he was able to make that
5   turnaround quicker than you were to, right?
6      A.    Yes.
7      Q.    He eventually goes back, and at
8   this point, it's northbound down Eadom.  You came
9   out of the lot and followed him?
10      A.    Yes.
11          MR. LEVIN:  I'm going to try to
12   play video of that, and we'll see how it
13   goes.
14   BY MR. LEVIN:
15      Q.    I'll represent to you that this is
16   video that was recovered, I believe, from the
17   storage facility.  And I will state for the
18   record, I know that there is -- I don't know if
19   this is the identical video, but there is
20   substantially similar video that was referenced
21   in the IAD report that you reviewed.
22          With that being said, let me play
23   this for you.  You'll see yourselves coming in
24   from the far left of the screen.  Bear with me.

Deposition of Officer Joseph Wolk                    Neal Miller and Donna Miller v. City of Philadelphia, et al.

Page 40

1    (At this time, the video was being
2  played.)
3  BY MR. LEVIN:
4    Q.    Were you able to see that okay?
5    A.    Yes.
6    Q.    Now, you would agree that at some
7  point you see the two vehicles coming in on the
8  left side of the screen in this video?
9    A.    Yes.
10    Q.    Did you see the rightward maneuver
11  that your vehicle took when it was next to Ryan's
12  scooter?
13    MR. KANE:  Objection to form.  You
14  can answer.
15    THE WITNESS:  It played really
16  fast.  I really couldn't see it.  It
17  wasn't playing at regular speed.  I
18  couldn't see.
19  BY MR. LEVIN:
20    Q.    Would you like to see it again?
21    A.    Yes.  Okay.  I can see it now.
22    Q.    Now, looking at where we have it
23  frozen, it looks like you're up beside -- maybe
24  even the front of your vehicle is a little ahead

Page 41

1  of the scooter; is that fair to say?
2    A.    It appears from the angle of the
3  video, yes.
4    Q.    I'm going to try to take this in
5  little increments, but it's difficult to do.  Try
6  to stay with me.
7    Now, at the point where I stopped
8  it, you see where your vehicle starts to veer off
9  to the right, and it looks like Ryan's does as
10  well?
11    MR. KANE:  Objection to form.
12    THE WITNESS:  It appears both of
13  us are turning simultaneous at the same
14  time.
15  BY MR. LEVIN:
16    Q.    Okay.  From this point, I'll just
17  play it through, but it looks like Ryan goes into
18  the lot, turns around, heads back down the way he
19  came on Eadom, and it appears that you actually
20  start to go into the lot but actually back out
21  and turn around.
22    Let's see if that's correct after
23  we watch it.  Do you see where I'm referring to?
24    A.    Yes, sir.

Page 42

1    Q.    Okay.  Obviously, that's a
2  recording of the event.  Is that how you remember
3  that happening?
4    A.    Yes.
5    Q.    Okay.  So, both of you are heading
6  back down Eadom at that point.
7    Now, when you made that sort of
8  right when you're right next to the scooter, does
9  that involve any risk that there might be a
10  collision between the two vehicles?  The scooter
11  was traveling straight up until that point in
12  time, it seems.
13    MR. KANE:  Objection to form.
14    THE WITNESS:  It appears that he's
15  next to me, but we simultaneously turned
16  at the same time.  He turned even a bit
17  before me.  I couldn't see who turned
18  first.
19  BY MR. LEVIN:
20    Q.    Now, were you able to see where he
21  was in relation to you at the time when you
22  initiated that turn maneuver?
23    A.    He was over to my right and
24  turning into the lot, that's why I turned.

Page 43

1    Q.    Okay.  Is it your testimony that
2  he started to turn first and then you followed,
3  as opposed to him turning right to avoid you?
4    A.    He just turned into the lot.
5    Q.    Okay.  Now, just generally when
6  you're operating a vehicle in proximity to
7  motorcycles, motor scooters, two-wheeled vehicles
8  of that nature, those riders are somewhat more
9  vulnerable than people in passenger cars and
10  SUVs, correct?
11    MR. KANE:  Objection to form.
12    THE WITNESS:  That's correct.
13  BY MR. LEVIN:
14    Q.    In other words, there's no
15  structure surrounding them that's engineered for
16  safety; it's just them on the thing they're
17  riding, right?
18    A.    That's correct.
19    Q.    So, when you're executing a
20  maneuver in close proximity to somebody who's on
21  a scooter or motorcycle, that can involve a risk
22  of harm to the person on that vehicle, correct?
23    MR. KANE:  Objection to form.
24    THE WITNESS:  That's a weird

Deposition of Officer Joseph Wolk                    Neal Miller and Donna Miller v. City of Philadelphia, et al.

Page 44

question. Say that again.

BY MR. LEVIN:

Q.    When you're executing a turning maneuver and you're right next to somebody who's on a motor scooter or a motorcycle, something of that nature, that involves a potential for a collision between the two vehicles and injury to that rider; doesn't it?

MR. KANE:  Objection to form and -- objection to form.  You can answer.

THE WITNESS:  Like I said, he's already made the turn before I did into the lot.  I was following.  I turned with him.  He turned and I went with him to keep an eye on him.  I'm trying to say -- the word you're trying to put it into.  I don't understand that one.

Do you want to try again?

BY MR. LEVIN:

Q.    Okay.  So, let me ask you this:  In a collision with a car or an SUV or a truck, somebody on a scooter or motorcycle is likely to suffer serious injuries, right?

Page 45

A.    Sure.

Q.    And --

MR. KANE:  Objection to form.

BY MR. LEVIN:

Q.    Notwithstanding what led up to it, that's what happened in the case with McKenna, right?  That ended up being fatal injuries, and he was on a motorcycle and collided with a car, right?

MR. KANE:  Objection to form.  You can answer.

THE WITNESS:  That's correct.

BY MR. LEVIN:

Q.    So, when you execute a sharp right maneuver directly next to Ryan's scooter, doesn't that involve a risk of harm to him?

MR. KANE:  Objection to form.  You can answer.

THE WITNESS:  Ryan was already turning into the lot when I turned.

BY MR. LEVIN:

Q.    I want to show you another document.  I'm going to represent to you -- let's see if I can bring this up.

Page 46

Do you see a document with the heading, Video Timeline?

A.    Yes.

Q.    I'm going to represent to you that this is a timeline of video that Internal Affairs had retrieved from various sources around the route of this proceeding.  One of them specifically talks about this.  I believe it's what's referred to as Camera 5 on the 5400 block of Eadom looking south.

Would you agree that's kind of the perspective that we were just looking at in the video?

A.    Yes.

Q.    Okay.

MR. LEVIN:  And just so that we can make it clear on the record, this document was previously marked Defense 000057.  We'll mark this as Wolk-1 for the deposition.

(At this time, the court reporter marked Exhibit WOLK-1 for identification.)

BY MR. LEVIN:

Q.    Per the narrative, Lieutenant

Page 47

Clowe (ph) from Internal Affairs testified the other day that he actually prepared this document after viewing the videos.

So, on that description for Camera 5 on that camera, it states that it begins at 7:15; 7:24:20, Scooter is observed southbound 5400 Eadom Street with Police SUV H14 -- which is your vehicle, right?

A.    That's correct.

Q.    -- traveling southbound 5400 Eadom on the left side of the scooter alongside the scooter; would you agree with that so far?

A.    Yes, sir.

MR. KANE:  Just to be clear, Michael, are you asking if he agrees with that you read it correctly or if --

MR. LEVIN:  That that's what happened.

BY MR. LEVIN:

Q.    I know that I can read it correctly, but is that what happened?

A.    I thought you meant what you were reading up there.  I'm sorry.  Go ahead.

Q.    All right.  I want to focus on

Page 48

this next coordinate, 7:24:22, this narrative
states, Police SUV H14, observed southbound on
5400 Eadom, veers right, forcing the scooter that
is traveling southbound on the 5400 block of
Eadom Street into the parking lot.
        That's at odds with what you just
testified to, correct?
        MR. KANE:  Objection to the form.
        THE WITNESS:  That's speculation
    of what the camera says.  I wouldn't
    force my vehicle into a motorcycle or a
    motor scooter.  I turned into the parking
    lot as he turned into the parking lot.
BY MR. LEVIN:
    Q.    Okay.  So, whereas this is
characterized by Lieutenant Clowe as you veering
right forcing the scooter over, it's your
testimony that he turned and you were just
following him?
    A.    He turned into the parking lot
which I turned also in.  I would not put my
vehicle in front of a moving scooter like that.
    Q.    And why not?
    A.    It would cause serious bodily

Page 49

injury.
    Q.    Now, at no point during this
pursuit did you lose control of your vehicle,
correct?
    A.    I did not.  That's correct.
    Q.    You were in conscious control of
the SUV the entire time?
    A.    Yes.
    Q.    Can we agree that as a law
enforcement officer, you can't use excessive
force during the apprehension of a citizen for a
violation of the Motor Vehicle Code?
    A.    Absolutely.
    Q.    Can we agree that the use of
excessive force would include ramming a police
vehicle into a citizen in order to detain or
apprehend that citizen?
        MR. KANE:  Objection to form.  You
    can answer.
        THE WITNESS:  Yes.
BY MR. LEVIN:
    Q.    Can we agree as well that the use
of excessive force would include using a law
enforcement vehicle as a roadblock to detain and

Page 50

apprehend the citizen?
    A.    That's correct.
        MR. KANE:  Objection.  Just to be
    clear, objection to any legal conclusions
    here.  I understand he's going to answer
    these questions.  But to the extent they
    are legal conclusions, I'm raising an
    objection.
        MR. LEVIN:  Understood.  Just to
    respond on the record, I'm trying not to
    ask him for a legal conclusion.  This is
    really more your understanding of what
    your duties and responsibilities as an
    officer are.  It's strictly your
    understanding, so that's what I'm trying
    to get at here.
BY MR. LEVIN:
    Q.    So, I just asked you that
excessive force would include using a law
enforcement vehicle as a roadblock; you agreed.
        You knew that on the day that this
incident occurred, right?
    A.    Right.
    Q.    And one of the reasons -- and I

Page 51

think you just stated it yourself before we went
down this list of questions.  The reason that a
law enforcement officer isn't supposed to do that
is because when you use those kinds of
techniques, you can't ensure the safety of the
citizen you're trying to apprehend, correct?
        MR. KANE:  Objection to form.  You
    can answer.
        THE WITNESS:  Yes.  It would
    damage my police vehicle.
BY MR. LEVIN:
    Q.    In any event, you're aware that,
you know, there is a possibility when you're
doing these kinds of things, it's
disproportionate or excessive when you're talking
about a motor vehicle violation, right?
    A.    That's correct.
    Q.    And, again, this is all stuff that
you understood back when this incident occurred,
right?
    A.    Yes.
    Q.    And would you also agree that a
law enforcement officer shouldn't use a vehicle
as a roadblock to apprehend a citizen riding on a

Deposition of Officer Joseph Wolk                    Neal Miller and Donna Miller v. City of Philadelphia, et al.

Page 52

1  motor scooter or motorcycle?
2          MR. KANE:  Objection to form.  You
3      can answer.
4          THE WITNESS:  Yes.
5  BY MR. LEVIN:
6      Q.    And you knew that on the day of
7  the incident, right?
8      A.    Yes.
9      Q.    And same thing, you shouldn't use
10 a vehicle as a barricade to apprehend a citizen
11 riding on a motor scooter, correct?
12     A.    Yes.
13     Q.    One reason you wouldn't do that is
14 because it could result in a high likelihood of
15 death or serious bodily injury to the person
16 riding it, right?
17     A.    That's correct.
18     Q.    I hate to even ask this question,
19 but I started out this deposition saying, you
20 know, that there's some superficial similarities
21 here between this situation and Bailey McKenna.
22 And I know that that situation with McKenna,
23 there was a group of people on dirt bikes and
24 ATVs; is that fair?

Page 53

1          MR. KANE:  Objection to form.  You
2      can answer.
3          THE WITNESS:  At what point?
4  BY MR. LEVIN:
5      Q.    Well, at some point before the
6  actual collision, there were a group of people
7  riding together kind of crazily and aggressively,
8  right?
9      A.    Yes.
10     Q.    All right.  And Philadelphia, like
11 many cities, has these kids out on these types of
12 vehicles, sometimes driving a little aggressively
13 or even recklessly; fair characterization?
14     A.    Yes.
15         MR. LEVIN:  For the record, it
16     drives me nuts, too.  I think that most
17     people have that reaction in traffic.
18 BY MR. LEVIN:
19     Q.    But given that there's been two
20 sort of situations where what's seemingly is a
21 Motor Vehicle Code violation turns into a
22 pursuit, and then through one path or another,
23 somebody gets hurt or killed, is there something
24 about this situation, kids riding around on these

Page 54

1  types of vehicles, that sort of sets you off in
2  any way?
3          MR. KANE:  Objection to form.  You
4      can answer.
5          THE WITNESS:  Sets me off?
6          MR. LEVIN:  Yeah.
7  BY MR. LEVIN:
8      Q.    To use the Internet language, does
9  it trigger you?
10         MR. KANE:  Same objection.  You
11     can answer.
12         THE WITNESS:  I wouldn't say it
13     sets me off.  It's a problem that has
14     just gotten larger and larger, including
15     Philadelphia and other cities, which most
16     of the time we can't do nothing about it.
17 BY MR. LEVIN:
18     Q.    I realize there's a little bit of
19 a catch-22 here, wouldn't you agree?  That what
20 these kids are mostly doing is mostly motor
21 vehicle violations which don't fit into what
22 you're allowed to, under the directives, initiate
23 a pursuit for, right?
24     A.    That's correct.

Page 55

1      Q.    So there's a little tension right
2  there, right?
3          MR. KANE:  Objection to form.
4          THE WITNESS:  What do you mean
5      tension?
6  BY MR. LEVIN:
7      Q.    Maybe that's a bad word for it.
8          That's a quandary for you as an
9  officer, right?  You see these people basically
10 doing things that are in violations of the Motor
11 Vehicle Code, could be dangerous to themselves,
12 could be dangerous to others, but they don't rise
13 to the level of what you're allowed to really
14 pursue a vehicle for, right?
15         MR. KANE:  Objection to form.  You
16     can answer.
17         THE WITNESS:  Most of the time,
18     they ride by us and we can't do nothing
19     about it.  That's the way it is.
20 BY MR. LEVIN:
21     Q.    So why the exception in this
22 particular case?
23     A.    Ryan Miller?
24     Q.    Yeah.

Deposition of Officer Joseph Wolk                                    Neal Miller and Donna Miller v. City of Philadelphia, et al.

Page 56

A.    Well, there was actions of not
stopping and driving into oncoming lanes of
traffic.  Something was going on there.  It
wasn't like he kept driving through red lights or
whatever, he was in oncoming traffic where he was
at very harm.  Then I put myself in harm's way in
getting ahead of him, because if he continued in
that lane, the car would have swerved and maybe
struck my vehicle.  I put myself in a situation
to try to stop his action of what was going on.
I had no idea.
Q.    Okay.  I get what you're saying
that what he did on Tacony Street is sort of what
led to it but that stopped on Tacony Street,
right?
A.    Yes.
MR. KANE:  Objection to form.  You
can answer.
THE WITNESS:  Yes.
BY MR. LEVIN:
Q.    But the pursuit continued for
awhile after that.  So, I'm sort of saying, why
did that not break it off when you realized he's
no longer traveling the wrong way on Tacony

Page 57

Street, and at best, up until that point what
he's doing is a motor vehicle violation, isn't
it?
A.    I caught up to him.  His actions
continued driving recklessly, and it was only a
span of two blocks and I did have him stopped.
Q.    What are you referring to when you
say the span of two blocks and you had him
stopped?
A.    When we go from Fraley and James,
it's literally only two blocks until Scattergood
when I had him stopped.
Q.    Okay.  He goes down Tacony, up
Fraley, down James, up Simon, down Eadom, around
the parking lot, back up Eadom, down Kennedy
then, is that where he went?
A.    No.  When I got behind him at
Fraley Street, it was literally -- them blocks
are so short.  From Fraley and Simon to where
that parking lot is, it's considered only a
block, block and a half.  And then back around
the corner, okay, we'll give you three total
blocks before he was stopped.  Those small blocks
are on top of each other.  It's not, like, a long

Page 58

block.
Q.    I realize these are tiny, little
houses packed right up on top of one another in a
very densely populated neighborhood.  I mean, --
I'm not trying to split hairs with you, but the
route until you reach Scattergood is from Tacony,
up Fraley, James, Simon, Eadom, into the parking
lot on Eadom, back down Eadom.  At some point, he
gets back onto James.  What street did he take to
get down to James?
MR. KANE:  Objection to form, but
you can answer.
THE WITNESS:  We go from Fraley --
MR. KANE:  Just answer the
question.
What was your last question,
Michael?
BY MR. LEVIN:
Q.    After Ryan took off from the
parking lot from the self-storage facility when
he pulls a U-bey and you have to go down the
other way that you just came from, my
understanding is that he ended up going down one
of the streets eastbound until he got to James

Page 59

again and then James to Scattergood; is that
correct?
A.    That's correct.
Q.    Which street was it that he used
to get back down to James?  Was it Kennedy?  Was
it Fraley?  Simon?
A.    I'm not sure.  There was also
another small street, I think Laurel, too.
Q.    Yeah, yeah.
A.    Another small street there.  It
was literally a couple little, small streets up
to Scattergood from Eadom.
Q.    Ultimately, it's determined that
this whole sequence of events constituted a
couple of violations in the department's pursuit
policy, right?
MR. KANE:  Objection to form.  You
can answer.
THE WITNESS:  No, I don't believe
so.
BY MR. LEVIN:
Q.    Okay.  I'm going to show you the
conclusion section from the IAD report, and I
believe you said that you read this this morning.

Page 60

MR. KANE:  Object to form.  He has
reviewed it in preparation, but not
necessarily this morning.

MR. LEVIN:  Right.  I'm sorry.  I
shouldn't have said this morning.

BY MR. LEVIN:

Q.    But you reviewed this prior to the
deposition.  Do you see the document?

MR. KANE:  We see the File
Explorer.  Let's go off the record.

(At this time, a discussion was
held off the record.)

(At this time, the court reporter
marked Exhibit WOLK-2 for identification.)

MR. LEVIN:  This is Wolk-2.

BY MR. LEVIN:

Q.    Do you see the document now?

A.    Yes, sir.

Q.    I'm just going to read the top.
It says, This investigation has sustained the
following violations of Police Department
Directive 9.4 against Police Officer Joseph Wolk;
it states your badge number, Highway Patrol.

9.4 is the vehicular pursuit

Page 61

directive, right?

A.    Yes.

Q.    Okay.  I'm going to jump down to
the third paragraph.  It says, Police Officer
Wolk attempted to apprehend the operator at
Scattergood Street and Eadom Street, but the
motor scooter managed to elude the officer who
was on foot at that time.  Driver failed to
yield, fled northbound on Eadom Street, and
eventually collided into the side of a truck.
The motor scooter's operator was killed as a
result of the collision.

Directive 9.4, Section 1-B-2
states, In all other circumstances, initiating a
vehicular pursuit is strictly prohibited.
Accordingly, initiating a pursuit solely for
stolen vehicles and traffic violations, including
DUI, is strictly prohibited.

So, that basically states that
this pursuit was a violation of the directive,
that stated section of the directive; would you
agree?

A.    That's correct.

Q.    So this sort of goes back into

Page 62

what I was asking you before.  You know, you've
established there's a traffic violation, and I
understand the fact that he failed to stop, so
forth.  But under the directive in question, that
still doesn't rise to the level of what you would
engage in this type of pursuit for, right?

A.    That's correct.

MR. LEVIN:  We may come back to
that.  Let me stop sharing now.

BY MR. LEVIN:

Q.    Also, I wanted to ask you, I know
that you stated initially when you were going to
make the stop on Tacony Street, you had your
lights and -- did you have your sirens on?

A.    Yes.

Q.    Now, at some point in time, did
you deactivate those?

A.    I did not.

MR. KANE:  Object to form.

BY MR. LEVIN:

Q.    I'm just going to represent to
you, I know there's a couple of witness
statements as well as video, two of which we've
actually seen, where your lights are no longer

Page 63

on.  Obviously the video, you can't tell with the
sirens, but the lights at least are clearly off
by the time you make the left turn from Fraley
onto James.

They don't go off by themselves,
right?

MR. KANE:  Objection to form.  You
can answer.

THE WITNESS:  No.

BY MR. LEVIN:

Q.    That would take some affirmative
action on your part?

MR. KANE:  Objection to form.  You
can answer.

THE WITNESS:  Yes, or they
malfunctioned, but.

BY MR. LEVIN:

Q.    Are you aware of any malfunction
with the vehicle?

A.    I am not, no.

Q.    Is it your normal practice to do a
sort of pretrip inspection of the vehicle before
you head out when you go in at the beginning of
your shift?

Page 64

1    A.    It is, yes.

2    Q.    Is that required, by the way?

3    A.    We're supposed to do it, yes.

4    Q.    Would your emergency equipment,

5 lights and sirens, be among the things, the items

6 that you check for functionality?

7    A.    Yes.

8    Q.    So, assuming that you had your

9 lights and sirens on on Tacony Street but they're

10 off by the time that you're at Fraley and James,

11 at what point in time did you deactivate them?

12    MR. KANE:  Objection to form.  You

13 can answer.

14    THE WITNESS:  Yeah.  After being

15 told through the IA report that at a

16 certain point they were off, I don't know

17 how -- if I accidentally knocked them off

18 or why they were off.  I have no reason

19 to turn them off.  They said they were

20 off.  Whether they were off on the video,

21 I might have accidentally hit it or

22 something fell and knocked them off.  I

23 don't know.  I can't answer that

24 question.

Page 65

1 BY MR. LEVIN:

2    Q.    Okay.  Where is the control for

3 those features located within the cruiser?

4    A.    To the right of my -- it's the

5 console.

6    Q.    To the right of the console, like

7 more on the passenger's side?

8    A.    The center console, it will be in

9 between, to the right that I would operate with

10 my right hand, around the hip area.

11    Q.    As we sit here today, do you have

12 any recollection of engaging in anything during

13 that portion of this sequence of events that

14 would have potentially turned off your emergency

15 equipment?

16    A.    I do not.

17    Q.    And I'm going to assume you don't

18 really remember when that occurred?

19    A.    I do not, no.

20    Q.    As you sit here today, you don't

21 know whether that was intentional or accidental?

22 If it was intentional, you don't know why you

23 would have done it?

24    A.    It was not intentional.  There

Page 66

1 would be no reason to turn them off to try to

2 stop someone.

3    Q.    Okay.  So, anyway, here we are

4 back on Eadom going down northbound and one of

5 the streets eastbound is taken to get back down

6 to James, right?

7    A.    That's correct.

8    Q.    And then the pursuit continues

9 southbound on James to Scattergood?

10    A.    That's correct.

11    Q.    Now, once this goes down

12 Scattergood, you managed to pull up ahead of

13 Ryan, correct?

14    A.    I was actually next to Ryan.  He

15 was on my left.

16    Q.    Okay.  Did you pull up, like, in

17 front of him or to either side in order to stop

18 his progress so you could get out of the car and

19 apprehend him?

20    MR. KANE:  Objection to form.  You

21 can answer.

22    THE WITNESS:  When I was on

23 Scattergood Street, I was next to him.  I

24 was hollering out the window to tell him

Page 67

1 to stop before he gets hurt, several,

2 several times.  He slowed up almost to a

3 stop, and then I pulled in front of his

4 vehicle and got out of my vehicle.

5 BY MR. LEVIN:

6    Q.    At that point in time, where was

7 the scooter situated in relation to your vehicle?

8    A.    At what point?

9    Q.    At the point where he slowed down

10 almost to a stop and you sort of pull over?

11    A.    He's on my left.  He's slowing

12 down.  He comes to a stop, and then I pull my

13 vehicle in front of him.

14    Q.    Okay.  Now, as you turned onto

15 Scattergood or any time while you were traveling

16 on James coming up to Scattergood, did you see a

17 blue Ford that eventually ended up being involved

18 in this sequence of events?

19    A.    No, I did not.

20    Q.    When was the first time that you

21 saw that vehicle?

22    A.    When I got out of my vehicle, and

23 I had grabbed Ryan, Mr. Miller, on the scooter.

24 He was pushing back on his feet, and I was trying

Deposition of Officer Joseph Wolk                    Neal Miller and Donna Miller v. City of Philadelphia, et al.

Page 68

to hold a firm grip of him so he couldn't pull
away.  And eventually, he pushed back, hit the
gas.  I had him by the back the shirt.  The back
of his shirt ripped.  And as I was reentering my
car, I noticed a car drove by me, making a
right-hand turn behind the scooter.

Q.    Okay.  And he took off at a pretty
good speed after the scooter, didn't he, the
driver of the blue car?

A.    I would say so, yes, around the
turn.  I didn't see -- he just blurred right by
me out of the corner of my eye.

Q.    And I know that after Ryan went
down there, you had to run to get back to your
car, correct?

A.    That's correct.

MR. KANE:  Objection to form.

BY MR. LEVIN:

Q.    When you pulled onto Scattergood,
you weren't really consciously aware of that blue
car?

A.    No.  I was actually driving
looking at Ryan telling him to stop, stop, you're
going to get hurt, and he came to a slow speed,

Page 69

and then he came to a stop.

Q.    Okay.  At any point in time before
you see the blue car turn down Eadom after Ryan,
did you see the car pulled over anywhere on
Scattergood or approaching up to the intersection
of Scattergood and Eadom?

A.    No.

Q.    So your first real perception of
that car is when it's going down Eadom after
Ryan?

A.    It's going past me, making a
right-hand turn after Ryan; that's correct.

Q.    And that's immediately after Ryan
sort of gave you the slip, right?

MR. KANE:  Objection to form.  You
can answer.

THE WITNESS:  I wouldn't say slip.

BY MR. LEVIN:

Q.    He managed to escape your grasp
when you had him by --

A.    I had him.  I had control of him.
His foot stepped on the gas, I tried to pull him
off, his shirt ripped, and he made the right
turn.

Page 70

MR. LEVIN:  I apologize for the
alliteration.

(At this time, a short break was
taken.)

BY MR. LEVIN:

Q.    At this point in time, sir, what I
think we're going to do is put up the video of
the portion of the pursuit on Scattergood Street.
Bear with me while I fumble around with my tech
again.

Here we go.  Are you now looking
at a still video frame?

A.    Yes.

Q.    Don't leave me hanging there,
buddy.

A.    I'm sorry.

Q.    I'm going to play this.  This goes
on for a couple minutes before the cars show up.
So I apologize for the delay, but I tried to fast
forward through this, and it will not display if
we do so we're stuck watching it.

(At this time, the video is being
played.)

Page 71

BY MR. LEVIN:

Q.    Before we get to the actual
portion of the video that we need to talk about,
have you seen the video from this vantage point
before?

A.    Yes.

Q.    And judging from the location,
would you agree that this is taken from the
perspective of the facility called Net Steps
that's there off on Bridge Street?

A.    I believe so.  I'm not sure.  This
is not an area -- I really don't drive back here
unless somebody lives back here or something.
It's isolated.

Q.    It certainly is that.

In the top right portion of the
screen, there's what looks to be a business,
white walls and there's a half brick wall.

Do you know if that's a place
called Fibber McGee's?

A.    I have no idea what that is.

Q.    Do you know of a bar that's called
Fibber McGee's that's right off of Bridge Street,
near Bridge and Tacony?

Deposition of Officer Joseph Wolk                    Neal Miller and Donna Miller v. City of Philadelphia, et al.

Page 72

A.     Now I know it's there, but I never knew it was there.

Q.     Okay.  So, after the fact you know?

A.     Yes, yes.

Q.     Okay.  So, I just paused the video at 7:27:19 p.m., at least the time stamp on this video, which may or may not be completely accurate.

Did you see the vehicle that pulled in ahead of where you see the scooter and the front of your vehicle?

A.     Yes.  The one that's on the block already?

Q.     Yes, it's already on the block.

A.     Yes, I see it.

Q.     Okay.  So, that pulled into Scattergood before you guys had pulled along the street, correct?

A.     That's correct.

Q.     Were you aware of that vehicle or its occupant's presence at any time before that happened?

A.     No.

Page 73

Q.     Now, I stopped it just a couple seconds later at 7:27:25 p.m.

Would you agree that we can now see the blue, what we now know to be a Ford, pulled over to the right side on Scattergood?

A.     Yes.

Q.     It seems to be letting you pass.  Your vehicle seems to be pretty much alongside Ryan's vehicle at that point?

A.     Yes.  That's when I'm talking to him, pulling up that block, through my driver's side window.

Q.     Okay.  And what do you recall saying?

A.     I was saying, Stop, stop, you're going to get hurt.  I was screaming loud, Stop, you're going to get hurt, and then he started slowing down.

Q.     Did he appear to look at you?  Did he say anything in response?

A.     I never even seen his face.  He was looking straight.  I just kept hollering at him.

Q.     Okay.  I'll play this through to

Page 74

where it picks up again.  All right.  I think we just watched a segment that's a couple seconds long.  I stopped it at 7:27:29 p.m., which is, I think, what you basically just described, Ryan slowing down.

As he's doing that, you pull over, and that would be towards your left?

A.     That's correct.

Q.     And that's sort of at least partially -- he can't go completely straight at that point, correct?

A.     That's correct.

Q.     You're partially in front of him?

A.     That's correct.

Q.     It appears you pulled over a little bit further, and when you open up your driver's side door, that's in front of what would have been Ryan's path of travel up until that point; is that fair to say?

A.     Yes.

Q.     He managed to back up the bike, and it looks like he scooted around behind the back of your vehicle as you got out?

A.     That's correct.

Page 75

Q.     And where we have this frozen at 7:27:36, you had gotten up to the corner of the house at Scattergood and Eadom, and you're now heading back to your vehicle, which is still pulled over with the door open, right?

A.     That's correct.

Q.     Meanwhile, only feet from you is that Ford Taurus, correct?

A.     I think, when I seen the video before, I think it's a Ford Fusion.

Q.     Oh, it's a Fusion.  I'm sorry.

A.     Yes.

Q.     At that point in time, did you have the opportunity to see who was occupying that vehicle?

A.     As it went by me, I seen his face as he went around me.

Q.     Okay.  And that ended up being somebody you actually knew, correct?

A.     Yes.

Q.     Let me play this through to the end.  I've now frozen it at 7:27:42 p.m., at which point you've just gotten back into your vehicle, which is still stopped, and Ryan and the

Page 76

Ford have both driven down Eadom Street and just
got off the screen, correct?

    A.    That's correct.

    Q.    Now, by 7:27:50 p.m., you've
followed in the same direction down Eadom Street
behind the Ford, which is in back of Ryan, right?

        MR. KANE:  Objection to form.  You
    can answer.

        THE WITNESS:  I'm not sure.  I see
    the taillights, way ahead of me, of the
    Ford; I don't see Ryan, though.

BY MR. LEVIN:

    Q.    Okay.  So there's a passenger
vehicle between you and the scooter, right?

    A.    I'm sorry.  Say that again?

    Q.    So, that passenger vehicle, the
Ford, is between you and the scooter, so it's
blocking your line of sight to the scooter?

    A.    Yes.

    Q.    Do you know where on Eadom Street
those vehicles were by the time that you had
gotten back in the car and started to drive?

    A.    They were approximately a block
and a half ahead of me.

Page 77

    Q.    Now, when you had that brief
opportunity to see the occupant of the vehicle,
did it register right away that that was this
person, Gary Bove?

    A.    I didn't know his name until
recently.  I knew it was Gary, yeah.  I knew him.
I didn't even know he was that close to me when I
seen that video.  When he accelerated around the
corner, I had seen his face, a blur of his face.

    Q.    Now, I don't know if you reviewed
any of the witness statements that AID took.

        Did you have the opportunity to do
that?

    A.    I'm not sure.

    Q.    Okay.  I'll represent there's one
by -- this may or may not refresh your
recollection.  There was a statement by a
gentleman by Robert Matos, who I believe lives on
Eadom Street.  He made a statement to the effect
that -- well, number one, he was under the
impression, apparently a false impression, that
Gary's car was also a police car because he took
off pretty aggressively after the scooter.

        But he also believed that you were

Page 78

driving slower and sort of let that vehicle take
the lead at that point.

        Had you slowed down or eased up on
the pursuit when you got back into the vehicle?

        MR. KANE:  Objection to form.  You
    can answer.

        THE WITNESS:  I got back in my
    vehicle, and I seen the taillights of the
    Ford, but I didn't know if Ryan turned
    down one of those side streets so I
    wasn't going that fast.

BY MR. LEVIN:

    Q.    Okay.  Was it your intention to
continue to try and follow Ryan to catch up with
him again?

    A.    No, because I lost sight of him.
I was looking down side streets, if he made a
right on one of those side streets.  I just lost
sight of him.

    Q.    Did it appear to you that the Ford
that Gary was occupying also made a right down
the same side street or one of the side streets
at some point?

    A.    Eventually I seen him turn right

Page 79

on Fraley Street, eastbound on Fraley.

    Q.    And you followed, correct?

    A.    I was -- yes, I was behind him.  I
seen the taillights when I made the turn, yes.

    Q.    To be fair, you had lost a good
deal of time after you had gotten out of the car
before you got back in, and you could start
moving again, and those two vehicles were already
pretty well ahead of you at that point, right?

        MR. KANE:  Objection to form.  You
    can answer.

        THE WITNESS:  Yes.

BY MR. LEVIN:

    Q.    So, if you had reacquired sight of
Ryan, was it your intention to continue to pursue
him?

        MR. KANE:  Objection to form.  You
    can answer.

        THE WITNESS:  No, he was gone.  I
    didn't see him anymore.

BY MR. LEVIN:

    Q.    Now, how do you know Gary?

    A.    Gary is in the area, too.  He's a
tow guy from the area that I've known for several

Page 80

1 years.  One time years ago, he gave me his number
2 if I needed his service to tow a car.  He said,
3 If you break down, give me a call.
4      Q.    Did you retain his number?
5      A.    Yes.
6      Q.    Do you still have it?
7      A.    No.
8      Q.    What happened to it?
9      A.    I deleted it.  I don't know if I
10 still have it.  No, I changed phones over.  I
11 don't have it anymore.
12      Q.    Okay.  And what you just described
13 when he gave you his number, was that before when
14 this incident occurred?
15      A.    Oh, yes, yes.
16      Q.    Around how long?  Are we talking a
17 couple years?
18      A.    Yeah, a couple years.
19      Q.    So, you would run into him for at
20 least that period of time, in the course of just
21 being a Highway Patrol officer, right?
22      A.    Yeah, he called me about
23 incidents.  One time about people breaking into
24 his car.  I told him to put cameras up or

Page 81

1 whatever.  One time he called me about his
2 granddaughter was raped by a family member, what
3 he should do.  Basically, I talked to him
4 sporadically, once in a blue moon.  It was just
5 somebody I knew that wasn't a friend, just
6 someone I knew in the area.
7      Q.    Well, you're a Highway Patrol
8 officer, he's a tow truck operator; you were kind
9 of part of the same ecosystem, right?
10           MR. KANE:  Objection to form.  You
11      can answer.
12           THE WITNESS:  We're Highway
13      Patrol; he's a tow truck operator.
14      Highway Patrol, we don't cover accidents.
15      Before when you asked what my
16      responsibility is, we respond to priority
17      jobs, shootings and robberies and stuff.
18      We don't handle auto accidents.
19 BY MR. LEVIN:
20      Q.    Do you remember the circumstances
21 where you first met Gary?
22      A.    Oh, no, no.
23      Q.    Was it in connection with work or
24 was it, like, social kind of interaction?

Page 82

1      A.    I do not recall.
2      Q.    You mentioned he called you on a
3 couple of occasions when he had stuff that he
4 wanted to discuss with you.
5           He had your number as well?
6      A.    Yes.
7      Q.    Did you receive any calls or texts
8 from him on the date of this incident?
9      A.    No.
10      Q.    Do you still have the same cell
11 phone number as you did on the date of this
12 incident?
13      A.    I believe so.
14      Q.    And who was your cell phone
15 carrier?
16      A.    At that time, I do not know.  I
17 don't remember.  I just changed it a few times.
18      Q.    Do you know for sure whether or
19 not it's changed since the date of this incident?
20      A.    Yeah, I changed it already, yes.
21 I changed it about a year ago.
22      Q.    Okay.  Who's your current carrier?
23      A.    T-Mobile.
24      Q.    And do you have any recollection

Page 83

1 at all who your carrier was at the time of this
2 accident?
3      A.    I think I had Simple Mobile at the
4 time.  I had them for quite a long period of
5 time.
6      Q.    Did you say it was Simple Mobile?
7      A.    Simple Mobile.
8           MR. LEVIN:  Off the record.
9           (At this time, a discussion was
10           held off the record.)
11 BY MR. LEVIN:
12      Q.    Outside of work, have you ever
13 socialized with Gary or any of his family or
14 friends?
15      A.    I don't know his family.  I don't
16 socialize with him, no.
17      Q.    The incident you just mentioned
18 where he contacted you because he had a family
19 member who was raped or sexually assaulted, when
20 was that in relation to this incident?
21      A.    Years prior to that, maybe three
22 or four years.  I believe his granddaughter was
23 raped.
24      Q.    That's terrible.

Deposition of Officer Joseph Wolk                    Neal Miller and Donna Miller v. City of Philadelphia, et al.

Page 84

1   Did you have any communication or
2 contact with him at any time in the months
3 leading up to this incident?
4   A.   No.  Like I said, sometimes I
5 wouldn't talk to him or hear from him for at
6 least a year, maybe more than that.
7   Q.   I'm going to jump ahead for a
8 couple minutes -- first off, let me take down
9 this video.
10  Just jumping ahead to the end of
11 the chase, I know that he was immediately behind
12 Ryan's vehicle.  And when I say immediately, he
13 was ahead of you and behind Ryan when the
14 accident occurred when Ryan ran into the truck.
15 I know that you had gone up towards Tacony and
16 Fraley after that had happened.
17  Did you have any discussion with
18 Gary at that point in time, like, at the scene?
19   MR. KANE:  Objection to form.  You
20   can answer.
21   THE WITNESS:  At what point you
22   said?  After?
23 BY MR. LEVIN:
24   Q.   Yeah.  After Ryan collided with

Page 85

1 the truck.
2   A.   Yes.  I believe ten minutes later,
3 the rescue came on the scene.  I called his cell
4 phone and said, Where are you?  You have to
5 come back here and give the statement.  He said
6 he was still in the area.  I think he was up on
7 Tacony Street with the driver of the tractor
8 trailer.  I didn't see him.  I said, Where did
9 you go?  You have to come back and make a
10 statement because I remember seeing his face go
11 by me.  He was behind me.
12   Q.   Was that a telephone call or a
13 text that you placed to him?
14   A.   I called him.
15   Q.   And what did he say?  Did he say
16 he would come back?
17   A.   He said he was still on --
18   Q.   Oh, he was right there?
19   A.   I believe he was -- I'm trying to
20 remember.  He was on Tacony Street.  I believe he
21 was further up south of the scene.  I'm not a
22 hundred percent sure where the truck driver was.
23 Maybe it was further up.  I don't know.  I just
24 remember telling him, wherever he was at, you

Page 86

1 have to come back and make a statement.  You were
2 behind the scooter or whatever.
3   Q.   Okay.  Did you discuss his
4 participation in going after Ryan at any point in
5 time?
6   A.   No.
7   MR. KANE:  Objection to form.
8   THE WITNESS:  No.
9 BY MR. LEVIN:
10   Q.   Did it appear to you that he was
11 following after Ryan in the moments leading up to
12 the crash?
13   A.   I don't know what he was doing.
14 All I know, he was behind the scooter, way ahead
15 of me.
16   Q.   Did he say anything to you about
17 whether or not he knew who Ryan was?
18   A.   I had no conversation with him.
19 He just told me he was on Tacony Street and when
20 AID showed up, the officer there, I told him
21 that -- I think he was standing next to the
22 driver.  I pulled down the street and said, The
23 operator who was behind the scooter was up the
24 street.  I think he did a statement on the

Page 87

1 street, but I'm not sure.  I had no conversation
2 with him after that.
3   Q.   Okay.  And you were the person who
4 actually called into police to get somebody to
5 come out to the accident scene, correct?
6   A.   Yes.
7   Q.   At the point when you did that,
8 you just said that you had come upon the
9 accident, right?
10   A.   No, I didn't say that.  I believe
11 I said a scooter -- I don't know if I said an
12 accident with a scooter and a motor vehicle; send
13 rescue.
14   Q.   At that point in time, you did not
15 say anything about the back story, the pursuit
16 that preceded all that, right?
17   MR. KANE:  Objection to form.  You
18   can answer.
19   THE WITNESS:  No.
20 BY MR. LEVIN:
21   Q.   Did it appear to you from when you
22 saw Gary pulling up to the corner of Scattergood
23 and Eadom and then go after Ryan or at least
24 follow him down, did it appear to you that he was

Deposition of Officer Joseph Wolk                    Neal Miller and Donna Miller v. City of Philadelphia, et al.

Page 88

1  involving himself in the pursuit of Ryan?
2          MR. KANE:  Object to the form.
3      You can answer.
4          THE WITNESS:  I don't know what he
5      was doing.  He just happened to be on the
6      block and seen me out of the vehicle, I
7      guess.  I didn't notice he was that close
8      to me in that Ford until I seen the video
9      and I seen the blur of his face going by.
10 BY MR. LEVIN:
11     Q.   I mean, I had earlier referenced
12 that guy Robert Matos' statement, and he said he
13 thought that that car was actually a police car
14 because he appeared to be going after him pretty
15 quick and aggressively.
16     Is that in line with what you were
17 able to see?  Obviously, you didn't think it was
18 a police car, but did it seem that he was going
19 after the scooter?
20     A.   He turned and was traveling in the
21 same area the scooter was going.  I don't know
22 what he was doing.
23     Q.   Okay.  Did he ever say what he was
24 doing?

Page 89

1      A.   No.
2      Q.   Did you ever see his written
3  statement to AID?
4      A.   Yes.
5      Q.   It sort of gratuitously states, I
6  was not involved in that.  Do you feel that that
7  is accurate?
8          MR. KANE:  Objection to the form.
9          THE WITNESS:  I don't believe I
10     read that part.  I read a few sentences,
11     but I didn't read the whole thing.
12 BY MR. LEVIN:
13     Q.   Do you see the accident
14 investigation interview record?
15     A.   Yes.
16     Q.   And are you familiar with this
17 form?
18     A.   No, I'm not.
19     Q.   It seems to be what AID was using
20 for witness statements in this matter, and I
21 guess they probably do it a lot.
22     Towards the bottom, after all of
23 the initial information up top, there's a couple
24 of questions and answers listed.

Page 90

1      The Question 1, Are you the driver
2  of Vehicle 1 or Vehicle 2; his answer was
3  neither, witnessed auto accident.  Question 2,
4  what type of vehicle are you driving; answer,
5  Ford Fusion, 2015.  In parentheses, I was not
6  involved.
7      Number one, he was only being
8  asked there what type of vehicle he was driving,
9  right?
10     A.   Yes.
11     Q.   So, the "I was not involved" was
12 sort of something he volunteered in addition to
13 what the question was asking for, right?
14         MR. KANE:  Objection to form.
15     Speculation.  You can answer.
16         THE WITNESS:  Say that again?  I'm
17     sorry.
18 BY MR. LEVIN:
19     Q.   Well, let me ask you this way:
20 The question didn't ask whether or not he was
21 involved in the accident, it only asked him what
22 kind of car he was driving, right?
23     A.   Yes.
24         MR. KANE:  Same objection.

Page 91

1  BY MR. LEVIN:
2      Q.   He stated there, I was not
3  involved.  Do you feel that that's an accurate
4  characterization?
5          MR. KANE:  Objection to form.  You
6      can answer.
7          THE WITNESS:  I can't say what he
8      was saying or what he was doing exactly
9      because I have no idea.
10 BY MR. LEVIN:
11     Q.   Okay.  Have you run into him since
12 then?
13     A.   It was shortly after the accident,
14 maybe a few weeks later he called me and he asked
15 me how I was doing and whatever and that was
16 basically it.  That's the last time I talked to
17 him.
18     Q.   Did you ever ask him why or what
19 he was doing the date when he was basically just
20 there during the pursuit of Ryan?
21     A.   I did not ask him, no.
22     Q.   Did it seem strange to you that
23 that had happened?
24     A.   What?  Him being there?

Deposition of Officer Joseph Wolk                    Neal Miller and Donna Miller v. City of Philadelphia, et al.

Page 92

Q.   Yeah, him being there and going --

A.   Yeah, I can't figure that one out.
Like I said, in the video, it shows the car
pulling over. I'm thinking maybe I was blowing
the air horn and he heard that and pulled to the
side. It's weird that I actually had seen his
face when he turned the corner when I'm out of my
vehicle. That's why I called him after I seen
his face to come back and make a statement when
he seen what was going on or whatever. I don't
know if -- you know, he went around me, you know,
what was he doing.

Q.   I'm going to show you your initial
statement to AID. Bear with me. It's a two-step
process every time. Now, what I'm showing you --

MR. LEVIN:   And, for the record,
we'll mark the Bove statement as Wolk-3,
and we'll mark Officer Wolk's statement
to AID as Wolk-4.

(At this time, the court reporter
marked Exhibits WOLK-3 and 4 for
identification.)

BY MR. LEVIN:

Q.   Are you familiar with this

Page 93

document, your statement to AID?

A.   Yes.

Q.   Did you have a chance to review
this prior to your deposition at some point?

A.   Yes.

Q.   Now, I think that we pretty much
covered the bulk of the substance here, but on
this first page, I believe it takes you sort of
through what occurred on Tacony Street. The last
question asked, Did the scooter come back into
the northbound lanes after you passed it is the
last question on that page; would you agree?

A.   Yes, I see it.

Q.   So, going onto Page 2 of the
statement, it's asking what did you do next.
Your answer appears to be, I made
a U-turn and caught up to the scooter on the 5400
block of James Street. Again, attempted to stop
it, but the operator again refused to stop. It
turned onto Scattergood Street and I followed.
My vehicle was next to the scooter on
Scattergood, and I yelled to the operator, Stop,
stop, just stop.
I pulled up to the corner of

Page 94

Scattergood and Eadom and exited my vehicle. The
scooter was stopped behind me. The operator
pushed the scooter backwards to maneuver around
the rear of my vehicle. I grabbed the operator
by the shirt and held ahold as the driver
accelerated and the shirt ripped from the body.
The operator made a northbound turn on Eadom
Street, and that's when I lost sight of the
scooter.
So, this appears to state -- and
correct me if I'm wrong -- after Ryan turned off
of Tacony Street, it states that you catch up to
him on James Street, and then the chase proceeds
up to Scattergood Street, where you have the
interaction that's described there, that we just
talked about a few minutes ago, where you try to
grab him, but he manages to get away. Gary goes
off in the same direction after him.
That account, correct me if I'm
wrong, does not include the portion of this
pursuit where you go down Eadom, there's the
right turn maneuver that both vehicles make into
the self-storage lot, back down Eadom, down
Fraley or one other street, back up James, and up

Page 95

Scattergood.
It basically indicates Tacony, to
Fraley, to James, to Scattergood, right?

A.   Yes.

Q.   So there's a portion there that
isn't present, correct?

A.   That's correct.

Q.   Then it sort of talks about the
crash itself and the aftermath. It says --
because I believe you had come down Fraley,
starting to turn back up James before you saw
this, right?

A.   Yes.

Q.   When you saw it, you stopped that
turn onto James, back up, drove back down to
Fraley, and then you're at the scene, right?

A.   Yes.

Q.   So, it looks like this is
proceeding right to that. It talks about where
was the scooter, you turned eastbound on Fraley
from Eadom, making a turn onto James. When you
look further down Fraley, you noticed the scooter
and the operator laying on Tacony Street.
So that portion also omits the

Deposition of Officer Joseph Wolk                    Neal Miller and Donna Miller v. City of Philadelphia, et al.

Page 96

1  fact of Gary's presence, as well as the fact that
2  you knew that individual, right?
3          MR. KANE:  Objection to form.
4          THE WITNESS:  Say that question
5      again.  I'm sorry.  I lost you on that
6      one.
7  BY MR. LEVIN:
8      Q.    This doesn't really discuss the
9  fact that Gary was present or that you knew Gary,
10  right?
11     A.    I just noticed that, too.  It's
12  not in there, you're correct.
13     Q.    I'll show you the remainder.
14  There's nothing towards the end there.
15          So, that's not included, right?
16  The two basic portions that we just discussed
17  that we now know occurred, but weren't initially
18  discussed in the AID report; is that fair?
19     A.    Yes, the AID report is basically a
20  brief synopsis of what happened.  I didn't know
21  that the streets in between, the little tiny
22  streets because I never been back there.  And I
23  also didn't have Gary in the AID report either,
24  that's correct.

Page 97

1      Q.    Okay.  It's months afterwards, I
2  believe, that you finally gave a statement to
3  Internal Affairs, right?
4      A.    Yes.
5          MR. KANE:  Object to the form.
6          MR. LEVIN:  I'll put that up.
7      This is Wolk-5.
8          (At this time, the court reporter
9      marked Exhibit WOLK-5 for identification.)
10  BY MR. LEVIN:
11     Q.    What I put up here is the
12  statement you gave to Internal Affairs.  I assume
13  that you had the opportunity to review this as
14  well?
15     A.    Yes.
16     Q.    This was actually given, it looks
17  like, September 4, 2019, so it's almost four
18  months after the fact, right?
19     A.    Yes.
20     Q.    It looks like you were represented
21  by counsel who was also present during this,
22  since that's your right obviously; that was
23  Danielle Nitti?
24     A.    I believe so.

Page 98

1      Q.    Had she represented you in any
2  other matter before?
3      A.    No.
4      Q.    Now, I'm going to page through
5  this.  I'll represent it's a six-page statement,
6  so I'm just going to go to the areas that we
7  just discussed.
8          I think this is where we're
9  looking at.  Do you see where my cursor is?
10     A.    Yes.
11     Q.    This is around midway down what's
12  marked as Defense 018.  Question is, On May 7,
13  '19, did you attempt to make a traffic
14  stop/vehicle investigation on a motorcycle or
15  motorized scooter in the area of Tacony Street
16  and Fraley Street.
17          I'll skip your answer to that
18  question and take it down to the next paragraph
19  because it sort of picks up from where we were
20  just discussing.
21          It states, As I approached the
22  curve, I noticed in my side view mirror that the
23  motorcycle was making a U-turn.  I made a U-turn
24  and attempted to stop him again.  Motorcycle made

Page 99

1  a right turn on Fraley Street.  I got behind him
2  once again southbound on James.  I had blown my
3  air horn in an attempt to get him to stop.  It
4  went south on James Street and made a right turn
5  on a small street, possibly Simon Street -- which
6  is something we discussed earlier, right?
7      A.    Yes.
8      Q.    The motorcycle drove southbound on
9  Eadom, and he drove through a parking lot and
10  doubled back onto northbound Eadom.  I lost sight
11  of him briefly when he had gone into the parking
12  lot.  I noticed him in my rear view mirror
13  exiting the lot area and heading north on Eadom
14  Street.
15          You then proceed to say the
16  motorcycle went down another small street towards
17  James Street and he made a southbound turn onto
18  James.  I continued to blow the air horn for him
19  to stop.  The motorcycle turned westbound onto
20  Scattergood Street.  Once on Scattergood Street,
21  I pulled alongside of the motorcyclist and told
22  him to stop before he had gotten hurt.  He
23  stopped the motorcycle.  I pulled in front of
24  him.  I exited my vehicle and went to the

Page 100

motorcycle.

As I approached the male, again, pushing the motorcycle backwards with his feet, I got close enough to grab the male by his shirt. As I grabbed him, he accelerated and began to drive away. His shirt ripped, and he left Scattergood Street and turned right onto northbound Eadom Street.

I remember seeing a civilian vehicle. I recognized the driver as a local tow truck operator named Gary, who operates in the Northeast. I saw him either on Scattergood or Eadom Street. The motorcycle went northbound on Eadom Street. I saw Gary turn right and begin to drive in the same direction as the motorcycle. And then we know the rest of the story.

Q. First off, have I read all of that correctly?

A. Yes.

Q. And do you recognize that as the statement that you had given to Internal Affairs?

A. Yes.

Q. Now, would it be fair to say that in this statement about the events of that day,

Page 101

which, again, is four months after the Accident Investigation Division statement, you do mention the one part where you're on Eadom, go down to the self-storage lot, there's the turnaround, back down Eadom, and ultimately loop back around James, and up Scattergood, and then you mentioned Gary, correct?

A. Yes.

Q. So both of those things that were omitted in the initial account you gave to AID, you can see that you recall them at the time when you spoke to Internal Affairs?

MR. KANE: Objection to form.

THE WITNESS: Yes.

BY MR. LEVIN:

Q. Now, when Internal Affairs commenced the investigation into whether there had been a departmental policy violation, were you notified of that?

A. Yes.

Q. Are you entitled to be provided notice when you're being investigated by IAD?

A. They send you a court notice. They don't tell you until you get a court notice.

Page 102

Q. When, if you recall, did you first hear there was an IAD investigation into this incident?

A. I do not recall.

Q. Do you know if it was within a month of the incident?

A. I do not recall.

Q. Nonetheless, by the time that you had gone into -- it was some months later, you had the opportunity to, if you want, to revisit the scene. Let me stop there.

You would have had the opportunity, if you wanted to in that four-month period, to revisit the scene and refresh your memory, right?

A. I did do that. The name of the streets, I didn't know. I went back and got the street names back there.

Q. I had to go and do this whole ride, too.

Did you know that when Internal Affairs was doing their investigation, they would go canvas for video and witnesses and so forth?

A. I guess that's their routine, I

Page 103

guess, yes.

Q. And that's an assumption that you would have made; fair to say?

A. Yes.

Q. So, by this time, four months later, they've had the opportunity to go out, and you've had the opportunity, if you wanted to, to go out, which I think you said that you did just to sort of familiarize yourself with the streets and such, you would have been perfectly able to see where there were outside cameras as well if you wanted to, right?

A. I didn't look for cameras. I was looking for street signs so I knew which streets I went up and down.

Q. Okay. Nonetheless, you provided a statement that offered additional detail that previously wasn't provided, right?

A. Yes.

MR. KANE: Objection to form.

BY MR. LEVIN:

Q. Now, we touched on it earlier, IAD ultimately determined there was a violation of the pursuit directive, right?

Page 104

A.   Yes.

Q.   And do you have any understanding of other than the fact, because we already discussed it earlier in your testimony, they determined that the pursuit shouldn't have been initiated; is that fair?

A.   That's correct.

Q.   They found some additional, I guess, what we would call procedural violations once it had been initiated; is that fair to say?

A.   That's correct.

Q.   Specifically, I think they -- well, first off, the type of vehicle that you were in, an SUV, under Directive 9.4, that's not one of the types of vehicles permitted to engage in vehicular pursuits?

A.   I'm not sure on that.  I know on the one report, it was the AID report that had me in a Chevy Tahoe.  It wasn't a Tahoe, which we use now all the time.  It was the --

Q.   You had an Explorer, right?

A.   Yes, Ford Explorer is what the department has.

Q.   My understanding, and correct me

Page 105

if I'm wrong, is that marked patrol cars, like passenger cars, not SUVs, are the types of vehicles that are authorized to engage in vehicular pursuits?

A.   I'm not sure on that one.

Q.   Let me put it up then.

Once again, I'm sharing my screen. Do you see up on your screen Directive 9.4?

A.   Yes.

Q.   And this is the Philadelphia Police Department's policy directive on vehicular pursuits that was in effect at the time when this incident happened?

A.   It was updated in '16.  I think so, yes.

Q.   Are you aware of any updates after that date?

A.   I don't, no.

Q.   Okay.  So, I'm just going to get through to the types of vehicles, and I think that's under General Procedures and Guidelines.

Before we even do that, the policy addresses what the permitted justifications for initiating a vehicular pursuit are, right?

Page 106

A.   Yes.

Q.   So, it states, that an officer is justified in initiating a vehicular pursuit only when they are in close proximity to a suspect vehicle and believes a pursuit is necessary to prevent the death or serious bodily injury of another person, or in close proximity to a suspect vehicle and believes both that the pursuit is necessary to effect the arrest or prevent escape.

And the officer has probable cause to believe that the person being pursued has committed or attempted a forcible felony; or has probable cause to believe that the person being pursued presents as a deadly weapon other than the vehicle itself.

Would you agree that those requirements were not met on the facts of this particular situation?

MR. KANE:  Objection to form.  You can answer.

THE WITNESS:  Yes, I guess.

BY MR. LEVIN:

Q.   Again, not to beat a dead horse

Page 107

over this, but IAD determined that it wasn't justified under that standard, right?

A.   Yes.

Q.   And it actually lists what the forcible felonies are that would sort of fall under that umbrella, correct?

A.   Yes.

Q.   None of those really were involved here, right?

A.   No.

Q.   While I'm fumbling around looking for what I'm looking for, IAD had also determined there was a violation in procedure in that the pursuit wasn't called in, right?

A.   Yes.

Q.   I think the policy also requires that once you initiate the pursuit, you maintain contact throughout, right?

A.   Yes.

Q.   And that wasn't done here either?

A.   No.

Q.   Policy requires that your lights and sirens are activated during the pursuit?

A.   Yes.

Page 108

Q.    And as we see from videos, at least in one respect, that was not done here?

A.    Yes.

Q.    And, also, I believe you're supposed to prepare a pursuit memorandum after the fact?

A.    Yes.

Q.    And that wasn't done here either, correct?

A.    That's correct.

Q.    Let's be clear that that's the same policy that IAD determined was violated in the McKenna incident?

MR. KANE:  Objection to form.  You can answer.

MR. LEVIN:  Not necessarily the same specifics, but 9.4 in general, correct?

THE WITNESS:  I believe so.  I believe so.

MR. LEVIN:  I recognize that there's differences in the facts.

We'll mark the Directive 9.4 as Wolk-6.

Page 109

(At this time, the court reporter marked Exhibit WOLK-6 for identification.)

BY MR. LEVIN:

Q.    And the pursuit policy itself, is that -- that's something you're trained on as a police officer in Philadelphia?

A.    Yes.

Q.    Now, I know that we discussed that one was last revised in 2016.  Is there any -- when they revised the policy of the nature -- I mean, obviously you've been on the force a lot longer than that.

How do they advise you that the policy has been updated?

A.    They come through with training materials.  Usually every one or two years, we get updated training forms that we sign for.

Q.    Is there any type of classroom instruction or the similar?

A.    No.  It's mostly on the training of the directive.

Q.    Okay.  So you're given the written materials and you're expected to absorb it, right?

Page 110

A.    Yes.

Q.    Obviously, vehicle pursuits can involve some serious risks, both to yourself, to whoever the fleeing suspect might be, as well as to bystanders, correct?

MR. KANE:  Objection to form.

THE WITNESS:  Yes.

BY MR. LEVIN:

Q.    And that's sort of the basis for why these types of policies are developed so that you have some guidance, right?

MR. KANE:  Objection to the extent it's speculative, but you can answer.

BY MR. LEVIN:

Q.    Let me ask you this:  You're not supposed to just be out there as a police officer with absolutely unbound discretion to do whatever you want, right?

A.    Absolutely correct.

Q.    You're supposed to be guided by the policies that the police force has in place?

A.    Yes.

Q.    And in the case of vehicular pursuits, the police department has developed a

Page 111

policy which they feel strikes a balance between law enforcement needs, as well as public safety needs, right?

MR. KANE:  Objection to form.  You can answer.

THE WITNESS:  Yes.

BY MR. LEVIN:

Q.    And those are the main considerations that are at play, right, because you're trying to enforce the laws but not unnecessarily endanger anybody?

A.    Yes.

Q.    So, just because things get heated or there is something that sort of makes you want to go after a person, if their conduct or the facts don't fit into the directive, you're not permitted to initiate that pursuit; is that fair?

A.    Yes.

Q.    So, notwithstanding what we just discussed in this particular situation, it is basically a traffic violation and you ended up pursuing the vehicle without calling it in, maintaining contact, or preparing a pursuit memorandum, and at some point, a civilian seems

Deposition of Officer Joseph Wolk                                    Neal Miller and Donna Miller v. City of Philadelphia, et al.

Page 112

1  to jump in and get himself involved; is that
2  fair?
3        MR. KANE:  Objection to form.
4        THE WITNESS:  Yes.
5  BY MR. LEVIN:
6     Q.    Now, are you aware of any prior
7  interactions that Ryan Miller had with the police
8  within the year that this incident occurred?
9     A.    Slightly after that incident
10 happened, someone informed me that he was being
11 investigated for a sexual crime or something like
12 that.
13    Q.    Do you have any specifics on that?
14    A.    He pulled a knife on a girl and
15 had her do a sexual favor on him or something.
16    Q.    From what my understanding is --
17 you know, the parents had been informed of what
18 had happened.
19       My understanding is that he
20 received oral sex from a girl that was younger
21 than him, and it was captured on video.  I guess
22 he shot a cell phone video of it.
23       Did you ever hear anything about
24 that incident in that kind of granular detail?

Page 113

1     A.    No, I did not hear any detail
2  afterwards about what happened.
3     Q.    Did you ever hear what the name of
4  that person was, the girl that was involved?
5     A.    No, I did not.
6     Q.    I've got some indication -- and I
7  cannot swear by this, but then again, I'm not
8  sworn as a witness -- that it might have been a
9  girl named --
10       MR. KANE:  Do you want to do that
11       off the record, Michael, since she's
12       underage?
13       MR. LEVIN:  That's a very good
14       point.
15 BY MR. LEVIN:
16    Q.    We're about to go off the record,
17 and I'm going to provide you with the name of who
18 we believe may be the minor girl that was
19 involved, and then I'll go back on the record and
20 ask you some questions.
21       Okay?
22    A.    Sure.
23       (At this time, a discussion was
24       held off the record.)

Page 114

1  BY MR. LEVIN:
2     Q.    We're back on the record.  I just
3  provided you with a name off the record.
4        Does that name mean anything to
5  you?
6     A.    No idea who that is.
7     Q.    Do you know if Gary is related to
8  anybody by the last name Ortiz?
9     A.    I have no idea who Gary is related
10 to.
11    Q.    Your partner at the time when the
12 McKenna incident occurred, was his name Soto?
13    A.    Oh, no, no, no.  That day -- my
14 regular partner was Soto, but he was off.  It's
15 William Toto.
16    Q.    Your regular partner was Soto,
17 though?
18    A.    He was my regular partner for many
19 years, that's correct.
20    Q.    Do you know if he is related to
21 anybody by the last name Ortiz?
22    A.    No.
23    Q.    I had just run a Lexis search
24 recently on Gary Bove, and there's a person that

Page 115

1  came up as an associate named Michelle Ortiz.
2        Do you have any idea who that
3  individual is?
4     A.    I have no idea who is he
5  associated with.
6     Q.    All right.  We're getting very
7  close to the end.
8        I just want to go over a couple of
9  things.  These had come up in your deposition, I
10 think, in the McKenna matter, which is where I
11 ran across them.  I just wanted to ask you a
12 couple of quick questions on these.  Bear with
13 me.  What we're looking at --
14       MR. LEVIN:  And we'll mark this as
15       Wolk-7.
16       (At this time, the court reporter
17       marked Exhibit WOLK-7 for identification.)
18 BY MR. LEVIN:
19    Q.    What we're looking at is a
20 four-page document.  It's actually a couple of
21 documents, which I believe are performance
22 evaluation reports for you, and some of these go
23 back quite a long time.
24       As an officer, are you given

Page 116

1 annual performance evaluations?
2     A.    Yes.
3     Q.    Okay.  Are you provided with the
4 results of those evaluations once they occur?  Do
5 you get a copy of these things once they're
6 written up?
7     A.    People get a copy.  You're able to
8 view it and either agree with it and sign it, or
9 disagree if you want to argue it.
10     Q.    And that's part of your overall
11 civil service protections and such?
12     A.    No.  It's the performance report,
13 they put in there your duties, how you're
14 performing.
15     Q.    So, this first one, which appears
16 to be dated February 3, 1998.  I can't really
17 make out the name of the rater, it looks like
18 James, maybe Kinny?
19     A.    Kimrey.
20     Q.    Okay.  How do you spell that?
21     A.    K-I-M-R-E-Y.
22     Q.    So, just to go through the
23 narrative section of what he put down on this
24 form, it says, Police Officer Joseph Wolk has

Page 117

1 been under my direct supervision since 12/22/97.
2 Since this time, he's demonstrated that he is a
3 dependable and aggressive patrol officer with a
4 great working knowledge of East Division, which
5 is a great asset of this unit.  I'm looking
6 forward to the great contribution and recognition
7 that I'm sure you'll bring to this unit.  Good
8 luck, and I wish you continued success in all you
9 do.
10         Have I read that correctly?
11     A.    You did.
12     Q.    All right.  The next one that I've
13 got, it looks like it's from 2003.  And I would
14 not even be able to begin to try and decipher who
15 the rater is on this.
16     A.    Let me see.  03?  I can't get that
17 one.
18     Q.    Yeah, it's very faint.
19         Looking at the comments to the
20 employee up towards the top -- and it's very,
21 very similar to the last one.  It says, Police
22 Officer Wolk is a very active police officer for
23 the Highway Patrol.  He's a member of the drill
24 team and takes great pride in his appearance.

Page 118

1 Police Officer Wolk was only sick two days last
2 year -- which, by the way, I have beat since the
3 pandemic.  18 PT one's; 184 vehicles; 71 P/S; 227
4 TVR's.
5         I guess those were statistics that
6 he's referring to?
7     A.    Yes.
8     Q.    Displays the aggressive nonstop
9 attitude he exudes.  Officer Wolk accepts orders
10 in a willing manner and has a talent to foresee
11 future problems and take action on his own to
12 correct any unpleasantness.
13         Have I read that correctly?
14     A.    Yes.
15     Q.    Going down to the next one, which
16 is dated 2011, it looks like the rater is a
17 Lieutenant William?
18     A.    Sergeant William Kleincard (ph).
19     Q.    Okay.  He's a sergeant?
20     A.    Yes.
21     Q.    In the comments to the employee,
22 it states, You're an integral member of the
23 squad.  Your time in service as well as your time
24 here in Highway Patrol are evident in your

Page 119

1 approach to the public and your peers alike.  He
2 misspelled peers.  I commend you on your service
3 as a member of the Highway Patrol drill team.  I
4 do understand you've had some changes in your
5 personal life recently and you've had to focus
6 more of your attention at home.  I appreciate you
7 keeping me informed of issues as they arise.
8         I do want to take this opportunity
9 to remind you that we, as a unit, are driven by
10 activity and are relied upon to have an impact in
11 the areas we're deployed through aggressive
12 patrol.  I would encourage you to take
13 promotional tests when practical.  Keep up the
14 hard work.
15         I've read that correctly?
16     A.    Yes.
17     Q.    Last one, this is from 2013, and
18 it looks like it's also by the same rater.
19 States, you are a valued member of the squad.
20 Your time in service as well as your time here in
21 Highway Patrol are evident in your approach to
22 the public and your peers alike.  Same
23 misspelling of peers.
24     A.    I'll tell him.

Page 120

Q.   He states, I commend you on your service as a member of the Highway Patrol and drill team.  You always volunteer when needed and can be counted on to handle any and all assignment with little or no supervision.  I do want to take this opportunity to remind you that we, as a unit, are driven by activity and are relied upon to have an impact in the areas we are employed through aggressive patrol.

I would encourage you to take promotional tests when practical as I feel you would have a positive impact.  Keep up the great work.

Not only did I read that correctly, but I smell a cut-and-paste job?

MR. KANE:  Objection to form.

BY MR. LEVIN:

Q.   The question I have, you've heard me read through these four evaluations by three different reviewers, I believe, and uniformly, all of them use the term aggressive.

Do you believe that that is part of what you're rated on in terms of your performance of a Philadelphia police officer,

Page 121

your aggressiveness as a police officer?

MR. KANE:  Objection to form.  You can answer.

THE WITNESS:  Yes.

MR. LEVIN:  I'll bring up the next one.  This will be Wolk-8.

(At this time, the court reporter marked Exhibit WOLK-8 for identification.)

BY MR. LEVIN:

Q.   These are Wolk-8.  These are from the same deposition.  These are the exhibits from the McKenna case.  I pulled them off the federal court docket in that case.  These appear to be applications for transfer that you made at various points in time over the course of your career with the department.

The first one being dated June 2, 1993, and it looks like it was endorsed by an inspector, James Donnelly.

Do you recall making this application?

A.   Yes.

Q.   And that's your signature there on the line that my cursor is hovering at?

Page 122

A.   Yes.

Q.   And what you state on your behalf making your pitch, it states, I feel with the experience and knowledge I've gained working in the 26th District, where I'm very aggressive and make numerous arrests, it would be an asset to the police department if I were transferred to Highway Patrol.  I also have the experience and ability to operate a motorcycle.

I've read that correctly?

A.   Yes.

Q.   Was this application approved?  Was this the one that got you onto Highway Patrol?

A.   I think I put two in when I was in the 26th District.  That's '93.  There might have been a second one I put in.  Matter of fact, there was a second one, because it was closer to the time I was transferred, which would be '97.

Q.   All right.  That's probably going to be the next one.  Oh, maybe not.  The next one is '95.

It looks like you were in the 26th at the time; does that sound correct?

Page 123

A.   Yes, I was.

Q.   And, again, this is a document that you prepared to apply for a transfer?

A.   Yes, the Major Crimes Auto Squad.

Q.   It states with the -- again, this is what you put in, I guess on your behalf, right?

A.   Yes.

Q.   I feel with the experience and knowledge I've gained working in the 26th District, where I am very aggressive and make numerous arrests, including --

A.   Re-vined.

Q.   -- re-vined -- I know what that is -- autos, it would be an asset to the police department if I was transferred to the Major Crimes Auto Squad.

Again, I've read that all correctly, right?

A.   Yes.

Q.   Finally, I think this is the one you had just touched on in '97.  Is this where you ended up getting transferred to Highway Patrol?

Page 124

A.    Yes, yes.

Q.    This one states, again, this is you on your behalf, I feel with the experience and knowledge I have gained on the 26th District currently assigned to Five Squad Burglary Detail, where I'm very aggressive making numerous arrests in problem/high crime areas within the 26th District, that I would be an asset to the Highway Patrol if I was respectively transferred.

I guess that was ultimately approved, right?

A.    Yes.

Q.    Now, again, this is you and I couldn't help but notice, it's the same word that's being used uniformly by you every time that was also used in your performance evaluation, that you're aggressive.

How is that defined by you in terms of how you approach police work?

A.    Aggressive is when you're assigned to a certain area or assigned when you're doing your job. Aggressive is going out there, looking at wanted posters, looking at the computer, see what goes on in the area, see who the

Page 125

perpetrators are. I was always at work doing something. I made countless, thousands of arrests my whole career.

Q.    I certainly don't want to get into semantics, but it sounds that what you're describing there is what I kind of consider as proactive, which is another occupational buzzword that a lot of people throw around, meaning that you try to get on top of things; you stay ahead of things.

Do you distinguish that type of meaning from the more common understanding of aggressive is like a physicality kind of thing?

A.    Not exactly.

Q.    I mean, were you using the term aggressive or were your supervisors in grading you using the term aggressive in some other way as it's commonly understood?

A.    No.

MR. KANE:  Objection to form.

THE WITNESS:  No.  Absolutely not.

BY MR. LEVIN:

Q.    Now, final thing.  I guess it's slightly personal, so I'm going to tread lightly.

Page 126

I know that I had seen after -- in your testimony in the McKenna matter, that seemed to have some emotional effects on you; would that be fair to say?

MR. KANE:  Are you talking about McKenna?

MR. LEVIN:  Yeah.

BY MR. LEVIN:

Q.    What happened with Bailey McKenna, that accident?

A.    Absolutely, yes.

Q.    Can you sort of describe for me what you were experiencing after that?

A.    Well, I witnessed a death.  I mean, a few deaths, a lot on the job.  Hundreds of deaths, different situations.  You know, him striking the side of my vehicle, I'm next to him trying to tell him to stay with me and all that stuff.  Including this case here, someone young died, who if you're not a human being and have a heart, it's taken effect on me and I see a behavioral doctor.

Q.    Now, I saw in your answers to discovery in this case -- maybe it was in the

Page 127

Internal Affairs stuff, there's some reference to you seeking some therapy after this thing with Ryan.

Had you seen anybody for therapy after the McKenna thing and before the incident with Ryan?

A.    After McKenna and continuing to this day.  I've also witnessed, coming home from work, someone decapitated on a motorcycle that I had to take action out of my car.  I'm in uniform.  People are looking at me.  I'm in uniform on a highway.  It builds up.

People don't know what you take home with you.  I got to a boiling point that -- doing the deposition and all, you sit here and it's 33 years doing this, I've been involved in four shootouts, close range shot at, numerous things that it's taken effect that it's just -- one thing in the police department, I talk to a lot of, with my partner, male officers, female officers, especially male, I tell them, don't keep everything inside of you.  If you seek help. I give numbers out.  I'm that kind of person always helping other officers who come to me.

Page 128

They know my number; call me if you need help.
I've been there.

One thing I put my partner on is
if he hears someone on the radio or we go to a
job and someone committed suicide, he would say,
oh, how can that person do that. I turned around
and said, Don't ever say that in front of me
again because I don't say too much to him about
what I've gone through; he knows a little bit.
But personally, I understand that more than ever.
I've been there.

I tell people, people who say
they're going to commit suicide, don't; the
people who don't say it, do it. I said I finally
took the step myself, years ago, and same
counselor to this day. I'm still seeing him
actively. It's a job that -- you know, being a
police officer, it takes effect on your life. I
try to keep it out of the home, you know, I try
to keep it inside and continuously get help for
that. It's not easy.

Q.   And thank you for your candor. I
am sensitive to the fact that this is a job that
can involve close proximity to violence, to

Page 129

death, and that has an inherent effect on the
human brain, no matter what. You know, people
manifest that in very different ways.

So let me ask you this: Have you
ever been diagnosed, as a result of all that,
with PTSD?

A.   Yeah, PTSD. I was already
diagnosed with that, yeah, not too long ago.

With this matter here, I'm looking
at a view of observing Mr. Miller going the wrong
way on a highway. When I lost my good friend at
work, Brian Lorenzo, in 2012, he was killed by a
driver going the wrong way on 95 right close to
my house, where I was living at the time. I put
my uniform back on and went to that scene. I
still can't erase it from my head what I seen.
Someone you work with, and you know, you just
try -- I tell officers when we come upon death of
someone close, it's hard at first, and then you
start healing.

I spoke to my guys, who gave me a
hug one day, and I stood in front of them and
said, I've been through partners who were killed
in the line of duty. I've been involved in

Page 130

plenty of shootouts; I shouldn't be here right
now. One of the guys was shot at -- this is
between me and Derek -- and he missed me.

I said to this day, I'm here for a
reason, including Ryan Miller. I played back all
night long thinking about it saying, I had him.
What if I took him to the ground. I keep
replaying when he was going the wrong way on the
roadway, I just seen disaster coming. That's why
I took action to stop him.

Like I said, it's hard. It's very
hard. I get more thanks than ever being a police
officer out there. People like you, you don't
know what we take home with us. That's why
suicide is so high in police. I lost a partner
in 1991. I almost quit the job, but I continued,
and I just kept my approach to being a good cop
and doing what I had to do. And my guys, my
younger guys, call me for everything. I don't
mind that. I tell them, you need to call. I'm
like a psychiatrist. People do call me.

Even off the job, I have friends
that have problems. Give me a call, and let's go
grab a drink or whatever. I've been through

Page 131

this. It's taken a toll on me, let's put it that
way. It really has. This coming up now, I
told Derek --

MR. KANE:  Hold on. You can't
tell him anything we spoke about.

MR. LEVIN:  I don't want to hear
what you told Derek, unless you're just
shooting crap about sports or something.

THE WITNESS:  I'm sorry.

MR. LEVIN:  I do appreciate it.
This is real talk and this is kind of
important.

BY MR. LEVIN:

Q.   Now, you had mentioned that you
lost -- did you say a partner or just a co-worker
in a similar kind of thing going down the wrong
way?

A.   Brian Lorenzo in 2012. I just
left him at work. He was riding his motorcycle
home. Drunk driver going the wrong way on 95 at
Cottman. I seen the videos and all. I was
there. I was done work, got my uniform back on,
and went up there. What I've seen, I'll never be
able to erase it from my mind.

Deposition of Officer Joseph Wolk

Neal Miller and Donna Miller v. City of Philadelphia, et al.

Page 132

Q.    So, you mentioned that your mind flashed to that when you saw Ryan going the wrong way?

A.    Absolutely.

Q.    Do you think that that might have had an effect on all this stress that you carried around that played in a role in you sort of departing from policy in doing this?

MR. KANE:  Objection to form.

THE WITNESS:  It wasn't departing from policy, it was stopping his actions to know what was going on, suicidal or DUI, before something happened to him. That's what I can say to you.  And I had him stopped and wish I would have tackled him so all this would have never happened.

BY MR. LEVIN:

Q.    Okay.  Let me backtrack that because that was probably a poorly asked question.

When you saw Ryan doing that, you flashed back to your experience with Mr. Lorenzo, that brings up some feelings for you when that

Page 133

happens, right?

MR. KANE:  Objection to form.  You can answer.

THE WITNESS:  Yes.

BY MR. LEVIN:

Q.    Do you feel that may have to some degree -- take policy out it.  Do you feel that that feeling, what you experienced then in some way informed your actions that day?

MR. KANE:  Objection to form.  You can answer.

THE WITNESS:  Yes.  I wanted him to stop what was going on, not knowing what was going on with him before something happened, his well-being.

MR. LEVIN:  Sir, I don't have anything else.  Thank you for hanging in there for that last part.

MR. KANE:  I have a couple very brief questions.  Let's take a five-minute break.

(At this time, a short break was taken.)

Page 134

BY MR. LEVIN:

Q.    We're back on the record after our break.  Staying along the same lines, we already established that this sort of took you back with the incident with Officer Lorenzo -- and, by the way, it didn't click to me until we were on break and you mentioned where this incident with Officer Lorenzo happened.

Is he the same person that on 95, it's now the Officers Lorenzo and O'Scanlon Memorial Highway?

A.    O'Hanlon was killed right by the same location, '85; he was run over by a tanker truck that caught fire.  So they dedicated the highway to Officer O'Hanlon and Officer Lorenzo, that part, yes.

Q.    So that's the same Lorenzo, correct?

A.    Yes.

Q.    Now, obviously that brings up a lot of emotions, right?

A.    Yes.

Q.    As we look back now, as you look back in your mind's eye that day, with Ryan, do

Page 135

you feel that that reaction could have clouded your judgment in any way during the course of this pursuit?

MR. KANE:  Objection to form.

THE WITNESS:  Judgment?

BY MR. LEVIN:

Q.    You know, you have to make some decisions, right, as you're doing your job there and this type of situation.

So you have to make some judgments as you're making some decisions, right?

A.    Yes.

Q.    Do you feel that your emotional reaction to that could have affected you in the course of discharging your duties that day?

A.    I don't think it was emotional. What I observed just brought back -- seeing him in that oncoming lane, going towards oncoming traffic, which put myself at risk of shooting up ahead of him in case contact with a car or a car swerves and misses him.  I don't know what was going to happen, but I put myself up there in that spot to save him from if someone came around that turn and would have gotten hurt.

Page 136

Q.   But at some point fairly early in this sequences of events, on that danger dissipated?  He ends up going the right way down Tacony, and he's traveling gown Fraley and James and all that.  That immediate threat you were reacting to is now dissipated, but yet the pursuit continues.  And there's a couple of times that you're in very close proximity to the scooter, and we've already discussed there are risks.

If you make a hard turn and you hit the guy on the scooter, it's all over for that guy.  Thank God that didn't happen, but there were a couple of close moments there during the course of this.

So, I'm just sort of trying to get a sense of after that danger dissipated, where your head was at.

MR. KANE:  Objection to form.  Argumentative.  You can answer it.

THE WITNESS:  When I got up to Fraley Street and James, it looks only a little bit of time that went by.  From the video showing, it looks like my

Page 137

vehicle swerved in front of his.  It would have damaged my car or injured him.  So, I would not put my car in front of someone to do that.  It was a very short period I had him stopped.

BY MR. LEVIN:

Q.   Anyway, you end up, after all this is done, at the accident scene, correct?

A.   Yes.

Q.   And did you have an opportunity to observe the injuries to Ryan?

A.   Yes.

Q.   What did you see?

A.   He had a head wound.

Q.   It was very severe, correct?

A.   Yes.

Q.   There was Officer Sevino -- he might not be an officer, he might have a different rank, but he was the guy that came and did the accident investigation.  He had indicated there was also some blood from where Ryan struck on the trailer body of the truck.

Did you see that?

A.   No.

Page 138

Q.   Did it appear that Ryan was responsive in any way, or do you feel that he died immediately as a result of his injuries?

A.   I believe he died immediately.

MR. LEVIN:  All right.  I have nothing further.

MR. KANE:  Very briefly.

BY MR. KANE:

Q.   Officer Wolk, do you remember what kind of vehicle Mr. Miller was using on the day we've been talking about?

A.   What he was operating?

Q.   Yes.

A.   It was a street legal Yamaha scooter -- street legal scooter.

Q.   Just a moment ago, you mentioned when you initially tried to stop Mr. Miller when he was in the wrong lane, you believed that he posed a danger to oncoming drivers as well as himself; is that correct?

A.   Absolutely.

Q.   Okay.  And I just want to -- and what kind of danger to oncoming drivers do you think he posed at that time?

Page 139

A.   Well, he was in the wrong lane of traffic.  Someone coming around that turn could have struck him or swerved and lost control of their car and crashed and been seriously hurt.

Q.   Okay.  I just want to go back to the term aggressive as we saw in some of the performance reviews.  Can you, again, tell us in your own words what you understand that to mean?  What's aggressive police work?

A.   Yes.  If an outside civilian is reading that word, what you're reading on a paper as aggressive, you may take it differently than that's meant in policing.  Like I said, to go out there every day, do the job, get Wanted fliers.  Get the people who are wanted out there, and do the work to change an area you're assigned to.

The 26th and all that stuff, when I was assigned there, aggressive was -- I was part of burglary detail.  I did schematics of burglary areas in plainclothes going out there each night aggressively -- I changed my hours for the certain time burglaries would happen to be out there to make the arrests and interview people I knew or whatever.  So that's

Page 140

1  aggressively.
2          Highway Patrol, same thing, going
3  out in -- we're in high-crime areas every night.
4  It's shootings all night long trying to catch the
5  bad guys.  We're not a car riding around
6  answering moderate calls, auto accidents, or
7  disturbance in the house.  We're out there
8  responding to the big stuff, robberies,
9  stabbings, you know, wanted people.  That's
10 aggressive.
11         To be in Highway Patrol, that's
12 what gets you there.  You want to do police work,
13 not just ride around in a patrol car and maybe
14 stop a car here and there and direct traffic.
15 We're a different part of the unit, of the police
16 department.
17      Q.    Just to be clear, the description
18 you just gave, is that what you believe the full
19 definition of aggressive is in the context we've
20 been talking about?
21      A.    Absolutely.  It's not aggressive
22 as far as what the public thinks of aggressive.
23 If someone is talking to you about being
24 aggressive, grabbing someone or doing something,

Page 141

1  no, it's not that.  It's going out there and
2  going above your responsibilities of a police
3  officer.
4          MR. KANE:  That's all the
5      questions I have.  There might be some
6      follow-ups based on that.
7          MR. LEVIN:  I do not.  Thank you
8      for your time and your indulgence.  I
9      know it got a little hairy and personal,
10     but thanks for hanging in there.
11         MR. KANE:  Thank you, everyone.
12         (Witness excused.)
13         (Deposition ended at 1:05 p.m.)
14
15
16
17
18
19
20
21
22
23
24

Deposition of Officer Joseph Wolk                    Neal Miller and Donna Miller v. City of Philadelphia, et al.

```
 1                 C E R T I F I C A T I O N

 2

 3

 4                  I, Julie A. Damiani, a

 5           Professional Reporter and Notary Public

 6           for the Commonwealth of Pennsylvania,

 7           do hereby certify that the foregoing is

 8           a true and accurate transcript of the

 9           stenographic notes taken by me in the

10           aforementioned matter.

11

12                         - - -

13

14

15

16

17

18

19

20   DATED: MAY 24, 2023

21

22
        _Julie Damiani_
23   _____

24   JULIE A. DAMIANI
```

## WORD INDEX

**< 0 >**
**000057** 46:*19*
**018** 98:*12*
**03** 117:*16*

**< 1 >**
**1** 90:*1, 2*
**1:05** 141:*13*
**10:11** 1:*17*
**109** 3:*20*
**115** 3:*21*
**12** 1:*14*
**12/22/97** 117:*1*
**121** 3:*22*
**1210** 2:*5*
**138** 3:*7*
**14th** 2:*13*
**1515** 2:*13*
**16** 105:*14*
**18** 118:*3*
**184** 118:*3*
**19** 98:*13*
**19053** 2:*6*
**19102** 2:*14*
**1983** 12:*15* 13:*11*
  22:*15*
**1990** 7:*2*
**1991** 130:*16*
**1993** 121:*18*
**1997** 7:*15*
**1998** 116:*16*
**1-B-2** 61:*13*

**< 2 >**
**2** 90:*2, 3* 93:*14*
  121:*17*
**2:20-cv-06301-ER**
  1:*12*
**2003** 117:*13*
**2011** 118:*16*
**2012** 129:*12* 131:*18*
**2013** 119:*17*
**2015** 90:*5*
**2016** 109:*9*
**2019** 24:*7* 97:*17*
**2021** 20:*6*
**2023** 1:*14* 142:*20*

**215.686.1774** 2:*14*
**215.953.5200** 2:*6*
**227** 118:*3*
**24** 142:*20*
**25** 32:*12* 35:*22*
**25th** 7:*11*
**26** 7:*2*
**26th** 7:*13, 15* 122:*5,*
  *16, 23* 123:*10* 124:*4,*
  *7* 139:*17*
**280** 2:*5*

**< 3 >**
**3** 116:*16*
**30** 32:*13*
**33** 127:*16*

**< 4 >**
**4** 3:*6* 92:*21* 97:*17*
**45** 27:*9*
**46** 3:*15*

**< 5 >**
**5** 46:*9* 47:*5*
**50** 27:*9*
**5400** 46:*9* 47:*7, 10*
  48:*3, 4* 93:*17*

**< 6 >**
**60** 3:*16*
**6734** 6:*14*

**< 7 >**
**7** 24:*7* 98:*12*
**7:15** 47:*6*
**7:24:20** 47:*6*
**7:24:22** 48:*1*
**7:27:19** 72:*7*
**7:27:25** 73:*2*
**7:27:29** 74:*3*
**7:27:36** 75:*2*
**7:27:42** 75:*22*
**7:27:50** 76:*4*
**71** 118:*3*

**< 8 >**
**85** 134:*13*

**< 9 >**

**9.4** 3:*20* 60:*22, 24*
  61:*13* 104:*14* 105:*8*
  108:*17, 23*
**90** 7:*2*
**92** 3:*17, 18*
**93** 122:*16*
**95** 7:*20* 8:*4* 122:*22*
  129:*13* 131:*20* 134:*9*
**97** 3:*19* 122:*19*
  123:*22*

**< A >**
**a.m** 1:*17*
**ability** 122:*9*
**able** 29:*20* 34:*20*
  35:*2* 39:*4* 40:*4*
  42:*20* 88:*17* 103:*10*
  116:*7* 117:*14* 131:*24*
**Absolutely** 49:*13*
  110:*17, 19* 125:*21*
  126:*11* 132:*4* 138:*21*
  140:*21*
**absorb** 109:*23*
**academy** 6:*24* 7:*1*
  23:*14*
**accelerated** 28:*10*
  77:*8* 94:*6* 100:*5*
**accepts** 118:*9*
**accident** 83:*2* 84:*14*
  87:*5, 9, 12* 89:*13*
  90:*3, 21* 91:*13* 101:*1*
  126:*10* 137:*8, 20*
**accidental** 65:*21*
**accidentally** 64:*17, 21*
**accidents** 81:*14, 18*
  140:*6*
**accommodate** 6:*4*
**account** 94:*19* 101:*10*
**accurate** 21:*13* 72:*9*
  89:*7* 91:*3* 142:*8*
**action** 56:*10* 63:*12*
  118:*11* 127:*10*
  130:*10*
**actions** 56:*1* 57:*4*
  132:*11* 133:*9*
**activated** 25:*18* 26:*5*
  107:*23*
**active** 117:*22*
**actively** 128:*17*

**activity** 119:*10* 120:*7*
**actual** 53:*6* 71:*2*
**addiction** 24:*3*
**addition** 90:*12*
**additional** 23:*24*
  103:*17* 104:*8*
**addresses** 105:*23*
**Administrators** 1:*5*
**advise** 109:*13*
**Affairs** 9:*11, 13* 14:*7,*
  *10* 23:*6* 46:*5* 47:*1*
  97:*3, 12* 100:*21*
  101:*12, 16* 102:*22*
  127:*1*
**affirmative** 63:*11*
**aforementioned**
  142:*10*
**aftermath** 95:*9*
**aggressive** 27:*5, 6*
  117:*3* 118:*8* 119:*11*
  120:*9, 21* 122:*5*
  123:*11* 124:*6, 17, 20,*
  *22* 125:*13, 16, 17*
  139:*6, 9, 12, 18*
  140:*10, 19, 21, 22, 24*
**aggressively** 53:*7, 12*
  77:*23* 88:*15* 139:*21*
  140:*1*
**aggressiveness** 121:*1*
**ago** 11:*2* 80:*1* 82:*21*
  94:*16* 128:*15* 129:*8*
  138:*16*
**agree** 19:*1* 20:*10*
  35:*6* 40:*6* 46:*11*
  47:*12* 49:*9, 14, 22*
  51:*22* 54:*19* 61:*22*
  71:*8* 73:*3* 93:*12*
  106:*17* 116:*8*
**agreed** 4:*2* 50:*20*
**agrees** 47:*15*
**ahead** 7:*10* 26:*14*
  29:*10* 30:*9* 40:*24*
  47:*23* 56:*7* 66:*12*
  72:*11* 76:*10, 24* 79:*9*
  84:*7, 10, 13* 86:*14*
  125:*9* 135:*20*
**ahold** 94:*5*
**AID** 9:*10* 23:*20*
  27:*1* 77:*11* 86:*20*
  89:*3, 19* 92:*14, 19*

Deposition of Officer Joseph Wolk                    Neal Miller and Donna Miller v. City of Philadelphia, et al.

93:1  96:18, 19, 23
101:10  104:18
**air**  92:5  99:3, 18
**al**  1:10
**alike**  119:1, 22
**allegation**  13:4
17:22  18:7, 9  21:19
**allegations**  20:24
21:6
**alleged**  21:4
**alliteration**  70:2
**allowed**  54:22  55:13
**alongside**  47:11  73:8
99:21
**angle**  36:2  41:2
**annual**  116:1
**answer**  5:10, 19  6:6
9:20  13:22  15:21
17:1, 2  18:3, 13
21:16  22:21  26:21
27:20  35:10  36:1
37:21  40:14  44:11
45:11, 18  49:19  50:5
51:8  52:3  53:2  54:4,
11  55:16  56:18
58:12, 14  59:18  63:8,
14  64:13, 23  66:21
69:16  76:8  78:6
79:11, 18  81:11
84:20  87:18  88:3
90:2, 4, 15  91:6
93:16  98:17  106:21
108:15  110:13  111:5
121:3  133:3, 11
136:20
**answering**  22:3
140:6
**answers**  89:24
126:23
**anticipation**  9:5
**anybody**  111:11
114:8, 21  127:4
**anymore**  79:20  80:11
**anyway**  28:7  66:3
137:7
**apologize**  70:1, 19
**apparently**  77:21
**appear**  21:22  73:19
78:20  86:10  87:21,

24  121:13  138:1
**appearance**  117:24
**appeared**  34:13, 15
88:14
**appears**  12:20  41:2,
12, 19  42:14  74:15
93:16  94:10  116:15
**application**  121:21
122:12
**applications**  121:14
**apply**  123:3
**appreciate**  119:6
131:10
**apprehend**  49:17
50:1  51:6, 24  52:10
61:5  66:19
**apprehension**  49:11
**approach**  119:1, 21
124:19  130:17
**approached**  98:21
100:2
**approaching**  69:5
**approved**  122:12
124:11
**approximately**  7:4
11:2  29:12  76:23
**Arch**  2:13
**area**  17:11  28:17
31:8  35:3  65:10
71:12  79:23, 24  81:6
85:6  88:21  98:15
99:13  124:21, 24
139:16
**areas**  7:24  98:6
119:11  120:8  124:7
139:20  140:3
**argue**  116:9
**Argumentative**
136:20
**arm**  91:2
**arrest**  10:15  11:17,
19  20:16  106:9
**arrested**  20:14  21:9
**arrests**  7:24  122:6
123:12  124:6  125:3
139:23
**Arsenal**  24:19
**asked**  4:18  6:6
20:13  50:18  81:15
90:8, 21  91:14  93:10
132:20

**asking**  17:14  33:10
47:15  62:1  90:13
93:15
**assaulted**  83:19
**asset**  117:5  122:6
123:15  124:8
**assigned**  7:3  8:20
20:13  25:14  124:5,
20, 21  139:16, 18
**assignment**  120:5
**associate**  115:1
**associated**  9:7  115:5
**ASSOCIATES**  2:4
**assume**  25:19  65:17
97:12
**assuming**  11:8  12:16
64:8
**assumption**  103:2
**attachments**  9:15, 16
**attempt**  98:13  99:3
**attempted**  61:5
93:18  98:24  106:13
**attended**  23:22
**attention**  119:6
**attitude**  118:9
**attorney**  4:17
**ATV**  13:17
**ATVs**  52:24
**auction**  10:18
**August**  7:2
**authority**  8:8
**authorized**  105:3
**auto**  81:18  90:3
123:4, 17  140:6
**autos**  123:15
**Avenue**  13:18  16:14,
16
**avoid**  28:12  43:3
**aware**  51:12  63:18
68:20  72:21  105:16
112:6
**awhile**  56:22

**< B >**
**back**  15:14  16:6
23:14  24:3  29:5
31:12, 19, 20  34:17,
18  36:12  38:21, 23
39:7  41:18, 20  42:6
51:19  57:15, 21  58:8,

9  59:5  61:24  62:8
66:4, 5  67:24  68:2, 3,
14  71:12, 13  74:21,
23  75:4, 23  76:6, 22
78:4, 7  79:7  85:5, 9,
16  86:1  87:15  92:9
93:10  94:23, 24
95:11, 15  96:22
99:10  101:5  102:17,
18  113:19  114:2
115:23  129:15  130:5
131:22  132:23  134:2,
4, 23, 24  135:17
139:5
**backtrack**  132:19
**backwards**  94:3
100:3
**bad**  55:7  140:5
**Badge**  6:13  60:23
**Bailey**  13:13, 20
14:2  52:21  126:9
**balance**  111:1
**bar**  71:22
**barricade**  52:10
**base**  18:23
**based**  141:6
**basic**  96:16
**basically**  13:4  21:4
35:2  38:18  55:9
61:19  74:4  81:3
91:16, 19  95:2  96:19
111:21
**basis**  4:20  9:2  110:9
**Bear**  19:15  33:16
39:24  70:9  92:14
115:12
**Beasley**  31:19
**beat**  7:4, 7, 8  106:24
118:2
**began**  100:5
**beginning**  34:6  63:23
**begins**  47:5
**behalf**  122:2  123:6
124:3
**behavioral**  126:22
**believe**  14:14  16:17
21:14  23:5  24:7
33:5  35:20  37:2, 5
39:16  46:8  59:19, 24
71:11  77:18  82:13

Case 2:20-cv-06301-MMB   Document 68-1   Filed 02/16/24   Page 42 of 68

Deposition of Officer Joseph Wolk                    Neal Miller and Donna Miller v. City of Philadelphia, et al.

83:22  85:2, *19, 20*
87:*10*  89:*9*  93:8
95:*10*  97:2, *24*
106:*12, 14*  108:4, *19,
20*  113:*18*  115:2*1*
120:2*0, 22*  138:4
140:*18*
**believed**  77:*24*
138:*18*
**believes**  106:5, *8*
**best**  29:*13*  57:*1*
**big**  140:8
**bike**  13:*17, 20*  14:2
17:*10*  74:2*1*
**bikes**  52:*23*
**bit**  34:*14*  36:*23*
39:*1*  42:*16*  54:*18*
74:*16*  128:*9*  136:2*3*
**blind**  28:4, *9*  29:2
**block**  46:*9*  48:4
57:2*1*  58:*1*  72:*13, 15*
73:*11*  76:2*3*  88:6
93:*18*
**blocking**  76:*18*
**blocks**  31:*13*  57:6, *8,
11, 18, 23*
**blood**  137:2*1*
**blow**  99:*18*
**blowing**  92:4
**blown**  99:2
**blue**  67:*17*  68:*9, 20*
69:*3*  73:4  81:4
**blur**  25:*12*  77:*9*
88:*9*
**blurred**  68:*11*
**Board**  23:4
**bodily**  48:2*4*  52:*15*
106:6
**body**  94:6  137:2*2*
**boiling**  127:*14*
**bottom**  89:2*2*
**Bove**  77:4  92:*17*
114:2*4*
**brain**  129:2
**break**  5:2*4*  6:3, *7*
56:2*3*  70:*3*  80:*3*
133:2*1, 22*  134:3, *6*
**breaking**  80:2*3*
**Brian**  129:*12*  131:*18*
**brick**  71:*18*

**Bridge**  24:*15, 16, 22*
28:2*3*  30:*19*  71:*10,
23, 24*
**brief**  4:*15, 23*  77:*1*
96:*20*  133:2*0*
**briefly**  15:*8*  99:*11*
138:*7*
**bring**  19:*13*  33:*15*
37:*11*  45:2*4*  117:*7*
121:*5*
**brings**  132:2*4*  134:2*0*
**broadly**  13:*16*
**brought**  20:*17*
135:*17*
**buddy**  70:*15*
**builds**  127:*12*
**bulk**  93:7
**bunch**  9:*14*  11:*10*
**burglaries**  139:2*2*
**Burglary**  124:5
139:*19, 20*
**business**  71:*17*
**buzzword**  125:7
**bystanders**  110:5

< C >
**call**  15:*1*  80:*3*  85:*12*
104:*9*  128:*1*  130:*19,
20, 21, 23*
**called**  7:2*2*  15:5, *6*
20:*15, 18*  71:*9, 20, 22*
80:2*2*  81:*1*  82:2
85:*3, 14*  87:4  91:*14*
92:*8*  107:*14*
**calling**  111:2*2*
**calls**  82:7  140:6
**camera**  36:*3*  46:*9*
47:4, *5*  48:*10*
**cameras**  80:2*4*
103:*11, 13*
**candor**  128:2*2*
**canvas**  102:2*3*
**caption**  20:5
**captured**  112:2*1*
**car**  8:2*1*  9:4  10:*16,
17, 19*  44:2*2*  45:8
56:8  66:*18*  68:5, *9,
15, 21*  69:3, *4, 9*
76:2*2*  77:2*2*  79:6
80:2, *24*  88:*13, 18*

90:2*2*  92:*3*  127:*10*
135:2*0*  137:2, *3*
139:*4*  140:5, *13, 14*
**career**  121:*16*  125:*3*
**carried**  132:6
**carrier**  82:*15, 22*
83:*1*
**cars**  27:7  30:2  43:*9*
70:*18*  105:*1, 2*
**case**  4:*17, 20*  9:7
10:*17*  11:6  12:*15, 16,
17, 19, 21*  13:*12, 14*
15:*4*  18:2*0, 24*  19:*4,
8, 12*  21:*1*  22:*11, 14*
45:6  55:2*2*  110:2*3*
121:*12, 13*  126:*19, 24*
135:2*0*
**cases**  11:*10, 14, 17,
18*  22:*15, 17*
**catch**  78:*14*  94:*12*
140:*4*
**catch-22**  54:*19*
**caught**  25:*12*  30:*14,
16*  57:4  93:*17*
134:*14*
**cause**  48:2*4*  106:*11,
14*
**cell**  82:*10, 14*  85:*3*
112:2*2*
**Center**  2:5  7:3, *9*
65:*8*
**certain**  64:*16*  124:2*1*
139:2*2*
**certainly**  71:*15*  125:*4*
**certification**  4:*4*
**certify**  142:7
**chain**  23:6
**chance**  93:*3*
**change**  28:6  139:*16*
**changed**  80:*10*  82:*17,
19, 20, 21*  139:2*1*
**changes**  119:*4*
**characterization**
53:*13*  91:*4*
**characterized**  48:*16*
**charged**  21:*9*
**charges**  11:2*0*
**chase**  29:*6*  84:*11*
94:*13*

**chatter**  34:*5*
**check**  64:*6*
**Chevy**  104:*19*
**choppier**  34:*14*
**choppy**  34:2*2, 23*
**circumstances**  61:*14*
81:2*0*
**cities**  53:*11*  54:*15*
**citizen**  49:*11, 16, 17*
50:*1*  51:*6, 24*  52:*10*
**CITY**  1:*9*  2:*8, 16*
7:3, *9*
**civil**  10:*5*  12:2*1*
116:*11*
**civilian**  100:*9*
111:2*4*  139:*10*
**classes**  23:*19*  24:2
**classroom**  109:*18*
**clear**  46:*17*  47:*14*
50:*4*  108:*11*  140:*17*
**clearly**  63:2
**click**  134:6
**close**  28:2*1*  32:4
35:2*1*  43:2*0*  77:7
88:7  100:*4*  106:4, *7*
115:7  127:*17*  128:2*4*
129:*13, 19*  136:8, *14*
**closer**  122:*18*
**Cloud**  19:*17*
**clouded**  135:*1*
**Clowe**  47:*1*  48:*16*
**Code**  49:*12*  53:2*1*
55:*11*
**codefendant**  21:*8*
**collided**  16:*19, 23*
45:8  61:*10*  84:2*4*
**collision**  13:*19*  15:*11*
17:*15*  18:*10*  28:*12,
13*  42:*10*  44:7, *22*
53:6  61:*12*
**come**  4:*18*  30:2*2, 23*
32:*18*  36:*12*  62:8
85:5, *9, 16*  86:*1*  87:5,
8*  92:*9*  93:*10*  95:*10*
109:*15*  115:*9*  127:2*4*
129:*18*
**comes**  8:6, *8*  28:5
67:*12*
**coming**  38:2*1, 23*
39:2*3*  40:7  67:*16*

127:8  130:9  131:2
139:2
**command**  23:6
**commenced**  101:17
**commend**  119:2
120:1
**comments**  117:19
118:21
**commit**  128:13
**committed**  14:12
106:13  128:5
**common**  125:12
**commonly**  125:18
**Commonwealth**  1:19
142:6
**communication**  84:1
**complaint**  13:3  21:7
**completely**  72:8
74:10
**computer**  124:23
**concerned**  13:12
**concerns**  21:20
**concerted**  5:24
**Conclusion**  3:16
9:18  50:11  59:23
**conclusions**  50:4, 7
**conduct**  111:15
**connect**  31:15
**connected**  14:7
**connection**  11:9
14:12  81:23
**conscious**  49:6
**consciously**  68:20
**consider**  125:6
**considerations**  111:9
**considered**  57:20
**console**  65:5, 6, 8
**constituted**  59:14
**contact**  84:2  107:18
111:23  135:20
**contacted**  83:18
**contains**  20:5
**contention**  15:9
**context**  140:19
**continue**  78:14  79:15
**continued**  56:7, 21
57:5  99:18  117:8
130:16
**continues**  66:8  136:7

**continuing**  23:15
127:7
**continuously**  128:20
**contribution**  117:6
**control**  49:3, 6  65:2
69:21  139:3
**conversation**  86:18
87:1
**Conversationally**  5:10
**convicted**  21:3
**conviction**  13:6  21:5
**coordinate**  48:1
**cop**  130:17
**copy**  20:12, 17  116:5,
7
**corner**  57:22  68:12
75:2  77:9  87:22
92:7  93:24
**Corporate**  2:5
**correct**  6:17  7:9
8:16  11:11  15:2, 7,
12  16:19, 20  17:8, 13,
18  18:1, 11  22:12, 13
24:10, 11  25:5, 7, 21,
22, 24  26:5, 6  29:6
30:5, 6, 13, 21  31:1, 2,
5  32:15, 21  35:12, 18
36:18  37:8, 14  38:4,
15  41:22  43:10, 12,
18, 22  45:12  47:9
48:7  49:4, 5  50:2
51:6, 17  52:11, 17
54:24  59:2, 3  61:23
62:7  66:7, 10, 13
68:15, 16  69:12
72:19, 20  74:8, 11, 12,
14, 24  75:6, 8, 19
76:2, 3  79:2  87:5
94:11, 19  95:6, 7
96:12, 24  101:7
104:7, 11, 24  107:6
108:9, 10, 18  110:5,
19  114:19  118:12
122:24  134:18  137:8,
15  138:20
**correctly**  47:16, 21
100:18  117:10
118:13  119:15
120:15  122:10

123:19
**Cottman**  131:21
**counsel**  4:2  97:21
**counselor**  128:16
**counted**  120:4
**countless**  125:2
**couple**  4:23  12:19
18:21  31:17  35:8
59:11, 15  62:22
70:18  73:1  74:2
80:17, 18  82:3  84:8
89:23  115:8, 12, 20
133:19  136:7, 14
**course**  80:20  121:15
135:2, 15  136:15
**COURT**  1:1  5:4
8:23  10:16  20:18
21:23  46:21  60:13
92:20  97:8  101:23,
24  109:1  115:16
121:7, 13
**cover**  6:2  81:14
**covered**  7:21  93:7
**co-worker**  131:15
**CPR**  23:20
**crap**  131:8
**crash**  86:12  95:9
**crashed**  139:4
**crazily**  53:7
**crime**  7:24  112:11
124:7
**crimes**  7:24  123:4, 17
**criminal**  11:10
**crosswalk**  17:11
**cruiser**  65:3
**current**  82:22
**currently**  7:16  124:5
**cursor**  98:9  121:24
**curve**  28:4, 15  29:15
98:22
**cut**  20:11  31:21
**cut-and-paste**  120:15
**cutoff**  36:15

< D >
**damage**  51:10
**damaged**  137:2
**Damiani**  1:18  142:4,
24

**danger**  136:2, 17
138:19, 23
**dangerous**  55:11, 12
**Danielle**  97:23
**date**  1:18  23:8  82:8,
11, 19  91:19  105:17
**dated**  116:16  118:16
121:17  142:20
**Davis**  20:9, 12, 16
21:8
**day**  47:2  50:21  52:6
100:24  114:13  127:8
128:16  129:22  130:4
133:9  134:24  135:15
138:10  139:14
**days**  118:1
**day's**  22:24
**day-to-day**  9:1
**deactivate**  62:17
64:11
**dead**  106:24
**deadly**  106:15
**deal**  79:6
**death**  52:15  106:6
126:14  129:1, 18
**deaths**  126:15, 16
**decapitated**  127:9
**December**  7:14
**decide**  23:7
**decipher**  117:14
**decisions**  135:8, 11
**dedicated**  134:14
**deep**  21:21
**Defendant**  2:16
**Defendants**  1:12  20:8
**Defense**  46:18  98:12
**defined**  124:18
**definition**  140:19
**degree**  133:7
**delay**  70:19
**deleted**  80:9
**demonstrated**  117:2
**densely**  58:4
**depart**  30:7
**departing**  132:8, 10
**DEPARTMENT**  2:12
6:16, 19, 23  14:11
60:21  104:23  110:24
121:16  122:7  123:16

127:*19*  140:*16*
**departmental**  101:*18*
**department's**  59:*15*
105:*11*
**dependable**  117:*3*
**depicted**  35:*4*
**depicts**  33:*13*
**deployed**  119:*11*
**Deposition**  1:*16*  4:*18*
5:*2*  21:*23*  46:*20*
52:*19*  60:*8*  93:*4*
115:*9*  121:*11*  127:*15*
141:*13*
**depositions**  4:*22*
**DEREK**  2:*12*  130:*3*
131:*3, 7*
**derek.kane@phila.gov**
2:*15*
**describe**  126:*12*
**described**  74:*4*
80:*12*  94:*15*
**describing**  125:*6*
**DESCRIPTION**  3:*14*
47:*4*  140:*17*
**detail**  103:*17*  112:*24*
113:*1*  124:*5*  139:*19*
**details**  8:*22*
**detain**  49:*16, 24*
**deter**  7:*24*
**determined**  59:*13*
103:*23*  104:*5*  107:*1,
12*  108:*12*
**developed**  110:*10, 24*
**development**  23:*23*
**diagnosed**  129:*5, 8*
**died**  126:*20*  138:*3, 4*
**Dietz**  28:*17*
**differences**  108:*22*
**different**  120:*20*
126:*16*  129:*3*  137:*19*
140:*15*
**differently**  139:*12*
**difficult**  29:*22*  41:*5*
**dignitary**  8:*6*
**direct**  6:*1*  117:*1*
140:*14*
**direction**  37:*17*  76:*5*
94:*18*  100:*15*
**Directive**  3:*20*  60:*22*
61:*1, 13, 20, 21*  62:*4*

103:*24*  104:*14*  105:*8,
11*  108:*23*  109:*21*
111:*16*
**directives**  54:*22*
**directly**  27:*24*  45:*15*
**dirt**  13:*17, 20*  14:*2*
52:*23*
**disagree**  116:*9*
**disaster**  130:*9*
**discharging**  135:*15*
**discipline**  22:*18*
**discovery**  126:*24*
**discretion**  110:*17*
**discuss**  82:*4*  86:*3*
96:*8*
**discussed**  96:*16, 18*
98:*7*  99:*6*  104:*4*
109:*8*  111:*20*  136:*9*
**discussing**  98:*20*
**discussion**  19:*19*
33:*22*  60:*11*  83:*9*
84:*17*  113:*23*
**disengaged**  15:*10*
**dismissed**  22:*6*
**display**  70:*20*
**Displays**  118:*8*
**disproportionate**
51:*15*
**disputed**  17:*23*
**dissipated**  136:*3, 6, 17*
**distinguish**  125:*11*
**DISTRICT**  1:*1*  7:*4,
12, 14, 15*  122:*5, 16*
123:*11*  124:*4, 8*
**disturbance**  140:*7*
**Division**  101:*2*  117:*4*
**docket**  121:*13*
**doctor**  126:*22*
**document**  19:*14, 22*
45:*23*  46:*1, 18*  47:*2*
60:*8, 17*  93:*1*  115:*20*
123:*2*
**Documents**  3:*15*  9:*7*
20:*2*  115:*21*
**doing**  5:*1*  9:*2*  13:*6*
14:*3*  27:*10, 16, 17*
37:*19*  51:*14*  54:*20*
55:*10*  57:*2*  74:*6*
86:*13*  88:*5, 22, 24*
91:*8, 15, 19*  92:*12*

102:*22*  124:*21*  125:*1*
127:*15, 16*  130:*18*
132:*8, 22*  135:*8*
140:*24*
**DONNA**  1:*4*
**Donnelly**  121:*19*
**door**  74:*17*  75:*5*
**doubled**  99:*10*
**drill**  117:*23*  119:*3*
120:*3*
**drink**  130:*24*
**Drive**  2:*5*  71:*12*
76:*22*  100:*6, 15*
**driven**  76:*1*  119:*9*
120:*7*
**Driver**  61:*8*  68:*9*
85:*7, 22*  86:*22*  90:*1*
94:*5*  100:*10*  129:*13*
131:*20*
**drivers**  138:*19, 23*
**driver's**  73:*11*  74:*17*
**drives**  53:*16*
**driving**  8:*19*  16:*8*
53:*12*  56:*2, 4*  57:*5*
68:*22*  78:*1*  90:*4, 8,
22*
**drove**  26:*11*  68:*5*
95:*15*  99:*8, 9*
**Drug**  24:*2*
**Drunk**  131:*20*
**DUI**  61:*18*  132:*13*
**duly**  4:*10*
**duties**  7:*17*  11:*9*
50:*13*  116:*13*  135:*15*
**duty**  23:*9*  129:*24*

< E >
**Eadom**  36:*17, 21, 24*
37:*7, 10*  38:*19*  39:*8*
41:*19*  42:*6*  46:*10*
47:*7, 10*  48:*3, 5*
57:*14, 15*  58:*7, 8*
59:*12*  61:*6, 9*  66:*4*
69:*3, 6, 9*  75:*3*  76:*1,
5, 20*  77:*19*  87:*23*
94:*1, 7, 21, 23*  95:*21*
99:*9, 10, 13*  100:*8, 13,
14*  101:*3, 5*
**earlier**  88:*11*  99:*6*

103:*22*  104:*4*
**early**  24:*8*  136:*1*
**eased**  78:*3*
**east**  25:*6*  117:*4*
**eastbound**  16:*9, 16*
24:*14, 23*  25:*2, 8*
58:*24*  66:*5*  79:*1*
95:*20*
**EASTERN**  1:*1*
**easy**  128:*21*
**eat**  16:*5, 8*
**ecosystem**  81:*9*
**education**  23:*15, 16*
**effect**  77:*19*  105:*12*
106:*9*  126:*21*  127:*18*
128:*18*  129:*1*  132:*6*
**effects**  126:*3*
**effort**  5:*24*
**either**  27:*2*  66:*17*
96:*23*  100:*12*  107:*20*
108:*8*  116:*8*
**elude**  61:*7*
**emergency**  64:*4*
65:*14*
**emotional**  126:*3*
135:*13, 16*
**emotions**  134:*21*
**employed**  120:*9*
**employee**  117:*20*
118:*21*
**encapsulated**  31:*8*
**encountered**  24:*9*
**encourage**  119:*12*
120:*10*
**endanger**  111:*11*
**ended**  13:*5*  45:*7*
58:*23*  67:*17*  75:*18*
111:*21*  123:*23*
141:*13*
**endorsed**  121:*18*
**ends**  136:*3*
**enforce**  111:*10*
**enforcement**  49:*10,
24*  50:*20*  51:*3, 23*
111:*2*
**engage**  62:*6*  104:*15*
105:*3*
**engaging**  65:*12*
**engineered**  43:*15*

Case 2:20-cv-06301-MMB   Document 68-1   Filed 02/16/24   Page 45 of 68

Deposition of Officer Joseph Wolk                    Neal Miller and Donna Miller v. City of Philadelphia, et al.

ensure  51:*5*
entail  7:*18*
entire  8:*15*  9:*22*
49:*7*
entitled  101:*21*
equipment  64:*4*
65:*15*
erase  129:*16*  131:*24*
escape  69:*19*  106:*10*
escort  8:*9*
especially  127:*21*
ESQUIRE  2:*4, 12*
established  62:*2*
134:*4*
Estate  1:*5*
estimate  10:*24*  11:*23*
12:*1, 3*
estimates  12:*12*
estimating  32:*13*
estimation  29:*13*
et  1:*10*
evade  26:*19*
evaluation  115:*22*
124:*17*
evaluations  116:*1, 4*
120:*19*
evening  24:*9*
event  32:*1*  42:*2*
51:*12*
events  36:*6, 7*  59:*14*
65:*13*  67:*18*  100:*24*
136:*2*
eventually  13:*19*
22:*5*  39:*7*  61:*10*
67:*17*  68:*2*  78:*24*
evidence  13:*5*  21:*2*
evident  118:*24*
119:*21*
exactly  29:*3*  91:*8*
125:*14*
examined  4:*10*
exception  55:*21*
excessive  49:*10, 15,*
*23*  50:*19*  51:*15*
excused  141:*12*
execute  29:*22*  37:*16*
45:*14*
executing  43:*19*  44:*3*

Exhibit  46:*22*  60:*14*
97:*9*  109:*2*  115:*17*
121:*8*
Exhibits  92:*21*
121:*11*
exited  35:*16*  94:*1*
99:*24*
exiting  99:*13*
expected  109:*23*
experience  122:*4, 8*
123:*9*  124:*3*  132:*23*
experienced  133:*8*
experiencing  126:*13*
Explorer  20:*1*  33:*19*
60:*10*  104:*21, 22*
extent  50:*6*  110:*12*
exudes  118:*9*
eye  44:*16*  68:*12*
134:*24*

< F >
fabrication  13:*5*  21:*2*
face  73:*21*  75:*16*
77:*9*  85:*10*  88:*9*
92:*7, 9*
facility  36:*24*  39:*17*
58:*20*  71:*9*
fact  14:*1*  15:*4*
17:*15*  31:*6*  62:*3*
72:*3*  96:*1, 9*  97:*18*
104:*3*  108:*6*  122:*17*
128:*23*
facts  106:*18*  108:*22*
111:*16*
failed  61:*8*  62:*3*
fails  26:*5*
faint  117:*18*
Fair  11:*8*  12:*11*
16:*21*  22:*8, 9*  31:*9*
35:*23*  41:*1*  52:*24*
53:*13*  74:*19*  79:*5*
96:*18*  100:*23*  103:*3*
104:*6, 10*  111:*17*
112:*2*  126:*3*
fairly  136:*1*
fall  107:*5*
false  77:*21*
familiar  28:*16*  89:*16*
92:*24*
familiarize  103:*9*

family  81:*2*  83:*13,*
*15, 18*
far  22:*2, 10*  32:*4*
37:*7*  39:*24*  47:*12*
140:*22*
fast  40:*16*  70:*19*
78:*11*
fatal  45:*7*
favor  112:*15*
features  65:*3*
February  116:*16*
federal  121:*12*
feel  89:*6*  91:*3*  111:*1*
120:*11*  122:*3*  123:*9*
124:*3*  133:*6, 7*  135:*1,*
*13*  138:*2*
feeling  133:*8*
feelings  132:*24*
feet  32:*12, 13*  35:*22*
67:*24*  75:*7*  100:*3*
fell  64:*22*
felonies  107:*5*
felony  106:*13*
female  127:*20*
Fibber  71:*20, 23*
figure  92:*2*
File  19:*24*  33:*19*
60:*9*
filed  12:*19*  20:*6*
filing  4:*4*
final  125:*23*
finally  97:*2*  123:*21*
128:*14*
find  14:*10*
finding  14:*18*
finish  5:*9*
fire  134:*14*
fireman's  8:*10*
firm  68:*1*
first  4:*10, 23*  20:*5*
23:*20*  24:*12*  25:*10*
30:*16, 22*  42:*18*  43:*2*
67:*20*  69:*8*  81:*21*
84:*8*  93:*8*  100:*17*
102:*1*  104:*13*  116:*15*
121:*17*  129:*19*
fit  54:*21*  111:*16*
five  11:*2*  124:*5*
five-minute  133:*21*

FLAGER  2:*4*
flashed  132:*2, 23*
fled  61:*9*
fleeing  110:*4*
fliers  139:*14*
Floor  2:*13*
focus  47:*24*  119:*5*
follow  78:*14*  87:*24*
followed  25:*24*  38:*9*
39:*9*  43:*2*  76:*5*  79:*2*
93:*20*
following  44:*14*
48:*19*  60:*21*  86:*11*
follows  4:*11*
follow-ups  141:*6*
foot  7:*4, 7, 8*  61:*8*
69:*22*
force  48:*11*  49:*11,*
*15, 23*  50:*19*  109:*11*
110:*21*
forcible  106:*13*  107:*5*
forcing  48:*3, 17*
Ford  67:*17*  73:*4*
75:*8, 10*  76:*1, 6, 11,*
*17*  78:*9, 20*  88:*8*
90:*5*  104:*22*
foregoing  142:*7*
foresee  118:*10*
form  4:*6*  9:*19*
13:*21*  15:*20*  16:*24*
17:*19*  18:*2, 12*  21:*15*
22:*20*  26:*20*  27:*19*
31:*10*  35:*9, 24*  37:*20*
40:*13*  41:*11*  42:*13*
43:*11, 23*  44:*9, 10*
45:*3, 10, 17*  48:*8*
49:*18*  51:*7*  52:*2*
53:*1*  54:*3*  55:*3, 15*
56:*17*  58:*11*  59:*17*
60:*1*  62:*19*  63:*7, 13*
64:*12*  66:*20*  68:*17*
69:*15*  76:*7*  78:*5*
79:*10, 17*  81:*10*
84:*19*  86:*7*  87:*17*
88:*2*  89:*8, 17*  90:*14*
91:*5*  96:*3*  97:*5*
101:*13*  103:*20*
106:*20*  108:*14*  110:*6*
111:*4*  112:*3*  116:*24*
120:*16*  121:*2*  125:*20*

132:9  133:2, *10*
135:*4*  136:*19*
**forms**  4:*19*  109:*17*
**forth**  62:*4*  102:*23*
**forward**  70:20  117:*6*
**found**  10:*16*  14:*23*
104:*8*
**four**  83:22  97:*17*
101:*1*  103:5  120:*19*
127:*17*
**four-month**  102:*13*
**four-page**  115:*20*
**fragments**  34:*21*
**Fraley**  28:*4*  29:*7*
30:*10, 19*  31:*18*  32:2,
*20*  33:*13*  35:*12*
57:*10, 14, 18, 19*  58:7,
*13*  59:*6*  63:*3*  64:*10*
79:*1*  84:*16*  94:24
95:*3, 10, 16, 20, 22*
98:*16*  99:*1*  136:*4, 22*
**frame**  70:*12*
**Friday**  1:*14*
**friend**  81:*5*  129:*11*
**friends**  83:*14*  130:22
**front**  26:*16*  27:7
32:*12*  40:24  48:22
66:*17*  67:*3, 13*  72:*12*
74:*13, 17*  99:*23*
128:7  129:22  137:*1,
3*
**frozen**  40:*23*  75:*1, 22*
**full**  6:*11*  140:*18*
**fumble**  70:*9*
**fumbling**  107:*11*
**functionality**  64:*6*
**funerals**  8:*10, 11*
**further**  28:*1*  36:*23*
74:*16*  85:*21, 23*
95:22  138:*6*
**Fusion**  75:*10, 11*
90:*5*
**future**  118:*11*

**< G >**
**gained**  122:*4*  123:*10*
124:*4*
**Gary**  77:*4, 6*  78:2*1*
79:22, *23*  81:2*1*
83:*13*  84:*18*  87:22

94:*17*  96:9, *23*
100:*11, 14*  101:7
114:7, *9, 24*
**Gary's**  77:22  96:*1*
**gas**  68:*3*  69:22
**General**  105:2*1*
108:*17*
**generally**  7:*18*  43:5
**gentleman**  77:*18*
**getting**  16:*4*  56:7
115:*6*  123:*23*
**girl**  112:*14, 20*  113:*4,
9, 18*
**give**  57:22  80:*3*
85:*5*  127:*23*  130:*23*
**given**  4:22  10:*4*
11:*10*  53:*19*  97:*16*
100:2*1*  109:22
115:*24*
**giving**  5:*9*
**glad**  5:*18*  6:*3*
**go**  4:*23*  7:*10*  14:*16*
22:*2*  25:2*1*  30:*2*
31:*4*  32:*2*  34:*17*
38:*17*  41:*20*  47:*23*
57:*10*  58:*13, 21*
60:*10*  63:*5, 23*  70:*11*
74:*10*  85:9, *10*  87:*23*
94:2*1*  101:*3*  102:*19,
23*  103:6, *8*  111:*15*
113:*16, 19*  115:8, *22*
116:22  128:*4*  130:*23*
139:5, *13*
**God**  136:*13*
**goes**  5:7  23:6  27:9
29:6  35:*17*  38:2
39:7, *13*  41:*17*  57:*13*
61:24  66:*11*  70:*17*
94:*17*  124:24
**going**  4:*16*  5:*24*
19:*13, 14*  24:*17*
25:*12*  26:*11, 14*
27:*17*  29:*3, 18*  33:*15,
17*  34:*2, 7*  36:*11*
37:*10*  39:*11*  41:*4*
45:*23*  46:*4*  50:*5*
56:*3, 10*  58:*23*  59:22
60:*19*  61:*3*  62:*12, 21*
65:*17*  66:*4*  68:*24*
69:9, *11*  70:7, *17*

73:*16, 17*  78:*11*  84:7
86:*4*  88:9, *14, 18, 21*
92:*1, 10, 13*  93:*14*
98:*4, 6*  105:*19*
113:*17*  118:*15*
122:*20*  124:22
125:*24*  128:*13*
129:*10, 13*  130:8
131:*16, 20*  132:2, *12*
133:*13, 14*  135:*18, 22*
136:*3*  139:*20*  140:*2*
141:*1, 2*
**Good**  4:*14*  19:*3*
68:*8*  79:*5*  113:*13*
117:7  129:*11*  130:*17*
**gotten**  32:*1*  54:*14*
75:2, *23*  76:22  79:6
99:22  135:*24*
**gown**  136:*4*
**grab**  94:*17*  100:*4*
130:*24*
**grabbed**  67:*23*  94:*4*
100:*5*
**grabbing**  140:*24*
**grading**  125:*16*
**Graduated**  7:2
**graduating**  23:*13*
**granddaughter**  81:2
83:22
**granular**  112:*24*
**grasp**  69:*19*
**gratuitously**  89:*5*
**great**  117:*4, 5, 6, 24*
120:*12*
**grid**  31:*16*
**grip**  68:*1*
**ground**  6:2  130:7
**group**  52:*23*  53:6
**guess**  13:*10, 17*
17:*20*  88:7  89:2*1*
102:*24*  103:*1*  104:9
106:22  112:2*1*  118:*5*
123:6  124:*10*  125:*23*
**guidance**  110:*11*
**guided**  110:*20*
**Guidelines**  105:2*1*
**guilty**  10:*17*
**guy**  79:*24*  88:*12*
136:*12, 13*  137:*19*

**guys**  7:*23*  8:*3*  72:*18*
129:2*1*  130:2, *18, 19*
140:*5*

**< H >**
**H14**  47:7  48:2
**hairs**  58:*5*
**hairy**  141:*9*
**half**  57:2*1*  71:*18*
76:*24*
**hand**  65:*10*
**handle**  81:*18*  120:*4*
**hanging**  6:*5*  70:*14*
133:*17*  141:*10*
**happen**  135:22
136:*13*  139:22
**happened**  13:*11*
15:*12*  45:6  47:*18, 21*
72:*23*  80:8  84:*16*
88:*5*  91:*23*  96:*20*
105:*13*  112:*10, 18*
113:2  126:9  132:*13,
17*  133:*15*  134:*8*
**happening**  42:*3*
**happens**  133:*1*
**hard**  119:*14*  129:*19*
130:*11, 12*  136:*11*
**harm**  43:22  45:*16*
56:*6*
**harm's**  56:*6*
**hate**  52:*18*
**head**  24:*1*  27:*12*
36:*15*  63:*23*  129:*16*
136:*18*  137:*14*
**headed**  27:24
**heading**  24:*18*  37:8
42:*5*  46:*2*  75:*4*
99:*13*
**heads**  41:*18*
**healing**  129:2*0*
**hear**  84:*5*  102:2
112:*23*  113:*1, 3*
131:*6*
**heard**  92:*5*  120:*18*
**hears**  128:*4*
**heart**  126:2*1*
**heated**  111:*13*
**held**  19:20  33:*23*
60:*12*  83:*10*  94:*5*

Deposition of Officer Joseph Wolk                    Neal Miller and Donna Miller v. City of Philadelphia, et al.

113:*24*

**helmet** 25:*14, 16*
**help** 124:*14* 127:22
128:*1, 20*
**helping** 127:*24*
**heroin** 21:*9*
**high** 7:*23* 52:*14*
130:*15*
**high-crime** 140:*3*
**Highway** 7:*16, 18*
8:5, *14* 60:*23* 80:*21*
81:7, *12, 14* 117:*23*
118:*24* 119:*3, 21*
120:*2* 122:*8, 13*
123:*23* 124:*8* 127:*12*
129:*11* 134:*11, 15*
140:2, *11*
**hip** 65:*10*
**history** 6:*23*
**hit** 14:2 64:*21* 68:2
136:*12*
**hold** 68:*1* 131:*4*
**hollering** 66:*24* 73:22
**home** 119:6 127:*8,*
*14* 128:*19* 130:*14*
131:*20*
**horn** 92:5 99:*3, 18*
**horse** 106:*24*
**hour** 27:9
**hours** 139:*21*
**house** 75:*3* 129:*14*
140:*7*
**houses** 58:*3*
**hovering** 121:*24*
**Howell** 16:*10, 17*
**hug** 129:22
**human** 126:*20* 129:2
**hundred** 33:7 85:22
**Hundreds** 126:*15*
**hurt** 53:*23* 67:*1*
68:*24* 73:*16, 17*
99:22 135:*24* 139:*4*

**< I >**
**I-95** 30:*21*
**IA** 64:*15*
**IAD** 39:*21* 59:*23*
101:22 102:2 103:22
107:*1, 12* 108:*12*

**idea** 26:22 27:*10*
56:*11* 71:*21* 91:9
114:6, *9* 115:2, *4*
**identical** 39:*19*
**identification** 46:22
60:*14* 92:22 97:9
109:2 115:*17* 121:8
**immediate** 136:5
**Immediately** 16:2
17:*10* 69:*13* 84:*11,*
*12* 138:*3, 4*
**impact** 119:*10* 120:*8,*
*12*
**important** 5:6 131:*12*
**imposed** 22:*18*
**imposes** 23:*3*
**impounded** 10:*15*
**impression** 77:*21*
**incident** 4:*19* 8:*17*
13:*10* 14:*8, 13* 23:9
24:7 50:22 51:*19*
52:7 80:*14* 82:8, *12,*
*19* 83:*17, 20* 84:*3*
102:3, *6* 105:*13*
108:*13* 112:8, *9, 24*
114:*12* 127:5 134:*5,*
*7*
**incidents** 23:*11* 80:*23*
**include** 49:*15, 23*
50:*19* 94:20
**included** 96:*15*
**including** 10:9 54:*14*
61:*17* 123:*12* 126:*19*
130:5
**increments** 41:5
**indicate** 26:*24*
**indicated** 137:*20*
**indicates** 21:7 95:2
**indication** 113:6
**individual** 13:*12*
96:2 115:*3*
**individually** 1:*4*
**indulgence** 141:*8*
**influence** 27:*11*
**information** 89:*23*
**informed** 112:*10, 17*
119:7 133:9
**inherent** 129:*1*
**initial** 26:*3* 27:*1*
89:*23* 92:*13* 101:*10*

**initially** 62:*12* 96:*17*
138:*17*
**initiate** 54:22 107:*17*
111:*17*
**initiated** 16:*3* 42:22
104:*6, 10*
**initiating** 61:*14, 16*
105:*24* 106:*3*
**injured** 137:*2*
**injuries** 44:*24* 45:7
137:*11* 138:*3*
**injury** 44:7 49:*1*
52:*15* 106:6
**Inquiry** 23:*4*
**inside** 127:22 128:*20*
**inspection** 63:22
**inspector** 121:*19*
**instruction** 109:*19*
**instructions** 4:*23*
**integral** 118:22
**intention** 78:*13* 79:*15*
**intentional** 17:24
18:*11* 65:*21, 22, 24*
**interaction** 81:*24*
94:*15*
**interactions** 112:7
**Internal** 9:*10, 13*
14:7, *10* 23:5 46:5
47:*1* 97:*3, 12* 100:*21*
101:*12, 16* 102:*21*
127:*1*
**Internet** 54:*8*
**interrogatories** 22:*3*
**intersection** 17:*11*
69:*5*
**interstates** 8:*2*
**interview** 89:*14*
139:*23*
**intoxicated** 27:*3*
**investigated** 101:22
112:*11*
**investigation** 14:7
60:20 89:*14* 98:*14*
101:*2, 17* 102:*2, 22*
137:*20*
**involve** 42:9 43:*21*
45:*16* 110:*3* 128:*24*
**involved** 4:*19* 11:*14*
12:4 67:*17* 89:6
90:*6, 11, 21* 91:*3*

107:*8* 112:*1* 113:*4,*
*19* 127:*16* 129:*24*
**involves** 44:*6*
**involving** 13:*24* 88:*1*
**isolated** 71:*14*
**issues** 119:7
**items** 64:5
**its** 72:22

**< J >**
**James** 30:*15, 24*
31:*3* 32:*3, 9, 11, 16,*
*18, 20* 33:*13* 35:*13*
36:7 57:*10, 14* 58:7,
*9, 10, 24* 59:*1, 5* 63:*4*
64:*10* 66:6, *9* 67:*16*
93:*18* 94:*13, 24* 95:*3,*
*11, 15, 21* 99:2, *4, 17,*
*18* 101:6 116:*18*
121:*19* 136:*4, 22*
**job** 5:*12* 12:9 14:*15*
120:*15* 124:22
126:*15* 128:*5, 17, 23*
130:*16, 22* 135:*8*
139:*14*
**jobs** 81:*17*
**JOSEPH** 1:*16* 3:*3*
4:*9* 6:*13* 20:7 60:22
116:*24*
**judging** 71:7
**judgment** 135:2, *5*
**judgments** 135:*10*
**Julie** 1:*18* 5:*11*
142:4, *24*
**jump** 7:6 61:*3* 84:7
112:*1*
**jumping** 84:*10*
**June** 121:*17*
**justifications** 105:*23*
**justified** 14:*20* 106:*3*
107:*2*

**< K >**
**KANE** 2:*12* 3:7
9:*19* 10:*21, 24* 13:*21*
15:20 16:*24* 17:*19*
18:2, *12* 19:*10, 18, 24*
20:20 21:*15* 22:20
26:20 27:*19* 31:*10*
32:6 33:*18* 34:*12*

Deposition of Officer Joseph Wolk                    Neal Miller and Donna Miller v. City of Philadelphia, et al.

35:9, *24*  37:20  40:*13*
41:*11*  42:*13*  43:*11*,
*23*  44:9  45:3, *10, 17*
47:14  48:8  49:*18*
50:*3*  51:7  52:2  53:*1*
54:*3, 10*  55:*3, 15*
56:*17*  58:*11, 14*
59:*17*  60:*1, 9*  62:*19*
63:7, *13*  64:*12*  66:*20*
68:*17*  69:*15*  76:7
78:5  79:*10, 17*  81:*10*
84:*19*  86:7  87:*17*
88:2  89:8  90:*14, 24*
91:5  96:*3*  97:5
101:*13*  103:*20*
106:*20*  108:*14*  110:*6,
12*  111:*4*  112:*3*
113:*10*  120:*16*  121:*2*
125:*20*  126:5  131:*4*
132:9  133:*2, 10, 19*
135:*4*  136:*19*  138:*7,
8*  141:*4, 11*
**keep**  18:*24*  44:*16*
119:*13*  120:*12*
127:*22*  128:*19, 20*
130:7
**keeping**  119:*7*
**Kennedy**  57:*15*  59:5
**kept**  56:*4*  73:22
130:*17*
**kids**  53:*11, 24*  54:*20*
**killed**  53:*23*  61:*11*
129:*12, 23*  134:*12*
**Kimrey**  116:*19*
**K-I-M-R-E-Y**  116:*21*
**kind**  5:*17*  8:8  28:*16*
30:*19*  46:*11*  53:7
81:8, *24*  90:22
112:*24*  125:6, *13*
127:*23*  131:*11, 16*
138:*10, 23*
**kinds**  51:*4, 14*
**Kinny**  116:*18*
**Kleincard**  118:*18*
**knew**  29:*1*  50:*21*
52:6  72:2  75:*19*
77:6  81:5, *6*  86:*17*
96:2, *9*  103:*14*
139:*24*

**knife**  112:*14*
**knocked**  64:*17, 22*
**know**  4:*21, 24*  8:*18*
9:*13*  12:*16, 17*  13:*8*
14:*6*  17:*23*  18:*8, 20*
19:*1, 9*  22:*5, 10*  25:*9*
28:*8*  33:*3*  37:*16*
39:*18*  47:*20*  51:*13*
52:*20, 22*  62:*1, 11, 22*
64:*16, 23*  65:*21, 22*
68:*13*  71:*19, 22*  72:*1,
4*  73:*4*  76:*20*  77:*5, 7,
10*  78:*9*  79:22  80:*9*
82:*16, 18*  83:*15*
84:*11, 15*  85:*23*
86:*13, 14*  87:*11*  88:*4,
21*  92:*11*  96:*17, 20*
100:*16*  102:*5, 17, 21*
104:*17*  109:*8*  112:*17*
114:*7, 20*  123:*14*
126:*1, 16*  127:*13*
128:*1, 17, 19*  129:*2,
17*  130:*14*  132:*12*
135:*7, 21*  140:*9*
141:*9*
**knowing**  133:*13*
**knowledge**  21:*11*
22:*7*  117:*4*  122:*4*
123:*10*  124:*4*
**known**  79:*24*
**knows**  128:*9*

**< L >**
**lane**  5:*12*  15:*19*
16:*14*  17:*10*  25:*10*
33:*6*  56:*8*  135:*18*
138:*18*  139:*1*
**lanes**  25:*8*  26:*9, 10,
12, 15*  27:*13*  28:*3*
29:*4, 6*  30:*5*  56:*2*
93:*11*
**language**  54:*8*
**larger**  31:*16*  54:*14*
**Laurel**  59:*8*
**LAW**  2:*12*  49:*9, 23*
50:*19*  51:*3, 23*  111:*2*
**laws**  111:*10*
**lawsuit**  10:*21*  17:*23*
18:*8*

**lawyers**  23:*15*
**laying**  95:*23*
**lead**  78:2
**leading**  15:*16*  16:*11*
84:*3*  86:*11*
**leads**  36:*17*
**leave**  6:*5*  70:*14*
**led**  21:*3*  45:5  56:*14*
**left**  15:*11*  16:*16*
30:*15, 16*  32:*3*  36:22
39:*24*  40:*8*  47:*11*
63:*3*  66:*15*  67:*11*
74:*7*  100:*6*  131:*19*
**left-hand**  15:*14, 17*
16:*9*
**legal**  23:*16, 20*  50:*4,
7, 11*  138:*14, 15*
**letting**  73:*7*
**level**  55:*13*  62:5
**LEVIN**  2:*4*  3:*6*
4:*13, 15*  9:*24*  10:*3,
23*  11:*4*  14:5  16:*1*
17:*5, 21*  18:*6, 15, 18*
19:*13, 21*  20:*3, 23*
21:*18*  23:2  26:*23*
27:22  31:*14*  32:8, *14*
34:*1, 16, 19*  35:*14*
36:*4, 11, 13*  38:*1*
39:*11, 14*  40:*3, 19*
41:*15*  42:*19*  43:*13*
44:*2, 20*  45:*4, 21, 23*
46:*16, 23*  47:*17, 19*
48:*14*  49:*21*  50:*9, 17*
51:*11*  52:5  53:*4, 15,
18*  54:*6, 7, 17*  55:*6,
20*  56:*20*  58:*18*
59:*21*  60:*4, 6, 15, 16*
62:*8, 10, 20*  63:*10, 17*
65:*1*  67:5  68:*18*
69:*18*  70:*1, 5*  71:*1*
76:*12*  78:*12*  79:*13,
21*  81:*19*  83:8, *11*
84:*23*  86:*9*  87:*20*
88:*10*  89:*12*  90:*18*
91:*1, 10*  92:*16, 23*
96:*7*  97:*6, 10*  101:*15*
103:*21*  106:*23*
108:*16, 21*  109:*3*
110:*8, 14*  111:*7*
112:*5*  113:*13, 15*

114:*1*  115:*14, 18*
120:*17*  121:*5, 9*
125:22  126:*7, 8*
131:*6, 10, 13*  132:*18*
133:*5, 16*  134:*1*
135:*6*  137:*6*  138:*5*
141:*7*
**Lexis**  114:*23*
**Lieutenant**  46:*24*
48:*16*  118:*17*
**life**  119:*5*  128:*18*
**lightly**  125:*24*
**lights**  25:*15, 19*  26:*4*
28:*10*  30:*17*  56:*4*
62:*14, 24*  63:2  64:*5,
9*  107:*22*
**likelihood**  52:*14*
**line**  7:22  76:*18*
88:*16*  121:*24*  129:*24*
**lines**  134:*3*
**list**  20:*1*  51:*2*
**listed**  20:8  89:*24*
**lists**  107:*4*
**literally**  57:*11, 18*
59:*11*
**litigated**  8:*19*
**little**  5:*8*  28:*1*  30:*9*
31:*20*  34:*13, 22*  36:*3,
23*  39:*1*  40:*24*  41:*5*
53:*12*  54:*18*  55:*1*
58:*2*  59:*11*  74:*16*
96:*21*  120:*5*  128:*9*
136:*23*  141:*9*
**lives**  71:*13*  77:*18*
**living**  129:*14*
**local**  100:*10*
**located**  28:*18*  36:*24*
65:*3*
**location**  71:*7*  134:*13*
**long**  32:*15*  57:*24*
74:*3*  80:*16*  83:*4*
115:*23*  129:*8*  130:*6*
140:*4*
**longer**  56:*24*  62:*24*
109:*12*
**look**  73:*19*  95:*22*
103:*13*  134:*23*
**looked**  13:*3*  25:*13*
29:*16*

looking 34:4 40:22
46:10, 12 68:23
70:11 73:22 78:17
98:9 103:14 107:11,
12 115:13, 19 117:5,
19 124:22, 23 127:11
129:9
looks 20:6 34:23
40:23 41:9, 17 71:17
74:22 95:18 97:16,
20 116:17 117:13
118:16 119:18
121:18 122:23
136:22, 24
loop 101:5
Lorenzo 129:12
131:18 132:23 134:5,
8, 10, 15, 17
lose 49:3
losses 10:19
lost 38:21 78:16, 18
79:5 94:8 96:5
99:10 129:11 130:15
131:15 139:3
lot 8:4, 5, 11 37:3
38:3, 9, 12, 15, 18
39:9 41:18, 20 42:24
43:4 44:14 45:20
48:5, 13, 20 57:15, 20
58:8, 20 89:21 94:23
99:9, 12, 13 101:4
109:11 125:8 126:15
127:20 134:21
loud 73:16
luck 117:8

< M >
main 111:8
maintain 107:17
maintaining 111:23
Major 123:4, 16
making 14:1 15:10,
14 16:4 18:8 29:17
68:5 69:11 95:21
98:23 121:20 122:3
124:6 135:11
male 10:16 100:2, 4
127:20, 21
malfunction 63:18

malfunctioned 63:16
malicious 13:4 21:2
manage 37:11
managed 29:9 61:7
66:12 69:19 74:21
manages 94:17
mandatory 25:16
maneuver 17:24
18:10 27:5 40:10
42:22 43:20 44:4
45:15 94:3, 22
maneuverable 39:1
manifest 129:3
manner 118:10
March 7:2
mark 46:19 92:17,
18 108:23 115:14
MARKED 3:14
46:18, 22 60:14
92:21 97:9 98:12
105:1 109:2 115:17
121:8
materials 109:16, 23
Matos 77:18 88:12
matter 10:12 12:22
22:9 89:20 98:2
115:10 122:17 126:2
129:2, 9 142:10
matters 10:5
McGee's 71:20, 23
McKenna 10:11
12:17 13:13 15:12
16:19 22:9, 24 23:1,
8 45:6 52:21, 22
108:13 114:12
115:10 121:12 126:2,
6, 9 127:5, 7
McKenna's 13:20
14:2
mean 5:16 7:6
10:21 55:4 58:4
88:11 109:11 114:4
125:15 126:15 139:8
meaning 125:8, 12
meant 47:22 139:13
meet 4:16
member 81:2 83:19
117:23 118:22 119:3,
19 120:2

memorandum 108:5
111:24
Memorial 134:11
memory 102:15
mention 101:2
mentioned 19:12
35:22 82:2 83:17
101:6 131:14 132:1
134:7 138:16
met 81:21 106:18
MICHAEL 2:4 4:15
10:22 32:7 33:19
34:15 47:15 58:17
113:11
michael@flagerlaw.co
m 2:7
Michelle 115:1
midway 98:11
miles 27:9
MILLER 1:4, 5 24:9,
13, 15 29:17 55:23
67:23 112:7 129:10
130:5 138:10, 17
mind 27:18 130:20
131:24 132:1
mind's 134:24
minor 113:18
minutes 15:13 35:8
70:18 84:8 85:2
94:16
mirror 25:13 29:17
98:22 99:12
missed 130:3
misses 135:21
misspelled 119:2
misspelling 119:23
Mobile 83:3, 6, 7
moderate 140:6
moment 19:16
138:16
moments 86:11
136:14
monitor 34:5
month 102:6
months 7:3, 5, 8
84:2 97:1, 18 101:1
102:9 103:5
moon 81:4
morning 4:14 59:24

60:3, 5
motion 34:23
motor 25:12 43:7
44:5 48:12 49:12
51:16 52:1, 11 53:21
54:20 55:10 57:2
61:7, 11 87:12
motorcycle 8:12, 21,
22, 24 14:16 24:3
43:21 44:5, 23 45:8
48:11 52:1 98:14, 23,
24 99:8, 16, 19, 23
100:1, 3, 13, 15 122:9
127:9 131:19
motorcycles 8:7 43:7
motorcyclist 99:21
motorized 98:15
move 37:16
movement 27:6
moving 48:22 79:8

< N >
name 4:14 6:12
11:5 12:20 20:7
28:6 77:5 102:16
113:3, 17 114:3, 4, 8,
12, 21 116:17
named 13:11, 12
19:8 100:11 113:9
115:1
names 102:18
narcotics 13:6 20:13
narrative 9:14, 17
46:24 48:1 116:23
narrow 31:12
nature 14:21 21:24
23:17, 24 43:8 44:6
109:10
NEAL 1:4
near 28:22 71:24
necessarily 60:3
108:16
necessary 106:5, 9
need 5:12, 23 6:3
71:3 128:1 130:20
needed 80:2 120:3
needs 111:2, 3
neighborhood 31:6
35:17 58:4

neither 90:*3*

Net 71:*9*

never 10:*18* 20:*15,*
*16, 18* 72:*1* 73:*21*
96:*22* 131:*23* 132:*16*

night 130:*6* 139:*21*
140:*3, 4*

Nitti 97:*23*

nonstop 118:*8*

normal 9:*1* 63:*21*

north 25:*21* 99:*13*

northbound 15:*18*
16:*13* 26:*11, 15* 28:*3*
29:*3* 38:*19* 39:*8*
61:*9* 66:*4* 93:*11*
94:*7* 99:*10* 100:*8, 13*

Northbrook 2:*5*

Northeast 100:*12*

Notary 1:*19* 142:*5*

notes 142:*9*

notice 88:*7* 101:*22,*
*23, 24* 124:*14*

noticed 38:*22* 68:*5*
95:*22* 96:*11* 98:*22*
99:*12*

notified 101:*19*

Notwithstanding 45:*5*
111:*19*

November 20:*6*

NUMBER 3:*14*
60:*23* 77:*20* 80:*1, 4,*
*13* 82:*5, 11* 90:*7*
128:*1*

numbers 127:*23*

numerous 122:*6*
123:*12* 124:*6* 127:*17*

nuts 53:*16*

< O >

Object 60:*1* 62:*19*
88:*2* 97:*5*

Objection 9:*19*
13:*21* 15:*20* 16:*24*
17:*19* 18:*2, 12* 21:*15*
22:*20* 26:*20* 27:*19*
31:*10* 35:*9, 24* 37:*20*
40:*13* 41:*11* 42:*13*
43:*11, 23* 44:*9, 10*
45:*3, 10, 17* 48:*8*
49:*18* 50:*3, 4, 8* 51:*7*

52:*2* 53:*1* 54:*3, 10*
55:*3, 15* 56:*17* 58:*11*
59:*17* 63:*7, 13* 64:*12*
66:*20* 68:*17* 69:*15*
76:*7* 78:*5* 79:*10, 17*
81:*10* 84:*19* 86:*7*
87:*17* 89:*8* 90:*14, 24*
91:*5* 96:*3* 101:*13*
103:*20* 106:*20*
108:*14* 110:*6, 12*
111:*4* 112:*3* 120:*16*
121:*2* 125:*20* 132:*9*
133:*2, 10* 135:*4*
136:*19*

objections 4:*5*

observe 137:*11*

observed 47:*6* 48:*2*
135:*17*

observing 129:*10*

Obviously 42:*1* 63:*1*
88:*17* 97:*22* 109:*11*
110:*2* 134:*20*

occasions 82:*3*

occupant 77:*2*

occupant's 72:*22*

occupational 125:*7*

occupying 9:*3* 75:*14*
78:*21*

occur 10:*20* 28:*14*
116:*4*

occurred 11:*24*
17:*16* 29:*14* 31:*7*
50:*22* 51:*19* 65:*18*
80:*14* 84:*14* 93:*9*
96:*17* 112:*8* 114:*12*

odds 48:*6*

offered 103:*17*

OFFICER 1:*16* 3:*3*
4:*9, 14* 6:*13, 15* 7:*13,*
*18* 8:*9, 13* 12:*4* 20:*9,*
*16, 21* 49:*10* 50:*14*
51:*3, 23* 55:*9* 60:*22*
61:*4, 7* 80:*21* 81:*8*
86:*20* 92:*18* 106:*2,*
*11* 109:*6* 110:*16*
115:*24* 116:*24* 117:*3,*
*22* 118:*1, 9* 120:*24*
121:*1* 128:*18* 130:*13*
134:*5, 8, 15* 137:*17,*
*18* 138:*9* 141:*3*

officers 127:*20, 21,*
*24* 129:*18* 134:*10*

officer's 8:*10*

Oh 24:*24* 28:*24*
34:*16* 75:*11* 80:*15*
81:*22* 85:*18* 114:*13*
122:*21* 128:*6*

O'Hanlon 134:*12, 15*

Okay 7:*10, 17* 9:*1, 5*
11:*23* 12:*2, 11* 13:*9*
15:*16* 20:*22* 24:*6*
25:*1, 9* 28:*15* 30:*3,*
*12, 18* 31:*24* 34:*9, 16*
35:*15, 19* 36:*5* 37:*15*
38:*24* 40:*4, 21* 41:*16*
42:*1, 5* 43:*1, 5* 44:*21*
46:*15* 48:*15* 56:*12*
57:*13, 22* 59:*22* 61:*3*
65:*2* 66:*3, 16* 67:*14*
68:*7* 69:*2* 72:*3, 6, 17*
73:*13, 24* 75:*18*
76:*13* 77:*15* 78:*13*
80:*12* 82:*22* 86:*3*
87:*3* 88:*23* 91:*11*
97:*1* 103:*16* 105:*19*
109:*22* 113:*21* 116:*3,*
*20* 118:*19* 132:*19*
138:*22* 139:*5*

omits 95:*24*

omitted 101:*10*

once 66:*11* 81:*4*
99:*2, 20* 104:*10*
105:*7* 107:*17* 116:*4,*
*5*

oncoming 27:*24*
29:*16, 21* 56:*2, 5*
135:*18* 138:*19, 23*

one's 118:*3*

ongoing 23:*14*

open 20:*1* 74:*16*
75:*5*

operate 65:*9* 122:*9*

operates 100:*11*

operating 43:*6*
138:*12*

operator 14:*16* 61:*5,*
*11* 81:*8, 13* 86:*23*
93:*19, 22* 94:*2, 4, 7*
95:*23* 100:*11*

opportunity 4:*15*
75:*14* 77:*2, 12* 97:*13*
102:*10, 13* 103:*6, 7*
119:*8* 120:*6* 137:*10*

opposed 28:*22* 43:*3*

opposing 26:*9*

Oral 1:*16* 112:*20*

order 49:*16* 66:*17*

orders 118:*9*

original 14:*15* 15:*13*

Originally 7:*19, 20*

Ortiz 114:*8, 21* 115:*1*

O'Scanlon 134:*10*

outlaw 24:*3*

outside 37:*3* 83:*12*
103:*11* 139:*10*

overall 116:*10*

overlapping 13:*10*

overpass 30:*19*

< P >

P.C 2:*4*

p.m 72:*7* 73:*2* 74:*3*
75:*22* 76:*4* 141:*13*

P/S 118:*3*

packed 58:*3*

PAGE 3:*5* 20:*5*
93:*8, 12, 14* 98:*4*

pandemic 118:*3*

paper 139:*11*

paragraph 61:*4*
98:*18*

parentheses 90:*5*

parents 112:*17*

parking 38:*2, 9, 12,*
*14, 18* 48:*5, 12, 13, 20*
57:*15, 20* 58:*7, 20*
99:*9, 11*

Parkway 2:*13*

part 17:*24* 24:*8*
63:*12* 81:*9* 89:*10*
101:*3* 116:*10* 120:*22*
133:*18* 134:*16*
139:*19* 140:*15*

partially 74:*10, 13*

participate 19:*11*

participation 86:*4*

particular 8:*17*
55:*22* 106:*19* 111:*20*

parties 4:*3*

Deposition of Officer Joseph Wolk                                    Neal Miller and Donna Miller v. City of Philadelphia, et al.

partner 16:7 114:*11,*
*14, 16, 18* 127:20
128:*3* 130:*15* 131:*15*
partners 129:23
pass 30:20 73:7
passed 93:*11*
passenger 43:9
76:*13, 16* 105:2
passenger's 65:7
passing 25:*3*
path 17:7 27:8
29:*18* 33:6 53:22
74:*18*
Patrol 7:*16, 18* 8:5,
*14, 21, 24* 9:4 15:*14*
16:6 60:23 80:2*1*
81:7, *13, 14* 105:*1*
117:*3, 23* 118:24
119:*3, 12, 21* 120:2, *9*
122:8, *14* 123:*24*
124:9 140:2, *11, 13*
patrols 9:2
paused 72:6
peers 119:*1, 2, 22, 23*
PENNSYLVANIA
1:*1, 20* 2:6, *14* 142:6
people 34:6 43:9
52:23 53:6, *17* 55:9
80:23 116:7 125:8
127:*11, 13* 128:*12, 14*
129:2 130:*13, 21*
139:*15, 24* 140:9
percent 33:8 85:22
perception 69:8
perfectly 103:*10*
Performance 3:2*1*
115:2*1* 116:*1, 12*
120:24 124:*16* 139:7
performing 116:*14*
period 80:2*0* 83:4
102:*14* 137:5
permitted 104:*15*
105:23 111:*17*
perpetrators 125:*1*
person 5:*3* 8:8 13:5
43:22 52:*15* 77:4
87:*3* 106:7, *12, 14*
111:*15* 113:4 114:24
127:23 128:6 134:9

personal 119:5
125:24 141:9
personally 128:*10*
perspective 46:*12*
71:9
ph 47:*1* 118:*18*
PHILADELPHIA
1:9 2:8, *14, 16* 6:*16,*
*18* 53:*10* 54:*15*
105:*10* 109:6 120:*24*
phone 82:*11, 14*
85:4 112:22
phones 80:*10*
physicality 125:*13*
picks 74:*1* 98:*19*
pitch 122:*3*
place 71:*19* 110:2*1*
placed 85:*13*
plainclothes 139:2*0*
plaintiff 11:6
Plaintiffs 1:7 2:8
4:*17* 18:7
plaintiff's 12:2*0* 20:7
plan 16:5
plant 28:*17*
platform 5:*1*
play 39:*12, 22* 41:*17*
70:*17* 73:24 75:2*1*
111:9
played 34:*11* 40:2,
*15* 70:23 130:5
132:7
playing 34:5, *18*
40:*17*
please 5:9 6:*11*
plenty 130:*1*
pocket 31:2*0*
point 16:*11, 18* 24:8
25:5 26:*3* 29:*10*
31:*3* 32:2, 5, 6, 8
36:5 37:7, 8, *15*
38:*15* 39:8 40:7
41:7, *16* 42:6, *11*
49:2 53:*3, 5* 57:*1*
58:8 62:*16* 64:*11, 16*
67:6, 8, 9 69:2 70:6
71:4 73:9 74:*11, 19*
75:*13, 23* 78:2, 23
79:9 84:*18, 21* 86:4

87:7, *14* 93:4 111:24
113:*14* 127:*14* 136:*1*
points 121:*15*
Police 6:*13, 15, 16, 19,*
*24* 7:*1* 8:9, 20 12:4
14:*17* 16:*12* 20:8
23:4, *13* 47:7 48:2
49:*15* 51:*10* 60:2*1,*
*22* 61:4 77:22 87:4
88:*13, 18* 105:*11*
109:6 110:*16, 21, 24*
112:7 116:24 117:2*1,*
*22* 118:*1* 120:24
121:*1* 122:7 123:*15*
124:*19* 127:*19*
128:*18* 130:*12, 15*
139:9 140:*12, 15*
141:2
policies 110:*10, 21*
policing 139:*13*
policy 14:*12, 20, 24*
59:*16* 101:*18* 105:*11,*
*22* 107:*16, 22* 108:*12*
109:*4, 10, 14* 111:*1*
132:8, *11* 133:7
poorly 132:2*0*
populated 58:4
portion 35:6 65:*13*
70:8 71:*3, 16* 94:2*0*
95:5, *24*
portions 96:*16*
posed 138:*19, 24*
position 18:9
positive 120:*12*
possession 21:9
possibility 51:*13*
possibly 99:5
post 26:7
posters 124:23
potential 44:6
potentially 65:*14*
practical 119:*13*
120:*11*
practice 63:2*1*
preceded 87:*16*
preface 33:*17* 34:2
preparation 60:2
prepare 108:5
prepared 47:2 123:*3*

preparing 111:2*3*
presence 72:22 96:*1*
present 95:6 96:9
97:2*1*
presents 106:*15*
president 8:6, 7
pretrip 63:22
pretty 35:2*1* 38:5
68:7 73:8 77:23
79:9 88:4 93:6
prevent 106:6, *10*
previously 10:5
46:*18* 103:*18*
pride 117:24
prior 16:2 19:*12*
60:7 83:2*1* 93:4
112:6
priority 81:*16*
proactive 125:7
probable 106:*11, 14*
probably 11:9 16:22
20:*15* 32:*11* 34:*3*
39:*1* 89:2*1* 122:2*0*
132:2*0*
problem 30:*1* 54:*13*
problem/high 124:7
problems 118:*11*
130:23
procedural 104:9
procedure 107:*13*
Procedures 105:2*1*
proceed 99:*15*
proceeding 46:7
95:*19*
proceeds 94:*13*
process 22:*11* 92:*15*
Professional 1:*18*
22:*18* 23:23 142:5
professionally 6:2*0*
progress 35:*3* 66:*18*
prohibited 61:*15, 18*
promotional 119:*13*
120:*11*
prosecution 13:4
prostitution 21:2
protection 8:6
protections 116:*11*
provide 113:*17*

Case 2:20-cv-06301-MMB  Document 68-1  Filed 02/16/24  Page 52 of 68

Deposition of Officer Joseph Wolk                    Neal Miller and Donna Miller v. City of Philadelphia, et al.

provided 101:*21* 103:*16*, *18* 114:*3* 116:*3*

proximity 43:*6*, *20* 106:*4*, *7* 128:*24* 136:*8*

psychiatrist 130:*21*

PT 118:*3*

PTSD 129:*6*, *7*

Public 1:*19* 111:*2* 119:*1*, *22* 140:*22* 142:*5*

pull 26:*5* 66:*12*, *16* 67:*10*, *12* 68:*1* 69:*22* 74:*6*

pulled 67:*3* 68:*19* 69:*4* 72:*11*, *17*, *18* 73:*5* 74:*15* 75:*5* 86:*22* 92:*5* 93:*24* 99:*21*, *23* 112:*14* 121:*12*

pulling 73:*11* 87:*22* 92:*4*

pulls 58:*21*

pursue 55:*14* 79:*15*

pursued 30:*12* 106:*12*, *15*

pursuing 13:*24* 111:*22*

pursuit 11:*19* 13:*17* 14:*15*, *17*, *19* 15:*1*, *10*, *14* 31:*7* 33:*14* 35:*7* 49:*3* 53:*22* 54:*23* 56:*21* 59:*15* 60:*24* 61:*15*, *16*, *20* 62:*6* 66:*8* 70:*8* 78:*4* 87:*15* 88:*1* 91:*20* 94:*21* 103:*24* 104:*5* 105:*24* 106:*3*, *5*, *9* 107:*14*, *17*, *23* 108:*5* 109:*4* 111:*17*, *23* 135:*3* 136:*7*

pursuits 11:*15*, *16* 12:*3* 104:*16* 105:*4*, *12* 110:*2*, *24*

pushed 68:*2* 94:*3*

pushing 67:*24* 100:*3*

put 28:*10* 44:*17* 48:*21* 56:*6*, *9* 70:*7* 80:*24* 97:*6*, *11* 105:*6*

116:*13*, *23* 122:*15*, *17* 123:*6* 128:*3* 129:*14* 131:*1* 135:*19*, *22* 137:*3*

< Q >

quandary 55:*8*

question 4:*6* 5:*9*, *16* 6:*5*, *6* 15:*23* 17:*3* 18:*4* 20:*21* 44:*1* 52:*18* 58:*15*, *16* 62:*4* 64:*24* 90:*1*, *3*, *13*, *20* 93:*10*, *12* 96:*4* 98:*12*, *18* 120:*18* 132:*21*

questioned 34:*7*

questions 22:*3* 50:*6* 51:*2* 89:*24* 113:*20* 115:*12* 133:*20* 141:*5*

quick 6:*1* 32:*20* 88:*15* 115:*12*

quicker 39:*5*

quit 130:*16*

quite 83:*4* 115:*23*

< R >

radio 8:*21* 9:*4* 14:*17* 128:*4*

raising 50:*7*

ramming 49:*15*

ran 84:*14* 115:*11*

range 23:*21* 127:*17*

rank 137:*19*

raped 81:*2* 83:*19*, *23*

rated 120:*23*

rater 116:*17* 117:*15* 118:*16* 119:*18*

reach 58:*6*

reacquired 79:*14*

reacting 136:*6*

reaction 53:*17* 135:*1*, *14*

read 9:*22* 10:*1* 47:*16*, *20* 59:*24* 60:*19* 89:*10*, *11* 100:*17* 117:*10* 118:*13* 119:*15* 120:*14*, *19* 122:*10* 123:*18*

reading 4:*3* 47:*23* 139:*11*

real 31:*11*, *13* 69:*8* 131:*11*

realize 54:*18* 58:*2*

realized 56:*23*

really 27:*14*, *16* 31:*15* 40:*15*, *16* 50:*12* 55:*13* 65:*18* 68:*20* 71:*12* 96:*8* 107:*8* 116:*16* 131:*2*

rear 35:*21* 94:*4* 99:*12*

reason 5:*15*, *23* 27:*8* 51:*2* 52:*13* 64:*18* 66:*1* 130:*5*

reasons 50:*24*

recall 12:*22* 13:*1*, *7*, *14* 14:*22*, *23* 25:*11* 37:*19* 38:*8* 73:*13* 82:*1* 101:*11* 102:*1*, *4*, *7* 121:*20*

receive 20:*11* 82:*7*

received 112:*20*

recklessly 53:*13* 57:*5*

recognition 117:*6*

recognize 100:*20* 108:*21*

recognized 100:*10*

recollection 13:*3* 19:*7* 65:*12* 77:*17* 82:*24*

record 4:*16* 6:*12* 19:*18*, *20* 33:*21*, *23* 34:*12* 39:*18* 46:*17* 50:*10* 53:*15* 60:*10*, *12* 83:*8*, *10* 89:*14* 92:*16* 113:*11*, *16*, *19*, *24* 114:*2*, *3* 134:*2*

recording 42:*2*

recovered 39:*16*

red 56:*4*

reentering 68:*4*

reference 29:*2* 127:*1*

referenced 39:*20* 88:*11*

referred 46:*9*

referring 9:*12* 28:*16* 41:*23* 57:*7* 118:*6*

refresh 13:*2* 77:*16* 102:*14*

refused 93:*19*

regard 11:*20*

register 77:*3*

regular 5:*2* 40:*17* 114:*14*, *16*, *18*

related 21:*10* 114:*7*, *9*, *20*

relation 42:*21* 67:*7* 83:*20*

relied 119:*10* 120:*8*

re-litigate 18:*19*

re-litigating 18:*23*

relying 5:*7*

remainder 96:*13*

remember 11:*5* 34:*8* 37:*22* 42:*2* 65:*18* 81:*20* 82:*17* 85:*10*, *20*, *24* 100:*9* 138:*9*

remind 119:*9* 120:*6*

repaid 10:*19*

repeat 5:*18* 15:*22* 17:*3* 18:*4*

rephrase 5:*19*

replaying 130:*8*

Report 9:*10*, *11*, *13*, *22* 10:*2* 20:*12* 39:*21* 59:*23* 64:*15* 96:*18*, *19*, *23* 104:*18* 116:*12*

Reporter 1:*18* 5:*4* 46:*21* 60:*13* 92:*20* 97:*8* 109:*1* 115:*16* 121:*7* 142:*5*

reports 115:*22*

represent 39:*15* 45:*23* 46:*4* 62:*21* 77:*15* 98:*5*

represented 97:*20* 98:*1*

Representing 2:*8*, *16*

Requests 3:*22*

required 64:*2*

requirements 106:*18*

requires 107:*16*, *22*

rescue 85:*3* 87:*13*

reserved 4:*6*

resolved 10:*12* 19:*5* 22:*10*

respect 108:*2*

respective 4:*3*

**respectively** 124:*9*
**respond** 50:*10* 81:*16*
**responding** 140:*8*
**response** 73:*20*
**responsibilities** 50:*13*
141:*2*
**responsibility** 81:*16*
**responsive** 138:*2*
**rest** 100:*16*
**result** 23:*10* 52:*14*
61:*12* 129:*5* 138:*3*
**resulted** 18:*10* 22:*17*
**results** 116:*4*
**retain** 80:*4*
**retired** 8:*10*
**retrieved** 46:*6*
**returned** 10:*18*
**review** 9:*16* 93:*3*
97:*13*
**reviewed** 9:*6, 9*
39:*21* 60:*2, 7* 77:*10*
**reviewers** 120:*20*
**Reviews** 3:*21* 139:*7*
**Re-vined** 123:*13, 14*
**revised** 109:*9, 10*
**revisit** 102:*10, 14*
**ride** 55:*18* 102:*20*
140:*13*
**rider** 44:*8*
**riders** 13:*18* 43:*8*
**riding** 43:*17* 51:*24*
52:*11, 16* 53:*7, 24*
131:*19* 140:*5*
**right** 5:*21* 6:*8* 10:*4*
17:*7, 16* 20:*1* 24:*1,*
*19* 25:*10* 29:*18*
30:*10, 24* 31:*16*
32:*17, 20* 33:*9, 14*
35:*15, 17* 37:*17* 38:*6*
39:*2, 5* 41:*9* 42:*8, 23*
43:*3, 17* 44:*4, 24*
45:*7, 9, 14* 47:*8, 24*
48:*3, 17* 50:*22, 23*
51:*16, 20* 52:*7, 16*
53:*8, 10* 54:*23* 55:*1,*
*2, 9, 14* 56:*15* 58:*3*
59:*16* 60:*4* 61:*1*
62:*6* 63:*6* 65:*4, 6, 9,*
*10* 66:*6* 68:*11* 69:*14,*
*23* 71:*16, 23* 73:*5*

74:*1* 75:*5* 76:*6, 14*
77:*3* 78:*18, 21, 24*
79:*9* 80:*21* 81:*9*
85:*18* 87:*9, 16* 90:*9,*
*13, 22* 94:*22* 95:*3, 12,*
*16, 19* 96:*2, 10, 15*
97:*3, 18, 22* 99:*1, 4, 6*
100:*7, 14* 102:*15*
103:*12, 18, 24* 104:*21*
105:*24* 107:*2, 9, 14,*
*18* 109:*24* 110:*11, 18*
111:*3, 9* 115:*6*
117:*12* 122:*20* 123:*7,*
*19* 124:*11* 129:*13*
130:*1* 133:*1* 134:*12,*
*21* 135:*8, 11* 136:*3*
138:*5*
**right-hand** 68:*6*
69:*12*
**rights** 12:*21*
**rightward** 40:*10*
**ripped** 68:*4* 69:*23*
94:*6* 100:*6*
**rise** 55:*12* 62:*5*
**risk** 42:*9* 43:*21*
45:*16* 135:*19*
**risks** 110:*3* 136:*10*
**road** 28:*1, 5*
**roadblock** 49:*24*
50:*20* 51:*24*
**roadway** 29:*12* 38:*7*
130:*9*
**robberies** 81:*17*
140:*8*
**Robert** 77:*18* 88:*12*
**role** 132:*7*
**route** 46:*7* 58:*6*
**routine** 102:*24*
**run** 68:*14* 80:*19*
91:*11* 114:*23* 134:*13*
**RYAN** 1:*5* 24:*9, 12*
41:*17* 45:*19* 55:*23*
58:*19* 66:*13, 14*
67:*23* 68:*13, 23* 69:*3,*
*10, 12, 13* 74:*4* 75:*24*
76:*6, 11* 78:*9, 14*
79:*15* 84:*13, 14, 24*
86:*4, 11, 17* 87:*23*
88:*1* 91:*20* 94:*11*
112:*7* 127:*3, 6* 130:*5*

132:*2, 22* 134:*24*
137:*11, 21* 138:*1*
**Ryan's** 36:*9* 37:*12*
40:*11* 41:*9* 45:*15*
73:*9* 74:*18* 84:*12*

**< S >**
**safety** 43:*16* 51:*5*
111:*2*
**sanitize** 18:*15*
**save** 135:*23*
**saw** 12:*18* 25:*10*
67:*21* 87:*22* 95:*11,*
*14* 100:*12, 14* 126:*23*
132:*2, 22* 139:*6*
**saying** 52:*19* 56:*12,*
*22* 73:*14, 15* 91:*8*
130:*6*
**says** 48:*10* 60:*20*
61:*4* 95:*9* 116:*24*
117:*21*
**Scattergood** 31:*21*
57:*11* 58:*6* 59:*1, 12*
61:*6* 66:*9, 12, 23*
67:*15, 16* 68:*19* 69:*5,*
*6* 70:*8* 72:*18* 73:*5*
75:*3* 87:*22* 93:*20, 22*
94:*1, 14* 95:*1, 3*
99:*20* 100:*7, 12*
101:*6*
**scene** 84:*18* 85:*3, 21*
87:*5* 95:*16* 102:*11,*
*14* 129:*15* 137:*8*
**schematics** 139:*19*
**Schuylkill** 7:*21* 8:*4*
**scooted** 74:*22*
**scooter** 24:*10* 25:*12*
35:*22* 36:*9, 20* 37:*12,*
*18* 38:*2, 24* 40:*12*
41:*1* 42:*8, 10* 43:*21*
44:*5, 23* 45:*15* 47:*6,*
*11, 12* 48:*3, 12, 17, 22*
52:*1, 11* 61:*7* 67:*7,*
*23* 68:*6, 8* 72:*11*
76:*14, 17, 18* 77:*23*
86:*2, 14, 23* 87:*11, 12*
88:*19, 21* 93:*10, 17,*
*21* 94:*2, 3, 9* 95:*20,*
*22* 98:*15* 136:*9, 12*

138:*15*
**scooters** 43:*7*
**scooter's** 61:*11*
**screaming** 73:*16*
**screen** 19:*15, 23*
35:*4* 39:*24* 40:*8*
71:*17* 76:*2* 105:*7, 8*
**sealing** 4:*4*
**search** 114:*23*
**second** 122:*17, 18*
**seconds** 38:*22* 73:*2*
74:*2*
**section** 9:*14, 17*
12:*15* 13:*11* 59:*23*
61:*13, 21* 116:*23*
**see** 19:*17, 22* 20:*1, 2*
24:*12* 28:*13* 29:*16,*
*20* 33:*18* 34:*3, 16, 20*
35:*2* 36:*15* 38:*21*
39:*12, 23* 40:*4, 7, 10,*
*16, 18, 20, 21* 41:*8, 22,*
*23* 42:*17, 20* 45:*24*
46:*1* 55:*9* 60:*8, 9, 17*
67:*16* 68:*11* 69:*3, 4*
72:*10, 11, 16* 73:*4*
75:*14* 76:*9, 11* 77:*2*
79:*20* 85:*8* 88:*17*
89:*2, 13* 93:*13* 98:*9*
101:*11* 103:*11* 105:*8*
108:*1* 117:*16* 124:*23,*
*24* 126:*21* 137:*13, 23*
**seeing** 33:*19, 20*
85:*10* 100:*9* 128:*16*
135:*17*
**seek** 127:*22*
**seeking** 127:*2*
**seemingly** 53:*20*
**seen** 20:*17* 25:*13*
29:*17* 62:*24* 71:*4*
73:*21* 75:*9, 16* 77:*8,*
*9* 78:*8, 24* 79:*4* 88:*6,*
*8, 9* 92:*6, 8, 10* 126:*1*
127:*4* 129:*16* 130:*9*
131:*21, 23*
**segment** 33:*14* 36:*15*
74:*2*
**self-storage** 36:*24*
58:*20* 94:*23* 101:*4*
**semantics** 125:*5*

seminars  23:*23*
send  87:*12*  101:*23*
senior  8:*3*
sense  12:*13*  26:*18*
136:*17*
sensitive  128:*23*
sentences  89:*10*
separate  22:*15*
September  97:*17*
sequence  36:6, *7*
59:*14*  65:*13*  67:*18*
sequences  136:*2*
Sergeant  118:*18, 19*
serious  44:*24*  48:*24*
52:*15*  106:*6*  110:*3*
seriously  139:*4*
served  20:*17*
service  8:*9*  22:*11*
80:*2*  116:*11*  118:*23*
119:*2, 20*  120:*2*
sets  54:*1, 5, 13*
settled  22:*6*
severe  137:*15*
Sevino  137:*17*
sex  112:*20*
sexual  112:*11, 15*
sexually  83:*19*
share  19:*14*
sharing  62:*9*  105:*7*
sharp  38:*5*  45:*14*
shift  24:*8*  63:*24*
shirt  68:*3, 4*  69:*23*
94:*5, 6*  100:*4, 6*
shooting  23:*21*
131:*8*  135:*19*
shootings  81:*17*
140:*4*
shootouts  127:*17*
130:*1*
short  57:*19*  70:*3*
133:*22*  137:*4*
shorter  36:*3*
shortly  7:*14*  28:*20*
91:*13*
shot  34:*4*  112:*22*
127:*17*  130:*2*
show  45:*22*  59:*22*
70:*18*  92:*13*  96:*13*
showed  86:*20*

showing  20:*4*  92:*15*
136:*24*
shows  37:*13*  38:*20*
92:*3*
sick  118:*1*
side  14:*2*  17:*8, 12*
25:*5, 6*  30:*23*  40:*8*
47:*11*  61:*10*  65:*7*
66:*17*  73:*5, 12*  74:*17*
78:*10, 17, 18, 22*  92:*6*
98:*22*  126:*17*
sides  31:*4*
sight  38:*21*  76:*18*
78:*16, 19*  79:*14*  94:*8*
99:*10*
sign  109:*17*  116:*8*
signature  121:*23*
signing  4:*3*
signs  103:*14*
similar  39:*20*  109:*19*
117:*21*  131:*16*
similarities  18:*22*
52:*20*
Simon  32:*21, 22*
33:*3*  35:*20*  36:*8, 16*
57:*14, 19*  58:*7*  59:*6*
99:*5*
Simple  83:*3, 6, 7*
simultaneous  41:*13*
simultaneously  42:*15*
sir  5:*22*  6:*9, 10*
24:*20*  33:*2*  35:*18*
41:*24*  47:*13*  60:*18*
70:*6*  133:*16*
sirens  25:*15, 19*  26:*5*
28:*10*  30:*17*  62:*14*
63:*2*  64:*5, 9*  107:*23*
sit  65:*11, 20*  127:*15*
situated  67:*7*
situation  18:*20*
52:*21, 22*  53:*24*  56:*9*
106:*19*  111:*20*  135:*9*
situations  53:*20*
126:*16*
six  22:*15*
six-page  98:*5*
skip  98:*17*
Slightly  112:*9*  125:*24*
slip  69:*14, 17*

slow  28:*13*  68:*24*
slowed  67:*2, 9*  78:*3*
slower  78:*1*
slowing  67:*11*  73:*18*
74:*5*
small  31:*8, 11, 13*
33:*9*  57:*23*  59:*8, 10,
11*  99:*5, 16*
smaller  32:*18*
smell  120:*15*
social  81:*24*
socialize  83:*16*
socialized  83:*13*
sold  10:*18*
solely  61:*16*
somebody  20:*13*
43:*20*  44:*4, 23*  53:*23*
71:*13*  75:*19*  81:*5*
87:*4*
somewhat  43:*8*
sorry  17:*4*  18:*5*
24:*24*  47:*23*  60:*4*
70:*16*  75:*11*  76:*15*
90:*17*  96:*5*  131:*9*
sort  5:*7, 10*  9:*17*
12:*12*  23:*24*  25:*4*
27:*15*  29:*7*  31:*7*
33:*13*  35:*17*  42:*7*
53:*20*  54:*1*  56:*13, 22*
61:*24*  63:*22*  67:*10*
69:*14*  74:*9*  78:*1*
89:*5*  90:*12*  93:*8*
95:*8*  98:*19*  103:*9*
107:*5*  110:*9*  111:*14*
126:*12*  132:*7*  134:*4*
136:*16*
Soto  114:*12, 14, 16*
sound  122:*24*
sounds  125:*5*
sources  46:*6*
south  28:*19, 20*
46:*10*  85:*21*  99:*4*
southbound  15:*18*
16:*13, 15*  26:*9, 12*
28:*3*  29:*4, 19*  30:*4,
15*  36:*22*  47:*6, 10*
48:*2, 4*  66:*9*  99:*2, 8,
17*
span  57:*6, 8*

speaking  5:*3, 13*
13:*16*
specifically  27:*4*
46:*8*  104:*12*
specifics  108:*17*
112:*13*
speculation  27:*15*
48:*9*  90:*15*
speculative  17:*1*
110:*13*
speed  40:*17*  68:*8, 24*
spell  116:*20*
split  58:*5*
spoke  101:*12*  129:*21*
131:*5*
sporadically  81:*4*
sports  131:*8*
spot  28:*9*  135:*23*
squad  7:*22, 23*
118:*23*  119:*19*  123:*4,
17*  124:*5*
square  31:*20*
stabbings  140:*9*
stamp  72:*7*
standard  107:*2*
standing  86:*21*
Stanley  20:*9, 12*  21:*8*
start  41:*20*  79:*7*
129:*20*
started  43:*2*  52:*19*
73:*17*  76:*22*
starting  6:*23*  95:*11*
starts  41:*8*
state  6:*11*  23:*20*
28:*4, 5*  39:*17*  94:*10*
122:*2*
stated  26:*7*  51:*1*
61:*21*  62:*12*  91:*2*
state-mandated  23:*19*
Statement  3:*17, 18,
19*  16:*7*  26:*3*  27:*1*
77:*17, 19*  85:*5, 10*
86:*1, 24*  88:*12*  89:*3*
92:*9, 14, 17, 18*  93:*1,
15*  97:*2, 12*  98:*5*
100:*21, 24*  101:*2*
103:*17*
statements  26:*8*
62:*23*  77:*11*  89:*20*

**STATES** 1:*1* 47:*5*
48:*2* 60:*23* 61:*14, 19*
89:*5* 94:*12* 98:*2*1
106:*2* 118:*22* 119:*19*
120:*1* 122:*3* 123:*5*
124:*2*
**statistics** 118:*5*
**status** 23:*9*
**stay** 5:*12* 41:*6*
125:*9* 126:*18*
**Staying** 134:*3*
**stenographic** 142:*9*
**step** 5:*10* 128:*15*
**stepped** 69:*22*
**Steps** 71:*9*
**stipulated** 4:*1*
**stolen** 61:*17*
**stood** 129:*22*
**stop** 20:*13* 35:*12*
56:*10* 62:*3, 9, 13*
66:*2, 17* 67:*1, 3, 10,*
*12* 68:*23* 69:*1* 73:*15,*
*16* 93:*18, 19, 22, 23*
98:*24* 99:*3, 19, 22*
102:*11* 130:*10*
133:*13* 138:*17*
140:*14*
**stop/vehicle** 98:*14*
**stopped** 41:*7* 56:*14*
57:*6, 9, 12, 23* 73:*1*
74:*3* 75:*24* 94:*2*
95:*14* 99:*23* 132:*15*
137:*5*
**stopping** 56:*2* 132:*11*
**storage** 39:*17*
**story** 87:*15* 100:*16*
**straight** 36:*17* 42:*11*
73:*22* 74:*10*
**straightforward** 5:*18*
**strange** 91:*22*
**Street** 2:*13* 16:*9, 10,*
*17* 24:*15, 16, 18, 22*
25:*3, 7* 28:*4* 29:*7*
30:*7, 10, 15, 16, 19, 22,*
*24* 31:*4, 19* 32:*3, 9,*
*11, 16, 21, 24* 33:*4, 6*
35:*13* 36:*8* 47:*7*
48:*5* 56:*13, 14* 57:*1,*
*18* 58:*9* 59:*4, 8, 10*
61:*6, 9* 62:*13* 64:*9*

66:*23* 70:*8* 71:*10, 23*
72:*19* 76:*1, 5, 20*
77:*19* 78:*22* 79:*1*
85:*7, 20* 86:*19, 22, 24*
87:*1* 93:*9, 18, 20*
94:*8, 12, 13, 14, 24*
95:*23* 98:*15, 16* 99:*1,*
*4, 5, 14, 16, 17, 20*
100:*7, 8, 13, 14*
102:*18* 103:*14*
136:*22* 138:*14, 15*
**streets** 31:*12* 32:*18*
33:*5, 10* 58:*24* 59:*11*
66:*5* 78:*10, 17, 18, 22*
96:*21, 22* 102:*17*
103:*9, 14*
**stress** 132:*6*
**strictly** 50:*14* 61:*15,*
*18*
**strikes** 111:*1*
**striking** 126:*17*
**struck** 17:*12, 18*
56:*9* 137:*21* 139:*3*
**structure** 43:*15*
**stuck** 70:*2*1
**stuff** 5:*17* 21:*10*
24:*4* 51:*18* 81:*17*
82:*3* 126:*19* 127:*1*
139:*17* 140:*8*
**substance** 93:*7*
**substantially** 39:*20*
**success** 117:*8*
**suffer** 44:*24*
**suicidal** 27:*2, 11*
132:*12*
**suicide** 128:*5, 13*
130:*15*
**Suite** 2:*5*
**superficial** 18:*21, 22*
52:*20*
**supervision** 117:*1*
120:*5*
**supervisors** 125:*16*
**supposed** 15:*1* 51:*3*
64:*3* 108:*5* 110:*16,*
*20*
**sure** 29:*2* 33:*8*
38:*11* 45:*1* 59:*7*
71:*11* 76:*9* 77:*14*
82:*18* 85:*22* 87:*1*

104:*17* 105:*5* 113:*22*
117:*7*
**surrounding** 43:*15*
**suspect** 106:*4, 8*
110:*4*
**suspension** 23:*1*
**sustained** 60:*20*
**SUV** 39:*2* 44:*22*
47:*7* 48:*2* 49:*7*
104:*14*
**SUVs** 8:*19* 43:*10*
105:*2*
**swear** 113:*7*
**swerved** 56:*8* 137:*1*
139:*3*
**swerves** 135:*21*
**switched** 7:*12*
**sworn** 4:*10* 113:*8*
**synopsis** 96:*20*

**< T >**
**tackled** 132:*15*
**Tacony** 24:*16, 18*
25:*3, 5, 7, 20, 21* 26:*4,*
*10* 28:*6, 22* 30:*5, 8,*
*11* 31:*22* 35:*16*
56:*13, 14, 24* 57:*13*
58:*6* 62:*13* 64:*9*
71:*24* 84:*15* 85:*7, 20*
86:*19* 93:*9* 94:*12*
95:*2, 23* 98:*15* 136:*4*
**tag** 25:*13*
**Tahoe** 104:*19*
**taillights** 76:*10* 78:*8*
79:*4*
**take** 5:*4, 23* 6:*3, 6,*
*22* 22:*8* 36:*11* 41:*4*
58:*9* 63:*11* 78:*1*
84:*8* 98:*18* 118:*11*
119:*8, 12* 120:*6, 10*
127:*10, 13* 130:*14*
133:*7, 20* 139:*12*
**taken** 66:*5* 70:*4*
71:*8* 126:*21* 127:*18*
131:*1* 133:*23* 142:*9*
**takes** 93:*8* 117:*24*
128:*18*
**talent** 118:*10*
**talk** 71:*3* 84:*5*
127:*19* 131:*11*

**talked** 81:*3* 91:*16*
94:*16*
**talking** 27:*14* 34:*6*
35:*7* 51:*15* 73:*10*
80:*16* 126:*5* 138:*11*
140:*20, 23*
**talks** 46:*8* 95:*8, 19*
**tanker** 134:*13*
**Taurus** 75:*8*
**team** 117:*24* 119:*3*
120:*3*
**tech** 70:*9*
**techniques** 51:*5*
**technology** 5:*7*
**telephone** 85:*12*
**tell** 63:*1* 66:*24*
101:*24* 119:*24*
126:*18* 127:*21*
128:*12* 129:*18*
130:*20* 131:*5* 139:*7*
**telling** 68:*23* 85:*24*
**ten** 12:*8, 10* 85:*2*
**tension** 55:*1, 5*
**term** 120:*21* 125:*15,*
*17* 139:*6*
**terms** 120:*23* 124:*19*
**terrible** 83:*24*
**testified** 4:*11* 20:*19*
47:*1* 48:*7*
**Testimony** 3:*3* 9:*6*
10:*5* 11:*10, 13, 20*
43:*1* 48:*18* 104:*4*
126:*1*
**tests** 119:*13* 120:*11*
**text** 85:*13*
**texts** 82:*7*
**thank** 128:*22* 133:*17*
136:*13* 141:*7, 11*
**Thanks** 6:*10* 130:*12*
141:*10*
**therapy** 127:*2, 4*
**thereabouts** 13:*18*
**thing** 6:*4* 19:*8*
43:*16* 52:*9* 89:*11*
125:*13, 23* 127:*2, 5,*
*19* 128:*3* 131:*16*
140:*2*
**things** 5:*2* 27:*15*
51:*14* 55:*10* 64:*5*
101:*9* 111:*13* 115:*9*

Case 2:20-cv-06301-MMB   Document 68-1   Filed 02/16/24   Page 56 of 68

Deposition of Officer Joseph Wolk                    Neal Miller and Donna Miller v. City of Philadelphia, et al.

116:5  125:9, 10
127:18
think  5:17  12:7
14:14  19:11  22:24
23:1  26:7  27:1, 5
31:18, 19  33:7, 12
34:14  51:1  53:16
59:8  70:7  74:1, 4
75:9, 10  83:3  85:6
86:21, 24  88:17  93:6
98:8  103:8  104:12
105:14, 20  107:16
115:10  122:15
123:21  132:5  135:16
138:24
thinking  92:4  130:6
thinks  140:22
third  61:4
Thirty-three  12:9
thought  27:2  47:22
88:13
thousands  125:2
threat  136:5
three  22:15  57:22
83:21  120:19
throw  125:8
thrown  10:17
time  4:7  5:4, 8, 11
6:4  8:4, 13, 15  13:6
19:5, 19  25:10, 19
33:22  34:10  40:1
41:14  42:12, 16, 21
46:21  49:7  54:16
55:17  60:11, 13  61:8
62:16  63:3  64:10, 11
67:6, 15, 20  69:2
70:3, 6, 22  72:7, 22
75:13  76:21  79:6
80:1, 20, 23  81:1
82:16  83:1, 4, 5, 9
84:2, 18  86:5  87:14
91:16  92:15, 20  97:8
101:11  102:8  103:5
104:20  105:12  109:1
113:23  114:11
115:16, 23  117:2
118:23  119:20  121:7,
15  122:19, 24  124:15
129:14  133:22

136:23  138:24
139:22  141:8
Timeline  46:2, 5
times  10:7  11:24
28:6  67:2  82:17
136:7
T-intersection  31:3
tiny  58:2  96:21
T-Mobile  82:23
today  9:6  23:9
65:11, 20
told  64:15  80:24
86:19, 20  99:21
131:3, 7
toll  131:1
top  24:1  57:24  58:3
60:19  71:16  89:23
117:20  125:9
Torresdale  13:18
15:19  16:14, 16
total  57:22
Toto  114:15
touch  18:23
touched  103:22
123:22
tow  79:24  80:2  81:8,
13  100:10
tractor  85:7
traffic  8:1  26:14
27:9, 24  28:1, 11
29:16, 18, 21  53:17
56:3, 5  61:17  62:2
98:13  111:21  135:19
139:2  140:14
trailer  85:8  137:22
trained  109:5
training  23:24  24:4
109:15, 17, 20
transcript  142:8
Transfer  3:22
121:14  123:3
transferred  7:5
122:7, 19  123:16, 23
124:9
transported  20:14
travel  15:18  16:13
17:7  26:9  29:6
74:18
traveled  27:8

traveling  15:18
16:13, 15  24:14, 15
27:12  28:2, 8, 9  30:4
32:5  42:11  47:10
48:4  56:24  67:15
88:20  136:4
tread  125:24
Trevose  2:6
trial  4:7
tried  69:22  70:19
138:17
trigger  54:9
truck  44:22  61:10
81:8, 13  84:14  85:1,
22  100:11  134:14
137:22
true  142:8
try  7:24  19:14
28:11  33:15  34:8
39:11  41:4, 5  44:19
56:10  66:1  78:14
94:16  117:14  125:9
128:19  129:18
trying  9:21  12:12
18:15, 24  35:11  36:8
44:16, 17  50:10, 15
51:6  58:5  67:24
85:19  111:10  126:18
136:16  140:4
turn  14:1  15:11, 15,
17  16:3, 4, 9, 12, 16,
22  17:7, 9, 15, 17
24:6  28:11, 22  29:2
30:10, 18  32:3, 10, 17,
19, 20  36:7, 20  37:16
38:5, 14  41:21  42:22
43:2  44:13  63:3
64:19  66:1  68:6, 11
69:3, 12, 24  78:24
79:4  94:7, 22  95:11,
15, 21  99:1, 4, 17
100:14  135:24
136:11  139:2
turnaround  39:5
101:4
turned  25:21  33:1
38:11, 12, 17  42:15,
16, 17, 24  43:4  44:14,
15  45:20  48:12, 13,
18, 20, 21  65:14

67:14  78:9  88:20
92:7  93:20  94:11
95:20  99:19  100:7
128:6
turning  25:10  32:9
35:13, 19  41:13
42:24  43:3  44:3
45:20
turns  41:18  53:21
TVR's  118:4
Twice  10:8
two  7:3, 5, 8  22:24
27:15  36:14  40:7
42:10  44:7  53:19
57:6, 8, 11  62:23
79:8  96:16  109:16
118:1  122:15
two-step  92:14
two-way  33:4, 6, 7
two-wheeled  43:7
type  12:2  14:11, 18
21:1  23:22  62:6
90:4, 8  104:13
109:18  125:11  135:9
types  53:11  54:1
104:15  105:2, 20
110:10

< U >
U-bey  58:21
Ultimately  59:13
101:5  103:23  124:10
umbrella  107:6
unbound  110:17
underage  113:12
understand  5:14, 16,
20  12:14  15:9  18:17
19:2  26:2  44:18
50:5  62:3  119:4
128:10  139:8
understanding  17:6
50:12, 15  58:23
104:2, 24  112:16, 19
125:12
Understood  50:9
51:19  125:18
uniform  127:11, 12
129:15  131:22
uniformly  120:20
124:15

Case 2:20-cv-06301-MMB   Document 68-1   Filed 02/16/24   Page 57 of 68

Deposition of Officer Joseph Wolk                    Neal Miller and Donna Miller v. City of Philadelphia, et al.

**unit** 117:5, 7  119:9
120:7  140:15
**UNITED** 1:1
**unnecessarily** 111:11
**unpleasantness**
118:12
**updated** 105:14
109:14, 17
**updates** 23:20  105:16
**use** 8:23  49:10, 14,
22  51:4, 23  52:9
54:8  104:20  120:21
**usually** 9:3  109:16
**U-turn** 25:15, 18, 23
29:17, 23  30:1  93:17
98:23

**< V >**
**vacation** 8:3
**valued** 119:19
**vantage** 71:4
**various** 46:6  121:15
**veer** 41:8
**veering** 37:17  48:16
**veers** 48:3
**vehicle** 13:20  14:3
15:12, 17  16:12, 19,
22  17:8, 13, 17  29:10
37:11, 14  40:11, 24
41:8  43:6, 22  47:8
48:11, 22  49:3, 12, 16,
24  50:20  51:10, 16,
23  52:10  53:21
54:21  55:11, 14  56:9
57:2  63:19, 22  67:4,
7, 13, 21, 22  72:10, 12,
21  73:8, 9  74:23
75:4, 15, 24  76:14, 16
77:2  78:1, 4, 8  84:12
87:12  88:6  90:2, 4, 8
92:8  93:21  94:1, 4
99:24  100:10  104:13
106:5, 8, 16  110:2
111:22  126:17  137:1
138:10
**vehicles** 32:2  35:3,
16  36:14  37:6  40:7
42:10  43:7  44:7
53:12  54:1  61:17
76:21  79:8  94:22

104:15  105:3, 20
118:3
**vehicular** 11:15, 16,
19  12:3  60:24  61:15
104:16  105:4, 11, 24
106:3  110:23
**vice** 8:7
**video** 17:12  33:12,
18, 20  34:4, 10, 13
36:15  37:13  38:20
39:12, 16, 19, 20  40:1,
8  41:3  46:2, 5, 13
62:23  63:1  64:20
70:7, 12, 22  71:3, 4
72:6, 8  75:9  77:8
84:9  88:8  92:3
102:23  112:21, 22
136:24
**Videoconference** 1:17
**videos** 47:3  108:1
131:21
**view** 98:22  99:12
116:8  129:10
**viewing** 47:3
**violated** 14:24
108:12
**violation** 14:11, 19
49:12  51:16  53:21
57:2  61:20  62:2
101:18  103:23
107:13  111:21
**violations** 8:1  54:21
55:10  59:15  60:21
61:17  104:9
**violence** 128:24
**volunteer** 120:3
**volunteered** 90:12
**vulnerable** 43:9

**< W >**
**wait** 20:20  30:2
**waived** 4:5
**wall** 71:18
**walls** 71:18
**want** 4:22  5:3, 19
18:19  19:10  21:20
44:19  45:22  47:24
102:10  110:18
111:14  113:10  115:8
116:9  119:8  120:6

125:4  131:6  138:22
139:5  140:12
**wanted** 10:19  18:22
21:7  62:11  82:4
102:13  103:7, 12
115:11  124:23
133:12  139:14, 15
140:9
**Ward** 12:20, 23  19:8
20:8  21:3  22:10, 22
**W-A-R-D** 12:24
**warn** 28:11
**warranted** 8:1
**watch** 41:23
**watched** 74:2
**watching** 34:24
70:21
**Watson** 28:17
**way** 22:19  23:14
24:3  34:18  36:20
38:19  41:18  54:2
55:19  56:6, 24  58:22
64:2  76:10  86:14
90:19  118:2  125:17
129:11, 13  130:8
131:2, 17, 20  132:3
133:9  134:6  135:2
136:3  138:2
**ways** 28:1  29:21, 24
31:17  129:3
**weapon** 106:15
**wearing** 25:14
**weeds** 21:21
**weeks** 7:12  91:14
**weird** 43:24  92:6
**well** 5:8  9:17  12:17
17:6  21:20  25:24
28:2  33:12, 14  38:10
41:10  49:22  53:5
56:1  62:23  77:20
79:9  81:7  82:5
90:19  96:1  97:14
103:11  104:13  110:4
111:2  118:23  119:20
126:14  138:19  139:1
**well-being** 133:15
**went** 6:24  7:1, 11, 13
24:2  25:11  33:3
37:6  44:15  51:1
57:16  68:13  75:16,

17  92:11  99:4, 16, 24
100:13  102:17
103:15  129:15
131:23  136:23
**we're** 5:1, 7  8:20
33:19, 20  34:3  64:3
70:7, 21  81:12  98:8
113:16  114:2  115:6,
13, 19  119:11  134:2
140:3, 5, 7, 15
**westbound** 24:16, 17,
21, 22, 23  25:8  36:16
99:19
**we've** 32:1  35:7
62:23  136:9  138:11
140:19
**whatsoever** 22:7
**wheelie** 14:4  17:12
**white** 71:18
**William** 114:15
118:17, 18
**willing** 118:10
**window** 66:24  73:12
**wish** 117:8  132:15
**WITNESS** 9:21  10:1
11:1  13:23  15:22
17:3, 20  18:4, 14, 17
20:22  21:17  22:22
26:22  27:21  31:11
32:10  35:11  36:2
37:22  40:15  41:12
42:14  43:12, 24
44:12  45:12, 19  48:9
49:20  51:9  52:4
53:3  54:5, 12  55:4,
17  56:19  58:13
59:19  62:22  63:9, 15
64:14  66:22  69:17
76:9  77:11  78:7
79:12, 19  81:12
84:21  86:8  87:19
88:4  89:9, 20  90:16
91:7  96:4  101:14
106:22  108:19  110:7
111:6  112:4  113:8
121:4  125:21  131:9
132:10  133:4, 12
135:5  136:21  141:12
**witnessed** 90:3

126:*14*  127:*8*

**witnesses**  102:*23*

**WOLK**  1:*16*  3:*3*
4:*9*  6:*13*  60:22  61:*5*
116:*24*  117:22  118:*1,*
*9*  138:*9*

**WOLK-1**  3:*15*  46:*19,*
*22*

**WOLK-2**  3:*16*  60:*14,*
*15*

**WOLK-3**  3:*17*  92:*17,*
*21*

**WOLK-4**  3:*18*  92:*19*

**WOLK-5**  3:*19*  97:*7,*
*9*

**WOLK-6**  3:*20*
108:*24*  109:2

**WOLK-7**  3:*21*
115:*15, 17*

**WOLK-8**  3:*22*  121:*6,*
*8, 10*

**Wolk's**  92:*18*

**wonky**  5:*8*

**word**  44:*17*  55:*7*
124:*14*  139:*11*

**words**  43:*14*  139:*8*

**work**  7:*23*  8:*23*
81:*23*  83:*12*  119:*14*
120:*13*  124:*19*  125:*1*
127:*9*  129:*12, 17*
131:*19, 22*  139:*9, 16*
140:*12*

**worked**  6:*19*  7:*4*  8:2

**working**  117:*4*  122:*4*
123:*10*

**wound**  137:*14*

**wrap**  27:*11*

**written**  22:*3*  89:2
109:22  116:6

**wrong**  27:8  56:*24*
94:*11, 20*  105:*1*
129:*10, 13*  130:8
131:*16, 20*  132:2
138:*18*  139:*1*

**wrongful**  21:*4*

**< Y >**

**Yamaha**  138:*15*

**Yeah**  11:*18*  14:*14*
16:*6*  23:*5*  54:*6*

55:*24*  59:9  64:*14*
77:6  80:*18, 22*  82:*20*
84:*24*  92:*1, 2*  117:*18*
126:7  129:7, *8*

**year**  19:*5*  23:*19*
82:*21*  84:6  112:8
118:2

**years**  11:2  12:*5, 9,*
*19*  22:*16*  24:*5*  80:*1,*
*17, 18*  83:*21, 22*
109:*16*  114:*19*
127:*16*  128:*15*

**yelled**  93:22

**yield**  61:*9*

**young**  126:*19*

**younger**  112:*20*
130:*19*

**< Z >**

**Zoom**  1:*17*  5:*1*

Deposition of Officer Joseph Wolk                                    Neal Miller and Donna Miller v. City of Philadelphia, et al.

## WORD LIST

**< 0 >**
**000057**  *(1)*
**018**  *(1)*
**03**  *(1)*

**< 1 >**
**1**  *(2)*
**1:05**  *(1)*
**10:11**  *(1)*
**109**  *(1)*
**115**  *(1)*
**12**  *(1)*
**12/22/97**  *(1)*
**121**  *(1)*
**1210**  *(1)*
**138**  *(1)*
**14th**  *(1)*
**1515**  *(1)*
**16**  *(1)*
**18**  *(1)*
**184**  *(1)*
**19**  *(1)*
**19053**  *(1)*
**19102**  *(1)*
**1983**  *(3)*
**1990**  *(1)*
**1991**  *(1)*
**1993**  *(1)*
**1997**  *(2)*
**1998**  *(1)*
**1-B-2**  *(1)*

**< 2 >**
**2**  *(4)*
**2:20-cv-06301-ER**  *(1)*
**2003**  *(1)*
**2011**  *(1)*
**2012**  *(2)*
**2013**  *(1)*
**2015**  *(1)*
**2016**  *(1)*
**2019**  *(2)*
**2021**  *(1)*
**2023**  *(2)*
**215.686.1774**  *(1)*
**215.953.5200**  *(1)*
**227**  *(1)*

**24**  *(1)*
**25**  *(2)*
**25th**  *(1)*
**26**  *(1)*
**26th**  *(9)*
**280**  *(1)*

**< 3 >**
**3**  *(1)*
**30**  *(1)*
**33**  *(1)*

**< 4 >**
**4**  *(3)*
**45**  *(1)*
**46**  *(1)*

**< 5 >**
**5**  *(2)*
**50**  *(1)*
**5400**  *(6)*

**< 6 >**
**60**  *(1)*
**6734**  *(1)*

**< 7 >**
**7**  *(2)*
**7:15**  *(1)*
**7:24:20**  *(1)*
**7:24:22**  *(1)*
**7:27:19**  *(1)*
**7:27:25**  *(1)*
**7:27:29**  *(1)*
**7:27:36**  *(1)*
**7:27:42**  *(1)*
**7:27:50**  *(1)*
**71**  *(1)*

**< 8 >**
**85**  *(1)*

**< 9 >**
**9.4**  *(8)*
**90**  *(1)*
**92**  *(2)*
**93**  *(1)*
**95**  *(6)*
**97**  *(3)*

**< A >**
**a.m**  *(1)*
**ability**  *(1)*
**able**  *(11)*
**Absolutely**  *(8)*
**absorb**  *(1)*
**academy**  *(3)*
**accelerated**  *(4)*
**accepts**  *(1)*
**accident**  *(13)*
**accidental**  *(1)*
**accidentally**  *(2)*
**accidents**  *(3)*
**accommodate**  *(1)*
**account**  *(2)*
**accurate**  *(5)*
**action**  *(5)*
**actions**  *(4)*
**activated**  *(3)*
**active**  *(1)*
**actively**  *(1)*
**activity**  *(2)*
**actual**  *(2)*
**addiction**  *(1)*
**addition**  *(1)*
**additional**  *(3)*
**addresses**  *(1)*
**Administrators**  *(1)*
**advise**  *(1)*
**Affairs**  *(14)*
**affirmative**  *(1)*
**aforementioned**  *(1)*
**aftermath**  *(1)*
**aggressive**  *(25)*
**aggressively**  *(6)*
**aggressiveness**  *(1)*
**ago**  *(7)*
**agree**  *(17)*
**agreed**  *(2)*
**agrees**  *(1)*
**ahead**  *(18)*
**ahold**  *(1)*
**AID**  *(15)*
**air**  *(3)*
**al**  *(1)*
**alike**  *(2)*
**allegation**  *(5)*
**allegations**  *(2)*

**alleged**  *(1)*
**alliteration**  *(1)*
**allowed**  *(2)*
**alongside**  *(3)*
**angle**  *(2)*
**annual**  *(1)*
**answer**  *(61)*
**answering**  *(2)*
**answers**  *(2)*
**anticipation**  *(1)*
**anybody**  *(4)*
**anymore**  *(2)*
**anyway**  *(3)*
**apologize**  *(2)*
**apparently**  *(1)*
**appear**  *(8)*
**appearance**  *(1)*
**appeared**  *(3)*
**appears**  *(9)*
**application**  *(2)*
**applications**  *(1)*
**apply**  *(1)*
**appreciate**  *(2)*
**apprehend**  *(7)*
**apprehension**  *(1)*
**approach**  *(4)*
**approached**  *(2)*
**approaching**  *(1)*
**approved**  *(2)*
**approximately**  *(4)*
**Arch**  *(1)*
**area**  *(16)*
**areas**  *(7)*
**argue**  *(1)*
**Argumentative**  *(1)*
**arrest**  *(5)*
**arrested**  *(2)*
**arrests**  *(6)*
**Arsenal**  *(1)*
**asked**  *(10)*
**asking**  *(6)*
**assaulted**  *(1)*
**asset**  *(4)*
**assigned**  *(9)*
**assignment**  *(1)*
**associate**  *(1)*
**associated**  *(2)*
**ASSOCIATES**  *(1)*
**assume**  *(3)*

Deposition of Officer Joseph Wolk                    Neal Miller and Donna Miller v. City of Philadelphia, et al.

assuming  (3)
assumption  (1)
attachments  (2)
attempt  (2)
attempted  (4)
attended  (1)
attention  (1)
attitude  (1)
attorney  (1)
ATV  (1)
ATVs  (1)
auction  (1)
August  (1)
authority  (1)
authorized  (1)
auto  (5)
autos  (1)
Avenue  (3)
avoid  (2)
aware  (6)
awhile  (1)

< B >
back  (74)
backtrack  (1)
backwards  (2)
bad  (2)
Badge  (2)
Bailey  (5)
balance  (1)
bar  (1)
barricade  (1)
base  (1)
based  (1)
basic  (1)
basically  (13)
basis  (3)
Bear  (6)
Beasley  (1)
beat  (5)
began  (1)
beginning  (2)
begins  (1)
behalf  (3)
behavioral  (1)
believe  (37)
believed  (2)
believes  (2)
best  (2)

big  (1)
bike  (5)
bikes  (1)
bit  (8)
blind  (3)
block  (11)
blocking  (1)
blocks  (7)
blood  (1)
blow  (1)
blowing  (1)
blown  (1)
blue  (6)
blur  (3)
blurred  (1)
Board  (1)
bodily  (3)
body  (2)
boiling  (1)
bottom  (1)
Bove  (3)
brain  (1)
break  (10)
breaking  (1)
Brian  (2)
brick  (1)
Bridge  (9)
brief  (5)
briefly  (3)
bring  (6)
brings  (2)
broadly  (1)
brought  (2)
buddy  (1)
builds  (1)
bulk  (1)
bunch  (2)
burglaries  (1)
Burglary  (3)
business  (1)
buzzword  (1)
bystanders  (1)

< C >
call  (9)
called  (17)
calling  (1)
calls  (2)
camera  (5)

cameras  (3)
candor  (1)
canvas  (1)
caption  (1)
captured  (1)
car  (37)
career  (2)
carried  (1)
carrier  (3)
cars  (6)
case  (29)
cases  (7)
catch  (3)
catch-22  (1)
caught  (6)
cause  (3)
cell  (4)
Center  (4)
certain  (3)
certainly  (2)
certification  (1)
certify  (1)
chain  (1)
chance  (1)
change  (2)
changed  (6)
changes  (1)
characterization  (1)
characterized  (1)
charged  (1)
charges  (1)
chase  (3)
chatter  (1)
check  (1)
Chevy  (1)
choppier  (1)
choppy  (2)
circumstances  (2)
cities  (2)
citizen  (7)
CITY  (5)
civil  (3)
civilian  (3)
classes  (2)
classroom  (1)
clear  (5)
clearly  (1)
click  (1)
close  (16)

closer  (1)
Cloud  (2)
clouded  (1)
Clowe  (2)
Code  (3)
codefendant  (1)
collided  (5)
collision  (11)
come  (19)
comes  (4)
coming  (9)
command  (1)
commenced  (1)
commend  (2)
comments  (1)
commit  (1)
committed  (3)
common  (1)
commonly  (1)
Commonwealth  (2)
communication  (1)
complaint  (2)
completely  (2)
computer  (1)
concerned  (1)
concerns  (1)
concerted  (1)
Conclusion  (4)
conclusions  (2)
conduct  (1)
connect  (1)
connected  (1)
connection  (3)
conscious  (1)
consciously  (1)
consider  (1)
considerations  (1)
considered  (1)
console  (3)
constituted  (1)
contact  (4)
contacted  (1)
contains  (1)
contention  (1)
context  (1)
continue  (2)
continued  (6)
continues  (2)
continuing  (3)

Deposition of Officer Joseph Wolk                    Neal Miller and Donna Miller v. City of Philadelphia, et al.

continuously *(1)*
contribution *(1)*
control *(5)*
conversation *(2)*
Conversationally *(1)*
convicted *(1)*
conviction *(2)*
coordinate *(1)*
cop *(1)*
copy *(4)*
corner *(7)*
Corporate *(1)*
correct *(105)*
correctly *(9)*
Cottman *(1)*
counsel *(2)*
counselor *(1)*
counted *(1)*
countless *(1)*
couple *(22)*
course *(5)*
COURT *(16)*
cover *(2)*
covered *(2)*
co-worker *(1)*
CPR *(1)*
crap *(1)*
crash *(2)*
crashed *(1)*
crazily *(1)*
crime *(3)*
crimes *(3)*
criminal *(1)*
crosswalk *(1)*
cruiser *(1)*
current *(1)*
currently *(2)*
cursor *(2)*
curve *(5)*
cut *(2)*
cut-and-paste *(1)*
cutoff *(1)*

< D >
damage *(1)*
damaged *(1)*
Damiani *(3)*
danger *(4)*
dangerous *(2)*

Danielle *(1)*
date *(7)*
dated *(4)*
Davis *(4)*
day *(14)*
days *(1)*
day's *(1)*
day-to-day *(1)*
deactivate *(2)*
dead *(1)*
deadly *(1)*
deal *(1)*
death *(5)*
deaths *(2)*
decapitated *(1)*
December *(1)*
decide *(1)*
decipher *(1)*
decisions *(2)*
dedicated *(1)*
deep *(1)*
Defendant *(1)*
Defendants *(2)*
Defense *(2)*
defined *(1)*
definition *(1)*
degree *(1)*
delay *(1)*
deleted *(1)*
demonstrated *(1)*
densely *(1)*
depart *(1)*
departing *(2)*
DEPARTMENT *(13)*
departmental *(1)*
department's *(2)*
dependable *(1)*
depicted *(1)*
depicts *(1)*
deployed *(1)*
Deposition *(12)*
depositions *(1)*
DEREK *(4)*
derek.kane@phila.gov *(1)*
describe *(1)*
described *(3)*
describing *(1)*
DESCRIPTION *(3)*

detail *(5)*
details *(1)*
detain *(2)*
deter *(1)*
determined *(6)*
developed *(2)*
development *(1)*
diagnosed *(2)*
died *(3)*
Dietz *(1)*
differences *(1)*
different *(5)*
differently *(1)*
difficult *(2)*
dignitary *(1)*
direct *(3)*
direction *(4)*
Directive *(14)*
directives *(1)*
directly *(2)*
dirt *(4)*
disagree *(1)*
disaster *(1)*
discharging *(1)*
discipline *(1)*
discovery *(1)*
discretion *(1)*
discuss *(3)*
discussed *(8)*
discussing *(1)*
discussion *(6)*
disengaged *(1)*
dismissed *(1)*
display *(1)*
Displays *(1)*
disproportionate *(1)*
disputed *(1)*
dissipated *(3)*
distinguish *(1)*
DISTRICT *(11)*
disturbance *(1)*
Division *(2)*
docket *(1)*
doctor *(1)*
document *(11)*
Documents *(4)*
doing *(31)*
DONNA *(1)*
Donnelly *(1)*

door *(2)*
doubled *(1)*
drill *(3)*
drink *(1)*
Drive *(5)*
driven *(3)*
Driver *(10)*
drivers *(2)*
driver's *(2)*
drives *(1)*
driving *(11)*
drove *(5)*
Drug *(1)*
Drunk *(1)*
DUI *(2)*
duly *(1)*
duties *(5)*
duty *(2)*

< E >
Eadom *(45)*
earlier *(4)*
early *(2)*
eased *(1)*
east *(2)*
eastbound *(10)*
EASTERN *(1)*
easy *(1)*
eat *(2)*
ecosystem *(1)*
education *(2)*
effect *(8)*
effects *(1)*
effort *(1)*
either *(7)*
elude *(1)*
emergency *(2)*
emotional *(3)*
emotions *(1)*
employed *(1)*
employee *(2)*
encapsulated *(1)*
encountered *(1)*
encourage *(2)*
endanger *(1)*
ended *(8)*
endorsed *(1)*
ends *(1)*
enforce *(1)*

Deposition of Officer Joseph Wolk          Neal Miller and Donna Miller v. City of Philadelphia, et al.

enforcement  (6)
engage  (3)
engaging  (1)
engineered  (1)
ensure  (1)
entail  (1)
entire  (3)
entitled  (1)
equipment  (2)
erase  (1)
escape  (2)
escort  (1)
especially  (1)
ESQUIRE  (2)
established  (2)
Estate  (1)
estimate  (4)
estimates  (1)
estimating  (1)
estimation  (1)
et  (1)
evade  (1)
evaluation  (2)
evaluations  (3)
evening  (1)
event  (3)
events  (7)
eventually  (7)
evidence  (2)
evident  (2)
exactly  (3)
examined  (1)
exception  (1)
excessive  (5)
excused  (1)
execute  (3)
executing  (2)
Exhibit  (6)
Exhibits  (2)
exited  (3)
exiting  (1)
expected  (1)
experience  (5)
experienced  (1)
experiencing  (1)
Explorer  (5)
extent  (2)
exudes  (1)
eye  (3)

< F >
fabrication  (2)
face  (8)
facility  (4)
fact  (14)
facts  (3)
failed  (2)
fails  (1)
faint  (1)
Fair  (20)
fairly  (1)
fall  (1)
false  (1)
familiar  (3)
familiarize  (1)
family  (4)
far  (7)
fast  (3)
fatal  (1)
favor  (1)
features  (1)
February  (1)
federal  (1)
feel  (12)
feeling  (1)
feelings  (1)
feet  (6)
fell  (1)
felonies  (1)
felony  (1)
female  (1)
Fibber  (2)
figure  (1)
File  (3)
filed  (2)
filing  (1)
final  (1)
finally  (3)
find  (1)
finding  (1)
finish  (1)
fire  (1)
fireman's  (1)
firm  (1)
first  (21)
fit  (2)
five  (2)
five-minute  (1)

FLAGER  (1)
flashed  (2)
fled  (1)
fleeing  (1)
fliers  (1)
Floor  (1)
focus  (2)
follow  (2)
followed  (7)
following  (4)
follows  (1)
follow-ups  (1)
foot  (5)
force  (7)
forcible  (2)
forcing  (2)
Ford  (13)
foregoing  (1)
foresee  (1)
form  (76)
forms  (2)
forth  (2)
forward  (2)
found  (3)
four  (6)
four-month  (1)
four-page  (1)
fragments  (1)
Fraley  (31)
frame  (1)
Friday  (1)
friend  (2)
friends  (2)
front  (16)
frozen  (3)
full  (2)
fumble  (1)
fumbling  (1)
functionality  (1)
funerals  (2)
further  (7)
Fusion  (3)
future  (1)

< G >
gained  (3)
Gary  (19)
Gary's  (2)
gas  (2)

General  (2)
generally  (2)
gentleman  (1)
getting  (4)
girl  (5)
give  (5)
given  (8)
giving  (1)
glad  (2)
go  (39)
God  (1)
goes  (15)
going  (75)
Good  (8)
gotten  (8)
gown  (1)
grab  (3)
grabbed  (3)
grabbing  (1)
grading  (1)
Graduated  (1)
graduating  (1)
granddaughter  (2)
granular  (1)
grasp  (1)
gratuitously  (1)
great  (5)
grid  (1)
grip  (1)
ground  (2)
group  (2)
guess  (14)
guidance  (1)
guided  (1)
Guidelines  (1)
guilty  (1)
guy  (5)
guys  (8)

< H >
H14  (2)
hairs  (1)
hairy  (1)
half  (3)
hand  (1)
handle  (2)
hanging  (4)
happen  (3)
happened  (20)

happening *(1)*
happens *(1)*
hard *(5)*
harm *(3)*
harm's *(1)*
hate *(1)*
head *(7)*
headed *(1)*
heading *(6)*
heads *(1)*
healing *(1)*
hear *(6)*
heard *(2)*
hears *(1)*
heart *(1)*
heated *(1)*
held *(6)*
helmet *(2)*
help *(4)*
helping *(1)*
heroin *(1)*
high *(3)*
high-crime *(1)*
Highway *(24)*
hip *(1)*
history *(1)*
hit *(4)*
hold *(2)*
hollering *(2)*
home *(6)*
horn *(3)*
horse *(1)*
hour *(1)*
hours *(1)*
house *(3)*
houses *(1)*
hovering *(1)*
Howell *(2)*
hug *(1)*
human *(2)*
hundred *(2)*
Hundreds *(1)*
hurt *(8)*

< I >
I-95 *(1)*
IA *(1)*
IAD *(8)*
idea *(9)*

identical *(1)*
identification *(7)*
immediate *(1)*
Immediately *(7)*
impact *(3)*
important *(2)*
imposed *(1)*
imposes *(1)*
impounded *(1)*
impression *(2)*
incident *(28)*
incidents *(2)*
include *(4)*
included *(1)*
including *(6)*
increments *(1)*
indicate *(1)*
indicated *(1)*
indicates *(2)*
indication *(1)*
individual *(3)*
individually *(1)*
indulgence *(1)*
influence *(1)*
information *(1)*
informed *(4)*
inherent *(1)*
initial *(5)*
initially *(3)*
initiate *(3)*
initiated *(4)*
initiating *(4)*
injured *(1)*
injuries *(4)*
injury *(4)*
Inquiry *(1)*
inside *(2)*
inspection *(1)*
inspector *(1)*
instruction *(1)*
instructions *(1)*
integral *(1)*
intention *(2)*
intentional *(5)*
interaction *(2)*
interactions *(1)*
Internal *(14)*
Internet *(1)*
interrogatories *(1)*

intersection *(2)*
interstates *(1)*
interview *(2)*
intoxicated *(1)*
investigated *(2)*
investigation *(9)*
involve *(5)*
involved *(15)*
involves *(1)*
involving *(2)*
isolated *(1)*
issues *(1)*
items *(1)*
its *(1)*

< J >
James *(41)*
job *(13)*
jobs *(1)*
JOSEPH *(7)*
judging *(1)*
judgment *(2)*
judgments *(1)*
Julie *(4)*
jump *(4)*
jumping *(1)*
June *(1)*
justifications *(1)*
justified *(3)*

< K >
KANE *(98)*
keep *(8)*
keeping *(1)*
Kennedy *(2)*
kept *(3)*
kids *(3)*
killed *(5)*
Kimrey *(1)*
K-I-M-R-E-Y *(1)*
kind *(17)*
kinds *(2)*
Kinny *(1)*
Kleincard *(1)*
knew *(14)*
knife *(1)*
knocked *(2)*
know *(85)*
knowing *(1)*

knowledge *(6)*
known *(1)*
knows *(1)*

< L >
lane *(10)*
lanes *(13)*
language *(1)*
larger *(3)*
Laurel *(1)*
LAW *(7)*
laws *(1)*
lawsuit *(3)*
lawyers *(1)*
laying *(1)*
lead *(1)*
leading *(4)*
leads *(1)*
leave *(2)*
led *(3)*
left *(15)*
left-hand *(3)*
legal *(7)*
letting *(1)*
level *(2)*
LEVIN *(135)*
Lexis *(1)*
Lieutenant *(3)*
life *(2)*
lightly *(1)*
lights *(12)*
likelihood *(1)*
line *(5)*
lines *(1)*
list *(2)*
listed *(1)*
lists *(1)*
literally *(3)*
litigated *(1)*
little *(22)*
lives *(1)*
living *(1)*
local *(1)*
located *(3)*
location *(2)*
long *(9)*
longer *(3)*
look *(5)*
looked *(3)*

Deposition of Officer Joseph Wolk                    Neal Miller and Donna Miller v. City of Philadelphia, et al.

looking *(20)*
looks *(18)*
loop *(1)*
Lorenzo *(8)*
lose *(1)*
losses *(1)*
lost *(11)*
lot *(35)*
loud *(1)*
luck *(1)*

< M >
main *(1)*
maintain *(1)*
maintaining *(1)*
Major *(2)*
making *(14)*
male *(5)*
malfunction *(1)*
malfunctioned *(1)*
malicious *(2)*
manage *(1)*
managed *(5)*
manages *(1)*
mandatory *(1)*
maneuver *(10)*
maneuverable *(1)*
manifest *(1)*
manner *(1)*
March *(1)*
mark *(5)*
MARKED *(11)*
materials *(2)*
Matos *(2)*
matter *(11)*
matters *(1)*
McGee's *(2)*
McKenna *(21)*
McKenna's *(2)*
mean *(11)*
meaning *(2)*
meant *(2)*
meet *(1)*
member *(7)*
memorandum *(2)*
Memorial *(1)*
memory *(1)*
mention *(1)*
mentioned *(9)*

met *(2)*
MICHAEL *(9)*
michael@flagerlaw.co
m *(1)*
Michelle *(1)*
midway *(1)*
miles *(1)*
MILLER *(14)*
mind *(4)*
mind's *(1)*
minor *(1)*
minutes *(6)*
mirror *(4)*
missed *(1)*
misses *(1)*
misspelled *(1)*
misspelling *(1)*
Mobile *(3)*
moderate *(1)*
moment *(2)*
moments *(2)*
monitor *(1)*
month *(1)*
months *(9)*
moon *(1)*
morning *(4)*
motion *(1)*
motor *(15)*
motorcycle *(26)*
motorcycles *(2)*
motorcyclist *(1)*
motorized *(1)*
move *(1)*
movement *(1)*
moving *(2)*

< N >
name *(16)*
named *(6)*
names *(1)*
narcotics *(2)*
narrative *(5)*
narrow *(1)*
nature *(7)*
NEAL *(1)*
near *(2)*
necessarily *(2)*
necessary *(2)*
need *(6)*

needed *(2)*
needs *(2)*
neighborhood *(3)*
neither *(1)*
Net *(1)*
never *(9)*
night *(4)*
Nitti *(1)*
nonstop *(1)*
normal *(2)*
north *(2)*
northbound *(15)*
Northbrook *(2)*
Northeast *(1)*
Notary *(1)*
notes *(1)*
notice *(5)*
noticed *(6)*
notified *(1)*
Notwithstanding *(2)*
November *(1)*
NUMBER *(10)*
numbers *(1)*
numerous *(4)*
nuts *(1)*

< O >
Object *(4)*
Objection *(75)*
objections *(1)*
observe *(1)*
observed *(3)*
observing *(1)*
Obviously *(7)*
occasions *(1)*
occupant *(1)*
occupant's *(1)*
occupational *(1)*
occupying *(3)*
occur *(3)*
occurred *(13)*
odds *(1)*
offered *(1)*
OFFICER *(49)*
officers *(5)*
officer's *(1)*
Oh *(10)*
O'Hanlon *(2)*
Okay *(72)*

omits *(1)*
omitted *(1)*
once *(9)*
oncoming *(9)*
one's *(1)*
ongoing *(1)*
open *(3)*
operate *(2)*
operates *(1)*
operating *(2)*
operator *(13)*
opportunity *(12)*
opposed *(2)*
opposing *(1)*
Oral *(2)*
order *(2)*
orders *(1)*
original *(2)*
Originally *(2)*
Ortiz *(3)*
O'Scanlon *(1)*
outlaw *(1)*
outside *(4)*
overall *(1)*
overlapping *(1)*
overpass *(1)*

< P >
P.C *(1)*
p.m *(6)*
P/S *(1)*
packed *(1)*
PAGE *(6)*
pandemic *(1)*
paper *(1)*
paragraph *(2)*
parentheses *(1)*
parents *(1)*
parking *(15)*
Parkway *(1)*
part *(12)*
partially *(2)*
participate *(1)*
participation *(1)*
particular *(4)*
parties *(1)*
partner *(9)*
partners *(1)*
pass *(2)*

passed *(1)*
passenger *(4)*
passenger's *(1)*
passing *(1)*
path *(6)*
Patrol *(30)*
patrols *(1)*
paused *(1)*
peers *(4)*
PENNSYLVANIA *(5)*
people *(20)*
percent *(2)*
perception *(1)*
perfectly *(1)*
Performance *(7)*
performing *(1)*
period *(4)*
permitted *(3)*
perpetrators *(1)*
person *(16)*
personal *(3)*
personally *(1)*
perspective *(2)*
ph *(2)*
PHILADELPHIA
  *(11)*
phone *(4)*
phones *(1)*
physicality *(1)*
picks *(2)*
pitch *(1)*
place *(2)*
placed *(1)*
plainclothes *(1)*
plaintiff *(1)*
Plaintiffs *(4)*
plaintiff's *(2)*
plan *(1)*
plant *(1)*
platform *(1)*
play *(7)*
played *(6)*
playing *(3)*
please *(2)*
plenty *(1)*
pocket *(2)*
point *(54)*
points *(1)*
Police *(48)*

policies *(2)*
policing *(1)*
policy *(17)*
poorly *(1)*
populated *(1)*
portion *(8)*
portions *(1)*
posed *(2)*
position *(1)*
positive *(1)*
possession *(1)*
possibility *(1)*
possibly *(1)*
post *(1)*
posters *(1)*
potential *(1)*
potentially *(1)*
practical *(2)*
practice *(1)*
preceded *(1)*
preface *(2)*
preparation *(1)*
prepare *(1)*
prepared *(2)*
preparing *(1)*
presence *(2)*
present *(3)*
presents *(1)*
president *(2)*
pretrip *(1)*
pretty *(8)*
prevent *(2)*
previously *(3)*
pride *(1)*
prior *(6)*
priority *(1)*
proactive *(1)*
probable *(2)*
probably *(9)*
problem *(2)*
problem/high *(1)*
problems *(2)*
procedural *(1)*
procedure *(1)*
Procedures *(1)*
proceed *(1)*
proceeding *(2)*
proceeds *(1)*
process *(2)*

Professional *(4)*
professionally *(1)*
progress *(2)*
prohibited *(2)*
promotional *(2)*
prosecution *(1)*
prostitution *(1)*
protection *(1)*
protections *(1)*
provide *(1)*
provided *(5)*
proximity *(6)*
psychiatrist *(1)*
PT *(1)*
PTSD *(2)*
Public *(6)*
pull *(8)*
pulled *(16)*
pulling *(3)*
pulls *(1)*
pursue *(2)*
pursued *(3)*
pursuing *(1)*
pursuit *(43)*
pursuits *(8)*
pushed *(2)*
pushing *(2)*
put *(21)*

< Q >
quandary *(1)*
question *(26)*
questioned *(1)*
questions *(8)*
quick *(4)*
quicker *(1)*
quit *(1)*
quite *(2)*

< R >
radio *(4)*
raising *(1)*
ramming *(1)*
ran *(2)*
range *(2)*
rank *(1)*
raped *(3)*
rated *(1)*
rater *(4)*

reach *(1)*
reacquired *(1)*
reacting *(1)*
reaction *(3)*
read *(17)*
reading *(4)*
real *(5)*
realize *(2)*
realized *(1)*
really *(14)*
rear *(3)*
reason *(8)*
reasons *(1)*
recall *(16)*
receive *(2)*
received *(1)*
recklessly *(2)*
recognition *(1)*
recognize *(1)*
recognized *(1)*
recollection *(5)*
record *(24)*
recording *(1)*
recovered *(1)*
red *(1)*
reentering *(1)*
reference *(2)*
referenced *(2)*
referred *(1)*
referring *(5)*
refresh *(3)*
refused *(1)*
regard *(1)*
register *(1)*
regular *(5)*
related *(4)*
relation *(3)*
relied *(2)*
re-litigate *(1)*
re-litigating *(1)*
relying *(1)*
remainder *(1)*
remember *(12)*
remind *(1)*
repaid *(1)*
repeat *(4)*
rephrase *(1)*
replaying *(1)*
Report *(15)*

Deposition of Officer Joseph Wolk                    Neal Miller and Donna Miller v. City of Philadelphia, et al.

**Reporter** *(10)*
**reports** *(1)*
**represent** *(6)*
**represented** *(2)*
**Representing** *(2)*
**Requests** *(1)*
**required** *(1)*
**requirements** *(1)*
**requires** *(2)*
**rescue** *(2)*
**reserved** *(1)*
**resolved** *(3)*
**respect** *(1)*
**respective** *(1)*
**respectively** *(1)*
**respond** *(2)*
**responding** *(1)*
**response** *(1)*
**responsibilities** *(2)*
**responsibility** *(1)*
**responsive** *(1)*
**rest** *(1)*
**result** *(5)*
**resulted** *(2)*
**results** *(1)*
**retain** *(1)*
**retired** *(1)*
**retrieved** *(1)*
**returned** *(1)*
**review** *(3)*
**reviewed** *(6)*
**reviewers** *(1)*
**Reviews** *(2)*
**Re-vined** *(2)*
**revised** *(2)*
**revisit** *(2)*
**ride** *(3)*
**rider** *(1)*
**riders** *(2)*
**riding** *(8)*
**right** *(133)*
**right-hand** *(2)*
**rights** *(1)*
**rightward** *(1)*
**ripped** *(4)*
**rise** *(2)*
**risk** *(4)*
**risks** *(2)*
**road** *(4)*

**roadblock** *(3)*
**roadway** *(3)*
**robberies** *(2)*
**Robert** *(2)*
**role** *(1)*
**route** *(1)*
**routine** *(1)*
**run** *(5)*
**RYAN** *(43)*
**Ryan's** *(8)*

**< S >**
**safety** *(3)*
**sanitize** *(1)*
**save** *(1)*
**saw** *(12)*
**saying** *(7)*
**says** *(6)*
**Scattergood** *(30)*
**scene** *(9)*
**schematics** *(1)*
**Schuylkill** *(2)*
**scooted** *(1)*
**scooter** *(56)*
**scooters** *(1)*
**scooter's** *(1)*
**screaming** *(1)*
**screen** *(9)*
**sealing** *(1)*
**search** *(1)*
**second** *(2)*
**seconds** *(3)*
**section** *(8)*
**see** *(64)*
**seeing** *(6)*
**seek** *(1)*
**seeking** *(1)*
**seemingly** *(1)*
**seen** *(25)*
**segment** *(3)*
**self-storage** *(4)*
**semantics** *(1)*
**seminars** *(1)*
**send** *(2)*
**senior** *(1)*
**sense** *(3)*
**sensitive** *(1)*
**sentences** *(1)*
**separate** *(1)*

**September** *(1)*
**sequence** *(5)*
**sequences** *(1)*
**Sergeant** *(2)*
**serious** *(5)*
**seriously** *(1)*
**served** *(1)*
**service** *(8)*
**sets** *(3)*
**settled** *(1)*
**severe** *(1)*
**Sevino** *(1)*
**sex** *(1)*
**sexual** *(2)*
**sexually** *(1)*
**share** *(1)*
**sharing** *(2)*
**sharp** *(2)*
**shift** *(2)*
**shirt** *(7)*
**shooting** *(3)*
**shootings** *(2)*
**shootouts** *(2)*
**short** *(4)*
**shorter** *(1)*
**shortly** *(3)*
**shot** *(4)*
**show** *(5)*
**showed** *(1)*
**showing** *(3)*
**shows** *(3)*
**sick** *(1)*
**side** *(22)*
**sides** *(1)*
**sight** *(7)*
**sign** *(2)*
**signature** *(1)*
**signing** *(1)*
**signs** *(1)*
**similar** *(4)*
**similarities** *(2)*
**Simon** *(11)*
**Simple** *(3)*
**simultaneous** *(1)*
**simultaneously** *(1)*
**sir** *(11)*
**sirens** *(10)*
**sit** *(3)*
**situated** *(1)*

**situation** *(8)*
**situations** *(2)*
**six** *(1)*
**six-page** *(1)*
**skip** *(1)*
**Slightly** *(2)*
**slip** *(2)*
**slow** *(2)*
**slowed** *(3)*
**slower** *(1)*
**slowing** *(3)*
**small** *(11)*
**smaller** *(1)*
**smell** *(1)*
**social** *(1)*
**socialize** *(1)*
**socialized** *(1)*
**sold** *(1)*
**solely** *(1)*
**somebody** *(9)*
**somewhat** *(1)*
**sorry** *(11)*
**sort** *(36)*
**Soto** *(3)*
**sound** *(1)*
**sounds** *(1)*
**sources** *(1)*
**south** *(5)*
**southbound** *(20)*
**span** *(2)*
**speaking** *(3)*
**specifically** *(3)*
**specifics** *(2)*
**speculation** *(3)*
**speculative** *(2)*
**speed** *(3)*
**spell** *(1)*
**split** *(1)*
**spoke** *(3)*
**sporadically** *(1)*
**sports** *(1)*
**spot** *(2)*
**squad** *(7)*
**square** *(1)*
**stabbings** *(1)*
**stamp** *(1)*
**standard** *(1)*
**standing** *(1)*
**Stanley** *(3)*

Deposition of Officer Joseph Wolk                                    Neal Miller and Donna Miller v. City of Philadelphia, et al.

start  *(3)*
started  *(4)*
starting  *(2)*
starts  *(1)*
state  *(8)*
stated  *(5)*
state-mandated  *(1)*
Statement  *(27)*
statements  *(4)*
STATES  *(16)*
statistics  *(1)*
status  *(1)*
stay  *(4)*
Staying  *(1)*
stenographic  *(1)*
step  *(2)*
stepped  *(1)*
Steps  *(1)*
stipulated  *(1)*
stolen  *(1)*
stood  *(1)*
stop  *(32)*
stop/vehicle  *(1)*
stopped  *(14)*
stopping  *(2)*
storage  *(1)*
story  *(2)*
straight  *(4)*
straightforward  *(1)*
strange  *(1)*
Street  *(95)*
streets  *(16)*
stress  *(1)*
strictly  *(3)*
strikes  *(1)*
striking  *(1)*
struck  *(5)*
structure  *(1)*
stuck  *(1)*
stuff  *(10)*
substance  *(1)*
substantially  *(1)*
success  *(1)*
suffer  *(1)*
suicidal  *(3)*
suicide  *(3)*
Suite  *(1)*
superficial  *(3)*
supervision  *(2)*

supervisors  *(1)*
supposed  *(6)*
sure  *(15)*
surrounding  *(1)*
suspect  *(3)*
suspension  *(1)*
sustained  *(1)*
SUV  *(6)*
SUVs  *(3)*
swear  *(1)*
swerved  *(3)*
swerves  *(1)*
switched  *(1)*
sworn  *(2)*
synopsis  *(1)*

< T >
tackled  *(1)*
Tacony  *(34)*
tag  *(1)*
Tahoe  *(2)*
taillights  *(3)*
take  *(24)*
taken  *(8)*
takes  *(3)*
talent  *(1)*
talk  *(4)*
talked  *(3)*
talking  *(10)*
talks  *(3)*
tanker  *(1)*
Taurus  *(1)*
team  *(3)*
tech  *(1)*
techniques  *(1)*
technology  *(1)*
telephone  *(1)*
tell  *(11)*
telling  *(2)*
ten  *(3)*
tension  *(2)*
term  *(4)*
terms  *(2)*
terrible  *(1)*
testified  *(4)*
Testimony  *(10)*
tests  *(2)*
text  *(1)*
texts  *(1)*

thank  *(5)*
Thanks  *(3)*
therapy  *(2)*
thereabouts  *(1)*
thing  *(13)*
things  *(12)*
think  *(40)*
thinking  *(2)*
thinks  *(1)*
third  *(1)*
Thirty-three  *(1)*
thought  *(3)*
thousands  *(1)*
threat  *(1)*
three  *(4)*
throw  *(1)*
thrown  *(1)*
time  *(87)*
Timeline  *(2)*
times  *(6)*
T-intersection  *(1)*
tiny  *(1)*
T-Mobile  *(1)*
today  *(4)*
told  *(7)*
toll  *(1)*
top  *(8)*
Torresdale  *(4)*
total  *(1)*
Toto  *(1)*
touch  *(1)*
touched  *(2)*
tow  *(5)*
tractor  *(1)*
traffic  *(21)*
trailer  *(1)*
trained  *(2)*
training  *(5)*
transcript  *(1)*
Transfer  *(3)*
transferred  *(6)*
transported  *(1)*
travel  *(6)*
traveled  *(1)*
traveling  *(18)*
tread  *(1)*
Trevose  *(1)*
trial  *(1)*
tried  *(3)*

trigger  *(1)*
truck  *(10)*
true  *(1)*
try  *(18)*
trying  *(18)*
turn  *(57)*
turnaround  *(2)*
turned  *(30)*
turning  *(9)*
turns  *(2)*
TVR's  *(1)*
Twice  *(1)*
two  *(19)*
two-step  *(1)*
two-way  *(3)*
two-wheeled  *(1)*
type  *(12)*
types  *(6)*

< U >
U-bey  *(1)*
Ultimately  *(4)*
umbrella  *(1)*
unbound  *(1)*
underage  *(1)*
understand  *(14)*
understanding  *(9)*
Understood  *(3)*
uniform  *(4)*
uniformly  *(2)*
unit  *(5)*
UNITED  *(1)*
unnecessarily  *(1)*
unpleasantness  *(1)*
updated  *(3)*
updates  *(2)*
use  *(10)*
usually  *(2)*
U-turn  *(9)*

< V >
vacation  *(1)*
valued  *(1)*
vantage  *(1)*
various  *(2)*
veer  *(1)*
veering  *(2)*
veers  *(1)*
vehicle  *(81)*

vehicles  *(19)*
vehicular  *(12)*
vice  *(1)*
video  *(40)*
Videoconference  *(1)*
videos  *(3)*
view  *(4)*
viewing  *(1)*
violated  *(2)*
violation  *(12)*
violations  *(7)*
violence  *(1)*
volunteer  *(1)*
volunteered  *(1)*
vulnerable  *(1)*

**< W >**
wait  *(2)*
waived  *(1)*
wall  *(1)*
walls  *(1)*
want  *(22)*
wanted  *(14)*
Ward  *(7)*
W-A-R-D  *(1)*
warn  *(1)*
warranted  *(1)*
watch  *(1)*
watched  *(1)*
watching  *(2)*
Watson  *(1)*
way  *(30)*
ways  *(5)*
weapon  *(1)*
wearing  *(1)*
weeds  *(1)*
weeks  *(2)*
weird  *(2)*
well  *(31)*
well-being  *(1)*
went  *(24)*
we're  *(22)*
westbound  *(8)*
we've  *(6)*
whatsoever  *(1)*
wheelie  *(2)*
white  *(1)*
William  *(3)*
willing  *(1)*

window  *(2)*
wish  *(2)*
WITNESS  *(77)*
witnessed  *(3)*
witnesses  *(1)*
WOLK  *(11)*
WOLK-1  *(3)*
WOLK-2  *(3)*
WOLK-3  *(3)*
WOLK-4  *(2)*
WOLK-5  *(3)*
WOLK-6  *(3)*
WOLK-7  *(3)*
WOLK-8  *(4)*
Wolk's  *(1)*
wonky  *(1)*
word  *(4)*
words  *(2)*
work  *(16)*
worked  *(3)*
working  *(3)*
wound  *(1)*
wrap  *(1)*
written  *(4)*
wrong  *(13)*
wrongful  *(1)*

**< Y >**
Yamaha  *(1)*
Yeah  *(20)*
year  *(6)*
years  *(16)*
yelled  *(1)*
yield  *(1)*
young  *(1)*
younger  *(2)*

**< Z >**
Zoom  *(2)*