UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NEAL MILER, : CIVIL ACTION No.: 20-6301

Plaintiff,

v.

PO JOSEPH WOLK, ET AL.,

Defendants.

------

Friday, December 15, 2023

------

Videotape deposition of ROBERT MATTOS held in Philadelphia Pennsylvania at 12:55 p.m., on the above date, before Tia Pierre, Digital Reporter and Notary Public.

------

APPEARANCES

FLAGLER & ASSOCIATES
BY: MICHAEL LEVIN, ESQ.
210 Northbrook Drive
Suite 280
Trevose, Pennsylvania 19053
Ph: 215.953.5200
Michael@flaglerlaw.com
Counsel for Plaintiff
(Via Zoom)

CITY OF PHILADELPHIA - LAW DEPARTMENT
BY: DEREK KANE, ESQ.
1515 Arch Street
17th Floor
Philadelphia, Pennsylvania 19102
Ph: 215.683.5235
Derek.Kane@phila.gov
Counsel for Defendant, PO Joseph Wolk
(Via Zoom)

------

INDEX

WITNESS: ROBERT MATTOS

EXAMINATION

| | PAGE |
|---|---|
| By MR. KANE | 6, 36 |
| By MR. LEVIN | 22, 45 |

------

EXHIBITS

(None marked.)

\- - -

PROCEEDINGS

\- - -

THE REPORTER: Okay, we are now on the record. It is Friday, December 15, 2023. The time is 12:55 p.m. Good afternoon, my name is Tia Pierre. I am the remote online notary and court reporter assigned by Lexitas. I request all parties stipulate and agree that by videoconference technology, this will be the remote deposition of Robert Mattos in the case of Neal Miller as the plaintiff and parole officer Joseph Wolk et al, as the defendant. This case number is 206301.

Before going on the record, the witness positively identified themselves to me as Robert Mattos by presenting a driver's license issued by the state of Florida. And the witness is currently located, I'm sorry, the state of Pennsylvania. And the witness is currently located in Philadelphia, Pennsylvania. Counsels, will you please state your appearance for the record, your

firm, who you represent, and that you agree to stipulate that I may place this witness under oath and report this proceeding remotely.

MR. LEVIN: Michael Levin, Flager and Associates, representing Plaintiffs, Neil and Donna Miller as administrators of the estate of Ryan Miller, deceased. And I agree to the video and Zoom recording of this deposition.

MR. KANE: This is Derek Kane on behalf of Police Officer Wolk. And yes, we consent to the remote deposition Ms. Pierre. Thank you.

THE REPORTER: Thank you. I will now swear in the witness. Sir, if you don't mind, can you please raise your right hand for me? Do you swear or affirm that the testimony you'll give today will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: Absolutely, yes.

ROBERT MATTOS, after having been first duly sworn, was examined and testified

Page 6

as follows:
THE REPORTER: Thank you.
Counselor, you may begin with questioning.
- - -
EXAMINATION
- - -
BY MR. KANE:
Q. Excellent. Good afternoon, Mr. Mattos.
A. Hello.
Q. I'm going to give you some of those same instructions just one more time, just to ensure that you're as comfortable as possible, you understand what's going on, all right?
A. Yes.
Q. To confirm you are not a defendant in this case, we believe that you were a witness to some of the events that form our litigation, okay?
A. Yes.
Q. Even though you're not a defendant, if you wanted to, you could have an attorney present. It's my understanding that you do not have an attorney with you, is that correct, Mr. Mattos?

Page 7

A. No, I don't.
Q. And are you fine proceeding today, answering our questions without having an attorney?
A. Yes.
Q. Just so you understand, this process, generally, even though we're doing this via Zoom, there is no video that's going to be created here. It's just going to be a transcript of what your answers are, what my questions are, what Mr. Levin's questions are, all right?
A. Yes.
Q. Before Mr. Levin joined, I explained to you the fact that you have that option of reading and signing at some point in the future or just kind of agreeing to the transcript that Ms. Pierre produces. Do you have a response as to whether or not you want to read and sign, or whether or not you're fine with Ms. Pierre's product?
A. No, I'm fine with it.
Q. Okay, so you waive, read and sign?
A. Yes.
Q. Okay. You may hear some objections

Page 8

during this deposition, Mr. Mattos. Those objections are typically to what's called the form of the question. You can still answer those questions if you hear that objection, okay?
A. Okay.
Q. Ms. Pierre mentioned something that's very important, which is that only one of us can speak at a time. That seems like a pretty easy instruction, but the way conversations typically work is the person who's asking a question. Sorry. The person answering a question typically knows what's being asked to them before they're done.
I'm going to ask you just for the purposes of today, let me finish that question, or let Mr. Levin finish the question before you answer it, just to ensure that whatever your answer is, we can see that full question when it's in the future, all right?
A. Okay.
Q. If you don't know an answer, you can say, I don't know. You can say, I don't remember. As long as those are the truthful, correct answers, that's completely fine. Please

Page 9

don't guess. Just give us the best answer that you have that you recall. All your answers have to be verbal. So when we do get to that question stage, you can't sort of nod your head or shrug your shoulders. And if you do so, I'll just remind you, I'll go Mr. Mattos, you know, is that a yes or is that a no? Not a big deal.
But just to let you know, that's why I'm going to do that. As Ms. Pierre said, you can take a break at any time. If you need a glass of water, if you need to go to the bathroom, just let us know. You're the star of the show. We're lucky to have you answering these questions. So if any point you want to take that break, just let us know. Is there any reason today that you can't give full and truthful testimony?
A. No, sir.
Q. Is it your understanding that we are here to talk about what you remember about an incident that occurred on May 7, 2019?
A. I believe that's the date, yes.
Q. I believe you spoke with an investigator sometime after that incident. Do

you remember that?
A. Yes, sir.
Q. Okay. Do you still have an independent recollection of any of the events that happened that day?
A. Independent as in?
Q. Like, without looking at a record, you just kind of remember something about that day?
A. Yes.
Q. Okay. One of the first things I'm going to do, Mr. Mattos, is just bring up those questions and answers you did with the investigator. Quickly go through them, make sure you agree with them, and then I'll probably have some follow up questions, and then I'll pass it over to Mr. Levin. All right?
A. Okay.
Q. I'm going to bring up those questions now, for the record, they are Defense Bates numbers 14 to 16, and it is the statement of Robert Mattos to Lieutenant James Cloth.
THE REPORTER: Just for the record, Counsel, was those already previously marked exhibits?

MR. KANE: Yes, that is correct. These are previously marked exhibits. Defense Bates numbers 14 to 16.
BY MR. KANE:
Q. Mr. Mattos, are you able to see a record on your screen right now?
A. Yes, sir.
Q. Okay. Would you agree with me that it said statement of Robert Mattos, 53?
A. Yes, sir.
Q. Okay. Below that is an address, 5343. Is that your current address?
A. Yes, sir.
Q. Okay. And was that the address that you had in May of 2019?
A. Yes, sir.
Q. Okay. And it does say you were interviewed by Lieutenant James Cloth. Do you remember him at all?
A. I remember speaking to someone, not especially the name.
Q. Got it. All right. I'm going to quickly just take a look at some of those questions. Mr. Mattos.

All right, the fourth question, I think I might just highlight it for you. It says, on May 7, 2019, did you see a motorcycle being chased by a Philadelphia police vehicle? And you answered yes. Is that correct?
A. Yes, sir.
Q. And you would agree with your answer to that question?
A. It was technically not a full size motorcycle, but yes.
Q. Right. How would you describe what that vehicle was, if you can?
A. it was more of a scooter type vehicle.
Q. Right. Do you remember what color it was?
A. I believe it was blue. I believe.
Q. Okay. I'm going to go your next question and answer. I'm going to bring it to you, and I'm just going to ask you to confirm that if you still believe that is correct. So the question was, can you please tell me what you witnessed in the area of 5300 Edom street on May 7, 2019, at approximately 7:20 to 7:25 p.m. And now I'm going to read your answer.

You said, "I was outside of my house putting windshield washer fluid in my car, and I saw the motorcycle being chased by a police SUV. It was heading southbound on Edom street. They almost stopped. The kid slowed down, and the police SUV was trying to get his front end in front of him. The kid on the motorcycle went over the sidewalk into the driveway, over the grassy island at the storage place. The motorcycle went eastbound down Kennedy to James towards 95. The police officer made a U-turn and went after him. The officer went northbound on Edom street and eastbound on Kennedy Street. I lost sight of them at that time." Did I read that correctly, Mr. Mattos?
A. Yes, sir.
Q. Okay. And would you agree that that is a truthful, correct answer to that question?
A. Yes, sir.
Q. Okay. You wouldn't change anything about that question now? your answer sorry. Now.
A. No, sir.
Q. That answer continued a little bit more going on to the next page, which is bates number

15. Defense bates number 15. Your further answer was about two minutes later, I heard the motorcycle coming. I looked up and saw the motorcycle being chased by a silver car. It had to be about 10 seconds later, the police SUV passed by. It was the motorcycle, the silver car. A gap in time, about 10 seconds, the police SUV went by. They all went through the stop sign at Kennedy street and turned right onto Frailey towards State Road. Did I read that correctly?

A. Yes, sir.

Q. And do you still believe that that is your truthful and best answer to that question?

A. Yes.

Q. I'm just going to quickly read through these questions, and at the end I'll ask you if they're still correct. "Do you recall the number on the police vehicle?" You answered, "No." "Have you ever seen a silver car or it's operator before?" You answered, "No." "Did the police vehicle have its overhead red blue lights and or audible siren activated anytime that you saw?" You answered, "No." "How many times did you see the motorcycle and police vehicle pass 5300 Edom

street where you were at?" You answered, "Twice." "Did the silver vehicle have any red blue lights on and or siren?" You answered, "No." "Was the silver vehicle beeping its horn or flashing its headlights?" You answered, "No." To the best of your recollection, Mr. Mattos, all those answers are correct?

A. Yes.

Q. Okay, I'm going to skip down and do that process one more time. Question, "When you saw the motorcycle the second time travel northbound on Edom Street, was it being pursued by another vehicle?" Answer, "Yes, the silver car." "Did the operator of the motorcycle say anything to the police officer or the driver of the silver vehicle as they passed you?" You answered, "No." "When you saw the motorcycle the second time travel north bound on Edom street, how fast would you estimate it was traveling?" You answered, "I would say 35 to 40, they were moving." And just to clarify, you mean to say 35 to 40 mph, Mr. Mattos?

A. Yes, sir.

Q. And the next question, "When you say

they were moving, who are you referring to?" You answered, "The motorcycle, the silver car, then the police SUV." And the final question on this page. "When you saw the motorcycle the second time travel northbound on Edom street, how far behind the motorcycle was the silver vehicle?" "Roughly 45 feet, it was about three houses." All those questions and your answers to them. Do you still believe those answers to be the correct answers to those questions, Mr. Mattos, to the best of your ability?

A. Yes, sir.

Q. All right, moving on to the last page, which is Defense Bates number 16. Question, "When you saw the motorcycle the second time, travel northbound on Edom street. How far behind the motorcycle was the police vehicle?" Answer, "At least 150 to 160 feet. I thought that the police SUV gave up on the chase and let the silver car take the chase. I figured that maybe the silver car was chasing the motorcycle because it was faster and the police car was an SUV. The silver car was aggressive, like he was a police officer." Your answer to that question, Mr.

Mattos, is that still your best answer to that question?

A. Yes, sir.

Q. And I'm just going to do the rest of the questions now. "How fast would you estimate the silver vehicle was traveling as it passed you while it was following the motorcycle?" Answer, "About the same speed as the motorcycle. They appeared to speed up as they got past Kennedy. I heard an engine speed up. I could not tell whose engine it was." Question, "How fast would you estimate the police vehicle was traveling when it passed you northbound on Edom street?" "He was slower than the other two. He seemed to have sped up a little when he passed Kennedy." Question, "Did you see any actual contact between the motorcycle and the police vehicle?" Answer, "No." Question, "Did you see any contact between the police vehicle and the motorcycle operator at -- street and Edom street?" You answered, "No." "Did all three vehicles completely disregard the stop sign at Kennedy street and Edom street?" You answered, "Yes." And then you were asked, "Do you have anything else you'd like to add to

Page 18

this interview or information that will be helpful in this investigation?" You answered, "No." The rest of those questions and answers Mr. Mattos, do you still believe that your answers to all those questions are truthful and correct to the best of your knowledge?

A. Yes.

Q. Okay. And just to be clear, that last question, "Do you have anything else you'd like to add to this interview or information that will be helpful in this investigation?" You answered, "No." Sitting here today having sort of seeing all those questions and answers again. Is there anything else that you would add now with the benefit of hindsight or anything like that?

A. No, sir.

Q. Okay. I have a couple more quick follow-up questions going to that top question and answer which I believe I've highlighted. Is that highlighted for your screen, Mr. Mattos?

A. Yes, sir.

Q. Okay. You were asked, "When you saw the motorcycle the second time travel northbound on Edom street, how far behind the motorcycle was

Page 19

the police car?" Police vehicle, I apologize. You answered, "At least 150 to 160 feet. I thought the police SUV gave up on the chase and let the silver car take the chase." Can you talk a little bit more, if possible, as to why you believe at that point that the police SUV had given up on the chase?

A. Because the motorcycle and the silver car passed me a lot, I mean, long time before the SUV, there was a big gap in time there.

Q. Right.

A. Not huge, but there was a gap in time.

Q. Got it. Other than that gap in time between when the motorcycle and the silver car passed, and then when the police SUV passed. Other than that gap of time, any other reason as to why you thought the police SUV gave up on the chase?

A. Not really, just the time.

Q. Got it.

A. Time difference. He wasn't right on the silver car's tail.

Q. Got it. There was some kind of time gap between the police SUV and the silver car, is

Page 20

that correct?

A. Yes, sir.

Q. Okay. This question here, it asks, did you see any contact between the motorcycle and the police vehicle? You answered, no. Just to clarify that, would I be correct in saying that at no point in time that day did you see the police SUV physically contact that motorcycle, or scooter, as you called it?

A. No, I didn't.

Q. Okay. You never saw the police SUV touch the scooter, is that correct?

A. No, but he did kind of cut him out, but I didn't see the actual touch. No.

Q. Got it. And when you say he cut him out, can you explain that a little bit more for us, Mr. Mattos?

A. The motorcycle appeared to be slowing down to stop, and then the police SUV pulled up and kind of cut over towards him, and the motorcycle like wobbled, and then the driver took off again.

Q. And what intersection was that? If you remember that you saw that.

Page 21

A. That was more towards Kennedy and Edom.

Q. Got it. I'm going to stop sharing this. Just a couple more questions for me, Mr. Mattos. The young man driving that scooter, he had the name Ryan Miller. Did you ever have any knowledge of Mr. Miller or any of his family, either before or after the day at issue?

A. No, sir. They had a memorial service, and I went up there. I really didn't talk to anyone.

Q. But that was sort of your first time ever, maybe seeing his family, for instance?

A. Yes, sir.

Q. Okay. The officer driving the SUV, that was an Officer Joseph Wolk. Are you aware of him at all, for any reason?

A. No, sir.

Q. Okay. And it's understood that the man driving the silver vehicle was a Gary Bove. Do you know who Gary Bove is at all?

A. No, sir.

Q. Okay.

MR. KANE: That's all my questions, Mr. Mattos, I really appreciate

Page 22

your time. Mr. Levin is going to have some follow ups, I believe. All right.
THE WITNESS: Yes, thank you.
- - -
EXAMINATION
- - -
BY MR. LEVIN:
Q. Hi, Mr. Mattos. Again, it's Michael Levin, I'm representing the Miller family in this. Can you hear me okay?
A. Yes, sir.
Q. All right. Now, going back to the first time you saw the pursuit, which is just the motor scooter and then the police SUV. Where were you standing when you first saw those vehicles?
A. I was in front of my house facing northbound. The direction they came down.
Q. Okay. And you're on Edom street across from the, there's a parking lot across the street, correct?
A. Yes, sir.
Q. All right. And am I correct the first time you saw those vehicles, they were coming

Page 23

from the direction of Fraley street and heading. They kept on going towards, like Scattergood?
A. Yes, sir.
Q. All right. Now, at the time when you first saw this, where did you first sort of pick up sight of those vehicles? Where were they?
A. They were about, I'm trying to think of the name of the streets down there, because I rarely go down there, like Simon street.
Q. Okay. Did you see either one or both of those vehicles turn from Simon or whatever street onto Edom street?
A. No, I saw. I didn't know what actual area they came from. I just saw around that area on Edom at Simon, roughly coming towards me.
Q. Okay. The boy, Ryan Miller, who was on the scooter, was he wearing a helmet or anything?
A. No, sir.
Q. As he was approaching you, being pursued by the police officer, could you make out anything about his state of mind? Did he seem like he was laughing, like he was scared? Anything that you could perceive?
A. To me, he seemed like he was scared

Page 24

trying to pull over on the side of the road, and then the police vehicle pulled up next to him. His motorcycle wobbled, and I guess he got scared of that and took off.
Q. Okay. And my understanding is what happened there is the police SUV pulls off to the left side of the motor scooter, correct?
A. Yes.
Q. Okay, so it's off to the left. Do you know if the SUV was in like basically the wrong lane of travel when it did that?
A. Yes, because it is like a two way street.
Q. Rig[ht.
A. No, he was on, yeah he was on the right side. I'm trying, I'm looking at my way of looking at him. So, no. If he's coming down, he was on the right side, but he was to the left side of Ryan at the curb.
Q. Okay, and --
A. That is his name? Ryan?
Q. Yes, yes.
A. Okay.
Q. So look, from your perspective, did it

Page 25

seem like the SUV was trying to get a little bit ahead of the scooter at that point in time?
A. Yes.
Q. And then the SUV sort of makes a maneuver to the right, correct?
A. Yes.
Q. Did that sort of force the boy, Ryan, into the parking lot where the self-storage is?
A. Not the parking lot, but towards the curb.
Q. Okay. He went over the curb there?
A. Yes.
Q. And my understanding from the video I saw, he sort of goes through that parking lot and goes around heading the other way down Edom at that point, right?
A. Yes, sir.
Q. Which the police SUV had to back out and make a U-turn in order to pursue at that point, right?
A. Yes.
Q. Now, did it seem that the SUV, when it made that sharp maneuver to the right, where Ryan ends up going into the parking lot of the self-

Page 26

storage, did that seem to be in close proximity to the motor scooter, did he pull that maneuver, like, very close?
A. Yes.
Q. Did it appear to you that Ryan had to do anything to avoid contact with the SUV when that maneuver was attempted?
A. Yes, he went up on the curb.
Q. Okay. If he had not done that, do you have any belief as to whether there would have been contact between the vehicles at that point?
MR. KANE: Object to form, you can answer, Mr. Mattos.
A. Yes.
BY MR. LEVIN:
Q. You think there would have been some contact?
A. Yes.
Q. So then when Ryan goes the other way down Edom basically back the way he came with the SUV in pursuit. It's your testimony they both made a right down Kennedy street, right?
A. Yes, sir.
Q. Okay. And have you lived in that house

Page 27

for a good period of time?
A. Yes, sir.
Q. How long?
A. Since 2001.
Q. Okay. So when you say they went down Kennedy street, there's no question in your mind they went down Kennedy as opposed to -- correct?
A. I do know. Yes, it was Kennedy.
Q. All right.
A. Because that's where the storage parking lot begins, and he went through the parking lot straight down the street.
Q. All right. So the next time they come by you, it's sort of coming from the other side, right? From the direction of Scattergood?
A. Yes, sir.
Q. And they're heading. That would be northbound on Edom.
A. Northbound.
Q. Right. Now, did you see either the motor scooter or the police SUV turn onto Edom when they were coming from that direction?
A. No, sir.
Q. From video that we've seen, I could

Page 28

show it to you. There was sort of like a situation where the police SUV pulled out ahead of the motor scooter. Police officer got out in an attempt to apprehend Ryan, and that's when Ryan sort of pulled onto Edom street. Did you see any of that sequence of events?
A. No, sir. Because I hate to add into this, but my son was in the parking lot bringing his car out, and I was worried about him pulling out into a chase.
Q. Okay. All right, so you didn't see any kind of that altercation? I just described that Scattergood and Edom, you didn't see any of that, right?
A. No, sir.
Q. When you first picked up sight of the vehicles again coming northbound on Edom. Well, first off, where was the motor scooter since that was in front of everybody?
A. When I heard them coming back the other way from Scattergood, they were about four houses down.
Q. Okay, so pretty close to you at that point?

Page 29

A. Yes.
Q. Okay. And at that point, there's a passenger car that's pursuing Ryan more closely than the SUV, right?
A. Yes, sir.
Q. And it seems you that vehicle was pursuing Ryan aggressively, right?
A. Yes, sir.
Q. Did you at the time think that that was a police officer in that vehicle?
A. Yes, sir, I did. And I feel bad for, I wanted to throw something at the kid on the bike, because the way he was, it seemed like they were chasing him. I thought he'd broken the law really bad. And I thought if I would have thrown something, I would have maybe hurt him and he would have got hurt on the motorcycle. But, in hindsight, maybe I should have because we would have stopped. I don't.
Q. Well, listen, you can't put yourself in the narrative and do would have, could have, should have. We're really only to find out what you saw. Please don't blame yourself for anything, obviously. I understand this is an

upsetting thing. Let me, if I can. Not so great as a zoom thing, but I'm going to try and share my screen. Bear with me. Okay. I am going to represent you, this is video that was sent to me by the city. And I have a shorter clip of this. Can you see the video I have up?

A. Yes, sir.

Q. Right now it's not playing, but.

MR. KANE: Michael, I apologize. Do you have a better, I'm looking at the name. It's not really jogging my memory. Do you have a better name for this file?

MR. LEVIN: This is the, yeah, hold on. Bear with me one second.

MR. KANE: Okay. It's from a folder --

MR. LEVIN: 5343, yeah.

MR. KANE: Just for the record, if you go back to that, Michael, and I'll just put it on the record.

MR. LEVIN: Sure. Bear with me.

MR. KANE: For the record, the video being shown now is from a folder entitled 5343 Edom.

MR. LEVIN: Yes.

MR. KANE: And it's a video file. And let's put for the record just how long it is. Just so that'll kind of doubly confirm.

MR. LEVIN: Yeah, well, all I have is the file size. I don't know. This isn't showing the total runtime.

MR. KANE: Okay.

BY MR. LEVIN:

Q. I'm not going to spend too much time on this video, but just want to fast forward to, we can see some people. All right, first off, we see somebody, and it looks like a salmon colored t-shirt walking across the street. Is that you?

A. Yes, sir.

Q. All right.

A. And that's my son in the car that I just left.

Q. Okay, so he's in the Maxima across the street in the parking lot?

A. Yes, sir.

Q. All right. Now, at that point in time, had the vehicles passed by the first time?

A. No, sir.

Q. Okay, I see that you have, it looks like you have your hood popped open.

A. And you'll see me look, because I hear the car, the SUV coming quick. You'll see me look down the street. Right there.

Q. There you go.

A. And now I'm worried about my son pulling out into a chase, out of the parking lot.

Q. Okay, and what we just saw here, around 5 minutes and 23 seconds into the video, was Ryan being followed by the silver car, and then a couple of seconds later by the police SUV, correct?

A. Yes, sir.

Q. Okay. And they were heading off towards Fraley, and that's the last time you saw those, right?

A. Yes, sir.

Q. Hold on. Let me get back into. There we go. Now, from that point forward, did you hear anything that led you to believe anything that had happened, after the three vehicles went down towards Fraley and turned on to Fraley?

A. No. I had to take my daughter out, so I got in my car and I left. And then I got a phone call saying that somebody had been hit.

Q. Okay. Where were you taking your daughter out? I don't want to get too intrusive, but was it a short trip?

A. Yes, I believe it was cheerleading.

Q. Okay. And when you got back to your residence, was there anything still going on in the area, any traffic investigation, what was happening then?

A. Yes, the police were set up around the corner with a sheet over the body.

Q. That was still present when you came back?

A. Yes.

Q. Was there also a tractor trailer, like, right near there at the scene?

A. I personally did not go down. They told me, and I just.

Q. How did you end up sort of getting back to your house? There's sort of limited access to that area back there.

A. No, I came in from Bridge street at

Page 34

Scattergood, that area.
Q. Okay.
A. And it's the other end where the accident occurred.
Q. Okay. And I believe that whether it was that evening or very shortly thereafter. You had given a statement to police, I think a written statement initially, right?
A. I went up to Dungan Road and spoke with -- I forget the officer's name.
Q. That was internal affairs, right?
A. Yes.
Q. Okay. And I believe that's the interview that Mr. Kane had just gone through with you. Had anybody contacted you within the first day or two after this incident played out to take a statement or ask if you had any security video, anything like that?
A. Yes, they did come out, and I said they could have access to my camera. And then they sent the gentleman out, an officer out, to pull the file.
Q. Okay. That video, by the way, that we just saw, it was marked 5343 Edom, was that your camera?

Page 35

A. Yes, sir.
Q. Okay, so the area that we're seeing, that's literally directly in front of your house.
A. Yes, sir.
Q. I certainly don't want to trigger anything or make you feel bad, but it seems that you have some emotions surrounding this whole thing. So since you're here, I certainly want to give you an opportunity to sort of express however you feel about what you saw that day and what you think.
A. Personally, if it was only for riding that motorized vehicle, the way they were chased, he was being chased just seemed extreme.
Q. Did it seem like they were going after him aggressively?
A. Yes.
Q. Did you ever find out after the fact that the person in the silver par wasn't even a police officer?
A. Yes, the officer who took my, the film, the camera notified me that he said, he's not a police officer, because I was explaining to him how he took over what I thought was the chase, and he said, no, he's not a police officer.

Page 36

Q. Now, if you had to characterize the way that the police officer in the police SUV conducted the pursuit of this individual, what was your impression about how he was going after him?
A. The first part that I saw, I thought it was aggressive, but he just kind of pushed him towards the curb, and the kid on the bike got away. The second part of it, I thought he was more laid back, and I thought he was watching this silver car. What I thought, being a police officer chasing the kid.
Q. All right.
MR. LEVIN: I don't think I have any further questions. Thank you, Mr. Mattos.
THE WITNESS: You're welcome.

\- - -

EXAMINATION

\- - -

BY MR. KANE:
Q. A couple of very quick follow ups. Mr. Mattos, just generally, what is your professional background?

Page 37

A. I was a production supervisor for Sun Chemical.
Q. Have you ever served in law enforcement or anything like that?
A. No, sir.
Q. Okay. I'm going to show you one more video in just a portion of it. Give me a second. I'm going to share my screen. Do you see a still image of a video, Mr. Mattos?
A. Yes, sir.
Q. Okay. And it says cam five on the bottom left?
A. Yes, sir.
Q. Okay. And then the top left. I'm just going to read in the first part of this title, it says, "XVR_CH5." Do you recognize the area shown in this video over the still image, Mr. Mattos?
A. Yes, sir.
Q. Okay. Is this looking down --
A. South.
Q. Which direction, Mr. Mattos?
A. Southbound.

Page 38

Q. Southbound. And which street is on the left?
A. That is Kennedy Street.
Q. Okay. Is this looking down --
A. The long street is Edom street. Yes.
Q. Edom, okay. So we're looking, would it be -- that we're looking southbound down, Edom?
A. Yes, sir.
Q. Okay. And were you standing somewhere in the background of this picture. Well, is your house somewhere down that street on the left?
A. Yes, sir. In the top left hand behind the tree. I'm in that area.
Q. Okay. I will submit to you that this video shows that one of the interactions that I believe you described. So the parking lot we see in the back of the picture, is that where your son was when you sort of crossed the street with that what I believe was window was fluid for your car?
A. Yes.
Q. Okay, I'm going to hit play, and I think we'll see your son's car in the background, and let's see if we can confirm that.

Page 39

A. Yes, sir. You could see his car backing now.
Q. Okay, so there's a car that just was backing up and now is actually facing towards us in the background. Is that your son's car?
A. Yes, sir.
Q. Okay, I'm now just going to play through the interaction that I believe you described. I believe you were asked by Mr. Levin if the police car's actions caused Mr. Miller to drive over the sidewalk. Do you remember answering that?
A. Yes. But this is after that interaction.
Q. It is after?
A. Yes.
Q. Let me hit play anyways, let's make sure that.
A. Okay.
Q. All right. We see, I just paused very quickly. We see a scooter and a part of a white vehicle now on the left. Do you see that, Mr. Mattos?
A. Yes.

Page 40

Q. Okay. Does that jog your memory, that this is actually the first time you saw them?
A. Yes.
Q. Okay. I'm going to hit play. I'm just going to ask you sort of basically one simple question, which is that after watching this video, well, let me hit play first. All right. Correct me if I'm wrong. What that interaction just showed was the police vehicle and the scooter sort of driving side by side on Edom. Is that correct?
A. Yes.
Q. The police vehicle did move to the right, and both the police vehicle and the scooter slowed down a lot. Is that correct?
A. Yes.
Q. And then the scooter drove up onto the sidewalk into the parking lot. Is that correct?
A. Yes.
Q. And now you see that the scooter is actually sort of driving the opposite direction in the parking lot. Is that correct?
A. Yes.
Q. And actually, let me hit play for a little bit longer. The scooter then drove up, sort of over a small median into another parking lot and then exited onto Edom street. Is that correct?
A. Yes.

Page 41

Q. Okay. My only question is, based on what you just saw from that video, have you ever seen this video before, Mr. Mattos?
A. No, sir.
Q. Okay. Based on what you see in that video, when Mr. Miller drove up onto the sidewalk into that parking lot, is it your understanding he did that in order to avoid running into the police vehicle, or did he do that in order to just get away from the police vehicle?
A. to avoid being a collision.
Q. Okay. You believe he did that turn to avoid the collision?
A. Yes.
Q. Okay. I just want to bring that back one more time. Let me see if I can, and I can't this video. Okay. Yeah, I'm having trouble offering this video. All right. But that's based on you viewing this video, is that correct,

Page 42

Mr. Mattos?

A. Yes, sir.

Q. Okay. And your recollection from the event when it happened?

A. Yes.

Q. And you'd agree with me when it happened, you were actually looking the opposite direction from the perspective of this video, is that correct?

A. I was looking towards where these cars right here are.

Q. You were looking towards them? like from --

A. Right, like that direction.

Q. Let me phrase it this way. You're looking, the way we're viewing this video, you'd actually be looking towards us. Is that correct?

A. Yes.

Q. Okay.

A. I was looking towards the SUV's front bumper.

Q. The police SUV?

A. The police SUV, yes.

Q. Excellent. Give me one quick second.

Page 43

I'm just going to show that video one more time. All right. I am once again showing the same video as shown before. XVR_CH5. I'm going to hit play again. Can you see this video, Mr. Mattos?

A. Yes, sir.

Q. Okay. And my question again is just going to be about the behavior of both Mr. Miller and the police vehicle. All right. The police vehicle and the scooter just sort of arrived in the frame on the left. Is that correct, Mr. Mattos?

A. Yes, sir.

Q. And for the record, we're about 20 seconds in. I'm going to hit play again. You'd agree with me at this point, it's a little bit hard to see, but the scooter is sort of, it's actually hard to see what's happening right now. Is that correct, Mr. Mattos?

A. From this, yes. But you can see the --

Q. I apologize, Mr. Mattos, you can answer.

A. You can see the SUV in front of the scooter.

Page 44

Q. Okay. And the scooter is then just sort of turning right onto the sidewalk, is that correct?

A. Yes.

Q. Okay. I guess you would agree with me that the scooter certainly didn't show any signs of wanting to stop for that police vehicle. Is that correct?

A. Well, during the whole chase, he did slow down.

Q. Who did?

A. The scooter.

Q. Okay.

Q. Did he ever stop, though?

A. No, sir.

Q. Okay.

MR. KANE: Those are all my questions. There might be some follow ups from Mr. Levin. And let me again express my gratitude for your time. And again, we apologize for having to sort of bring this event up to you again, so far after it. But let me pass you over to Mr. Levin, all right?

Page 45

THE WITNESS: Yes.

MR. LEVIN: All right. I just have a very couple of questions.

\- - -

EXAMINATION

\- - -

BY MR. LEVIN:

Q. We've already sort of gone through the police SUV during that maneuver where the scooter ends up going into the parking lot, had gotten slightly out ahead of the scooter, and then made a sharp right turn, correct?

A. Yes.

Q. And if Ryan had continued straight without also turning right, which you believe he did, to avoid collision, there would have been impact between the vehicles, correct?

MR. KANE: Object to the form.

THE WITNESS: I'm sorry.

BY MR. KANE:

Q. That's okay. And I realize you can't get inside anybody's head, but I mean, obviously you can observe what's ahead of you and draw whatever conclusion you're going to draw from

Page 46

what you see. Did it seem to you when the officer made that maneuver because he was intending to cause contact, as opposed to trying to get Ryan to pull over into that lot?

A. Yes --

MR. KANE: Objection.

BY MR. LEVIN:

Q. Could you repeat your answer because you were both talking at the same time?

A. Yes.

Q. And having viewed that video that was taken from that parking lot that you just saw, you had not seen that before today's deposition, right?

A. No, sir.

Q. Did anything about that video change your impression about what had transpired during that maneuver?

A. No, sir.

MR. LEVIN: All right. I don't have anything further. Thank you.

MR. KANE: Nothing further. Thank you so much for your time, Mr. Mattos.

THE WITNESS: You're welcome.

Page 47

MR. LEVIN: All right, we are done. Ms. Pierre, do you need anything else from Mr. Mattos?

THE REPORTER: Not at the moment, no. He's free to go.

MR. LEVIN: All right. Thank you so much, sir. We appreciate your time.

THE WITNESS: Thank you.

THE REPORTER: Let me call us off the record officially. We are now off the record. The time is 1:44 p.m.

(Proceedings concluded at 1:44 p.m.)

Page 48

CERTIFICATE OF DIGITAL REPORTER

I, TIA PIERRE, a Digital Reporter and Notary Public within and for the State of Pennsylvania, do hereby certify:

That the foregoing proceeding herein before set forth was accurately captured with annotations by me during the proceeding.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS THEREOF, I have hereunto set my hand this 15th day of December, 2023.

Tia L. Pierre

Tia Pierre
Notary Commission FL HH 216931
Commission Expires: January 17, 2026

**1**

**10** 14:5,7
**12:55** 4:6
**14** 10:20 11:3
**15** 4:5 14:1
**150** 16:18 19:2
**16** 10:20 11:3 16:14
**160** 16:18 19:2
**1:44** 47:11,12

**2**

**20** 43:14
**2001** 27:4
**2019** 9:21 11:15 12:3,23
**2023** 4:6
**206301** 4:15
**23** 32:11

**3**

**35** 15:20,21

**4**

**40** 15:20,22
**45** 16:7

**5**

**5** 32:11
**53** 11:9
**5300** 12:22 14:24
**5343** 11:11 30:17,24 34:24

**7**

**7** 9:21 12:3, 23
**7:20** 12:23
**7:25** 12:23

**9**

**95** 13:11

**A**

**ability** 16:11
**Absolutely** 5:22
**access** 33:22 34:20
**accident** 34:4
**actions** 39:10
**activated** 14:22
**actual** 17:16 20:14 23:13
**add** 17:24 18:10,14 28:7
**address** 11:11,12, 14
**administrators** 5:7
**affairs** 34:11
**affirm** 5:18
**afternoon** 4:7 6:8
**aggressive** 16:23 36:9
**aggressively** 29:7 35:17
**agree** 4:10 5:1,9 10:14 11:8 12:7 13:17 42:6 43:16 44:5
**agreeing** 7:16
**ahead** 25:2 28:2 45:11,23
**altercation** 28:12
**answering** 7:3 8:11 9:13 39:12
**answers** 7:10 8:24 9:2 10:12 15:7 16:8, 9,10 18:3, 5,13
**anybody's** 45:22
**anytime** 14:22
**apologize** 19:1 30:9 43:21 44:21
**appearance** 4:24
**appeared** 17:9 20:18
**apprehend** 28:4
**approaching** 23:19
**approximately** 12:23
**area** 12:22 23:14 33:10,23 34:1 35:3 37:18 38:13
**arrived** 43:10
**asks** 20:3
**assigned** 4:9
**Associates** 5:6
**attempt** 28:4
**attempted** 26:7
**attorney** 6:21,23 7:4
**audible** 14:22
**avoid** 26:6 41:13,16, 18 45:16
**aware** 21:15

**B**

**back** 22:12 25:18 26:20 28:20 30:19 32:20 33:8,15, 21,23 36:12 38:17 41:20
**background** 37:2 38:10,23 39:5
**backing** 39:2,4

**bad** 29:11,15 35:7
**based** 41:6,10,24
**basically** 24:10 26:20 40:5
**bates** 10:19 11:3 13:24 14:1 16:14
**bathroom** 9:12
**Bear** 30:3,14,21
**beeping** 15:4
**begin** 6:3
**begins** 27:11
**behalf** 5:12
**behavior** 43:8
**belief** 26:10
**benefit** 18:15
**big** 9:7 19:10
**bike** 29:12 36:10
**bit** 13:23 19:5 20:16 25:1 41:1 43:16
**blame** 29:23
**blue** 12:16 14:21 15:3
**body** 33:13
**bottom** 37:14
**bound** 15:18
**Bove** 21:19,20
**boy** 23:16 25:7
**break** 9:10,15
**Bridge** 33:24
**bring** 10:11,18 12:18 41:20 44:21
**bringing** 28:8
**broken** 29:14
**bumper** 42:21

**C**

**call** 33:3 47:9
**called** 8:2 20:9
**cam** 37:13
**camera** 34:20 35:1,23
**car** 13:2 14:4,7,19 15:14 16:2,20,21,22,23 19:1,4,9,14,24 28:9 29:3 31:18 32:5,12 33:2 36:13 38:20,23 39:1,3,5
**car's** 19:22 39:10
**cars** 42:10
**case** 4:12,15 6:16
**caused** 39:10
**change** 13:20 46:16
**characterize** 36:3
**chase** 16:19,20 19:3,4,7,18 28:10 32:9 36:1 44:9
**chased** 12:4 13:3 14:4 35:14,15
**chasing** 16:21 29:14 36:14
**cheerleading** 33:7
**Chemical** 37:4
**city** 30:5
**clarify** 15:21 20:6
**clear** 18:8
**clip** 30:5
**close** 26:1,3 28:23
**closely** 29:3
**Cloth** 10:21 11:18
**collision** 41:16,18 45:16
**color** 12:14
**colored** 31:14
**comfortable** 6:12
**completely** 8:24 17:21
**concluded** 47:12
**conclusion** 45:24
**conducted** 36:5
**confirm** 6:15 12:19 31:5 38:24
**consent** 5:13
**contact** 17:16,18 20:4,8 26:6,11,17 46:3
**contacted** 34:15
**continued** 13:23 45:14
**conversations** 8:9
**corner** 33:13
**correct** 6:23 8:24 11:1 12:5,20 13:18 14:17 15:7 16:9 18:6 20:1,6,12 22:21,23 24:7 25:5 27:7 32:14 40:8,11,15,18,22 41:4,24 42:9,17 43:11,19 44:3,8 45:12,17
**correctly** 13:15 14:10
**Counsel** 10:23

**Counselor** 6:3
**Counsels** 4:23
**couple** 18:17 21:3 32:13 36:24 45:3
**court** 4:8
**created** 7:8
**crossed** 38:18
**curb** 24:19 25:10,11 26:8 36:10
**current** 11:12
**cut** 20:13,15, 20

**D**

**date** 9:22
**daughter** 33:1,5
**day** 10:5,8 20:7 21:7 34:16 35:11
**deal** 9:7
**deceased** 5:8
**December** 4:5
**defendant** 4:14 6:15, 20
**Defense** 10:19 11:3 14:1 16:14
**deposition** 4:12 5:10, 13 8:1 46:13
**Derek** 5:11
**describe** 12:11
**difference** 19:21
**direction** 22:18 23:1 27:15,22 37:23 40:21 42:8,14
**directly** 35:4
**disregard** 17:21
**Donna** 5:7
**doubly** 31:4
**draw** 45:23,24
**drive** 39:11
**driver** 15:15 20:21
**driver's** 4:18
**driveway** 13:8
**driving** 21:4,14,19 40:10,21
**drove** 40:17 41:1,11
**duly** 5:24
**Dungan** 34:9

**E**

**eastbound** 13:10,13
**easy** 8:8
**Edom** 12:22 13:4,13 14:24 15:12,18 16:5,16 17:13,20, 22 18:24 21:1 22:19 23:12,15 25:15 26:20 27:18,21 28:5,13,17 30:24 34:24 38:5,6,7 40:10 41:3
**emotions** 35:8
**end** 13:6 14:16 33:21 34:3
**ends** 25:24 45:10
**enforcement** 37:5
**engine** 17:10,11
**ensure** 6:12 8:17
**entitled** 30:24
**estate** 5:8
**estimate** 15:19 17:5,12
**et al** 4:14
**evening** 34:6
**event** 42:4 44:22
**events** 6:17 10:4 28:6
**EXAMINATION** 6:5 22:5 36:21 45:5
**examined** 5:24
**Excellent** 6:8 42:24
**exhibits** 10:24 11:2
**exited** 41:3
**explain** 20:16
**explained** 7:13
**explaining** 35:24
**express** 35:10 44:19
**extreme** 35:15

**F**

**facing** 22:17 39:4
**fact** 7:14 35:19
**family** 21:6,12 22:9
**fast** 15:19 17:5,11 31:12
**faster** 16:22
**feel** 29:11 35:7,11
**feet** 16:7,18 19:2
**figured** 16:20
**file** 30:12 31:2,7 34:22
**film** 35:22
**final** 16:3
**find** 29:22

35:19

**fine**
7:2,19,21
8:24

**finish**
8:15,16

**firm**
5:1

**Flager**
5:5

**flashing**
15:5

**Florida**
4:19

**fluid**
13:2 38:19

**folder**
30:16,23

**follow**
10:15 22:2
36:24
44:18

**follow-up**
18:18

**force**
25:7

**forget**
34:10

**form**
6:17 8:3
26:12
45:18

**forward**
31:12
32:21

**fourth**
12:1

**Frailey**
14:9

**Fraley**
23:1
32:17,24

**frame**
43:11

**free**
47:5

**Friday**
4:5

**front**
13:6,7
22:17
28:19 35:4
42:20
43:23

**full**
8:18 9:16
12:9

**future**
7:15 8:19

**G**

**gap**
14:7
19:10,12,
13,16,24

**Gary**
21:19,20

**gave**
16:19
19:3,17

**generally**
7:7 37:1

**gentleman**
34:21

**give**
5:19 6:10
9:1,16
35:10 37:9
42:24

**glass**
9:11

**good**
4:6 6:8
27:1

**grassy**
13:9

**gratitude**
44:20

**great**
30:1

**guess**
9:1 24:3
44:5

**H**

**hand**
5:17 38:12

**happened**
10:4 24:6
32:23
42:4,7

**happening**
33:11
43:18

**hard**
43:17,18

**hate**
28:7

**head**
9:4 45:22

**heading**
13:4 23:1
25:15
27:17
32:16

**headlights**
15:5

**hear**
7:24 8:4

22:10
32:4,22

**heard**
14:2 17:10
28:20

**helmet**
23:17

**helpful**
18:2,11

**highlight**
12:2

**highlighted**
18:19,20

**hindsight**
18:15
29:18

**hit**
33:3 38:22
39:17
40:4,7,24
43:4,15

**hold**
30:14
32:20

**hood**
32:3

**horn**
15:4

**house**
13:1 22:17
26:24
33:22 35:4
38:11

**houses**
16:7 28:21

**huge**
19:12

**hurt**
29:16,17

**I**

**identified**
4:17

**image**
37:11,19

**impact**
45:17

**important**
8:7

**impression**
36:6 46:17

**incident**
9:21,24
34:16

**independent**
10:3,6

**individual**
36:5

**information**
18:1,10

**initially**
34:8

**inside**
45:22

**instance**
21:12

**instruction**
8:9

**instructions**
6:11

**intending**
46:3

**interaction**
39:8,14
40:8

**interactions**
38:15

**internal**

34:11
**intersection** 20:23
**interview** 18:1,10 34:14
**interviewed** 11:18
**intrusive** 33:5
**investigation** 18:2,11 33:10
**investigator** 9:24 10:13
**island** 13:9
**issue** 21:7
**issued** 4:19

**J**

**James** 10:21 11:18 13:10
**jog** 40:1
**jogging** 30:11
**joined** 7:13
**Joseph** 4:14 21:15

**K**

**Kane** 5:11 6:7 11:1,4 21:23 26:12 30:9,15, 18,22 31:2,9 34:14 36:23 44:17 45:18,20 46:6,22
**Kennedy** 13:10,13 14:9 17:9, 15,22 21:1 26:22 27:6,7,8 38:3
**kid** 13:5,7 29:12 36:10,14
**kind** 7:16 10:8 19:23 20:13,20 28:12 31:4 36:9
**knowledge** 18:6 21:6

**L**

**laid** 36:12
**lane** 24:11
**laughing** 23:22
**law** 29:14 37:5
**led** 32:22
**left** 24:7,9,18 31:19 33:2 37:14,16 38:2,11,12 39:22 43:11
**Levin** 5:5 7:13 8:16 10:16 22:1,7,9 26:15 30:13,17, 21 31:1,6, 10 36:16 39:9 44:19,23 45:2,7 46:7,20 47:1,6
**Levin's** 7:11
**Lexitas** 4:9
**license** 4:19
**Lieutenant** 10:21 11:18
**lights** 14:21 15:3
**limited** 33:22
**listen** 29:20
**literally** 35:4
**litigation** 6:17
**lived** 26:24
**located** 4:20,22
**long** 8:23 19:9 27:3 31:3 38:5
**longer** 41:1
**looked** 14:3
**lost** 13:14
**lot** 19:9 22:20 25:8,9,14, 24 27:11, 12 28:8 31:21 32:9 38:16 40:15,18, 22 41:3,12 45:10 46:4,12
**lucky** 9:13

**M**

**made** 13:11 25:23 26:22 45:11 46:2
**make** 10:13 23:20 25:19 35:7 39:17
**makes** 25:4
**man** 21:4,18
**maneuver** 25:5,23 26:2,7 45:9 46:2, 18
**marked** 10:24 11:2 34:24
**Mattos** 4:12,18 5:23 6:8, 24 8:1 9:6 10:11,21 11:5,9,24 13:15 15:6,22 16:10 17:1 18:4,20 20:17 21:4,24 22:8 26:13 36:18 37:1,11, 19,23 39:23 41:8 42:1 43:5, 12,19,21 46:23 47:3
**Maxima** 31:20
**median** 41:2
**memorial** 21:8
**memory** 30:11 40:1
**mentioned** 8:6
**Michael** 5:5 22:8

30:9,19

**Miller**
4:13  5:7,8
21:5,6
22:9  23:16
39:10
41:11  43:8

**mind**
5:17  23:21
27:6

**minutes**
14:2  32:11

**moment**
47:4

**motor**
22:14  24:7
26:2  27:21
28:3,18

**motorcycle**
12:3,10
13:3,7,10
14:3,4,6,
24  15:11,
14,17
16:2,4,6,
15,17,21
17:7,8,17,
19  18:23,
24  19:8,14
20:4,8,18,
21  24:3
29:17

**motorized**
35:14

**move**
40:13

**moving**
15:21
16:1,13

**mph**
15:22

**N**

**narrative**
29:21

**Neal**
4:13

**Neil**
5:7

**nod**
9:4

**north**
15:18

**northbound**
13:12
15:12
16:5,16
17:13
18:23
22:18
27:18,19
28:17

**notary**
4:8

**notified**
35:23

**number**
4:15  13:24
14:1,17
16:14

**numbers**
10:20  11:3

**O**

**oath**
5:3

**Object**
26:12
45:18

**objection**
8:4  46:6

**objections**
7:24  8:2

**observe**
45:23

**occurred**
9:21  34:4

**offering**
41:23

**officer**
4:14  5:12
13:11,12
15:15
16:24
21:14,15
23:20  28:3
29:10
34:21
35:21,22,
24  36:2,4,
14  46:2

**officer's**
34:10

**officially**
47:10

**online**
4:8

**open**
32:3

**operator**
14:19
15:14
17:19

**opportunity**
35:10

**opposed**
27:7  46:3

**opposite**
40:21  42:7

**option**
7:14

**order**
25:19
41:13,14

**overhead**
14:21

**P**

**p.m.**
4:6  12:23
47:11,12

**par**
35:20

**parking**
22:20
25:8,9,14,
24  27:11,
12  28:8
31:21  32:9
38:16
40:18,22
41:2,12
45:10
46:12

**parole**
4:13

**part**
36:8,11
37:17
39:21

**parties**
4:9

**pass**
10:15
14:24
44:23

**passed**
14:6  15:16
17:6,13,15
19:9,15
31:24

**passenger**

29:3

**past**
17:9

**paused**
39:20

**Pennsylvania**
4:21,23

**people**
31:13

**perceive**
23:23

**period**
27:1

**person**
8:10,11
35:20

**personally**
33:19
35:13

**perspective**
24:24  42:8

**Philadelphia**
4:22  12:4

**phone**
33:3

**phrase**
42:15

**physically**
20:8

**pick**
23:5

**picked**
28:16

**picture**
38:10,17

**Pierre**
4:7  5:13
7:17  8:6
9:9  47:2

**Pierre's** 7:19
**place** 5:2 13:9
**plaintiff** 4:13
**Plaintiffs** 5:6
**play** 38:22 39:7,17 40:4,7,24 43:4,15
**played** 34:16
**playing** 30:8
**point** 7:15 9:14 19:6 20:7 25:2,16,20 26:11 28:24 29:2 31:23 32:21 43:16
**police** 5:12 12:4 13:3,6,11 14:5,7,18, 20,24 15:15 16:3,17, 19,22,23 17:12,17, 19 19:1,3, 6,15,17,24 20:5,8,11, 19 22:14 23:20 24:2,6 25:18 27:21 28:2,3 29:10 32:13 33:12 34:7 35:21,24 36:2,4,13 39:10 40:9,13,14 41:14,15 42:22,23 43:9 44:7 45:9
**popped** 32:3
**portion** 37:9
**positively** 4:17
**present** 6:22 33:14
**presenting** 4:18
**pretty** 8:8 28:23
**previously** 10:24 11:2
**proceeding** 5:3 7:2
**proceedings** 4:2 47:12
**process** 7:6 15:10
**produces** 7:17
**product** 7:20
**production** 37:3
**professional** 37:2
**proximity** 26:1
**pull** 24:1 26:2 34:21 46:4
**pulled** 20:19 24:2 28:2,5
**pulling** 28:9 32:9
**pulls** 24:6
**purposes** 8:15
**pursue** 25:19
**pursued** 15:12 23:20
**pursuing** 29:3,7
**pursuit** 22:13 26:21 36:5
**pushed** 36:9
**put** 29:20 30:20 31:3
**putting** 13:2

**Q**

**question** 8:3,10,11, 15,16,18 9:3 12:1, 8,18,21 13:18,21 14:13 15:10,24 16:3,14,24 17:2,11, 16,18 18:9,18 20:3 27:6 40:6 41:6 43:7
**questioning** 6:3
**questions** 7:3,10,11 8:4 9:14 10:12,15, 18 11:24 14:16 16:8,10 17:5 18:3, 5,13,18 21:3,24 36:17 44:18 45:3
**quick** 18:17 32:5 36:24 42:24
**quickly** 10:13 11:23 14:15 39:21

**R**

**raise** 5:17
**rarely** 23:9
**read** 7:18,22 12:24 13:14 14:10,15 37:17
**reading** 7:14
**realize** 45:21
**reason** 9:16 19:16 21:16
**recall** 9:2 14:17
**recognize** 37:18
**recollection** 10:4 15:6 42:3
**record** 4:5,16,24 10:7,19,23 11:6 30:18,20, 22 31:3 43:14 47:10,11
**recording** 5:9
**red** 14:21 15:2
**referring** 16:1
**remember** 8:23 9:20 10:1,8 11:19,20 12:14 20:24 39:11
**remind** 9:6
**remote** 4:8,11

5:13

**remotely** 5:4

**repeat** 46:8

**report** 5:3

**reporter** 4:4,8 5:15 6:2 10:22 47:4,9

**represent** 5:1 30:4

**representing** 5:6 22:9

**request** 4:9

**residence** 33:9

**response** 7:17

**rest** 17:4 18:3

**riding** 35:13

**Rig[ht** 24:14

**road** 14:10 24:1 34:9

**Robert** 4:12,18 5:23 10:21 11:9

**roughly** 16:7 23:15

**running** 41:13

**runtime** 31:8

**Ryan** 5:8 21:5 23:16 24:19,21 25:7,23 26:5,19 28:4,5 29:3,7 32:11 45:14 46:4

**S**

**salmon** 31:14

**scared** 23:22,24 24:3

**Scattergood** 23:2 27:15 28:13,21 34:1

**scene** 33:18

**scooter** 12:13 20:9,12 21:4 22:14 23:17 24:7 25:2 26:2 27:21 28:3,18 39:21 40:10,15, 17,20 41:1 43:10,17, 24 44:1,6, 12 45:9,11

**screen** 11:6 18:20 30:3 37:10

**seconds** 14:5,7 32:11,13 43:15

**security** 34:18

**self-** 25:24

**self-storage** 25:8

**sequence** 28:6

**served** 37:5

**service** 21:8

**set** 33:12

**share** 30:2 37:10

**sharing** 21:2

**sharp** 25:23 45:12

**sheet** 33:13

**short** 33:6

**shorter** 30:5

**shortly** 34:6

**shoulders** 9:5

**show** 9:13 28:1 37:8 43:1 44:6

**showed** 40:9

**showing** 31:8 43:2

**shown** 30:23 37:18 43:3

**shows** 38:15

**shrug** 9:4

**side** 24:1,7,16, 18,19 27:14 40:10

**sidewalk** 13:8 39:11 40:18 41:11 44:2

**sight** 13:14 23:6 28:16

**sign** 7:18,22 14:8 17:22

**signing** 7:15

**signs** 44:6

**silver** 14:4,6,19 15:2,4,13, 16 16:2,6, 20,21,23 17:6 19:4, 8,14,22,24 21:19 32:12 35:20 36:13

**Simon** 23:9,11,15

**simple** 40:5

**sir** 5:16 9:18 10:2 11:7, 10,13,16 12:6 13:16,19, 22 14:11 15:23 16:12 17:3 18:16,21 20:2 21:8, 13,17,21 22:11,22 23:3,18 25:17 26:23 27:2,16,23 28:7,15 29:5,8,11 30:7 31:16,22 32:1,15,19 35:2,5 37:7,12, 15,20 38:8,12 39:1,6 41:9 42:2 43:6,13 44:15 46:15,19 47:7

**siren** 14:22 15:3

**Sitting** 18:12

**situation** 28:2

**size** 12:9 31:7

**skip** 15:9
**slightly** 45:11
**slow** 44:10
**slowed** 13:5 40:15
**slower** 17:14
**slowing** 20:18
**small** 41:2
**son** 28:8 31:18 32:8 38:18
**son's** 38:23 39:5
**sort** 9:4 18:12 21:11 23:5 25:4,7,14 27:14 28:1,5 33:21,22 35:10 38:18 40:5,10,21 41:2 43:10,17 44:2,21 45:8
**South** 37:22
**southbound** 13:4 37:24 38:1,7
**speak** 8:8
**speaking** 11:20
**sped** 17:15
**speed** 17:8,9,10
**spend** 31:11
**spoke** 9:23 34:9
**stage** 9:4
**standing** 22:15 38:9
**star** 9:12
**state** 4:19,21,24 14:10 23:21
**statement** 10:20 11:9 34:7,8,17
**stipulate** 4:10 5:2
**stop** 14:8 17:22 20:19 21:2 44:7,14
**stopped** 13:5 29:19
**storage** 13:9 26:1 27:10
**straight** 27:12 45:14
**street** 12:22 13:4,13 14:9 15:1,12,18 16:5,16 17:13,20,22 18:24 22:19,21 23:1,9,12 24:13 26:22 27:6,12 28:5 31:15,21 32:6 33:24 38:1,3,5,11,18 41:3
**streets** 23:8
**submit** 38:14
**Sun** 37:3
**supervisor** 37:3
**surrounding** 35:8
**SUV** 13:3,6 14:5,8 16:3,19,22 19:3,6,10,15,17,24 20:8,11,19 21:14 22:14 24:6,10 25:1,4,18,22 26:6,21 27:21 28:2 29:4 32:5,13 36:4 42:22,23 43:23 45:9
**SUV's** 42:20
**swear** 5:16,18
**sworn** 5:24

**T**

**t-shirt** 31:15
**tail** 19:22
**taking** 33:4
**talk** 9:20 19:4 21:9
**talking** 46:9
**technically** 12:9
**technology** 4:11
**testified** 5:24
**testimony** 5:19 9:17 26:21
**that'll** 31:4
**thing** 30:1,2 35:9
**things** 10:10
**thought** 16:18 19:3,17 29:14,15 36:1,8,11,12,13
**throw** 29:12
**thrown** 29:15
**Tia** 4:7
**time** 4:6 6:11 8:8 9:10 13:14 14:7 15:10,11,18 16:5,15 18:23 19:9,10,12,13,16,19,21,23 20:7 21:11 22:1,13,24 23:4 25:2 27:1,13 29:9 31:11,23,24 32:17 40:2 41:21 43:1 44:20 46:9,23 47:7,11
**times** 14:23
**title** 37:17
**today** 5:19 7:2 8:15 9:16 18:12
**today's** 46:13
**told** 33:20
**top**

18:18 37:16 38:12
**total** 31:8
**touch** 20:12,14
**tractor** 33:17
**traffic** 33:10
**trailer** 33:17
**transcript** 7:9,16
**transpired** 46:17
**travel** 15:11,18 16:5,16 18:23 24:11
**traveling** 15:19 17:6,12
**tree** 38:13
**trigger** 35:6
**trip** 33:6
**trouble** 41:22
**truth** 5:20,21
**truthful** 8:23 9:17 13:18 14:13 18:5
**turn** 23:11 27:21 41:17 45:12
**turned** 14:9 32:24
**turning** 44:2 45:15
**type** 12:13
**typically** 8:2,9,11

**U**

**U-TURN** 13:11 25:19
**understand** 6:13 7:6 29:24
**understanding** 6:22 9:19 24:5 25:13 41:12
**understood** 21:18
**ups** 22:2 36:24 44:18
**upsetting** 30:1

**V**

**vehicle** 12:4,12,13 14:18,21, 24 15:2,4, 13,16 16:6,17 17:6,12, 17,19 19:1 20:5 21:19 24:2 29:6, 10 35:14 39:22 40:9,13,14 41:14,15 43:9,10 44:7
**vehicles** 17:21 22:16,24 23:6,11 26:11 28:17 31:24 32:23 45:17
**verbal** 9:3
**video** 5:9 7:8 25:13 27:24 30:4,6,23 31:2,12 32:11 34:18,23 37:9,11,19 38:15 40:7 41:7,8,11, 22,23,24 42:8,16 43:1,3,4 46:11,16
**videoconference** 4:10
**viewed** 46:11
**viewing** 41:24 42:16

**W**

**waive** 7:22
**walking** 31:15
**wanted** 6:21 29:12
**wanting** 44:7
**washer** 13:2
**watching** 36:12 40:6
**water** 9:11
**wearing** 23:17
**white** 39:21
**window** 38:19
**windshield** 13:2
**witnessed** 12:22
**wobbled** 20:21 24:3
**Wolk** 4:14 5:12 21:15
**work** 8:10
**worried** 28:9 32:8
**written** 34:8
**wrong** 24:10 40:8

**X**

**XVR_CH5** 37:18 43:3

**Y**

**young** 21:4

**Z**

**zoom** 5:9 7:7 30:2