1            IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3                          - - -

4

5     NEAL MILLER and DONNA    :
      MILLER, Individually     :
6     and as Administrators    :
      of the Estate of RYAN    :
7     MILLER,                   :
                                :
8              Plaintiffs,      :    NO. 2:20-cv-06301-ER
                                :
9          vs.                  :
                                :
10    CITY OF PHILADELPHIA,     :
      et al.,                   :
11                              :
               Defendants.      :
12

13

14

15            The video conference deposition of

16    LIEUTENANT JAMES CLOUGH on Wednesday, May 10, 2023,

17    commencing at 1:00 p.m. before Natalie J. Goldhill,

18    a Professional Reporter and a Notary Public in and

19    for the Commonwealth of Pennsylvania.

20

21

22

23

24

 1   A P P E A R A N C E S :

 2


 3      FLAGER & ASSOCIATES, P.C.
        BY:  MICHAEL S. LEVIN, ESQUIRE
 4      One Northbrook Corporate Center
        1210 Northbrook Drive, Suite 280
 5      Trevose, Pennsylvania 19053
        (215) 953-5200
 6              Representing the Plaintiffs

 7

 8      CITY OF PHILADELPHIA LAW DEPARTMENT
        BY:  DEREK KANE, ESQUIRE
 9      One Parkway Building
        1515 Arch Street, 14th Floor
        Philadelphia, Pennsylvania 19102
10      (215) 683-5382
        derek.kane@Phila.gov
11              Representing the Defendant, City of
        Philadelphia

12

13                        - - -

14

15

16

17

18

19

20

21

22

23

24

Case 2:20-cv-06301-MMB   Document 68-3   Filed 02/16/24   Page 3 of 39

Deposition of Lt. James Clough                          Neal Miller and Donna Miller v. City of Philadelphia, et al.

1                          I N D E X

2

3     WITNESS                                      PAGE

4     LIEUTENANT JAMES CLOUGH

5            Examination by Mr. Levin          4

6

7

8

9

10              - - E X H I B I T S - -

11    EXHIBIT NUMBER        DESCRIPTION          PAGE MARKED/
                                                 REFERENCED
12    Plaintiffs 1          Internal Affairs     71/7
                            Investigation
13                          Materials

14    Plaintiffs 2          Screen Shots         71/61
                            Images from Video
15

16                         - - -

17

18

19

20

21

22

23

24

Deposition of Lt. James Clough                                    Neal Miller and Donna Miller v. City of Philadelphia, et al.

Page 4

1          S T I P U L A T I O N S
2          IT WAS STIPULATED AND AGREED by and
3  between counsel for the respective parties that the
4  reading, signing, sealing, and filing of the
5  transcript is waived, and that all objections except
6  as to the form of the question are reserved until
7  the time of trial.
8          - - - - - - - - - -
9          . . . . . . LIEUTENANT JAMES CLOUGH,
10 was called as a witness, and after having been duly
11 sworn remotely, according to the law, was examined
12 and testified as follows:
13          - - EXAMINATION - -
14 BY MR. LEVIN:
15     Q.    Good afternoon, Lieutenant Clough.  We
16 met off the record.  My name is Michael Levin.  I'm
17 representing the plaintiff in this case.
18          My understanding is that you pretty
19 much led an internal affairs department
20 investigation into an incident that relates to this
21 case.  So we wanted to have you come in and just
22 testify about the facts of that investigation and
23 what it uncovered.
24          Before I begin, have you ever given

Page 5

1  testimony in a deposition setting before?
2     A.    Yes, I have.
3     Q.    Okay.  So you're pretty familiar with
4  the rules, I'm assuming.  But since we're doing this
5  by the Zoom platform, I want to stress let's try and
6  not talk over one another.  It makes it very
7  difficult for the court reporter.  Let me spit out
8  my entire question and I'll certainly do my best not
9  to step on your answer.  It just makes it easier to
10 keep a record of what's said.
11          If for any reason I ask you a question
12 you don't understand, let me know and I'll be glad
13 to address that.  All right?
14     A.    Okay.
15     Q.    Could you please state your full name
16 for the record, sir.
17     A.    It's Lieutenant James Clough.
18     Q.    Okay.  What is your current job title
19 with the Philadelphia Police Department?
20     A.    I'm a lieutenant.
21     Q.    Okay.  Where are you assigned?
22     A.    Internal affairs division.
23     Q.    How long have you been with internal
24 affairs?

Page 6

1     A.    Since 2007.
2     Q.    You don't have to go into great
3  detail, but can you give me sort of a synopsis of
4  your history with the Philadelphia Police
5  Department, when you started, positions you've held,
6  and so forth?
7     A.    I started in May of 1989.  After the
8  academy, I patrolled in the 26th police district.
9  From there, I went to the anti-crime team.  I did
10 detailed SWAT for a year, I was in highway patrol
11 for a year, I was in narcotics for a few years.
12          I got promoted to the rank of sergeant
13 in 2003, went to the 26th district as patrol
14 supervisor, and then I got transferred in 2007 to
15 internal affairs as a sergeant.
16          I got promoted to lieutenant in 2015
17 and I remained in internal affairs and that's
18 currently where I'm assigned to.
19     Q.    It sounds like through your history
20 with the department, you've pretty much run the
21 gamut through various assignments?
22     A.    Yes.
23     Q.    All right.  Now you were involved in
24 the investigation conducted by the IAD regarding a

Page 7

1  May 7th, 2019 incident in which Ryan Miller died in
2  a collision with a tractor trailer.  Correct?
3     A.    Yes.
4     Q.    My understanding is that internal
5  affairs got involved to investigate a potential
6  police department policy violation on the part of
7  Police Officer Wolk.  Is that correct?
8     A.    That's correct.
9     Q.    All right.  We had been referring
10 throughout these depositions, there were a couple
11 this morning, to what we've marked as Plaintiff's
12 Exhibit 1, which is a packet of documents, which I
13 believe is the majority, if not the entirety, of the
14 internal affairs file.
15          So I'm going to put that up on the
16 screen so it can facilitate our discussion a little
17 bit.  Okay?
18     A.    Okay.
19          MR. KANE:  Michael, I'm going to
20 approach the computer so I can move your faces over
21 to try to make it easier.  No, this works.  We can
22 see the document below.
23          MR. LEVIN:  Okay.
24 BY MR. LEVIN:

Page 8

1  Q.    What you see up on the screen, you're
2  looking at the Complaint Investigation Worksheet?
3  A.    Yes.
4  Q.    Okay.  Just to sort of get our
5  bearings for the purpose of this discussion, you'll
6  see in the lower right-hand corner of each of these
7  pages, there's a sequential numbered Bates stamp,
8  Defense 001 and it goes all the way through 189.
9      We're not going to discuss mercifully
10 every single one of those pages, but I do have some
11 questions to ask you about some of this stuff.
12     First off, could you tell me the
13 circumstances before we dive into the documents
14 about how you got involved in this investigation?
15 A.    Internal affairs somehow became
16 notified about a social media posting regarding the
17 incident or the accident and an investigation was
18 launched and it was assigned to me.
19 Q.    Okay.  Ultimately, that investigation
20 concluded that there had been violations of some
21 department policies.  Correct?
22     MR. KANE:  Objection to form.
23     THE WITNESS:  Yes.
24 BY MR. LEVIN:

Page 9

1  Q.    That's reflected on this first page,
2  Defense 01, indicating the department violation
3  sustained.  Correct?
4  A.    Correct.
5  Q.    If we go a little bit further down the
6  page, it indicates the specific policy which was
7  violated, which was Philadelphia Police Department
8  Directive 9.4, which pertains to vehicle pursuits.
9  Am I correct?
10 A.    Correct.
11 Q.    All right.  This also indicates that
12 there were not going to be any criminal charges
13 filed against Officer Wolk as a result of this.
14 Right?
15 A.    Well, there are no criminal charges.
16 It doesn't indicate that there is or there isn't.
17 Q.    Okay.  My understanding because I
18 asked this today, this is the big thing I learned,
19 the field there which indicates that he was not
20 Gnioteked means that he wasn't provided with any
21 kind of notification that there might be criminal
22 charges coming his way.  Is that fair to say?
23 A.    Gniotek means that there was no
24 official proceeding to dismiss Officer Wolk.

Page 10

1  Q.    Okay.  So that would relate to
2  proceedings to dismiss him from the police force as
3  opposed to charging him criminally.  Correct?
4  A.    Correct.  They arrested -- it says
5  arrested, no, but someone can be Gnioteked -- that
6  is the official proceeding to conduct the dismissal.
7  That could also be departmental violations, not just
8  criminal.
9  Q.    All right, understood.  Starting to go
10 through, the face page indicates that you're the
11 investigator assigned.  It looks like some superiors
12 I guess signed off on the report that you prepared?
13 A.    Yes.
14 Q.    Okay.  I can see that one of those is
15 Commanding Officer Deborah Francis.  It looks like
16 she signed off on it on October 3rd, 2019?
17 A.    Yes.
18 Q.    I can't make out that signature below
19 at all, but the next person is October 9th.  Are you
20 familiar with who that signature is?
21 A.    That signature should be Chief
22 Inspector Chris Flacco, F-L-A-C-C-O.
23 Q.    Flacco.  Okay, thank you.  Next on
24 Page 003, this appears to be just an index of the

Page 11

1  documents that are contained in the file along with
2  the report.  Is that a fair characterization?
3  A.    Yes.
4  Q.    All right.  Beginning on Page 004,
5  which we're looking at right now, this is sort of a
6  memorandum form report about this investigation.  Is
7  that correct?
8  A.    Correct.
9  Q.    All right.  Did you prepare the bulk
10 of this report?
11 A.    Yes, I did.
12 Q.    Okay.  Did anybody else do any
13 substantive work on the contents of the report that
14 you're aware of?
15     MR. KANE:  Objection to the form.  You
16 can answer.
17     THE WITNESS:  On this form
18 specifically?
19 BY MR. LEVIN:
20 Q.    Well, that was a poorly asked
21 question.  So let me try to clarify.  I know that
22 there were other officers involved in gathering
23 information, gathering video, witness statements,
24 things of that nature.  Obviously all that stuff was

Deposition of Lt. James Clough                                    Neal Miller and Donna Miller v. City of Philadelphia, et al.

Page 12

1  relied upon in coming up with your report.
2          The actual contents of the memorandum
3  here, to your knowledge, did anybody else write any
4  substantial portion of the memorandum itself?
5      A.   No, they did not.
6      Q.   Okay.  So this is your work product
7  and basically putting it all together into a report
8  form?
9      A.   Yes.
10     Q.   All right.  By the way, before we
11 delve into the contents of this, had you ever been
12 involved in any other investigations for internal
13 affairs which involved Officer Wolk?
14     A.   To my knowledge, no.  I can't say a
15 hundred percent.
16     Q.   Okay.  Were you aware at any point in
17 time that there had been prior investigations
18 concerning Officer Wolk with internal affairs?
19         MR. KANE:  Objection to form.  You can
20 answer.
21         THE WITNESS:  I believe there have
22 been others, yeah, at the time.  Yes.
23 BY MR. LEVIN:
24     Q.   Okay.  Do you have any sense of what

Page 13

1  the subject matter was at any point in time while
2  you were working on this investigation?
3      A.   I don't know, honestly.  I don't
4  remember.
5      Q.   That's fine.  Now let's just sort of
6  go through this.  We'll try and confine ourselves
7  mostly to the memorandum portion of this, but I may
8  have some questions about some of the supporting
9  documents.  Let's just sort of go through this
10 initially.
11         It looks like the first couple of
12 paragraphs sort of provide a back story of how this
13 investigation was commenced.  Is that fair?
14     A.   That's fair, yes.
15     Q.   All right.  You had mentioned earlier
16 that internal affairs was notified of this accident
17 and also was advised of some social media postings
18 indicating that the accident followed a police
19 pursuit?
20     A.   Correct.
21     Q.   Do you have any recollection as to how
22 the social media postings came to the attention of
23 IAD?
24     A.   I do not remember.

Page 14

1      Q.   Okay.  Do you know if the department
2  has anybody monitoring social media like community
3  groups, things of that nature?
4      A.   I don't know.  I don't know the
5  answer.
6      Q.   All right.  So with respect to
7  internal affairs' involvement in this type of
8  matter, is it routine that you investigate all
9  pursuits or was it a question of there was an
10 indication that the policy may have been violated
11 and that's what prompted the investigation?
12         MR. KANE:  Objection to the form.  You
13 can answer.
14         THE WITNESS:  Because of the
15 allegations of the departmental violations is why
16 this investigation commenced.
17 BY MR. LEVIN:
18     Q.   Okay.  My sense from reading this is
19 that until the social media postings, it wasn't
20 recognized that there even had been a pursuit and
21 that raised some questions?
22         MR. KANE:  Objection to form.  You can
23 answer if you can.
24         THE WITNESS:  Ask that one more time.

Page 15

1  BY MR. LEVIN:
2      Q.   Yeah.  Just reading through this, the
3  sense that I got, and correct me if I'm wrong
4  because I'm not trying to put words in anybody's
5  mouth, but from reading through this, it sounds to
6  me that when it was discovered there was a pursuit
7  that preceded this accident and then I guess the
8  department wasn't aware of there having been a
9  pursuit, is that what triggered the investigation?
10         MR. KANE:  Objection to form.  You be
11 answer.
12         THE WITNESS:  That sounds right.
13 Because of the accident and the allegation of a
14 pursuit, yes.
15 BY MR. LEVIN:
16     Q.   Okay.  So there was something more
17 there that hadn't really been known from just the
18 occurrence of the accident itself.
19         When it was discovered from the social
20 media postings that people were saying that there
21 was a pursuit that led up to this, the question then
22 became what's the story with the pursuit, was there
23 one.
24         Is that pretty much the questions that

Page 16

1 prompted the investigation?
2          MR. KANE:  Objection to the form.  You
3 can answer.
4          THE WITNESS:  That's accurate, yes.
5 BY MR. LEVIN:
6     Q.    Okay.  The police department has
7 specific policies pertaining to the conduct of
8 vehicular pursuits.  Right?
9     A.    Yes.
10     Q.    Are you familiar with the substance of
11 those policies as an investigator for internal
12 affairs?
13     A.    Yes, sir.
14     Q.    Okay.  There are basically certain
15 circumstances under which a pursuit can be
16 initiated.  Is that fair?
17     A.    Yes.
18     Q.    Outside those circumstances, they're
19 not permitted?
20     A.    They're pretty specific of when a
21 pursuit's allowed.
22     Q.    Okay.  We'll get to the actual policy
23 because I do have that document to review, but it's
24 my understanding that there has to be some kind of

Page 17

1 imminent threat to public safety or the person had
2 to have committed some type of forcible felony.  I
3 may be paraphrasing there, but is that pretty much
4 the circumstances where a pursuit could be
5 initiated?
6     A.    Yeah, that's fair.
7     Q.    Okay.  For a traffic offense, is a
8 pursuit ever permissible under that particular
9 directive?
10     A.    No.
11     Q.    Okay.  Does the police department
12 policy, or directive more accurately, does it limit
13 the types of vehicles that it can engage in a
14 vehicular pursuit?
15     A.    Yes.
16     Q.    And what are the vehicles that are
17 permitted to engage in a pursuit when warranted?
18     A.    Are you asking what vehicles are?
19     Q.    Yeah.  What kind of vehicles are
20 allowed to engage in pursuits?
21     A.    Marked vehicles, specifically the
22 sedan type of vehicle.
23     Q.    Okay.  So would that be like passenger
24 cars like the Ford Tauruses and so forth versus SUVs

Page 18

1 or vans?
2     A.    Correct.
3     Q.    The same policy also opposes
4 procedural requirements, what you're supposed to do
5 when you initiate a pursuit.  Is that fair?
6     A.    That's fair.
7     Q.    Okay.  What does the policy require in
8 terms of if there's a permissible pursuit that's
9 initiated, what does the officer have to do?
10          MR. KANE:  Objection to form.  Just to
11 be clear, you're asking to the best of his
12 knowledge.  Correct?
13          MR. LEVIN:  Certainly.
14 BY MR. LEVIN:
15     Q.    This is all based on your
16 understanding.  I'm not asking you to provide a
17 legal interpretation.  There's a document that will
18 speak for itself.  Obviously, this frames our
19 conversation, I think.
20     A.    When pursuit is initiated and it's
21 allowed, we look for things such as you have to be
22 operating with lights and sirens, be aware of
23 surroundings, conditions, notify police radio,
24 updating police radio, the radio band you're

Page 19

1 supposed to be on, things such that.  Number of
2 vehicles engaged in the pursuit.
3     Q.    All right.  Afterwards, is there
4 supposed to be a memorandum submitted?
5     A.    Yes.
6     Q.    That's supposed to be done by the
7 pursuing officer?
8     A.    Pursuing officer and if there's any
9 other secondary additional units involved, they're
10 supposed to do one for the monitoring supervisor and
11 add comments, as well.
12     Q.    Okay, fair enough.  So in any event,
13 IAD learns of an accident that happened Tuesday, May
14 7, 2019 shortly before 7:30 at Tacony and Fraley
15 Street, which was a collision between the operator
16 of a motorized scooter and a tractor trailer.
17          The operator of the scooter died as a
18 result of the accident.  IAD then learns that people
19 are saying there had been a pursuit before that and
20 then an investigation is opened to determine the
21 circumstances of whether there was a pursuit and
22 whether there was a violation of policy.  All of
23 that a fair characterization of the beginning of
24 this document?

Page 20

1  A.    Yes.
2  Q.    So you were assigned to head up the
3  investigation?
4  A.    Yes, the investigation was assigned to
5  me.
6  Q.    Okay.  By whom?
7  A.    Well, they're normally by my
8  commanding officer, but I don't recall who my
9  commanding officer was at the time and who assigned
10 it to me.
11 Q.    Okay.  So some other IAD personnel who
12 are referred to on this page as well, the paragraph
13 that begins on Wednesday, 5-8-19.  It looks like IAD
14 personnel went out to the area, recovered various
15 pieces of surveillance video and that showed a
16 marked police SUV pursuing the scooter.  Correct?
17 A.    It says RPC H, for Highway, 14.
18 Q.    Okay.  What is RPC?
19 A.    Radio Patrol Car.
20 Q.    Okay.  So the vehicle is what sort of
21 allowed you to determine who was driving the
22 vehicle.  Correct?
23 A.    The vehicle number, is that what
24 you're saying?

Page 21

1  Q.    Yes.
2  A.    Yes.  Based on the vehicle number,
3  yes, we could determine who was driving.
4  Q.    Okay.  It looks like there was a check
5  of your computerized personnel database.  I'm
6  assuming that Officer Wolk was identified as the
7  operator of that vehicle on that day?
8  A.    Yes.
9  Q.    All right.  So the next section is
10 Investigative Analysis.  It seems from my
11 read-through of this is this is your regurgitation
12 of everything that was done during the course of the
13 investigation and the evidence that was gathered.
14 Is that fair?
15 A.    That's fair.
16 Q.    Okay.  So the first thing that you
17 mention is the date of the incident, a couple of
18 hours later at 11:00 p.m., Officer Wolk went to IAD
19 and provided a witness statement because he was --
20 my understanding is he actually called in the
21 accident, which you may or may not be able to
22 confirm.
23        What follows here is pretty much the
24 summary of what Officer Wolk described to the IAD

Page 22

1  investigator at the time?
2  A.    Yes.
3  Q.    Okay.  He stated there -- first off,
4  when you were preparing this summary, were you
5  trying to summarize pretty much the substance of
6  what Officer Wolk had said or was anything omitted?
7  A.    You broke off at the last part.
8  Anything he said...
9  Q.    Or did you did you omit anything he
10 said?
11       MR. KANE:  Objection to form.  You can
12 answer the question.
13       THE WITNESS:  It was a summary.  So
14 it's not word for word.
15 BY MR. LEVIN:
16 Q.    Certainly, I understand.  But you're
17 trying to convey the substance of what his statement
18 was?
19 A.    Yes.
20 Q.    Okay.  So at the time when he gave his
21 statement, I'm assuming you just reviewed the
22 statement itself.  Correct?
23 A.    To prepare this document and what I'm
24 referring to in the document, yes, it was by that

Page 23

1  statement.
2  Q.    Okay.  So what Officer Wolk told the
3  investigator from IAD is he had seen a motorized
4  scooter traveling northbound on Tacony Street, saw
5  that he didn't have a license plate, so he puts on
6  his lights and sirens and attempts to initiate a
7  traffic stop.  That's all pretty routine up to that
8  point.  Correct?
9        MR. KANE:  Objection to form.
10       THE WITNESS:  Yeah, it seemed like it.
11 BY MR. LEVIN:
12 Q.    Okay.  Then Officer Wolk says the
13 operator of the motorized scooter failed to stop,
14 sped up, and began to travel northbound on Tacony,
15 same direction he had been, but in the southbound
16 lanes of traffic.  Officer Wolk said that he was
17 approaching a blind curve while operating in the
18 wrong lanes of traffic.
19       Are you familiar with the area where
20 this incident occurred?
21 A.    Vaguely familiar.
22 Q.    Okay.  Did anybody to your knowledge
23 go out and confirm that there was actually a blind
24 curve in that location?

Deposition of Lt. James Clough                    Neal Miller and Donna Miller v. City of Philadelphia, et al.

Page 24

1    A.    I mean, I've been out to the scene,
2  I've been out to the area.
3    Q.    Okay.  Do you have a sense from what
4  Officer Wolk said and the substance of what curve in
5  the roadway he's referring to?  I'm aware of two.
6         I guess what I'm asking is was he
7  referring to the roundabout near the Tacony bridge
8  entrance or the smaller curve near the Dietz &
9  Watson plant?
10   A.    I'm not aware of exactly where he was
11 referring to.
12   Q.    Okay.  I guess I'll ask him.  So that
13 point, Officer Wolk speeds past the scooter,
14 actually passes him, in an attempt to get to the
15 curve ahead of them.
16        It states that he feared that the
17 operator of the scooter may have been driving under
18 the influence or possibly suicidal.  He wants to
19 warn southbound traffic of the potential danger
20 ahead.
21        It says, once he passes the scooter,
22 Officer Wolk obverses the scooter's operator make a
23 U-turn and describes catching up to him on the 5400
24 block of James Street where he, once again, attempts

Page 25

1  to initiate a traffic stop.
2         First off, Tacony and James Street are
3  parallel.  Correct?
4    A.    Yes, I believe they are.
5    Q.    Okay.  So you didn't indicate in this
6  IAD statement what street the scooter operator
7  turned onto to reach James Street as far as I can
8  see.  Is that fair?
9    A.    I'd have to look at the document.
10 Again, when I look at my summary...
11   Q.    Sure, sure.  It relates that Officer
12 Wolk drove alongside the scooter on Scattergood
13 Street, instructed the operator to stop, stopped in
14 front of the scooter at Scattergood Street and James
15 where Officer Wolk exits the vehicle, grabs the
16 operator of the scooter by his shirt, but the
17 scooter operator managed to get away.
18        Driver and the police vehicle then
19 flee down Eadom Street and apparently turned onto
20 Fraley Street from there, Police Officer Wolk
21 following, and he subsequently sees the operator of
22 the scooter lying on the highway at Tacony and
23 Fraley, at which point he arrives on the scene and
24 requests medics, calls in the accident essentially.

Page 26

1  Is that correct?
2    A.    Well, you said he said he was
3  following.  I don't see that in that report.
4    Q.    Okay.  It says, Police Officer Wolk
5  turned eastbound onto Fraley Street from Eadom
6  Street and then began to turn onto southbound James
7  Street when he noticed the scooter and the operator
8  lying on the highway of Tacony Street and Fraley
9  Street.
10        Maybe you didn't say he said that he
11 saw the scooter operator turn down Fraley Street,
12 but Officer Wolk turned down Fraley Street and it
13 appears that the operator of the scooter was further
14 down Fraley Street.
15        So from that, does it sound like the
16 scooter operator had traveled down Fraley Street to
17 Tacony where the accident happened?
18   A.    That's what it seemed like to me, yes.
19   Q.    That's pretty much your summary of the
20 substance of Officer Wolk's testimony to IAD.
21 Right?
22   A.    Correct.
23   Q.    IAD also conducted a witness interview
24 with a gentleman named Gary Bove?

Page 27

1    A.    Yes.
2    Q.    Okay.  You had a chance to review the
3  substance of that statement, as well.  Correct?
4    A.    Yes, I did.
5         MR. KANE:  Just to be clear, are you
6  talking about in preparation for the deposition or
7  in his investigation?
8  BY MR. LEVIN:
9    Q.    I'm assuming you certainly reviewed it
10 in connection with the investigation because you had
11 to summarize it for this report.  Right?
12   A.    Right.
13   Q.    Okay.  Did you have a chance to review
14 it before your testimony today?
15   A.    I did look at it, yes.
16   Q.    Okay.  It was a written statement on
17 an IAD form.  Is that fair to say?
18   A.    That's fair.
19   Q.    Okay.  On that, he told Officer
20 Anderson from IAD he wasn't involved the accident,
21 merely witnessed the auto accident, and said that he
22 had been driving his vehicle in the area of
23 Scattergood Street when he noticed the police
24 officer attempting to grab a white male on a bike by

Page 28

1  pulling him.  He saw the white male pulling away,
2  taking off on the bike.  Mr. Bove stated he
3  basically followed him down Eadom Street and then
4  down onto Fraley Street.
5       Did you ever have the opportunity to
6  speak to Mr. Bove yourself in connection with your
7  investigation?
8       A.  I did not.
9       Q.  Okay.  You had made the attempt
10 several times to connect with him.  Hadn't you?
11      A.  Yes, I did.
12      Q.  Did he just fail to respond to your
13 inquiries?
14      A.  Correct.  He failed to respond.
15      Q.  Is there any type of potential
16 consequence for the failure to respond in connection
17 with an investigation such as this?
18      A.  No.
19      Q.  Now there was also some video that was
20 recovered from various sources that showed Mr. Bove
21 sort of pretty engaged in this pursuit, as well.  Is
22 that fair to say?
23      MR. KANE:  Objection to form.  You can
24 answer.

Page 29

1       THE WITNESS:  I'm just not
2  sure,engaged, what your interpretation is.
3  BY MR. LEVIN:
4       Q.  I'm not trying to make it a loaded
5  question.  There's a portion of video and we'll show
6  it to you in a little bit, but I'm assuming you've
7  pretty much reviewed the video while you were doing
8  the investigation and the report.  Correct?
9       A.  Correct.
10      Q.  There was some video that showed the
11 Bove vehicle sort of traveling along with the other
12 vehicles that were involved in this pursuit.
13 Correct?
14      A.  Correct.
15      Q.  Okay.  In fact, at one point after
16 this incident on Scattergood Street, it's actually
17 the Bove vehicle that's ahead of Officer Wolk's
18 vehicle following the scooter.  Isn't it?
19      A.  Yes.
20      Q.  Ultimately, later on in your
21 investigation you came to find out that Mr. Bove
22 knew Officer Wolk or vice-versa.  Correct?
23      A.  Yes.
24      Q.  So going down further, it looks like

Page 30

1  you have a summary of what the IAD statement was
2  from the driver of the truck the scooter driver
3  collided with.  I'm not going to ask you too much
4  about that because he realized there was a collision
5  and stopped, more or less.
6       Then there's on Page 0006 a summary of
7  an IAD interview with Jennifer Scheffield who
8  witnessed part of what was going on.  You reviewed
9  that statement, as well?
10      A.  Yes, I did.
11      Q.  All right.  She had told the
12 investigator from IAD that she was outside Fibber
13 McGee's Bar, which is at Bridge and Eadom, I
14 believe?
15      MR. KANE:  Only if you know.
16      THE WITNESS:  Honestly, I don't know.
17 I'm not sure of the location of it.
18 BY MR. LEVIN:
19      Q.  Okay, fair enough.  It says it's
20 located at Bridge Street right before Tacony.  She
21 said she saw the kid on the dirt bike run into the
22 rear of the patrol car and then take off.  The
23 officer got out of his car and tried to grab the kid
24 on the dirt bike.

Page 31

1       Officer then got back into his car
2  when the kid took off.  Police chased him and Ms.
3  Scheffield saw another car, light blue four-door
4  car, follow behind the officer's vehicle.  She
5  stated the officer's emergency lights and sirens
6  were not on or operating.
7       Now having sort of reviewed the
8  various statements and you've also seen video, does
9  it sound to you that this person is describing the
10 portion of the pursuit where Officer Wolk cut off
11 the scooter operator at Scattergood and Eadom, tried
12 to get out, and grab him by the shirt?
13      MR. KANE:  Objection to form.  You can
14 answer.
15      THE WITNESS:  Yeah, I believe that's
16 the part where she is describing.
17 BY MR. LEVIN:
18      Q.  Okay.  She's sort of describing it as
19 the dirt bike runs into the rear of the patrol car,
20 but that's just sort of her characterization.
21 You've seen the video of that portion of the
22 pursuit.  Right?
23      A.  I've seen it, yes.
24      Q.  Okay.  So we can agree that at one

Page 32

1 point during the pursuit, Officer Wolk manages to
2 sort of get out in front of the scooter, gets out of
3 his vehicle, and attempts to physically grab the
4 kid.  Right?
5      A.    From the video, that's what it looks
6 like, yes.
7      Q.    Okay.  I think that's later confirmed
8 by Officer Wolk.  The kid manages to get away and
9 then both Officer Wolk and the vehicle driven by
10 Mr. Bove follow along.  Is that fair?
11      A.    Well, it's Mr. Bove first, then the
12 officer.
13      Q.    Yes.  She appears to have that
14 backwards.  Would you agree?
15      A.    Yes.
16      Q.    Okay.  She had also been at the bar.
17 Right?
18      A.    That's where she was interviewed.
19      Q.    There you go.  Do you know if there
20 was ever any subsequent attempt to interview her?
21      A.    I don't believe so, no.
22      Q.    Okay.
23      A.    Not by me.
24      Q.    All right.  Then we have a summary of,

Page 33

1 again, another witness, Robert Mattos.  He was
2 interviewed by you.  Is that correct?
3      A.    Correct.
4      Q.    All right.  Could you describe what he
5 told you?
6           MR. KANE:  Objection to form.  You can
7 answer.
8           THE WITNESS:  When I interviewed him,
9 he told me he was outside working on his vehicle and
10 he said that he saw at one point I believe the
11 police SUV go by and the scooter -- the scooter and
12 then the SUV go by and then they had -- the scooter
13 went through the parking lot I think of a storage
14 place or something.
15           Then a couple minutes later, I think
16 he said he heard engines and then he heard the
17 scooter and saw it go by.  Then he saw the silver
18 car go by following the scooter.
19           Then he made his own conclusion I
20 guess that he believed that the silver car was
21 chasing the scooter.  He even made his own
22 conclusion that he believed that the police SUV had
23 backed off and let the silver car take over and
24 engage in the pursuit.

Page 34

1           As they went by his house, he
2 described the distance of how far the silver car was
3 from the scooter and then how far the police vehicle
4 was behind the silver car.
5      Q.    It looks like he also indicated that
6 the police vehicle, Officer Wolk's vehicle, didn't
7 have emergency lights activated nor a siren on?
8      A.    Correct.
9      Q.    That's also corroborated by Ms.
10 Scheffield outside the bar and also by video.
11 Correct?
12      A.    Correct.
13           MR. KANE:  Objection to form.
14 BY MR. LEVIN:
15      Q.    All right.  Now we've already sort of
16 discussed the basics of Officer Wolk's statement to
17 IAD.  He subsequently talks to you and this is like
18 months later at internal affairs.  Is that correct?
19      A.    Yes.  Can I add one thing to the last
20 thing you summarized?
21      Q.    Yes.
22      A.    The video, the video didn't have any
23 audio.  So I can't say for sure whether or not the
24 video corroborated the use of sirens or air horn.

Page 35

1      Q.    Okay.  You can only tell about the
2 lights from the video.  Correct?
3      A.    Correct.
4      Q.    All right.  That's a fair point to
5 make.  I'm unaware of any -- I've seen some video,
6 certainly not everything that was gathered.  I would
7 agree, for the record, that none of what I saw had
8 any audio attached to it.
9           Nonetheless, the video does appear to
10 confirm that emergency lights were not activated on
11 the police SUV.  Right?
12      A.    At various points during the videos
13 that we have, the lights are not on.  At some
14 points, they are on.
15      Q.    Okay.  My recollection is that the
16 lights were on right at the beginning I guess when
17 Officer Wolk was trying to make this traffic stop.
18 Is that fair?
19      A.    I would assume that's -- I would agree
20 with you there, yes.
21           MR. KANE:  Objection to form.
22 BY MR. LEVIN:
23      Q.    Okay.  Just so we're clear, it's even
24 mentioned here right before you get into Officer

Case 2:20-cv-06301-MMB   Document 68-3   Filed 02/16/24   Page 12 of 39

Deposition of Lt. James Clough      Neal Miller and Donna Miller v. City of Philadelphia, et al.

Page 36

1 Wolk's statement that you have a narrative
2 description of what the various videos show included
3 in the report itself.  Correct?
4      A.  Correct.
5      Q.  All right.  So in any event, you
6 personally get a chance to interview Police Officer
7 Wolk on September 4th at internal affairs.  First
8 off, was he accompanied by counsel?
9      A.  Yes, he had counsel.
10      Q.  Okay.  Do you know who that person
11 was?
12      A.  It's been a few years.  I don't
13 remember.
14      Q.  Okay.  I think it's actually indicated
15 on the statement that was transcribed.  He tells you
16 he was working solo, basically an evening shift, six
17 p.m. to two a.m. that night.  Right?
18      A.  Correct.
19      Q.  So he's fairly close, an hour, an hour
20 and a half into his shift when this happens.  What
21 did he relate to you about what happened in this
22 incident?
23      A.  I mean, from my memory?
24      Q.  You can refer to the report.  You

Page 37

1 don't have to talk about the pre-patrol inspection.
2 You can start from the part where he's in the area
3 of Tacony Street and Bridge Street.
4      MR. KANE:  Objection to form.  Only to
5 the extent that what we're looking at is a summary
6 and the full interview was 17.  Just a little bit of
7 an issue here.
8      MR. LEVIN:  Okay.
9 BY MR. LEVIN:
10      Q.  Obviously, we'll get to the statement
11 itself later on and authenticate that for the
12 record.  Could you go through what your summary
13 states that he said?
14      A.  He told me he was near the Tacony
15 bridge on 5-7-19, approximately 7:25.  He observed
16 the scooter, no tag, traveling westbound on Bridge
17 and went up at Tacony.  He attempted to initiate an
18 investigation.  He said he activated lights and
19 sirens.  Disregarded the signal, which would be the
20 indications to stop.  Refused.  A few seconds
21 traveling northbound on Tacony in the left lane.
22 The scooter entered the southbound lanes of Tacony,
23 still traveling northbound against the flow of
24 traffic.

Page 38

1      He continued northbound in the
2 southbound lanes past Fraley and approached a blind
3 turn.  He recognized the danger to the southbound
4 motorists who may not have seen the scooter.  He
5 drove past the scooter in an attempt to warn the
6 southbound motorists and then he added what we
7 talked about earlier, the scooter may have been
8 either intoxicated or suicidal.
9      Q.  Okay.  Let me stop you there and just
10 ask you a couple of questions.  First off, did he
11 offer you any sense of why or what his basis for
12 believing the person was either intoxicated or
13 suicidal was?
14      A.  No, he did not.
15      Q.  Now at the point when he tries to pull
16 the person over and it's really just a traffic
17 offense pretty much.  Correct?
18      A.  That's what it appears, a traffic
19 offense.  I mean, maybe he thinks it's a stolen
20 vehicle.
21      Q.  Okay.  So he tries to initiate a
22 traffic stop.  I think we can agree that he doesn't
23 at that point have any reason to believe that this
24 is a violent felon or he had just committed a

Page 39

1 forcible felony, the circumstances that clearly
2 justify a pursuit under the applicable directive.
3 When the person starts to flee, what should he have
4 done at that point in time?
5      MR. KANE:  Objection to form.  You can
6 answer.
7      THE WITNESS:  Absent those
8 circumstances we spoke about earlier, then he should
9 have disregarded and disengaged any further actions.
10 BY MR. LEVIN:
11      Q.  Okay.  Would it be reasonable to call
12 it into the radio to say that this happened.
13 Wouldn't it?
14      MR. KANE:  Objection to form.  You can
15 answer.
16      THE WITNESS:  Yes.
17 BY MR. LEVIN:
18      Q.  Okay.  But the actual initiation of a
19 pursuit, not proper under the directive.  Correct?
20      MR. KANE:  Same objection.
21      THE WITNESS:  Correct.
22 BY MR. LEVIN:
23      Q.  At least not under the facts as we
24 know them from this.  Correct?

Page 40

1    A.    Correct.

2    Q.    All right.  So in any event, then it

3 seems he tells you that as he approaches the blind

4 curve ahead of the motor scooter, he sees the motor

5 scooter makes a U-turn and now heading southbound on

6 Tacony, which would take him back toward Bridge

7 Street.  Right?

8    A.    Yes.

9    Q.    Wolk then makes a U-turn, attempts to

10 stop the motor scooter once again.  It doesn't seem

11 -- at least on this it's not clear where that

12 occurs.  Right?

13    A.    That's correct.

14    Q.    All right.  He then relates the motor

15 scooter turned onto Fraley Street from Tacony Street

16 and then southbound onto James Street.

17         So here he seems to indicate Fraley

18 was how the scooter driver gets to James from Tacony

19 where we didn't have that information on the initial

20 AID report.  Remember?

21    A.    Right.

22    Q.    Now Officer Wolk utilizes the

23 vehicle's air horn.  Again, we don't have anybody to

24 support or deny that.  Right?

Page 41

1         MR. KANE:  Objection to form.

2         THE WITNESS:  Correct.

3 BY MR. LEVIN:

4    Q.    It says, in an attempt to get the

5 motor scooter to stop.  The motor scooter again

6 disregards the signal, turns onto a small street

7 possibly Simon Street, turns onto southbound Eadom

8 through a parking lot and doubles back traveling

9 northbound on Eadom Street, at which point Officer

10 Wolk briefly lost sight of the motor scooter,

11 follows it down a small street onto southbound

12 James.  He says he continues to blow the air horn in

13 an attempt to get the motor scooter to stop.

14 Instead it continues on James, turns west onto

15 Scattergood Street.

16         Now it seems to me if we go back to

17 the earlier statement that Officer Wolk gave to IAD,

18 it sounds like we have some additional detail in

19 this description that he gave to you that wasn't

20 there.  Is that fair to say?

21         MR. KANE:  Objection to form.  You can

22 answer.

23         THE WITNESS:  Yes.

24 BY MR. LEVIN:

Page 42

1    Q.    The whole part where he goes from

2 southbound Eadom through a parking lot, doubles

3 back, none of that appeared in his earlier statement

4 to IAD?

5    A.    Correct.

6    Q.    All right.  Did you review any video

7 that showed that portion of what I'm going to call a

8 pursuit?

9    A.    I do believe that there's some video

10 of that.

11    Q.    Do you recall seeing during that

12 sequence of events Officer Wolk actually gets

13 alongside or slightly ahead of the scooter and makes

14 a sharp right to try and get ahead of the scooter?

15         MR. KANE:  Objection to form.  You can

16 answer.

17         THE WITNESS:  Yeah, there is part of

18 the video where he tries.  I don't remember if it

19 was right or left.

20 BY MR. LEVIN:

21    Q.    Okay.  We'll get to some screen grabs

22 from that in a little bit.  Based on your review of

23 that video when Officer Wolk is next to this person

24 on a motor scooter and turns sharply, does that

Page 43

1 involve a risk that he might collide with that motor

2 scooter or vice-versa?

3         MR. KANE:  Objection to form.

4 Speculation.  You can answer if you can.

5         THE WITNESS:  I can't comment on that

6 specific question like that.

7 BY MR. LEVIN:

8    Q.    Let me ask you this: in terms of sort

9 of police policy or procedure, are police officers

10 trained at all on whether they should or should not

11 attempt to use a vehicle against somebody who is on

12 a two-wheeled vehicle like a motorcycle, a motor

13 bike?

14    A.    Right.  You're not allowed -- well,

15 we're not allowed to strike any vehicles.

16    Q.    Well, the reason I ask that is I know

17 there's something called the precision intervention

18 technique or maneuver that is sometimes used by

19 police officers.  Right?

20    A.    Not in Philadelphia.

21    Q.    Not in Philadelphia, you don't do it?

22    A.    No.

23    Q.    Okay.  You're familiar with what that

24 is, though.  Correct?

Page 44

1   A.   Yes, I am.

2   Q.   Okay.  That's basically a situation

3   where you would come up behind a car and sort of get

4   it from the corner and it makes the driver lose

5   control and it forces the car to stop.

6         I know you say Philadelphia, it's

7   prohibited for use, but that's the general sense of

8   what it's supposed to do.  It's supposed to be able

9   to get the fleeing vehicle to stop.  Right?

10   A.   I guess, generally.  Generally, yes.

11   Q.   Okay.  Now that's something that you

12   would do against a passenger car or something of the

13   like.  Right?  You wouldn't try that against a

14   two-wheeled vehicle because it's a whole different

15   degree of risk.  Isn't that fair to say?

16         MR. KANE:  Objection to form.

17         THE WITNESS:  I would agree with that,

18   yes.

19   BY MR. LEVIN:

20   Q.   Okay.  Moving onto the next page.

21   Here's where Officer Wolk is describing what happens

22   on Scattergood Street when he gets out ahead of the

23   motor scooter.  He told you he pulled alongside the

24   motor scooter on Scattergood Street, told the

Page 45

1   operator stop before he gets himself hurt.  The

2   irony is not lost on me.

3         The operator stops the motor scooter

4   and Police Officer Wolk pulled in front of the motor

5   scooter, exits his vehicle, approached the operator

6   at the rear of the police vehicle.  And as Police

7   Officer Wolk approached, the motorcyclist began to

8   push his motor scooter backwards.  He grabs him by

9   the shirt and the motorcyclist was able to

10   accelerate the motor scooter and get away by turning

11   northbound on Eadom.

12         Now that sounds like it was pretty

13   much consistent with what he had told IAD earlier, I

14   believe.  Fair to say?

15         MR. KANE:  Objection to form.

16         THE WITNESS:  That's fair.

17   BY MR. LEVIN:

18   Q.   Okay.  However, he then goes on to add

19   some detail, which he didn't provide earlier.

20   Right?  He starts talking about he sees this person,

21   Gary, who he knows in the alley on Scattergood

22   Street?

23   A.   Yeah.  Yes.

24   Q.   Now by the time that you sat down with

Page 46

1   Officer Wolk to take this statement, had you already

2   obtained video that showed this segment of the

3   pursuit?

4         MR. KANE:  Objection to form.  You can

5   answer.

6         THE WITNESS:  Yes, I have.

7   BY MR. LEVIN:

8   Q.   Okay.  It's a pretty clear video, I

9   believe, from across the street that shows the

10   sequence of events.  Right?

11   A.   Yes.

12   Q.   So by this time, you've been able to

13   confirm for yourself that there's this other vehicle

14   that sort of pulls to the side and let's this all

15   take place and then pulls out after the motor

16   scooter before Officer Wolk can get back into his

17   car.  Correct?

18         MR. KANE:  Objection to form.  You can

19   answer.

20         THE WITNESS:  Yes, that's what it

21   looks like.

22   BY MR. LEVIN:

23   Q.   All right.  So when he initially gave

24   his statement to IAD, Officer Wolk made no mention

Page 47

1   of seeing this other individual or his vehicle

2   whatsoever.  Did he?

3         MR. KANE:  Objection to form.  You can

4   answer.

5         THE WITNESS:  I didn't see it in the

6   statement, no.

7   BY MR. LEVIN:

8   Q.   Okay.  He certainly didn't indicate

9   that this was a person who he knew.  Right?

10         MR. KANE:  Same objection.  You can

11   answer.

12         THE WITNESS:  Well, if he never said

13   it, yeah.

14   BY MR. LEVIN:

15   Q.   It follows, right, yes.  So that's new

16   information that he hadn't previously provided.

17   Right?

18         MR. KANE:  Objection to form.

19         THE WITNESS:  Correct.

20   BY MR. LEVIN:

21   Q.   It's now four months after the fact of

22   this incident and that's the first time that as far

23   as we can see anything of that nature came out of

24   Officer Wolk's mouth to anybody in the department?

Page 48

MR. KANE:  Objection to form.  You can answer.

THE WITNESS:  I can't say to anybody. We're talking IAD and me.  I can't talk about everyone else.

BY MR. LEVIN:

Q.    Well, obviously, we can only talk about what we know about.  It's just you and IAD and this is information that was not supplied earlier. Right?

A.    Correct.

Q.    Okay.

MR. KANE:  Same objection.

BY MR. LEVIN:

Q.    Now when you're sitting down with Officer Wolk having already seen the video, so you knew what had happened with this other vehicle and everything, were you surprised when he indicated that he knew this person?

MR. KANE:  Objection.  You can answer.

THE WITNESS:  I don't remember what reaction I had.

BY MR. LEVIN:

Q.    Did it raise any questions in your

Page 49

mind?

A.    I asked some questions about it, yes. I wanted to investigate it.

Q.    We'll get to the statement.  So if you don't recall while we're sitting here now, we'll get to it shortly.

You asked if there was any contact between the two of them while this was going on. Didn't you?

A.    Yes, I did.

Q.    And he denied that.  Right?

A.    Correct.

Q.    Was anything further done to look into that, whether or not there had been any communication?

A.    He denied it to me and I also attempted to interview Mr. Bove, but he failed to cooperate.

Q.    So in any event, he then relates the rest of it that after Gary takes off after the motor scooter, he's following behind on Eadom.  Officer Wolk reaches Fraley Street, goes eastbound toward Tacony.

At one point, he actually began to

Page 50

turn south onto James Street.  As he was doing that, he saw the accident already occurring.  So he goes further down to the intersection and calls in the accident.  All that is pretty much consistent with what he had previously told IAD.  Right?

MR. KANE:  Objection.  You can answer.

THE WITNESS:  I believe so, yes.

BY MR. LEVIN:

Q.    Okay.  So based on just the witness statements and everything that you had reviewed to date, did it appear to you that there had been some violation of departmental policy?

A.    Yes.

Q.    Ultimately, it was determined that Officer Wolk had committed -- well, let me rephrase that.  It was ultimately determined that he had violated Directive 9.4 in several respects.  Right?

A.    Correct.

Q.    Okay.  Could you sort of run down for me the specific ways in which he violated the applicable directive?

A.    Off the top of my head, the reason for the pursuit, the failure to notify police radio, the failure to utilize the equipment, the emergency

Page 51

equipment, which would be the siren and overhead lights, and the reporting of the pursuit.

Q.    Okay.  The vehicle he was in, it was an SUV.  Right?  That's not supposed to be one of the vehicles that engages?

A.    Correct.

Q.    Okay.  Going down to the portion of this that begins on Page 10.  This basically goes down the various manners in which the directive was violated.  Right?

A.    Correct.

Q.    Okay.  Now towards the end of this, it's actually, signed the conclusion portion, by Deborah Francis who I understand is the commanding officer at IAD.  Is that correct?  Do I have that right?

A.    At the time, she was commanding officer of internal affairs.  She's currently chief inspector now.

Q.    Okay.  Now I guess my question is because I see up until that point, I saw pretty much your work product.  We've already discussed that. You've signed off on it.  It's approved by Danielle Vales who is the captain at IAD.  Then you have the

Page 52

1  conclusion section, which is a page and a half, and
2  Deborah Francis signs off on it.
3        Was the conclusion section authored by
4  you and then edited by her or it has to be finalized
5  by her?  How come it's her name as opposed to yours
6  on that section?
7     A.    The conclusion is ultimately the
8  responsibility of the commanding officer of internal
9  affairs, the inspector or staff inspector.
10        As far as the conclusion itself, it's
11  mostly authored by me, but it's her document in the
12  end.  So she or any of the inspectors, the
13  commanding officers, can make whatever changes they
14  wish and however they want.
15     Q.    Okay, very good.  I'm going to go
16  through some stuff.  Bear with me because a lot of
17  this stuff we can skip past.
18        Beginning on Page 14, we're just going
19  to go through this.  You'd already discussed what
20  Mr. Mattos related to you in summary, but would I be
21  correct this is the transcript of your recorded
22  interview with him?
23     A.    Yes, that is.
24     Q.    Okay.  You actually did the recording

Page 53

1  and you interviewed the witness.  Right?
2     A.    Correct.
3     Q.    He told you his story about seeing the
4  vehicles proceeding down the street and so forth.
5  Now beginning on Page 17, this is your interview
6  with Officer Wolk.  Correct?
7     A.    Correct.
8     Q.    Also recorded and this is just a
9  straight transcription?
10     A.    Yes.
11     Q.    All right.  It looks like the witness
12  who actually signed on this Danielle Nitti, Esquire.
13  I'm assuming that was Officer Wolk's attorney?
14     A.    Yes.
15     Q.    So he had the right to counsel and
16  counsel was present when he spoke to you.  Right?
17     A.    Correct.
18     Q.    Now on Page 20, this is the discussion
19  that we just talked about a few minutes ago when you
20  were asking him about Gary Bove who was the operator
21  of the other vehicle that is seen at least following
22  after the scooter that various points.
23        Now Officer Wolk told you that he's a
24  local tow truck operator he's known for a number of

Page 54

1  years and he denies he had any kind of communication
2  with Bove during the course of this.  Right?  Well,
3  hold on.  You specifically asked him, this is what I
4  wanted to get to, did you request any help from or
5  the assistance of Gary Bove in stopping the
6  motorcycle or the motor scooter and he told you no.
7        At the time, did you have any
8  questions about whether Officer Wolk was being
9  honest with you on that score?
10     A.    Say that again.
11     Q.    When Officer Wolk denied any type of
12  communication or coordination with Gary Bove, did
13  you have any questions based on his demeanor about
14  whether he was being forthcoming with you?
15        MR. KANE:  Objection to form.  You can
16  answer.
17        THE WITNESS:  I had no reason to not
18  believe him.
19  BY MR. LEVIN:
20     Q.    Okay.  Fairly odd circumstance,
21  though.  Wouldn't you agree?
22        MR. KANE:  Objection to form.  You can
23  answer.
24        THE WITNESS:  I mean, it can look odd,

Page 55

1  yes.
2  BY MR. LEVIN:
3     Q.    I mean, it's not typical for a
4  civilian who happens to know the pursuing officer to
5  insert himself into the middle of the action.  Is
6  it?
7        MR. KANE:  Objection to form.
8        THE WITNESS:  You asked typical?
9  BY MR. LEVIN:
10     Q.    Yes.  Is that something you run into a
11  lot, civilian just sort of joining in with the
12  police?
13        MR. KANE:  Same objection.  You can
14  answer.
15        THE WITNESS:  It's nothing that you
16  see a lot, no.
17  BY MR. LEVIN:
18     Q.    But, again, even though you tried,
19  Mr. Bove never responded to your inquiries to sort
20  of probe at that further.  Right?
21     A.    Correct.
22     Q.    Let me skip to the videos.  Bear with
23  me for a moment.  This is a portion of the package
24  beginning on Page 57, which is headed Video

Page 56

1  Timeline.
2         It appears to be a narrative
3  description of the various videos that were
4  recovered and showing portions of this.  Do you know
5  who prepared the timeline?
6     A.   I did.
7     Q.   Okay.  So this is you making notes of
8  what happens when after looking at all the various
9  pieces of video.  Right?
10    A.   Correct.
11    Q.   Okay.  Did you review any of that
12 video in preparation for your testimony today?
13    A.   Yes.
14    Q.   Okay.  Can you tell me which videos
15 you reviewed or was it all of them?
16    A.   No, I looked at the one from the
17 arsenal complex looking westbound.  I looked at the
18 video in front of I think it was 5343 Eadom.  I
19 think that was one of the addresses I obtained video
20 from.
21    Q.   This one?
22    A.   This one, yes.
23    Q.   Just so that we're all on the same
24 page, that's on Page 58.  There's a residential

Page 57

1  camera listed at 5343 Eadom.  That's one that you
2  reviewed.  Right?
3     A.   Yes.
4     Q.   Okay.  This is the one I wanted to ask
5  you about.  Did you happen to review this one, at
6  the bottom of Page 57, there's -- I believe it's one
7  of multiple cameras at one commercial location,
8  which may be the storage place that we've talked
9  about.  I'm not sure.
10         It's listed as Camera 5, which I guess
11 it probably shows on the screen as Camera 5.  Is
12 that your recollection?
13    A.   I, honestly, don't remember.
14    Q.   All right.  Do you know if this is one
15 that you looked at in preparation for your
16 testimony?
17    A.   I don't think I looked at that one.
18 There's some that I -- that the video player changed
19 and I couldn't get them opened.
20    Q.   Okay.  I just want to go through sort
21 of what this shows.  We don't need to be too
22 concerned with the time.
23         The first thing relative to this chase
24 that's shown is scooter observed southbound on 5400

Page 58

1  Eadom, which would be heading towards Bridge Street,
2  with the police SUV traveling on his left side
3  alongside the scooter.  Two seconds later, it shows
4  the police SUV veering right forcing the scooter
5  into the parking lot.
6         We started to touch on this a little
7  bit, the maneuver of he's alongside the scooter,
8  veers right.  That involves some risk of contacting
9  the scooter.  Correct?
10        MR. KANE:  Objection to form.
11        THE WITNESS:  I guess any driving
12 behind, next to, runs the risk of contacting the
13 scooter.
14 BY MR. LEVIN:
15    Q.   Okay.
16    A.   Or any vehicle that you're following,
17 chasing, driving next to.  There's always a risk.
18    Q.   Right.  But when you're driving in the
19 vicinity of a two-wheeled vehicle, there's some
20 additional risks to that rider from contact with
21 another vehicle as opposed to if a person is inside
22 of a passenger vehicle or some other four-wheeled
23 vehicle.  Correct?
24        MR. KANE:  Objection to form.  You can

Page 59

1  answer, if you know.
2         THE WITNESS:  I would say there's
3  always a risk.
4  BY MR. LEVIN:
5     Q.   Okay.  Well, motorcyclists and scooter
6  riders are a little bit more vulnerable than
7  passengers in cars and SUVs.  Isn't that fair to
8  say?
9         MR. KANE:  Same objection.
10        THE WITNESS:  They're more vulnerable
11 in what way?
12 BY MR. LEVIN:
13    Q.   To serious injury in the event of a
14 collision with another vehicle.
15        MR. KANE:  Same objection.  You can
16 answer.
17        THE WITNESS:  There's a lot of
18 variables I guess you would have to consider with a
19 collision.  So, you know, are you comparing apples
20 to apples?  You know, that's a -- I can't really
21 answer.
22 BY MR. LEVIN:
23    Q.   Well, I mean, as I'm driving to work,
24 I rarely find myself next to a scooter and suddenly

Page 60

1  veering right to force that person into another lane
2  of travel or an adjacent property, but that's
3  depicted in this video.  Correct?
4       MR. KANE:  Objection to form.  You can
5  answer.
6       THE WITNESS:  Pretty much, yes.
7  BY MR. LEVIN:
8    Q.    Okay.  So you have an individual in an
9  SUV alongside an individual on a scooter who then
10 sharply turns right and the rider of the scooter has
11 to sharply turn right to avoid contact with the SUV
12 at that point.  Right?
13   A.    Correct.
14   Q.    It even says, "he veers right forcing
15 the scooter into the parking lot."  If he did not
16 make the evasive maneuver, he could have contacted
17 the SUV and there could have been a serious injury.
18 Correct?
19       MR. KANE:  Objection to form.
20 Speculation, but you can answer if you can.
21       THE WITNESS:  I can't answer that.  I
22 don't know.
23 BY MR. LEVIN:
24   Q.    Let me do this, I'm going to show you

Page 61

1  screen grabs from that particular video.  We will
2  mark these as Plaintiff's Exhibit 2.  I apologize
3  for the resolution.  It's a security camera.
4       This is trying to detail a portion of
5  the screen.  However, I'll represent to you I think
6  this roughly lines up with what you have listed as
7  sort of the first event in the sequence, the SUV on
8  the left side of the scooter alongside of him.  Does
9  that seem accurate?
10   A.    Yes.
11   Q.    Okay.  These are just sequences a
12 couple of frames apart.  In the next screenshot, it
13 looks like the police SUV is maybe getting a little
14 bit ahead of the scooter.  Do you see what I'm
15 referring to?
16   A.    Yes.
17   Q.    On this third page of the next shot,
18 you can see it appears that maybe this is the part
19 where the SUV is starting to veer over to its right
20 and it looks like maybe there is a break light lit
21 up on the back of the scooter.  Is that fair?
22   A.    That looks accurate.
23   Q.    Now in the next frame, this is hard to
24 see.  It seems we now see the SUV a little bit more

Page 62

1  oriented towards the right and it looks like perhaps
2  the scooter rider maybe has a leg out on the
3  right-hand side?
4       MR. KANE:  Objection.  You can answer
5  if you can.
6       THE WITNESS:  That's hard to
7  determine.
8  BY MR. LEVIN:
9    Q.    Okay, fair enough.  Now next, the
10 fifth screen grab, I think it looks a little bit
11 more pronounced where you can now see the right rear
12 direction of the SUV and it looks like the motor
13 scooter rider is leaning off to the right and
14 perhaps has his leg out.  Is that more clear from
15 there?
16       MR. KANE:  Same objection.  You can
17 answer if you can.
18       THE WITNESS:  That's so blurry.  I
19 can't quite tell.
20 BY MR. LEVIN:
21   Q.    Okay.  Can you tell from the sixth
22 image here if we're seeing what I just described?
23       MR. KANE:  Same objection.
24       THE WITNESS:  That's very blurry.

Page 63

1  It's hard to make out.
2  BY MR. LEVIN:
3    Q.    Okay.  Can you make out the right rear
4  of the motor scooter?
5       MR. KANE:  Same objection.
6       THE WITNESS:  It's too blurry for me
7  to really tell.
8  BY MR. LEVIN:
9    Q.    Okay.  Does the SUV appear oriented
10 more towards the right, like it's turning right?
11   A.    It does.
12   Q.    When you looked at the video, you
13 characterized this as it veers over to the right
14 forcing the motor scooter into the parking lot.
15 Correct?
16   A.    Correct.
17   Q.    We can see the parking lot there on
18 the right-hand side of this image?
19   A.    Correct.
20   Q.    This is very, very blurry because,
21 again, it's moving and has low resolution, but this
22 also shows -- the seventh page of this shows the SUV
23 turning towards the right.  Correct?
24       MR. KANE:  Objection to form.

Case 2:20-cv-06301-MMB   Document 68-3   Filed 02/16/24   Page 19 of 39

Deposition of Lt. James Clough                    Neal Miller and Donna Miller v. City of Philadelphia, et al.

Page 64

THE WITNESS: I mean, it appears off
to the right.
BY MR. LEVIN:
Q.   Okay. Finally, this page, Page 8,
we're not even able to see the scooter in this frame
from what I can see, but you can see the SUV turning
more towards the right?
A.   It appears that way, correct.
Q.   Okay. There seems to be a tree in the
foreground that's blocking part of the image. Is
that fair to say?
A.   Yes.
Q.   On Page 9 of this sequence, it appears
here that the SUV is now turning into the parking
lot and I think that we can see the motor scooter
popping out sort of behind some of the parked cars
on the right-hand side of the image. Do you see
what I'm referring to?
A.   I see the police car. It looks like
it's on the sidewalk or on the parking lot apron. I
can't make out the scooter.
Q.   Okay, fair enough. We don't need to
get any further into that.
     Do those screen grabs appear to be

Page 65

from the same video that we were talking about that
was looking down the 5400 block of Eadom that you
have summarized here?
A.   It appears so, yes.
Q.   Okay. Now at some point, the two
vehicles -- excuse me, the police vehicle and the
motor scooter were both photographed. Would that
have been done by the accident investigation
division?
A.   I photographed the police vehicle.
Q.   You did, okay.
A.   Yes. I did go and photograph the
police vehicle.
     MR. KANE: They were the pictures that
were in the packet, Michael.
     MR. LEVIN: Yes, that's what I'm
getting to.
BY MR. LEVIN:
Q.   Okay. So I'm just going to run
through a series of them and ask if these are the
photographs you took.
     Beginning on Page 109, which is where
we are now, there's a series of photos. This is the
vehicle that Officer Wolk was driving. Correct?

Page 66

A.   H 14, yes. They do look like they're
the photos I took.
Q.   Okay, great. I know that the report
ultimately concludes that there was no sign of the
actual collision between the motor scooter and
Officer Wolk's vehicle.
     I did have one question. In this
image, which is on Page 110 of the defense document
production, there appears to be like a scrape or a
scuff mark on like the right rear quarter panel of
the SUV.
     Do you know if that may have been
caused by the sequence that we just saw with the SUV
turning and forcing the motor scooter into the
parking lot?
     MR. KANE: Objection to form.
     THE WITNESS: I have no idea where
that came from.
BY MR. LEVIN:
Q.   Was that something that you considered
or it wasn't even something you really thought
about?
A.   Honestly, I don't remember even seeing
any scratches, dents, smudges, smears anything on

Page 67

that police car.
Q.   Okay. Did you see what I was
referring to just then, though?
A.   I saw that in the photograph, yes.
Q.   Okay. But you can't say as we sit
here that you have an opinion on where or what it's
from. Right?
A.   Correct.
Q.   Do you know if that vehicle is still
in service?
A.   I'm sorry?
Q.   Do you know if that vehicle is still
in service?
A.   I have no knowledge of that.
Q.   All right. Fair enough. Now going
back to the memo. Ultimately, in the conclusion
portion, we've discussed that various violations of
Directive 9.4 were found.
     The last closing sentence in the
report indicates that it's to be sent to the
commanding officer for the Police Board of Inquiry
for necessary action, which I understand that's the
procedure to forward the findings of your
investigation on to the body that basically gives

Page 68

1  out discipline or not.  Correct?

2      A.    That's where it'll ultimately end up

3  after it goes through the chain of command.

4      Q.    Okay.  Do you know one way or the

5  other whether there was any action, disciplinary

6  action, taken by the PBI with regard to this

7  incident?

8      A.    I have no knowledge.

9      Q.    Okay.  If there had been, would that

10 be something that would come to your attention in

11 the normal course or no?

12     A.    It's yes and no.  Yes and no is really

13 my answer.  I'll just tell you if it's one of these

14 things where it goes and there becomes a hearing,

15 like a not guilty type of hearing, I very well might

16 be brought down to testify.  But if it's adjudicated

17 before that or some other way, then, no, I wouldn't

18 be brought in.

19     Q.    Okay.  So you're not necessarily going

20 to just be uniformly notified.  You would find out

21 if you were called upon to testify and offer some

22 participation in the hearing itself.  Right?

23     A.    Correct.

24     Q.    All right.  Now we discussed that

Page 69

1  there were additional details that were provided to

2  you during your interview with Officer Wolk above

3  and beyond what he had indicated to IAD initially.

4  Is that fair to say?

5          MR. KANE:  Objection to form.  You can

6  answer.

7          THE WITNESS:  Can you repeat that

8  again?

9  BY MR. LEVIN:

10     Q.    Yes.  I think we already touched on

11 this, but just to circle back on it.  When you

12 interviewed Officer Wolk and took his statement, he

13 provided some additional details to you, which he

14 had not previously offered in his statement to IAD.

15 Right?

16         MR. KANE:  Objection to form.  You can

17 answer.

18         THE WITNESS:  Yes.

19 BY MR. LEVIN:

20     Q.    Okay.  Unless I'm missing something,

21 it seems like those details concern two particular

22 pieces of the sequence of events, the first being

23 that sequence where he makes the right turn and the

24 motor scooter has to turn into the parking lot to

Page 70

1  avoid him.  The second part is where the Bove

2  vehicle sort of ends up in the sequence of events

3  from Scattergood Street onto the conclusion of the

4  chase.

5          Did you draw any conclusions from the

6  fact that those two particular things had been

7  omitted earlier?

8          MR. KANE:  Objection to form.  You can

9  answer.

10         THE WITNESS:  No, I didn't draw any

11 conclusions from that.

12 BY MR. LEVIN:

13     Q.    Did you believe there was a

14 possibility that Officer Wolk had previously been

15 trying to conceal those portions of the sequence of

16 events from IAD?

17         MR. KANE:  Objection to form.  You can

18 answer.

19         THE WITNESS:  I have no reason to

20 believe that he was trying to conceal anything.

21 BY MR. LEVIN:

22     Q.    A knowing material omission when he

23 was speaking to you would have been grounds for

24 potentially severe discipline.  Correct?

Page 71

1      A.    Correct.

2      Q.    All right.  I don't believe I have

3  anything else.

4          MR. KANE:  Give me a second.  I don't

5  think I do, but let me double-check.  I have no

6  questions.  Thank you for your time.

7              (Witness excused.)

8          (Deposition concluded at 2:21 p.m.)

9  (Whereupon the documents were post-marked, for

10     identification purposes, as Plaintiffs 1 and

11             Plaintiff 2.)

12

13

14

15

16

17

18

19

20

21

22

23

24

Case 2:20-cv-06301-MMB   Document 68-3   Filed 02/16/24   Page 21 of 39

Deposition of Lt. James Clough                    Neal Miller and Donna Miller v. City of Philadelphia, et al.

1        C E R T I F I C A T E

2

3        I, Natalie J. Goldhill, a Court Reporter

4    and Notary Public, Chester County, Pennsylvania, do

5    hereby certify that the witness was by me first duly

6    sworn to testify to the whole truth and that the

7    above deposition was recorded stenographically by me

8    and was transcribed by means of computer-aided

9    transcription under my personal direction and that

10   the said deposition constitutes a true record of the

11   testimony given by said witness.

12        I further certify that I am not a relative

13   or employee of any of the parties, a relative or

14   employee of any attorney involved in this action, or

15   financially interested directly or indirectly in

16   this action.

17

18

19

20                    _____
                      Natalie J. Goldhill, Notary Public
                      Chester County, Pennsylvania and
21                    New Castle County, Delaware

22

23

24

Case 2:20-cv-06301-MMB   Document 68-3   Filed 02/16/24   Page 22 of 39

Deposition of Lt. James Clough                                    Neal Miller and Donna Miller v. City of Philadelphia, et al.

## WORD INDEX

**< 0 >**
**0006** 30:*6*
**001** 8:*8*
**003** 10:*24*
**004** 11:*4*
**01** 9:*2*

**< 1 >**
**1** 3:*12* 7:*12* 71:*10*
**1:00** 1:*17*
**10** 1:*16* 51:*8*
**109** 65:*22*
**11:00** 21:*18*
**110** 66:*8*
**1210** 2:*4*
**14** 20:*17* 52:*18* 66:*1*
**14th** 2:*9*
**1515** 2:*9*
**17** 37:*6* 53:*5*
**189** 8:*8*
**19053** 2:*5*
**19102** 2:*9*
**1989** 6:*7*

**< 2 >**
**2** 3:*14* 61:*2* 71:*11*
**2:20-cv-06301-ER** 1:*8*
**2:21** 71:*8*
**20** 53:*18*
**2003** 6:*13*
**2007** 6:*1, 14*
**2015** 6:*16*
**2019** 7:*1* 10:*16*
 19:*14*
**2023** 1:*16*
**215** 2:*5, 10*
**26th** 6:*8, 13*
**280** 2:*4*

**< 3 >**
**3rd** 10:*16*

**< 4 >**
**4** 3:*5*
**4th** 36:*7*

**< 5 >**

**5** 57:*10, 11*
**5343** 56:*18* 57:*1*
**5400** 24:*23* 57:*24*
 65:*2*
**57** 55:*24* 57:*6*
**5-7-19** 37:*15*
**58** 56:*24*
**5-8-19** 20:*13*

**< 6 >**
**683-5382** 2:*10*

**< 7 >**
**7** 19:*14*
**7:25** 37:*15*
**7:30** 19:*14*
**71/61** 3:*14*
**71/7** 3:*12*
**7th** 7:*1*

**< 8 >**
**8** 64:*4*

**< 9 >**
**9** 64:*13*
**9.4** 9:*8* 50:*17* 67:*18*
**953-5200** 2:*5*
**9th** 10:*19*

**< A >**
**a.m.** 36:*17*
**able** 21:*21* 44:*8*
 45:*9* 46:*12* 64:*5*
**Absent** 39:*7*
**academy** 6:*8*
**accelerate** 45:*10*
**accident** 8:*17* 13:*16,*
*18* 15:*7, 13, 18* 19:*13,*
*18* 21:*21* 25:*24*
 26:*17* 27:*20, 21* 50:*2,*
*4* 65:*8*
**accompanied** 36:*8*
**accurate** 16:*4* 61:*9,*
*22*
**accurately** 17:*12*
**action** 55:*5* 67:*22*
 68:*5, 6* 72:*14, 16*
**actions** 39:*9*
**activated** 34:*7* 35:*10*
 37:*18*

**actual** 12:*2* 16:*22*
 39:*18* 66:*5*
**add** 19:*11* 34:*19*
 45:*18*
**added** 38:*6*
**additional** 19:*9*
 41:*18* 58:*20* 69:*1, 13*
**address** 5:*13*
**addresses** 56:*19*
**adjacent** 60:*2*
**adjudicated** 68:*16*
**Administrators** 1:*6*
**advised** 13:*17*
**Affairs** 3:*12* 4:*19*
 5:*22, 24* 6:*15, 17* 7:*5,*
*14* 8:*15* 12:*13, 18*
 13:*16* 14:*7* 16:*12*
 34:*18* 36:*7* 51:*18*
 52:*9*
**afternoon** 4:*15*
**ago** 53:*19*
**agree** 31:*24* 32:*14*
 35:*7, 19* 38:*22* 44:*17*
 54:*21*
**AGREED** 4:*2*
**ahead** 24:*15, 20*
 29:*17* 40:*4* 42:*13, 14*
 44:*22* 61:*14*
**AID** 40:*20*
**air** 34:*24* 40:*23*
 41:*12*
**al** 1:*10*
**allegation** 15:*13*
**allegations** 14:*15*
**alley** 45:*21*
**allowed** 16:*21* 17:*20*
 18:*21* 20:*21* 43:*14,*
*15*
**alongside** 25:*12*
 42:*13* 44:*23* 58:*3, 7*
 60:*9* 61:*8*
**Analysis** 21:*10*
**Anderson** 27:*20*
**answer** 5:*9* 11:*16*
 12:*20* 14:*5, 13, 23*
 15:*11* 16:*3* 22:*12*
 28:*24* 31:*14* 33:*7*
 39:*6, 15* 41:*22* 42:*16*
 43:*4* 46:*5, 19* 47:*4,*
*11* 48:*2, 20* 50:*6*

**54:***16, 23* **55:***14* **59:***1,*
*16, 21* **60:***5, 20, 21*
*62:***4, 17* **68:***13* **69:***6,*
*17* **70:***9, 18*
**anti-crime** 6:*9*
**anybody** 11:*12* 12:*3*
 14:*2* 23:*22* 40:*23*
 47:*24* 48:*3*
**anybody's** 15:*4*
**apart** 61:*12*
**apologize** 61:*2*
**apparently** 25:*19*
**appear** 35:*9* 50:*11*
 63:*9* 64:*24*
**appeared** 42:*3*
**appears** 10:*24* 26:*13*
 32:*13* 38:*18* 56:*2*
 61:*18* 64:*1, 8, 13*
 65:*4* 66:*9*
**apples** 59:*19, 20*
**applicable** 39:*2*
 50:*21*
**approach** 7:*20*
**approached** 38:*2*
 45:*5, 7*
**approaches** 40:*3*
**approaching** 23:*17*
**approved** 51:*23*
**approximately** 37:*15*
**apron** 64:*20*
**Arch** 2:*9*
**area** 20:*14* 23:*19*
 24:*2* 27:*22* 37:*2*
**arrested** 10:*4, 5*
**arrives** 25:*23*
**arsenal** 56:*17*
**asked** 9:*18* 11:*20*
 49:*2, 7* 54:*3* 55:*8*
**asking** 17:*18* 18:*11,*
*16* 24:*6* 53:*20*
**assigned** 5:*21* 6:*18*
 8:*18* 10:*11* 20:*2, 4, 9*
**assignments** 6:*21*
**assistance** 54:*5*
**ASSOCIATES** 2:*3*
**assume** 35:*19*
**assuming** 5:*4* 21:*6*
 22:*21* 27:*9* 29:*6*
 53:*13*
**attached** 35:*8*

**attempt** 24:*14* 28:*9* 32:*20* 38:*5* 41:*4, 13* 43:*11*

**attempted** 37:*17* 49:*17*

**attempting** 27:*24*

**attempts** 23:*6* 24:*24* 32:*3* 40:*9*

**attention** 13:*22* 68:*10*

**attorney** 53:*13* 72:*14*

**audio** 34:*23* 35:*8*

**authenticate** 37:*11*

**authored** 52:*3, 11*

**auto** 27:*21*

**avoid** 60:*11* 70:*1*

**aware** 11:*14* 12:*16* 15:*8* 18:*22* 24:*5, 10*

**< B >**

**back** 13:*12* 31:*1* 40:*6* 41:*8, 16* 42:*3* 46:*16* 61:*21* 67:*16* 69:*11*

**backed** 33:*23*

**backwards** 32:*14* 45:*8*

**band** 18:*24*

**Bar** 30:*13* 32:*16* 34:*10*

**based** 18:*15* 21:*2* 42:*22* 50:*9* 54:*13*

**basically** 12:*7* 16:*14* 28:*3* 36:*16* 44:*2* 51:*8* 67:*24*

**basics** 34:*16*

**basis** 38:*11*

**Bates** 8:*7*

**Bear** 52:*16* 55:*22*

**bearings** 8:*5*

**began** 23:*14* 26:*6* 45:*7* 49:*24*

**Beginning** 11:*4* 19:*23* 35:*16* 52:*18* 53:*5* 55:*24* 65:*22*

**begins** 20:*13* 51:*8*

**believe** 7:*13* 12:*21* 25:*4* 30:*14* 31:*15* 32:*21* 33:*10* 38:*23* 42:*9* 45:*14* 46:*9*

**believed** 33:*20, 22*

**believing** 38:*12*

**best** 5:*8* 18:*11*

**beyond** 69:*3*

**big** 9:*18*

**bike** 27:*24* 28:*2* 30:*21, 24* 31:*19* 43:*13*

**bit** 7:*17* 9:*5* 29:*6* 37:*6* 42:*22* 58:*7* 59:*6* 61:*14, 24* 62:*10*

**blind** 23:*17, 23* 38:*2* 40:*3*

**block** 24:*24* 65:*2*

**blocking** 64:*10*

**blow** 41:*12*

**blue** 31:*3*

**blurry** 62:*18, 24* 63:*6, 20*

**Board** 67:*21*

**body** 67:*24*

**bottom** 57:*6*

**Bove** 26:*24* 28:*2, 6, 20* 29:*11, 17, 21* 32:*10, 11* 49:*17* 53:*20* 54:*2, 5, 12* 55:*19* 70:*1*

**break** 61:*20*

**bridge** 24:*7* 30:*13, 20* 37:*3, 15, 16* 40:*6* 58:*1*

**briefly** 41:*10*

**broke** 22:*7*

**brought** 68:*16, 18*

**Building** 2:*8*

**bulk** 11:*9*

**< C >**

**call** 39:*11* 42:*7*

**called** 4:*10* 21:*20* 43:*17* 68:*21*

**calls** 25:*24* 50:*3*

**camera** 57:*1, 10, 11* 61:*3*

**cameras** 57:*7*

**captain** 51:*24*

**Car** 20:*19* 30:*22, 23* 31:*1, 3, 4, 19* 33:*18,*

*20, 23* 34:*2, 4* 44:*3, 5, 12* 46:*17* 64:*19* 67:*1*

**cars** 17:*24* 59:*7* 64:*16*

**case** 4:*17, 21*

**Castle** 72:*21*

**catching** 24:*23*

**caused** 66:*13*

**Center** 2:*4*

**certain** 16:*14*

**certainly** 5:*8* 18:*13* 22:*16* 27:*9* 35:*6* 47:*8*

**certify** 72:*5, 12*

**chain** 68:*3*

**chance** 27:*2, 13* 36:*6*

**changed** 57:*18*

**changes** 52:*13*

**characterization** 11:*2* 19:*23* 31:*20*

**characterized** 63:*13*

**charges** 9:*12, 15, 22*

**charging** 10:*3*

**chase** 57:*23* 70:*4*

**chased** 31:*2*

**chasing** 33:*21* 58:*17*

**check** 21:*4*

**Chester** 72:*4, 20*

**Chief** 10:*21* 51:*18*

**Chris** 10:*22*

**circle** 69:*11*

**circumstance** 54:*20*

**circumstances** 8:*13* 16:*15, 18* 17:*4* 19:*21* 39:*1, 8*

**CITY** 1:*10* 2:*6, 11*

**civilian** 55:*4, 11*

**clarify** 11:*21*

**clear** 18:*11* 27:*5* 35:*23* 40:*11* 46:*8* 62:*14*

**clearly** 39:*1*

**close** 36:*19*

**closing** 67:*19*

**CLOUGH** 1:*16* 3:*4* 4:*9, 15* 5:*17*

**collide** 43:*1*

**collided** 30:*3*

**collision** 7:*2* 19:*15* 30:*4* 59:*14, 19* 66:*5*

**come** 4:*21* 44:*3* 52:*5* 68:*10*

**coming** 9:*22* 12:*1*

**command** 68:*3*

**Commanding** 10:*15* 20:*8, 9* 51:*14, 17* 52:*8, 13* 67:*21*

**commenced** 13:*13* 14:*16*

**commencing** 1:*17*

**comment** 43:*5*

**comments** 19:*11*

**commercial** 57:*7*

**committed** 17:*2* 38:*24* 50:*15*

**Commonwealth** 1:*19*

**communication** 49:*15* 54:*1, 12*

**community** 14:*2*

**comparing** 59:*19*

**Complaint** 8:*2*

**complex** 56:*17*

**computer** 7:*20*

**computer-aided** 72:*8*

**computerized** 21:*5*

**conceal** 70:*15, 20*

**concern** 69:*21*

**concerned** 57:*22*

**concerning** 12:*18*

**concluded** 8:*20* 71:*8*

**concludes** 66:*4*

**conclusion** 33:*19, 22* 51:*13* 52:*1, 3, 7, 10* 67:*16* 70:*3*

**conclusions** 70:*5, 11*

**conditions** 18:*23*

**conduct** 10:*6* 16:*7*

**conducted** 6:*24* 26:*23*

**conference** 1:*15*

**confine** 13:*6*

**confirm** 21:*22* 23:*23* 35:*10* 46:*13*

**confirmed** 32:*7*

**connect** 28:*10*

**connection** 27:*10* 28:*6, 16*

**consequence** 28:*16*

**consider** 59:*18*

considered 66:20
consistent 45:13 50:4
constitutes 72:10
contact 49:7 58:20
60:11
contacted 60:16
contacting 58:8, 12
contained 11:1
contents 11:13 12:2,
11
continued 38:1
continues 41:12, 14
control 44:5
conversation 18:19
convey 22:17
cooperate 49:18
coordination 54:12
corner 8:6 44:4
Corporate 2:4
Correct 7:2, 7, 8
8:21 9:3, 4, 9, 10
10:3, 4 11:7, 8 13:20
15:3 18:2, 12 20:16,
22 22:22 23:8 25:3
26:1, 22 27:3 28:14
29:8, 9, 13, 14, 22
33:2, 3 34:8, 11, 12,
18 35:2, 3 36:3, 4, 18
38:17 39:19, 21, 24
40:1, 13 41:2 42:5
43:24 46:17 47:19
48:11 49:12 50:18
51:6, 11, 15 52:21
53:2, 6, 7, 17 55:21
56:10 58:9, 23 60:3,
13, 18 63:15, 16, 19,
23 64:8 65:24 67:8
68:1, 23 70:24 71:1
corroborated 34:9, 24
counsel 4:3 36:8, 9
53:15, 16
County 72:4, 20, 21
couple 7:10 13:11
21:17 33:15 38:10
61:12
course 21:12 54:2
68:11
COURT 1:1 5:7
72:3

criminal 9:12, 15, 21
10:8
criminally 10:3
current 5:18
currently 6:18 51:18
curve 23:17, 24 24:4,
8, 15 40:4
cut 31:10

< D >
danger 24:19 38:3
Danielle 51:23 53:12
database 21:5
date 21:17 50:11
day 21:7
Deborah 10:15
51:14 52:2
Defendant 2:11
Defendants 1:11
Defense 8:8 9:2 66:8
degree 44:15
Delaware 72:21
delve 12:11
demeanor 54:13
denied 49:11, 16
54:11
denies 54:1
dents 66:24
deny 40:24
DEPARTMENT 2:6
4:19 5:19 6:5, 20
7:6 8:21 9:2, 7 14:1
15:8 16:6 17:11
47:24
departmental 10:7
14:15 50:12
depicted 60:3
deposition 1:15 5:1
27:6 71:8 72:7, 10
depositions 7:10
DEREK 2:8
derek.kane@Phila.gov
2:10
describe 33:4
described 21:24
34:2 62:22
describes 24:23
describing 31:9, 16,
18 44:21

DESCRIPTION 3:11
36:2 41:19 56:3
detail 6:3 41:18
45:19 61:4
detailed 6:10
details 69:1, 13, 21
determine 19:20
20:21 21:3 62:7
determined 50:14, 16
died 7:1 19:17
Dietz 24:8
different 44:14
difficult 5:7
direction 23:15
62:12 72:9
Directive 9:8 17:9,
12 39:2, 19 50:17, 21
51:9 67:18
directly 72:15
dirt 30:21, 24 31:19
disciplinary 68:5
discipline 68:1 70:24
discovered 15:6, 19
discuss 8:9
discussed 34:16
51:22 52:19 67:17
68:24
discussion 7:16 8:5
53:18
disengaged 39:9
dismiss 9:24 10:2
dismissal 10:6
Disregarded 37:19
39:9
disregards 41:6
distance 34:2
DISTRICT 1:1, 2
6:8, 13
dive 8:13
division 5:22 65:9
document 7:22
16:23 18:17 19:24
22:23, 24 25:9 52:11
66:8
documents 7:12
8:13 11:1 13:9 71:9
doing 5:4 29:7 50:1
DONNA 1:5
double-check 71:5

doubles 41:8 42:2
draw 70:5, 10
Drive 2:4
driven 32:9
Driver 25:18 30:2
40:18 44:4
driving 20:21 21:3
24:17 27:22 58:11,
17, 18 59:23 65:24
drove 25:12 38:5
duly 4:10 72:5

< E >
Eadom 25:19 26:5
28:3 30:13 31:11
41:7, 9 42:2 45:11
49:21 56:18 57:1
58:1 65:2
earlier 13:15 38:7
39:8 41:17 42:3
45:13, 19 48:9 70:7
easier 5:9 7:21
eastbound 26:5
49:22
EASTERN 1:2
edited 52:4
either 38:8, 12
emergency 31:5 34:7
35:10 50:24
employee 72:13, 14
ends 70:2
engage 17:13, 17, 20
33:24
engaged 19:2 28:21
engages 51:5
engines 33:16
entered 37:22
entire 5:8
entirety 7:13
entrance 24:8
equipment 50:24
51:1
ESQUIRE 2:3, 8
53:12
essentially 25:24
Estate 1:6
et 1:10
evasive 60:16
evening 36:16

Case 2:20-cv-06301-MMB   Document 68-3   Filed 02/16/24   Page 25 of 39

Deposition of Lt. James Clough                    Neal Miller and Donna Miller v. City of Philadelphia, et al.

**event** 19:*12* 36:*5*
40:*2* 49:*19* 59:*13*
61:*7*
**events** 42:*12* 46:*10*
69:*22* 70:*2, 16*
**evidence** 21:*13*
**exactly** 24:*10*
**Examination** 3:*5*
4:*13*
**examined** 4:*11*
**excuse** 65:*6*
**excused** 71:*7*
**EXHIBIT** 3:*11* 7:*12*
61:*2*
**exits** 25:*15* 45:*5*
**extent** 37:*5*

**< F >**
**face** 10:*10*
**faces** 7:*20*
**facilitate** 7:*16*
**fact** 29:*15* 47:*21*
70:*6*
**facts** 4:*22* 39:*23*
**fail** 28:*12*
**failed** 23:*13* 28:*14*
49:*17*
**failure** 28:*16* 50:*23,
24*
**fair** 9:*22* 11:*2* 13:*13,
14* 16:*16* 17:*6* 18:*5,
6* 19:*12, 23* 21:*14, 15*
25:*8* 27:*17, 18* 28:*22*
30:*19* 32:*10* 35:*4, 18*
41:*20* 44:*15* 45:*14,
16* 59:*7* 61:*21* 62:*9*
64:*11, 22* 67:*15* 69:*4*
**fairly** 36:*19* 54:*20*
**familiar** 5:*3* 10:*20*
16:*10* 23:*19, 21*
43:*23*
**far** 25:*7* 34:*2, 3*
47:*22* 52:*10*
**feared** 24:*16*
**felon** 38:*24*
**felony** 17:*2* 39:*1*
**Fibber** 30:*12*
**field** 9:*19*
**fifth** 62:*10*

**file** 7:*14* 11:*1*
**filed** 9:*13*
**filing** 4:*4*
**finalized** 52:*4*
**Finally** 64:*4*
**financially** 72:*15*
**find** 29:*21* 59:*24*
68:*20*
**findings** 67:*23*
**fine** 13:*5*
**First** 8:*12* 9:*1* 13:*11*
21:*16* 22:*3* 25:*2*
32:*11* 36:*7* 38:*10*
47:*22* 57:*23* 61:*7*
69:*22* 72:*5*
**Flacco** 10:*22, 23*
**F-L-A-C-C-O** 10:*22*
**FLAGER** 2:*3*
**flee** 25:*19* 39:*3*
**fleeing** 44:*9*
**Floor** 2:*9*
**flow** 37:*23*
**follow** 31:*4* 32:*10*
**followed** 13:*18* 28:*3*
**following** 25:*21* 26:*3*
29:*18* 33:*18* 49:*21*
53:*21* 58:*16*
**follows** 4:*12* 21:*23*
41:*11* 47:*15*
**force** 10:*2* 60:*1*
**forces** 44:*5*
**forcible** 17:*2* 39:*1*
**forcing** 58:*4* 60:*14*
63:*14* 66:*14*
**Ford** 17:*24*
**foreground** 64:*10*
**form** 4:*6* 8:*22* 11:*6,
15, 17* 12:*8, 19* 14:*12,
22* 15:*10* 16:*2* 18:*10*
22:*11* 23:*9* 27:*17*
28:*23* 31:*13* 33:*6*
34:*13* 35:*21* 37:*4*
39:*5, 14* 41:*1, 21*
42:*15* 43:*3* 44:*16*
45:*15* 46:*4, 18* 47:*3,
18* 48:*1* 54:*15, 22*
55:*7* 58:*10, 24* 60:*4,
19* 63:*24* 66:*16* 69:*5,
16* 70:*8, 17*

**forth** 6:*6* 17:*24* 53:*4*
**forthcoming** 54:*14*
**forward** 67:*23*
**found** 67:*18*
**four** 47:*21*
**four-door** 31:*3*
**four-wheeled** 58:*22*
**Fraley** 19:*14* 25:*20,
23* 26:*5, 8, 11, 12, 14,
16* 28:*4* 38:*2* 40:*15,
17* 49:*22*
**frame** 61:*23* 64:*5*
**frames** 18:*18* 61:*12*
**Francis** 10:*15* 51:*14*
52:*2*
**front** 25:*14* 32:*2*
45:*4* 56:*18*
**full** 5:*15* 37:*6*
**further** 9:*5* 26:*13*
29:*24* 39:*9* 49:*13*
50:*3* 55:*20* 64:*23*
72:*12*

**< G >**
**gamut** 6:*21*
**Gary** 26:*24* 45:*21*
49:*20* 53:*20* 54:*5, 12*
**gathered** 21:*13* 35:*6*
**gathering** 11:*22, 23*
**general** 44:*7*
**generally** 44:*10*
**gentleman** 26:*24*
**getting** 61:*13* 65:*17*
**give** 6:*3* 71:*4*
**given** 4:*24* 72:*11*
**gives** 67:*24*
**glad** 5:*12*
**Gniotek** 9:*23*
**Gnioteked** 9:*20* 10:*5*
**go** 6:*2* 9:*5* 10:*9*
13:*6, 9* 23:*23* 32:*19*
33:*11, 12, 17, 18*
37:*12* 41:*16* 52:*15,
19* 57:*20* 65:*12*
**goes** 8:*8* 42:*1* 45:*18*
49:*22* 50:*2* 51:*8*
68:*3, 14*
**going** 7:*15, 19* 8:*9*
9:*12* 29:*24* 30:*3, 8*
42:*7* 49:*8* 51:*7*

**52:*15, 18* 60:*24*
65:*19* 67:*15* 68:*19*
**Goldhill** 1:*17* 72:*3,
20*
**Good** 4:*15* 52:*15*
**grab** 27:*24* 30:*23*
31:*12* 32:*3* 62:*10*
**grabs** 25:*15* 42:*21*
45:*8* 61:*1* 64:*24*
**great** 6:*2* 66:*3*
**grounds** 70:*23*
**groups** 14:*3*
**guess** 10:*12* 15:*7*
24:*6, 12* 33:*20* 35:*16*
44:*10* 51:*20* 57:*10*
58:*11* 59:*18*
**guilty** 68:*15*

**< H >**
**half** 36:*20* 52:*1*
**happen** 57:*5*
**happened** 19:*13*
26:*17* 36:*21* 39:*12*
48:*17*
**happens** 36:*20* 44:*21*
55:*4* 56:*8*
**hard** 61:*23* 62:*6*
63:*1*
**head** 20:*2* 50:*22*
**headed** 55:*24*
**heading** 40:*5* 58:*1*
**heard** 33:*16*
**hearing** 68:*14, 15, 22*
**held** 6:*5*
**help** 54:*4*
**highway** 6:*10* 20:*17*
25:*22* 26:*8*
**history** 6:*4, 19*
**hold** 54:*3*
**honest** 54:*9*
**honestly** 13:*3* 30:*16*
57:*13* 66:*23*
**horn** 34:*24* 40:*23*
41:*12*
**hour** 36:*19*
**hours** 21:*18*
**house** 34:*1*
**hundred** 12:*15*
**hurt** 45:*1*

Case 2:20-cv-06301-MMB   Document 68-3   Filed 02/16/24   Page 26 of 39

Deposition of Lt. James Clough                    Neal Miller and Donna Miller v. City of Philadelphia, et al.

**< I >**

**IAD**  6:*24*  13:*23*
  19:*13*, *18*  20:*11*, *13*
  21:*18*, *24*  23:*3*  25:*6*
  26:20, *23*  27:*17*, *20*
  30:*1*, *7*, *12*  34:*17*
  41:*17*  42:*4*  45:*13*
  46:*24*  48:*4*, *8*  50:*5*
  51:*15*, *24*  69:*3*, *14*
  70:*16*
**idea**  66:*17*
**identification**  71:*10*
**identified**  21:*6*
**image**  62:22  63:*18*
  64:*10*, *17*  66:*8*
**Images**  3:*14*
**imminent**  17:*1*
**incident**  4:*20*  7:*1*
  8:*17*  21:*17*  23:*20*
  29:*16*  36:22  47:22
  68:*7*
**included**  36:2
**index**  10:*24*
**indicate**  9:*16*  25:*5*
  40:*17*  47:*8*
**indicated**  34:*5*  36:*14*
  48:*18*  69:*3*
**indicates**  9:*6*, *11*, *19*
  10:*10*  67:*20*
**indicating**  9:2  13:*18*
**indication**  14:*10*
**indications**  37:*20*
**indirectly**  72:*15*
**individual**  47:*1*  60:*8*,
  *9*
**Individually**  1:*5*
**influence**  24:*18*
**information**  11:*23*
  40:*19*  47:*16*  48:*9*
**initial**  40:*19*
**initially**  13:*10*  46:*23*
  69:*3*
**initiate**  18:*5*  23:*6*
  25:*1*  37:*17*  38:*21*
**initiated**  16:*16*  17:*5*
  18:*9*, *20*
**initiation**  39:*18*
**injury**  59:*13*  60:*17*

**inquiries**  28:*13*  55:*19*
**Inquiry**  67:*21*
**insert**  55:*5*
**inside**  58:*21*
**inspection**  37:*1*
**Inspector**  10:22
  51:*19*  52:*9*
**inspectors**  52:*12*
**instructed**  25:*13*
**interested**  72:*15*
**Internal**  3:*12*  4:*19*
  5:*22*, *23*  6:*15*, *17*  7:*4*,
  *14*  8:*15*  12:*12*, *18*
  13:*16*  14:*7*  16:*11*
  34:*18*  36:*7*  51:*18*
  52:*8*
**interpretation**  18:*17*
  29:2
**intersection**  50:*3*
**intervention**  43:*17*
**interview**  26:*23*  30:*7*
  32:*20*  36:*6*  37:*6*
  49:*17*  52:22  53:*5*
  69:2
**interviewed**  32:*18*
  33:2, *8*  53:*1*  69:*12*
**intoxicated**  38:*8*, *12*
**investigate**  7:*5*  14:*8*
  49:*3*
**Investigation**  3:*12*
  4:*20*, 22  6:*24*  8:2, *14*,
  *17*, *19*  11:6  13:2, *13*
  14:*11*, *16*  15:*9*  16:*1*
  19:*20*  20:*3*, *4*  21:*13*
  27:*7*, *10*  28:*7*, *17*
  29:*8*, *21*  37:*18*  65:*8*
  67:*24*
**investigations**  12:*12*,
  *17*
**Investigative**  21:*10*
**investigator**  10:*11*
  16:*11*  22:*1*  23:*3*
  30:*12*
**involve**  43:*1*
**involved**  6:*23*  7:*5*
  8:*14*  11:22  12:*12*, *13*
  19:*9*  27:*20*  29:*12*
  72:*14*
**involvement**  14:*7*

**involves**  58:*8*
**irony**  45:2
**issue**  37:*7*
**it'll**  68:2
**its**  61:*19*

**< J >**

**JAMES**  1:*16*  3:*4*
  *4*:9  5:*17*  24:*24*  25:*2*,
  *7*, *14*  26:6  40:*16*, *18*
  41:*12*, *14*  50:*1*
**Jennifer**  30:*7*
**job**  5:*18*
**joining**  55:*11*
**justify**  39:2

**< K >**

**KANE**  2:*8*  7:*19*
  8:22  11:*15*  12:*19*
  14:*12*, 22  15:*10*  16:2
  18:*10*  22:*11*  23:*9*
  27:*5*  28:*23*  30:*15*
  31:*13*  33:6  34:*13*
  35:*21*  37:*4*  39:*5*, *14*,
  *20*  41:*1*, *21*  42:*15*
  43:*3*  44:*16*  45:*15*
  46:*4*, *18*  47:*3*, *10*, *18*
  48:*1*, *13*, *20*  50:6
  54:*15*, 22  55:*7*, *13*
  58:*10*, *24*  59:*9*, *15*
  60:*4*, *19*  62:*4*, *16*, *23*
  63:*5*, *24*  65:*14*  66:*16*
  69:*5*, *16*  70:*8*, *17*
  71:*4*
**keep**  5:*10*
**kid**  30:*21*, *23*  31:2
  32:*4*, *8*
**kind**  9:*21*  16:*24*
  17:*19*  54:*1*
**knew**  29:22  47:*9*
  48:*17*, *19*
**know**  5:*12*  11:*21*
  13:*3*  14:*1*, *4*  30:*15*,
  *16*  32:*19*  36:*10*
  39:*24*  43:*16*  44:6
  48:*8*  55:*4*  56:*4*
  57:*14*  59:*1*, *19*, *20*
  60:22  66:*3*, *12*  67:*9*,
  *12*  68:*4*
**knowing**  70:22

**knowledge**  12:*3*, *14*
  18:*12*  23:22  67:*14*
  68:*8*
**known**  15:*17*  53:*24*
**knows**  45:*21*

**< L >**

**lane**  37:*21*  60:*1*
**lanes**  23:*16*, *18*
  37:22  38:2
**launched**  8:*18*
**LAW**  2:6  4:*11*
**leaning**  62:*13*
**learned**  9:*18*
**learns**  19:*13*, *18*
**led**  4:*19*  15:*21*
**left**  37:*21*  42:*19*
  58:2  61:*8*
**leg**  62:2, *14*
**legal**  18:*17*
**LEVIN**  2:*3*  3:*5*
  *4*:14, *16*  7:*23*, *24*
  8:*24*  11:*19*  12:*23*
  14:*17*  15:*1*, *15*  16:*5*
  18:*13*, *14*  22:*15*
  23:*11*  27:*8*  29:*3*
  30:*18*  31:*17*  34:*14*
  35:22  37:*8*, *9*  39:*10*,
  *17*, 22  41:*3*, *24*  42:*20*
  43:*7*  44:*19*  45:*17*
  46:*7*, 22  47:*7*, *14*, *20*
  48:*6*, *14*, *23*  50:*8*
  54:*19*  55:*2*, *9*, *17*
  58:*14*  59:*4*, *12*, 22
  60:*7*, *23*  62:*8*, *20*
  63:*2*, *8*  64:*3*  65:*16*,
  *18*  66:*19*  69:*9*, *19*
  70:*12*, *21*
**license**  23:*5*
**LIEUTENANT**  1:*16*
  3:*4*  4:*9*, *15*  5:*17*, *20*
  6:*16*
**light**  31:*3*  61:*20*
**lights**  18:22  23:6
  31:*5*  34:*7*  35:2, *10*,
  *13*, *16*  37:*18*  51:2
**limit**  17:*12*
**lines**  61:6
**listed**  57:*1*, *10*  61:6
**lit**  61:*20*

**little**  7:*16*  9:*5*  29:*6*
37:*6*  42:*22*  58:*6*
59:*6*  61:*13, 24*  62:*10*
**loaded**  29:*4*
**local**  53:*24*
**located**  30:*20*
**location**  23:*24*  30:*17*
57:*7*
**long**  5:*23*
**look**  18:*21*  25:*9, 10*
27:*15*  49:*13*  54:*24*
66:*1*
**looked**  56:*16, 17*
57:*15, 17*  63:*12*
**looking**  8:*2*  11:*5*
37:*5*  56:*8, 17*  65:*2*
**looks**  10:*11, 15*
13:*11*  20:*13*  21:*4*
29:*24*  32:*5*  34:*5*
46:*21*  53:*11*  61:*13,*
*20, 22*  62:*1, 10, 12*
64:*19*
**lose**  44:*4*
**lost**  41:*10*  45:*2*
**lot**  33:*13*  41:*8*  42:*2*
52:*16*  55:*11, 16*  58:*5*
59:*17*  60:*15*  63:*14,*
*17*  64:*15, 20*  66:*15*
69:*24*
**low**  63:*21*
**lower**  8:*6*
**lying**  25:*22*  26:*8*

**< M >**
**majority**  7:*13*
**making**  56:*7*
**male**  27:*24*  28:*1*
**managed**  25:*17*
**manages**  32:*1, 8*
**maneuver**  43:*18*
58:*7*  60:*16*
**manners**  51:*9*
**mark**  61:*2*  66:*10*
**MARKED**  3:*11*  7:*11*
17:*21*  20:*16*
**material**  70:*22*
**Materials**  3:*13*
**matter**  13:*1*  14:*8*
**Mattos**  33:*1*  52:*20*
**McGee's**  30:*13*

**mean**  24:*1*  36:*23*
38:*19*  54:*24*  55:*3*
59:*23*  64:*1*
**means**  9:*20, 23*  72:*8*
**media**  8:*16*  13:*17,*
*22*  14:*2, 19*  15:*20*
**medics**  25:*24*
**memo**  67:*16*
**memorandum**  11:*6*
12:*2, 4*  13:*7*  19:*4*
**memory**  36:*23*
**mention**  21:*17*  46:*24*
**mentioned**  13:*15*
35:*24*
**mercifully**  8:*9*
**merely**  27:*21*
**met**  4:*16*
**MICHAEL**  2:*3*  4:*16*
7:*19*  65:*15*
**middle**  55:*5*
**MILLER**  1:*5, 7*  7:*1*
**mind**  49:*1*
**minutes**  33:*15*  53:*19*
**missing**  69:*20*
**moment**  55:*23*
**monitoring**  14:*2*
19:*10*
**months**  34:*18*  47:*21*
**morning**  7:*11*
**motor**  40:*4, 10, 14*
41:*5, 10, 13*  42:*24*
43:*1, 12*  44:*23, 24*
45:*3, 4, 8, 10*  46:*15*
49:*20*  54:*6*  62:*12*
63:*4, 14*  64:*15*  65:*7*
66:*5, 14*  69:*24*
**motorcycle**  43:*12*
54:*6*
**motorcyclist**  45:*7, 9*
**motorcyclists**  59:*5*
**motorists**  38:*4, 6*
**motorized**  19:*16*
23:*3, 13*
**mouth**  15:*5*  47:*24*
**move**  7:*20*
**Moving**  44:*20*  63:*21*
**multiple**  57:*7*

**< N >**

**name**  4:*16*  5:*15*
52:*5*
**named**  26:*24*
**narcotics**  6:*11*
**narrative**  36:*1*  56:*2*
**Natalie**  1:*17*  72:*3, 20*
**nature**  11:*24*  14:*3*
47:*23*
**NEAL**  1:*5*
**near**  24:*7, 8*  37:*14*
**necessarily**  68:*19*
**necessary**  67:*22*
**need**  57:*21*  64:*22*
**never**  47:*12*  55:*19*
**new**  47:*15*  72:*21*
**night**  36:*17*
**Nitti**  53:*12*
**normal**  68:*11*
**normally**  20:*7*
**northbound**  23:*4, 14*
37:*21, 23*  38:*1*  41:*9*
45:*11*
**Northbrook**  2:*4*
**Notary**  1:*18*  72:*4, 20*
**notes**  56:*7*
**noticed**  26:*7*  27:*23*
**notification**  9:*21*
**notified**  8:*16*  13:*16*
68:*20*
**notify**  18:*23*  50:*23*
**NUMBER**  3:*11*  19:*1*
20:*23*  21:*2*  53:*24*
**numbered**  8:*7*

**< O >**
**Objection**  8:*22*
11:*15*  12:*19*  14:*12,*
*22*  15:*10*  16:*2*  18:*10*
22:*11*  23:*9*  28:*23*
31:*13*  33:*6*  34:*13*
35:*21*  37:*4*  39:*5, 14,*
*20*  41:*1, 21*  42:*15*
43:*3*  44:*16*  45:*15*
46:*4, 18*  47:*3, 10, 18*
48:*1, 13, 20*  50:*6*
54:*15, 22*  55:*7, 13*
58:*10, 24*  59:*9, 15*
60:*4, 19*  62:*4, 16, 23*
63:*5, 24*  66:*16*  69:*5,*

*16*  70:*8, 17*
**objections**  4:*5*
**observed**  37:*15*  57:*24*
**obtained**  46:*2*  56:*19*
**obverses**  24:*22*
**Obviously**  11:*24*
18:*18*  37:*10*  48:*7*
**occurred**  23:*20*
**occurrence**  15:*18*
**occurring**  50:*2*
**occurs**  40:*12*
**October**  10:*16, 19*
**odd**  54:*20, 24*
**offense**  17:*7*  38:*17,*
*19*
**offer**  38:*11*  68:*21*
**offered**  69:*14*
**Officer**  7:*7*  9:*13, 24*
10:*15*  12:*13, 18*  18:*9*
19:*7, 8*  20:*8, 9*  21:*6,*
*18, 24*  22:*6*  23:*2, 12,*
*16*  24:*4, 13, 22*  25:*11,*
*15, 20*  26:*4, 12, 20*
27:*19, 24*  29:*17, 22*
30:*23*  31:*1, 10*  32:*1,*
*8, 9, 12*  34:*6, 16*
35:*17, 24*  36:*6*  40:*22*
41:*9, 17*  42:*12, 23*
44:*21*  45:*4, 7*  46:*1,*
*16, 24*  47:*24*  48:*16*
49:*21*  50:*15*  51:*15,*
*18*  52:*8*  53:*6, 13, 23*
54:*8, 11*  55:*4*  65:*24*
66:*6*  67:*21*  69:*2, 12*
70:*14*
**officers**  11:*22*  43:*9,*
*19*  52:*13*
**officer's**  31:*4, 5*
**official**  9:*24*  10:*6*
**Okay**  5:*3, 14, 18, 21*
7:*17, 18, 23*  8:*4, 19*
9:*17*  10:*1, 14, 23*
11:*12*  12:*6, 16, 24*
14:*1, 18*  15:*16*  16:*6,*
*14, 22*  17:*7, 11, 23*
18:*7*  19:*12*  20:*6, 11,*
*18, 20*  21:*4, 16*  22:*3,*
*20*  23:*2, 12, 22*  24:*3,*
*12*  25:*5*  26:*4*  27:*2,*
*13, 16, 19*  28:*9*  29:*15*

Case 2:20-cv-06301-MMB  Document 68-3  Filed 02/16/24  Page 28 of 39

Deposition of Lt. James Clough                    Neal Miller and Donna Miller v. City of Philadelphia, et al.

30:*19*  31:*18, 24*  32:*7,*
*16, 22*  35:*1, 15, 23*
36:*10, 14*  37:*8*  38:*9,*
*21*  39:*11, 18*  42:*21*
43:*23*  44:*2, 11, 20*
45:*18*  46:*8*  47:*8*
48:*12*  50:*9, 19*  51:*3,*
*7, 12, 20*  52:*15, 24*
54:*20*  56:*7, 11, 14*
57:*4, 20*  58:*15*  59:*5*
60:*8*  61:*11*  62:*9, 21*
63:*3, 9*  64:*4, 9, 22*
65:*5, 11, 19*  66:*3*
67:*2, 5*  68:*4, 9, 19*
69:*20*
**omission** 70:*22*
**omit** 22:*9*
**omitted** 22:*6*  70:*7*
**once** 24:*21, 24*  40:*10*
**opened** 19:*20*  57:*19*
**operating** 18:*22*
*23:17* 31:*6*
**operator** 19:*15, 17*
*21:7* 23:*13*  24:*17, 22*
*25:6, 13, 16, 17, 21*
*26:7, 11, 13, 16* 31:*11*
*45:1, 3, 5* 53:*20, 24*
**opinion** 67:*6*
**opportunity** 28:*5*
**opposed** 10:*3* 52:*5*
*58:21*
**opposes** 18:*3*
**oriented** 62:*1* 63:*9*
**Outside** 16:*18* 30:*12*
*33:9* 34:*10*
**overhead** 51:*1*

**< P >**
**P.C** 2:*3*
**p.m** 1:*17* 21:*18*
*36:17* 71:*8*
**package** 55:*23*
**packet** 7:*12* 65:*15*
**PAGE** 3:*3, 11*  9:*1, 6*
*10:10, 24* 11:*4* 20:*12*
*30:6* 44:*20* 51:*8*
*52:1, 18* 53:*5, 18*
*55:24* 56:*24* 57:*6*
*61:17* 63:*22* 64:*4, 13*

65:*22*  66:*8*
**pages** 8:*7, 10*
**panel** 66:*10*
**paragraph** 20:*12*
**paragraphs** 13:*12*
**parallel** 25:*3*
**paraphrasing** 17:*3*
**parked** 64:*16*
**parking** 33:*13*  41:*8*
*42:2* 58:*5* 60:*15*
*63:14, 17* 64:*14, 20*
*66:15* 69:*24*
**Parkway** 2:*8*
**part** 7:*6* 22:*7* 30:*8*
*31:16* 37:*2* 42:*1, 17*
*61:18* 64:*10* 70:*1*
**participation** 68:*22*
**particular** 17:*8* 61:*1*
*69:21* 70:*6*
**parties** 4:*3* 72:*13*
**passenger** 17:*23*
*44:12* 58:*22*
**passengers** 59:*7*
**passes** 24:*14, 21*
**patrol** 6:*10, 13*
*20:19* 30:*22* 31:*19*
**patrolled** 6:*8*
**PBI** 68:*6*
**PENNSYLVANIA**
*1:2, 19*  2:*5, 9* 72:*4,*
*20*
**people** 15:*20* 19:*18*
**percent** 12:*15*
**permissible** 17:*8*
*18:8*
**permitted** 16:*19*
*17:17*
**person** 10:*19* 17:*1*
*31:9* 36:*10* 38:*12, 16*
*39:3* 42:*23* 45:*20*
*47:9* 48:*19* 58:*21*
*60:1*
**personal** 72:*9*
**personally** 36:*6*
**personnel** 20:*11, 14*
*21:5*
**pertaining** 16:*7*
**pertains** 9:*8*
**PHILADELPHIA**
*1:10*  2:*6, 9, 11*  5:*19*

*6:4*  9:*7* 43:*20, 21*
*44:6*
**photograph** 65:*12*
*67:4*
**photographed** 65:*7,*
*10*
**photographs** 65:*21*
**photos** 65:*23* 66:*2*
**physically** 32:*3*
**pictures** 65:*14*
**pieces** 20:*15* 56:*9*
*69:22*
**place** 33:*14* 46:*15*
*57:8*
**plaintiff** 4:*17* 71:*11*
**Plaintiffs** 1:*8*  2:*6*
*3:12, 14*  71:*10*
**Plaintiff's** 7:*11*  61:*2*
**plant** 24:*9*
**plate** 23:*5*
**platform** 5:*5*
**player** 57:*18*
**please** 5:*15*
**point** 12:*16*  13:*1*
*23:8* 24:*13* 25:*23*
*29:15* 32:*1* 33:*10*
*35:4* 38:*15, 23* 39:*4*
*41:9* 49:*24* 51:*21*
*60:12* 65:*5*
**points** 35:*12, 14*
*53:22*
**Police** 5:*19*  6:*4, 8*
*7:6, 7*  9:*7* 10:*2*
*13:18* 16:*6* 17:*11*
*18:23, 24* 20:*16*
*25:18, 20* 26:*4* 27:*23*
*31:2* 33:*11, 22* 34:*3,*
*6* 35:*11* 36:*6* 43:*9,*
*19* 45:*4, 6* 50:*23*
*55:12* 58:*2, 4* 61:*13*
*64:19* 65:*6, 10, 13*
*67:1, 21*
**policies** 8:*21* 16:*7, 11*
**policy** 7:*6*  9:*6* 14:*10*
*16:22* 17:*12* 18:*3, 7*
*19:22* 43:*9* 50:*12*
**poorly** 11:*20*
**popping** 64:*16*
**portion** 12:*4* 13:*7*
*29:5* 31:*10, 21* 42:*7*

*51:7, 13* 55:*23* 61:*4*
*67:17*
**portions** 56:*4* 70:*15*
**positions** 6:*5*
**possibility** 70:*14*
**possibly** 24:*18* 41:*7*
**posting** 8:*16*
**postings** 13:*17, 22*
*14:19* 15:*20*
**post-marked** 71:*9*
**potential** 7:*5* 24:*19*
*28:15*
**potentially** 70:*24*
**preceded** 15:*7*
**precision** 43:*17*
**preparation** 27:*6*
*56:12* 57:*15*
**prepare** 11:*9* 22:*23*
**prepared** 10:*12* 56:*5*
**preparing** 22:*4*
**pre-patrol** 37:*1*
**present** 53:*16*
**pretty** 4:*18*  5:*3*
*6:20* 15:*24* 16:*20*
*17:3* 21:*23* 22:*5*
*23:7* 26:*19* 28:*21*
*29:7* 38:*17* 45:*12*
*46:8* 50:*4* 51:*21*
*60:6*
**previously** 47:*16*
*50:5* 69:*14* 70:*14*
**prior** 12:*17*
**probably** 57:*11*
**probe** 55:*20*
**procedural** 18:*4*
**procedure** 43:*9*
*67:23*
**proceeding** 9:*24*
*10:6* 53:*4*
**proceedings** 10:*2*
**product** 12:*6* 51:*22*
**production** 66:*9*
**Professional** 1:*18*
**prohibited** 44:*7*
**promoted** 6:*12, 16*
**prompted** 14:*11* 16:*1*
**pronounced** 62:*11*
**proper** 39:*19*
**property** 60:*2*

Deposition of Lt. James Clough                    Neal Miller and Donna Miller v. City of Philadelphia, et al.

provide  13:12  18:16
  45:19
provided  9:20  21:19
  47:16  69:1, 13
Public  1:18  17:1
  72:4, 20
pull  38:15
pulled  44:23  45:4
pulling  28:1
pulls  46:14, 15
purpose  8:5
purposes  71:10
pursuing  19:7, 8
  20:16  55:4
pursuit  13:19  14:20
  15:6, 9, 14, 21, 22
  16:15  17:4, 8, 14, 17
  18:5, 8, 20  19:2, 19,
  21  28:21  29:12
  31:10, 22  32:1  33:24
  39:2, 19  42:8  46:3
  50:23  51:2
pursuits  9:8  14:9
  16:8  17:20
pursuit's  16:21
push  45:8
put  7:15  15:4
puts  23:5
putting  12:7

< Q >
quarter  66:10
question  4:6  5:8, 11
  11:21  14:9  15:21
  22:12  29:5  43:6
  51:20  66:7
questions  8:11  13:8
  14:21  15:24  38:10
  48:24  49:2  54:8, 13
  71:6
quite  62:19

< R >
radio  18:23, 24
  20:19  39:12  50:23
raise  48:24
raised  14:21
rank  6:12
rarely  59:24

reach  25:7
reaches  49:22
reaction  48:22
reading  4:4  14:18
  15:2, 5
read-through  21:11
realized  30:4
really  15:17  38:16
  59:20  63:7  66:21
  68:12
rear  30:22  31:19
  45:6  62:11  63:3
  66:10
reason  5:11  38:23
  43:16  50:22  54:17
  70:19
reasonable  39:11
recall  20:8  42:11
  49:5
recognized  14:20
  38:3
recollection  13:21
  35:15  57:12
record  4:16  5:10, 16
  35:7  37:12  72:10
recorded  52:21  53:8
  72:7
recording  52:24
recovered  20:14
  28:20  56:4
refer  36:24
REFERENCED  3:11
referred  20:12
referring  7:9  22:24
  24:5, 7, 11  61:15
  64:18  67:3
reflected  9:1
Refused  37:20
regard  68:6
regarding  6:24  8:16
regurgitation  21:11
relate  10:1  36:21
related  52:20
relates  4:20  25:11
  40:14  49:19
relative  57:23  72:12,
  13
relied  12:1
remained  6:17

remember  13:4, 24
  36:13  40:20  42:18
  48:21  57:13  66:23
remotely  4:11
repeat  69:7
rephrase  50:15
report  10:12  11:2, 6,
  10, 13  12:1, 7  26:3
  27:11  29:8  36:3, 24
  40:20  66:3  67:20
Reporter  1:18  5:7
  72:3
reporting  51:2
represent  61:5
Representing  2:6, 11
  4:17
request  54:4
requests  25:24
require  18:7
requirements  18:4
reserved  4:6
residential  56:24
resolution  61:3  63:21
respect  14:6
respective  4:3
respects  50:17
respond  28:12, 14, 16
responded  55:19
responsibility  52:8
rest  49:20
result  9:13  19:18
review  16:23  27:2,
  13  42:6, 22  56:11
  57:5
reviewed  22:21  27:9
  29:7  30:8  31:7
  50:10  56:15  57:2
rider  58:20  60:10
  62:2, 13
riders  59:6
right  5:13  6:23  7:9
  9:11, 14  10:9  11:4, 5,
  9  12:10  13:15  14:6
  15:12  16:8  19:3
  21:9  26:21  27:11, 12
  30:11, 20  31:22  32:4,
  17, 24  33:4  34:15
  35:4, 11, 16, 24  36:5,
  17  40:2, 7, 12, 14, 21,
  24  42:6, 14, 19  43:14,

  19  44:9, 13  45:20
  46:10, 23  47:9, 15, 17
  48:10  49:11  50:5, 17
  51:4, 10, 16  53:1, 11,
  15, 16  54:2  55:20
  56:9  57:2, 14  58:4, 8,
  18  60:1, 10, 11, 12, 14
  61:19  62:1, 11, 13
  63:3, 10, 13, 23  64:2,
  7  66:10  67:5, 15
  68:22, 24  69:15, 23
  71:2
right-hand  8:6  62:3
  63:18  64:17
risk  43:1  44:15
  58:8, 12, 17  59:3
risks  58:20
roadway  24:5
Robert  33:1
roughly  61:6
roundabout  24:7
routine  14:8  23:7
RPC  20:17, 18
rules  5:4
run  6:20  30:21
  50:19  55:10  65:19
runs  31:19  58:12
RYAN  1:6  7:1

< S >
safety  17:1
sat  45:24
saw  23:4  26:11
  28:1  30:21  31:3
  33:10, 17  35:7  50:2
  51:21  66:13  67:4
saying  15:20  19:19
  20:24
says  10:4  20:17
  23:12  24:21  26:4
  30:19  41:4, 12  60:14
Scattergood  25:12, 14
  27:23  29:16  31:11
  41:15  44:22, 24
  45:21  70:3
scene  24:1  25:23
Scheffield  30:7  31:3
  34:10
scooter  19:16, 17
  20:16  23:4, 13  24:13,

17, 21   25:6, 12, 14, 16,
17, 22   26:7, 11, 13, 16
29:18   30:2   31:11
32:2   33:11, 12, 17, 18,
21   34:3   37:16, 22
38:4, 5, 7   40:4, 5, 10,
15, 18   41:5, 10, 13
42:13, 14, 24   43:2
44:23, 24   45:3, 5, 8,
10   46:16   49:21
53:22   54:6   57:24
58:3, 4, 7, 9, 13   59:5,
24   60:9, 10, 15   61:8,
14, 21   62:2, 13   63:4,
14   64:5, 15, 21   65:7
66:5, 14   69:24
**scooter's**   24:22
**score**   54:9
**scrape**   66:9
**scratches**   66:24
**Screen**   3:14   7:16
8:1   42:21   57:11
61:1, 5   62:10   64:24
**screenshot**   61:12
**scuff**   66:10
**sealing**   4:4
**second**   70:1   71:4
**secondary**   19:9
**seconds**   37:20   58:3
**section**   21:9   52:1, 3,
6
**security**   61:3
**sedan**   17:22
**see**   7:22   8:1, 6
10:14   25:8   26:3
47:5, 23   51:21   55:16
61:14, 18, 24   62:11
63:17   64:5, 6, 15, 17,
19   67:2
**seeing**   42:11   47:1
53:3   62:22   66:23
**seen**   23:3   31:8, 21,
23   35:5   38:4   48:16
53:21
**sees**   25:21   40:4
45:20
**segment**   46:2
**sense**   12:24   14:18
15:3   24:3   38:11

44:7
**sent**   67:20
**sentence**   67:19
**September**   36:7
**sequence**   42:12
46:10   61:7   64:13
66:13   69:22, 23   70:2,
15
**sequences**   61:11
**sequential**   8:7
**sergeant**   6:12, 15
**series**   65:20, 23
**serious**   59:13   60:17
**service**   67:10, 13
**setting**   5:1
**seventh**   63:22
**severe**   70:24
**sharp**   42:14
**sharply**   42:24   60:10,
11
**shift**   36:16, 20
**shirt**   25:16   31:12
45:9
**shortly**   19:14   49:6
**shot**   61:17
**Shots**   3:14
**show**   29:5   36:2
60:24
**showed**   20:15   28:20
29:10   42:7   46:2
**showing**   56:4
**shown**   57:24
**shows**   46:9   57:11, 21
58:3   63:22
**side**   46:14   58:2
61:8   62:3   63:18
64:17
**sidewalk**   64:20
**sight**   41:10
**sign**   66:4
**signal**   37:19   41:6
**signature**   10:18, 20,
21
**signed**   10:12, 16
51:13, 23   53:12
**signing**   4:4
**signs**   52:2
**silver**   33:17, 20, 23
34:2, 4

**Simon**   41:7
**single**   8:10
**sir**   5:16   16:13
**siren**   34:7   51:1
**sirens**   18:22   23:6
31:5   34:24   37:19
**sit**   67:5
**sitting**   48:15   49:5
**situation**   44:2
**six**   36:16
**sixth**   62:21
**skip**   52:17   55:22
**slightly**   42:13
**small**   41:6, 11
**smaller**   24:8
**smears**   66:24
**smudges**   66:24
**social**   8:16   13:17, 22
14:2, 19   15:19
**solo**   36:16
**somebody**   43:11
**sorry**   67:11
**sort**   6:3   8:4   11:5
13:5, 9, 12   20:20
28:21   29:11   31:7, 18,
20   32:2   34:15   43:8
44:3   46:14   50:19
55:11, 19   57:20   61:7
64:16   70:2
**sound**   26:15   31:9
**sounds**   6:19   15:5, 12
41:18   45:12
**sources**   28:20
**south**   50:1
**southbound**   23:15
24:19   26:6   37:22
38:2, 3, 6   40:5, 16
41:7, 11   42:2   57:24
**speak**   18:18   28:6
**speaking**   70:23
**specific**   9:6   16:7, 20
43:6   50:20
**specifically**   11:18
17:21   54:3
**Speculation**   43:4
60:20
**sped**   23:14
**speeds**   24:13
**spit**   5:7

**spoke**   39:8   53:16
**staff**   52:9
**stamp**   8:7
**start**   37:2
**started**   6:5, 7   58:6
**Starting**   10:9   61:19
**starts**   39:3   45:20
**state**   5:15
**stated**   22:3   28:2
31:5
**statement**   21:19
22:17, 21, 22   23:1
25:6   27:3, 16   30:1, 9
34:16   36:1, 15   37:10
41:17   42:3   46:1, 24
47:6   49:4   69:12, 14
**statements**   11:23
31:8   50:10
**STATES**   1:1   24:16
37:13
**stenographically**   72:7
**step**   5:9
**STIPULATED**   4:2
**stolen**   38:19
**stop**   23:7, 13   25:1,
13   35:17   37:20   38:9,
22   40:10   41:5, 13
44:5, 9   45:1
**stopped**   25:13   30:5
**stopping**   54:5
**stops**   45:3
**storage**   33:13   57:8
**story**   13:12   15:22
53:3
**straight**   53:9
**Street**   2:9   19:15
23:4   24:24   25:2, 6, 7,
13, 14, 19, 20   26:5, 6,
7, 8, 9, 11, 12, 14, 16
27:23   28:3, 4   29:16
30:20   37:3   40:7, 15,
16   41:6, 7, 9, 11, 15
44:22, 24   45:22   46:9
49:22   50:1   53:4
58:1   70:3
**stress**   5:5
**strike**   43:15
**stuff**   8:11   11:24
52:16, 17

Case 2:20-cv-06301-MMB   Document 68-3   Filed 02/16/24   Page 31 of 39

Deposition of Lt. James Clough                                    Neal Miller and Donna Miller v. City of Philadelphia, et al.

**subject** 13:*1*
**submitted** 19:*4*
**subsequent** 32:*20*
**subsequently** 25:*21* 34:*17*
**substance** 16:*10* 22:*5, 17* 24:*4* 26:*20* 27:*3*
**substantial** 12:*4*
**substantive** 11:*13*
**suddenly** 59:*24*
**suicidal** 24:*18* 38:*8, 13*
**Suite** 2:*4*
**summarize** 22:*5* 27:*11*
**summarized** 34:*20* 65:*3*
**summary** 21:*24* 22:*4, 13* 25:*10* 26:*19* 30:*1, 6* 32:*24* 37:*5, 12* 52:*20*
**superiors** 10:*11*
**supervisor** 6:*14* 19:*10*
**supplied** 48:*9*
**support** 40:*24*
**supporting** 13:*8*
**supposed** 18:*4* 19:*1, 4, 6, 10* 44:*8* 51:*4*
**Sure** 25:*11* 30:*17* 34:*23* 57:*9*
**sure,engaged** 29:*2*
**surprised** 48:*18*
**surroundings** 18:*23*
**surveillance** 20:*15*
**sustained** 9:*3*
**SUV** 20:*16* 33:*11, 12, 22* 35:*11* 51:*4* 58:*2, 4* 60:*9, 11, 17* 61:*7, 13, 19, 24* 62:*12* 63:*9, 22* 64:*6, 14* 66:*11, 13*
**SUVs** 17:*24* 59:*7*
**SWAT** 6:*10*
**sworn** 4:*11* 72:*6*
**synopsis** 6:*3*

**< T >**
**Tacony** 19:*14* 23:*4, 14* 24:*7* 25:*2, 22*

26:*8, 17* 30:*20* 37:*3, 14, 17, 21, 22* 40:*6, 15, 18* 49:*23*
**tag** 37:*16*
**take** 30:*22* 33:*23* 40:*6* 46:*1, 15*
**taken** 68:*6*
**takes** 49:*20*
**talk** 5:*6* 37:*1* 48:*4, 7*
**talked** 38:*7* 53:*19* 57:*8*
**talking** 27:*6* 45:*20* 48:*4* 65:*1*
**talks** 34:*17*
**Tauruses** 17:*24*
**team** 6:*9*
**technique** 43:*18*
**tell** 8:*12* 35:*1* 56:*14* 62:*19, 21* 63:*7* 68:*13*
**tells** 36:*15* 40:*3*
**terms** 18:*8* 43:*8*
**testified** 4:*12*
**testify** 4:*22* 68:*16, 21* 72:*6*
**testimony** 5:*1* 26:*20* 27:*14* 56:*12* 57:*16* 72:*11*
**thank** 10:*23* 71:*6*
**thing** 9:*18* 21:*16* 34:*19, 20* 57:*23*
**things** 11:*24* 14:*3* 18:*21* 19:*1* 68:*14* 70:*6*
**think** 18:*19* 32:*7* 33:*13, 15* 36:*14* 38:*22* 56:*18, 19* 57:*17* 61:*5* 62:*10* 64:*15* 69:*10* 71:*5*
**thinks** 38:*19*
**third** 61:*17*
**thought** 66:*21*
**threat** 17:*1*
**time** 4:*7* 12:*17, 22* 13:*1* 14:*24* 20:*9* 22:*1, 20* 39:*4* 45:*24* 46:*12* 47:*22* 51:*17* 54:*7* 57:*22* 71:*6*
**Timeline** 56:*1, 5*
**times** 28:*10*
**title** 5:*18*

**today** 9:*18* 27:*14* 56:*12*
**told** 23:*2* 27:*19* 30:*11* 33:*5, 9* 37:*14* 44:*23, 24* 45:*13* 50:*5* 53:*3, 23* 54:*6*
**top** 50:*22*
**touch** 58:*6*
**touched** 69:*10*
**tow** 53:*24*
**tractor** 7:*2* 19:*16*
**traffic** 17:*7* 23:*7, 16, 18* 24:*19* 25:*1* 35:*17* 37:*24* 38:*16, 18, 22*
**trailer** 7:*2* 19:*16*
**trained** 43:*10*
**transcribed** 36:*15* 72:*8*
**transcript** 4:*5* 52:*21*
**transcription** 53:*9* 72:*9*
**transferred** 6:*14*
**travel** 23:*14* 60:*2*
**traveled** 26:*16*
**traveling** 23:*4* 29:*11* 37:*16, 21, 23* 41:*8* 58:*2*
**tree** 64:*9*
**Trevose** 2:*5*
**trial** 4:*7*
**tried** 30:*23* 31:*11* 55:*18*
**tries** 38:*15, 21* 42:*18*
**triggered** 15:*9*
**truck** 30:*2* 53:*24*
**true** 72:*10*
**truth** 72:*6*
**try** 5:*5* 7:*21* 11:*21* 13:*6* 42:*14* 44:*13*
**trying** 15:*4* 22:*5, 17* 29:*4* 35:*17* 61:*4* 70:*15, 20*
**Tuesday** 19:*13*
**turn** 26:*6, 11* 38:*3* 50:*1* 60:*11* 69:*23, 24*
**turned** 25:*7, 19* 26:*5, 12* 40:*15*
**turning** 45:*10* 63:*10, 23* 64:*6, 14* 66:*14*

**turns** 41:*6, 7, 14* 42:*24* 60:*10*
**two** 24:*5* 36:*17* 49:*8* 58:*3* 65:*5* 69:*21* 70:*6*
**two-wheeled** 43:*12* 44:*14* 58:*19*
**type** 14:*7* 17:*2, 22* 28:*15* 54:*11* 68:*15*
**types** 17:*13*
**typical** 55:*3, 8*

**< U >**
**Ultimately** 8:*19* 29:*20* 50:*14, 16* 52:*7* 66:*4* 67:*16* 68:*2*
**unaware** 35:*5*
**uncovered** 4:*23*
**understand** 5:*12* 22:*16* 51:*14* 67:*22*
**understanding** 4:*18* 7:*4* 9:*17* 16:*24* 18:*16* 21:*20*
**understood** 10:*9*
**uniformly** 68:*20*
**UNITED** 1:*1*
**units** 19:*9*
**updating** 18:*24*
**use** 34:*24* 43:*11* 44:*7*
**utilize** 50:*24*
**utilizes** 40:*22*
**U-turn** 24:*23* 40:*5, 9*

**< V >**
**Vaguely** 23:*21*
**Vales** 51:*24*
**vans** 18:*1*
**variables** 59:*18*
**various** 6:*21* 20:*14* 28:*20* 31:*8* 35:*12* 36:*2* 51:*9* 53:*22* 56:*3, 8* 67:*17*
**veer** 61:*19*
**veering** 58:*4* 60:*1*
**veers** 58:*8* 60:*14* 63:*13*
**vehicle** 9:*8* 17:*22* 20:*20, 22, 23* 21:*2, 7* 25:*15, 18* 27:*22*

Deposition of Lt. James Clough                                    Neal Miller and Donna Miller v. City of Philadelphia, et al.

29:*11, 17, 18*   31:*4*
32:*3, 9*   33:*9*   34:*3, 6*
38:*20*   43:*11, 12*   44:*9,*
*14*   45:*5, 6*   46:*13*
47:*1*   48:*17*   51:*3*
53:*21*   58:*16, 19, 21,*
*22, 23*   59:*14*   65:*6, 10,*
*13, 24*   66:*6*   67:*9, 12*
70:*2*
**vehicles**   17:*13, 16, 18,*
*19, 21*   19:*2*   29:*12*
43:*15*   51:*5*   53:*4*
65:*6*
**vehicle's**   40:*23*
**vehicular**   16:*8*   17:*14*
**versus**   17:*24*
**vice-versa**   29:*22*   43:*2*
**vicinity**   58:*19*
**video**   1:*15*   3:*14*
*11:23*   20:*15*   28:*19*
*29:5, 7, 10*   31:*8, 21*
*32:5*   34:*10, 22, 24*
*35:2, 5, 9*   42:*6, 9, 18,*
*23*   46:*2, 8*   48:*16*
*55:24*   56:*9, 12, 18, 19*
*57:18*   60:*3*   61:*1*
*63:12*   65:*1*
**videos**   35:*12*   36:*2*
*55:22*   56:*3, 14*
**violated**   9:*7*   14:*10*
*50:17, 20*   51:*10*
**violation**   7:*6*   9:*2*
*19:22*   50:*12*
**violations**   8:*20*   10:*7*
*14:15*   67:*17*
**violent**   38:*24*
**vs**   1:*9*
**vulnerable**   59:*6, 10*

**< W >**
**waived**   4:*5*
**want**   5:*5*   52:*14*
*57:20*
**wanted**   4:*21*   49:*3*
*54:4*   57:*4*
**wants**   24:*18*
**warn**   24:*19*   38:*5*
**warranted**   17:*17*
**Watson**   24:*9*

**way**   8:*8*   9:*22*   12:*10*
*59:11*   64:*8*   68:*4, 17*
**ways**   50:*20*
**Wednesday**   1:*16*
*20:13*
**Well**   9:*15*   11:*20*
*19:11*   20:*7, 12*   26:*2*
*27:3*   28:*21*   30:*9*
*32:11*   43:*14, 16*
*47:12*   48:*7*   50:*15*
*54:2*   59:*5, 23*   68:*15*
**went**   6:*9, 13*   20:*14*
*21:18*   33:*13*   34:*1*
*37:17*
**we're**   5:*4*   8:*9*   11:*5*
*35:23*   37:*5*   43:*15*
*48:4*   49:*5*   52:*18*
*56:23*   62:*22*   64:*5*
**west**   41:*14*
**westbound**   37:*16*
*56:17*
**we've**   7:*11*   34:*15*
*51:22*   57:*8*   67:*17*
**whatsoever**   47:*2*
**white**   27:*24*   28:*1*
**wish**   52:*14*
**WITNESS**   3:*3*   4:*10*
*8:23*   11:*17, 23*   12:*21*
*14:14, 24*   15:*12*   16:*4*
*21:19*   22:*13*   23:*10*
*26:23*   29:*1*   30:*16*
*31:15*   33:*1, 8*   39:*7,*
*16, 21*   41:*2, 23*   42:*17*
*43:5*   44:*17*   45:*16*
*46:6, 20*   47:*5, 12, 19*
*48:3, 21*   50:*7, 9*   53:*1,*
*11*   54:*17, 24*   55:*8, 15*
*58:11*   59:*2, 10, 17*
*60:6, 21*   62:*6, 18, 24*
*63:6*   64:*1*   66:*17*
*69:7, 18*   70:*10, 19*
*71:7*   72:*5, 11*
**witnessed**   27:*21*   30:*8*
**Wolk**   7:*7*   9:*13, 24*
*12:13, 18*   21:*6, 18, 24*
*22:6*   23:*2, 12, 16*
*24:4, 13, 22*   25:*12, 15,*
*20*   26:*4, 12*   29:*22*
*31:10*   32:*1, 8, 9*
*35:17*   36:*7*   40:*9, 22*

41:*10, 17*   42:*12, 23*
*44:21*   45:*4, 7*   46:*1,*
*16, 24*   48:*16*   49:*22*
*50:15*   53:*6, 23*   54:*8,*
*11*   65:*24*   69:*2, 12*
*70:14*
**Wolk's**   26:*20*   29:*17*
*34:6, 16*   36:*1*   47:*24*
*53:13*   66:*6*
**word**   22:*14*
**words**   15:*4*
**work**   11:*13*   12:*6*
*51:22*   59:*23*
**working**   13:*2*   33:*9*
*36:16*
**works**   7:*21*
**Worksheet**   8:*2*
**write**   12:*3*
**written**   27:*16*
**wrong**   15:*3*   23:*18*

**< Y >**
**yeah**   12:*22*   15:*2*
*17:6, 19*   23:*10*   31:*15*
*42:17*   45:*23*   47:*13*
**year**   6:*10, 11*
**years**   6:*11*   36:*12*
*54:1*

**< Z >**
**Zoom**   5:*5*

## WORD LIST

**< 0 >**
**0006** *(1)*
**001** *(1)*
**003** *(1)*
**004** *(1)*
**01** *(1)*

**< 1 >**
**1** *(3)*
**1:00** *(1)*
**10** *(2)*
**109** *(1)*
**11:00** *(1)*
**110** *(1)*
**1210** *(1)*
**14** *(3)*
**14th** *(1)*
**1515** *(1)*
**17** *(2)*
**189** *(1)*
**19053** *(1)*
**19102** *(1)*
**1989** *(1)*

**< 2 >**
**2** *(3)*
**2:20-cv-06301-ER** *(1)*
**2:21** *(1)*
**20** *(1)*
**2003** *(1)*
**2007** *(2)*
**2015** *(1)*
**2019** *(3)*
**2023** *(1)*
**215** *(2)*
**26th** *(2)*
**280** *(1)*

**< 3 >**
**3rd** *(1)*

**< 4 >**
**4** *(1)*
**4th** *(1)*

**< 5 >**
**5** *(2)*

**5343** *(2)*
**5400** *(3)*
**57** *(2)*
**5-7-19** *(1)*
**58** *(1)*
**5-8-19** *(1)*

**< 6 >**
**683-5382** *(1)*

**< 7 >**
**7** *(1)*
**7:25** *(1)*
**7:30** *(1)*
**71/61** *(1)*
**71/7** *(1)*
**7th** *(1)*

**< 8 >**
**8** *(1)*

**< 9 >**
**9** *(1)*
**9.4** *(3)*
**953-5200** *(1)*
**9th** *(1)*

**< A >**
**a.m** *(1)*
**able** *(5)*
**Absent** *(1)*
**academy** *(1)*
**accelerate** *(1)*
**accident** *(16)*
**accompanied** *(1)*
**accurate** *(3)*
**accurately** *(1)*
**action** *(6)*
**actions** *(1)*
**activated** *(3)*
**actual** *(4)*
**add** *(3)*
**added** *(1)*
**additional** *(5)*
**address** *(1)*
**addresses** *(1)*
**adjacent** *(1)*
**adjudicated** *(1)*
**Administrators** *(1)*

**advised** *(1)*
**Affairs** *(18)*
**afternoon** *(1)*
**ago** *(1)*
**agree** *(7)*
**AGREED** *(1)*
**ahead** *(8)*
**AID** *(1)*
**air** *(3)*
**al** *(1)*
**allegation** *(1)*
**allegations** *(1)*
**alley** *(1)*
**allowed** *(6)*
**alongside** *(7)*
**Analysis** *(1)*
**Anderson** *(1)*
**answer** *(40)*
**anti-crime** *(1)*
**anybody** *(7)*
**anybody's** *(1)*
**apart** *(1)*
**apologize** *(1)*
**apparently** *(1)*
**appear** *(4)*
**appeared** *(1)*
**appears** *(11)*
**apples** *(2)*
**applicable** *(2)*
**approach** *(1)*
**approached** *(3)*
**approaches** *(1)*
**approaching** *(1)*
**approved** *(1)*
**approximately** *(1)*
**apron** *(1)*
**Arch** *(1)*
**area** *(5)*
**arrested** *(2)*
**arrives** *(1)*
**arsenal** *(1)*
**asked** *(6)*
**asking** *(5)*
**assigned** *(7)*
**assignments** *(1)*
**assistance** *(1)*
**ASSOCIATES** *(1)*
**assume** *(1)*
**assuming** *(6)*

**attached** *(1)*
**attempt** *(7)*
**attempted** *(2)*
**attempting** *(1)*
**attempts** *(4)*
**attention** *(2)*
**attorney** *(2)*
**audio** *(2)*
**authenticate** *(1)*
**authored** *(2)*
**auto** *(1)*
**avoid** *(2)*
**aware** *(6)*

**< B >**
**back** *(10)*
**backed** *(1)*
**backwards** *(2)*
**band** *(1)*
**Bar** *(3)*
**based** *(5)*
**basically** *(7)*
**basics** *(1)*
**basis** *(1)*
**Bates** *(1)*
**Bear** *(2)*
**bearings** *(1)*
**began** *(4)*
**Beginning** *(7)*
**begins** *(2)*
**believe** *(17)*
**believed** *(1)*
**believing** *(1)*
**best** *(2)*
**beyond** *(1)*
**big** *(1)*
**bike** *(6)*
**bit** *(10)*
**blind** *(4)*
**block** *(2)*
**blocking** *(1)*
**blow** *(1)*
**blue** *(1)*
**blurry** *(4)*
**Board** *(1)*
**body** *(1)*
**bottom** *(1)*
**Bove** *(16)*
**break** *(1)*

Deposition of Lt. James Clough                    Neal Miller and Donna Miller v. City of Philadelphia, et al.

bridge  (8)
briefly  (1)
broke  (1)
brought  (2)
Building  (1)
bulk  (1)

< C >
call  (2)
called  (4)
calls  (2)
camera  (4)
cameras  (1)
captain  (1)
Car  (18)
cars  (3)
case  (2)
Castle  (1)
catching  (1)
caused  (1)
Center  (1)
certain  (1)
certainly  (6)
certify  (2)
chain  (1)
chance  (3)
changed  (1)
changes  (1)
characterization  (3)
characterized  (1)
charges  (3)
charging  (1)
chase  (2)
chased  (1)
chasing  (2)
check  (1)
Chester  (2)
Chief  (2)
Chris  (1)
circle  (1)
circumstance  (1)
circumstances  (7)
CITY  (3)
civilian  (2)
clarify  (1)
clear  (6)
clearly  (1)
close  (1)
closing  (1)

CLOUGH  (5)
collide  (1)
collided  (1)
collision  (6)
come  (4)
coming  (2)
command  (1)
Commanding  (8)
commenced  (2)
commencing  (1)
comment  (1)
comments  (1)
commercial  (1)
committed  (3)
Commonwealth  (1)
communication  (3)
community  (1)
comparing  (1)
Complaint  (1)
complex  (1)
computer  (1)
computer-aided  (1)
computerized  (1)
conceal  (1)
concern  (1)
concerned  (1)
concerning  (1)
concluded  (2)
concludes  (1)
conclusion  (9)
conclusions  (2)
conditions  (1)
conduct  (2)
conducted  (2)
conference  (1)
confine  (1)
confirm  (4)
confirmed  (1)
connect  (1)
connection  (3)
consequence  (1)
consider  (1)
considered  (1)
consistent  (2)
constitutes  (1)
contact  (3)
contacted  (1)
contacting  (2)
contained  (1)

contents  (3)
continued  (1)
continues  (2)
control  (1)
conversation  (1)
convey  (1)
cooperate  (1)
coordination  (1)
corner  (1)
Corporate  (1)
Correct  (81)
corroborated  (2)
counsel  (5)
County  (3)
couple  (6)
course  (3)
COURT  (3)
criminal  (4)
criminally  (1)
current  (1)
currently  (2)
curve  (6)
cut  (1)

< D >
danger  (2)
Danielle  (2)
database  (1)
date  (2)
day  (1)
Deborah  (3)
Defendant  (1)
Defendants  (1)
Defense  (3)
degree  (1)
Delaware  (1)
delve  (1)
demeanor  (1)
denied  (3)
denies  (1)
dents  (1)
deny  (1)
DEPARTMENT  (14)
departmental  (3)
depicted  (1)
deposition  (6)
depositions  (1)
DEREK  (1)
derek.kane@Phila.gov

(1)
describe  (1)
described  (3)
describes  (1)
describing  (4)
DESCRIPTION  (4)
detail  (4)
detailed  (1)
details  (3)
determine  (4)
determined  (2)
died  (2)
Dietz  (1)
different  (1)
difficult  (1)
direction  (3)
Directive  (9)
directly  (1)
dirt  (1)
disciplinary  (1)
discipline  (2)
discovered  (2)
discuss  (1)
discussed  (5)
discussion  (3)
disengaged  (1)
dismiss  (2)
dismissal  (1)
Disregarded  (2)
disregards  (1)
distance  (1)
DISTRICT  (4)
dive  (1)
division  (2)
document  (9)
documents  (5)
doing  (3)
DONNA  (1)
double-check  (1)
doubles  (2)
draw  (2)
Drive  (1)
driven  (1)
Driver  (5)
driving  (9)
drove  (2)
duly  (2)

< E >

Deposition of Lt. James Clough                                   Neal Miller and Donna Miller v. City of Philadelphia, et al.

**Eadom**  *(14)*
**earlier**  *(9)*
**easier**  *(2)*
**eastbound**  *(2)*
**EASTERN**  *(1)*
**edited**  *(1)*
**either**  *(2)*
**emergency**  *(4)*
**employee**  *(2)*
**ends**  *(1)*
**engage**  *(4)*
**engaged**  *(2)*
**engages**  *(1)*
**engines**  *(1)*
**entered**  *(1)*
**entire**  *(1)*
**entirety**  *(1)*
**entrance**  *(1)*
**equipment**  *(2)*
**ESQUIRE**  *(3)*
**essentially**  *(1)*
**Estate**  *(1)*
**et**  *(1)*
**evasive**  *(1)*
**evening**  *(1)*
**event**  *(6)*
**events**  *(5)*
**evidence**  *(1)*
**exactly**  *(1)*
**Examination**  *(2)*
**examined**  *(1)*
**excuse**  *(1)*
**excused**  *(1)*
**EXHIBIT**  *(3)*
**exits**  *(2)*
**extent**  *(1)*

**< F >**
**face**  *(1)*
**faces**  *(1)*
**facilitate**  *(1)*
**fact**  *(3)*
**facts**  *(2)*
**fail**  *(1)*
**failed**  *(3)*
**failure**  *(3)*
**fair**  *(31)*
**fairly**  *(2)*
**familiar**  *(6)*

**far**  *(5)*
**feared**  *(1)*
**felon**  *(1)*
**felony**  *(2)*
**Fibber**  *(1)*
**field**  *(1)*
**fifth**  *(1)*
**file**  *(2)*
**filed**  *(1)*
**filing**  *(1)*
**finalized**  *(1)*
**Finally**  *(1)*
**financially**  *(1)*
**find**  *(3)*
**findings**  *(1)*
**fine**  *(1)*
**First**  *(14)*
**Flacco**  *(2)*
**F-L-A-C-C-O**  *(1)*
**FLAGER**  *(1)*
**flee**  *(2)*
**fleeing**  *(1)*
**Floor**  *(1)*
**flow**  *(1)*
**follow**  *(2)*
**followed**  *(2)*
**following**  *(7)*
**follows**  *(4)*
**force**  *(2)*
**forces**  *(1)*
**forcible**  *(2)*
**forcing**  *(4)*
**Ford**  *(1)*
**foreground**  *(1)*
**form**  *(47)*
**forth**  *(3)*
**forthcoming**  *(1)*
**forward**  *(1)*
**found**  *(1)*
**four**  *(1)*
**four-door**  *(1)*
**four-wheeled**  *(1)*
**Fraley**  *(14)*
**frame**  *(2)*
**frames**  *(2)*
**Francis**  *(3)*
**front**  *(4)*
**full**  *(2)*
**further**  *(9)*

**< G >**
**gamut**  *(1)*
**Gary**  *(6)*
**gathered**  *(2)*
**gathering**  *(2)*
**general**  *(1)*
**generally**  *(2)*
**gentleman**  *(1)*
**getting**  *(2)*
**give**  *(2)*
**given**  *(2)*
**gives**  *(1)*
**glad**  *(1)*
**Gniotek**  *(1)*
**Gnioteked**  *(2)*
**go**  *(17)*
**goes**  *(8)*
**going**  *(16)*
**Goldhill**  *(3)*
**Good**  *(2)*
**grab**  *(5)*
**grabs**  *(5)*
**great**  *(2)*
**grounds**  *(1)*
**groups**  *(1)*
**guess**  *(11)*
**guilty**  *(1)*

**< H >**
**half**  *(2)*
**happen**  *(1)*
**happened**  *(5)*
**happens**  *(4)*
**hard**  *(3)*
**head**  *(2)*
**headed**  *(1)*
**heading**  *(2)*
**heard**  *(2)*
**hearing**  *(3)*
**held**  *(1)*
**help**  *(1)*
**highway**  *(4)*
**history**  *(2)*
**hold**  *(1)*
**honest**  *(1)*
**honestly**  *(4)*
**horn**  *(3)*
**hour**  *(2)*

**hours**  *(1)*
**house**  *(1)*
**hundred**  *(1)*
**hurt**  *(1)*

**< I >**
**IAD**  *(30)*
**idea**  *(1)*
**identification**  *(1)*
**identified**  *(1)*
**image**  *(5)*
**Images**  *(1)*
**imminent**  *(1)*
**incident**  *(9)*
**included**  *(1)*
**index**  *(1)*
**indicate**  *(4)*
**indicated**  *(4)*
**indicates**  *(5)*
**indicating**  *(2)*
**indication**  *(1)*
**indications**  *(1)*
**indirectly**  *(1)*
**individual**  *(3)*
**Individually**  *(1)*
**influence**  *(1)*
**information**  *(4)*
**initial**  *(1)*
**initially**  *(3)*
**initiate**  *(5)*
**initiated**  *(4)*
**initiation**  *(1)*
**injury**  *(2)*
**inquiries**  *(2)*
**Inquiry**  *(1)*
**insert**  *(1)*
**inside**  *(1)*
**inspection**  *(1)*
**Inspector**  *(4)*
**inspectors**  *(1)*
**instructed**  *(1)*
**interested**  *(1)*
**Internal**  *(18)*
**interpretation**  *(2)*
**intersection**  *(1)*
**intervention**  *(1)*
**interview**  *(9)*
**interviewed**  *(5)*
**intoxicated**  *(2)*

investigate  (3)
Investigation  (28)
investigations  (2)
Investigative  (1)
investigator  (5)
involve  (1)
involved  (10)
involvement  (1)
involves  (1)
irony  (1)
issue  (1)
it'll  (1)
its  (1)

< J >
JAMES  (14)
Jennifer  (1)
job  (1)
joining  (1)
justify  (1)

< K >
KANE  (60)
keep  (1)
kid  (5)
kind  (4)
knew  (4)
know  (26)
knowing  (1)
knowledge  (6)
known  (2)
knows  (1)

< L >
lane  (2)
lanes  (4)
launched  (1)
LAW  (2)
leaning  (1)
learned  (1)
learns  (2)
led  (2)
left  (4)
leg  (2)
legal  (1)
LEVIN  (65)
license  (1)
LIEUTENANT  (7)
light  (2)

lights  (10)
limit  (1)
lines  (1)
listed  (3)
lit  (1)
little  (10)
loaded  (1)
local  (1)
located  (1)
location  (3)
long  (1)
look  (7)
looked  (5)
looking  (6)
looks  (17)
lose  (1)
lost  (2)
lot  (15)
low  (1)
lower  (1)
lying  (2)

< M >
majority  (1)
making  (1)
male  (2)
managed  (1)
manages  (2)
maneuver  (3)
manners  (1)
mark  (2)
MARKED  (4)
material  (1)
Materials  (1)
matter  (2)
Mattos  (2)
McGee's  (1)
mean  (7)
means  (3)
media  (6)
medics  (1)
memo  (1)
memorandum  (5)
memory  (1)
mention  (2)
mentioned  (2)
mercifully  (1)
merely  (1)
met  (1)

MICHAEL  (4)
middle  (1)
MILLER  (4)
mind  (1)
minutes  (2)
missing  (1)
moment  (1)
monitoring  (2)
months  (2)
morning  (1)
motor  (28)
motorcycle  (2)
motorcyclist  (2)
motorcyclists  (1)
motorists  (2)
motorized  (3)
mouth  (2)
move  (1)
Moving  (2)
multiple  (1)

< N >
name  (3)
named  (1)
narcotics  (1)
narrative  (2)
Natalie  (3)
nature  (3)
NEAL  (1)
near  (3)
necessarily  (1)
necessary  (1)
need  (2)
never  (2)
new  (2)
night  (1)
Nitti  (1)
normal  (1)
normally  (1)
northbound  (7)
Northbrook  (1)
Notary  (3)
notes  (1)
noticed  (2)
notification  (1)
notified  (3)
notify  (2)
NUMBER  (5)
numbered  (1)

< O >
Objection  (54)
objections  (1)
observed  (2)
obtained  (2)
obverses  (1)
Obviously  (4)
occurred  (1)
occurrence  (1)
occurring  (2)
occurs  (1)
October  (2)
odd  (2)
offense  (3)
offer  (2)
offered  (1)
Officer  (73)
officers  (4)
officer's  (2)
official  (2)
Okay  (109)
omission  (1)
omit  (1)
omitted  (2)
once  (3)
opened  (2)
operating  (3)
operator  (21)
opinion  (1)
opportunity  (1)
opposed  (3)
opposes  (1)
oriented  (2)
Outside  (4)
overhead  (1)

< P >
P.C  (1)
p.m  (2)
package  (1)
packet  (2)
PAGE  (26)
pages  (2)
panel  (1)
paragraph  (1)
paragraphs  (1)
parallel  (1)
paraphrasing  (1)

parked  *(1)*
parking  *(11)*
Parkway  *(1)*
part  *(10)*
participation  *(1)*
particular  *(4)*
parties  *(2)*
passenger  *(3)*
passengers  *(1)*
passes  *(2)*
patrol  *(5)*
patrolled  *(1)*
PBI  *(1)*
PENNSYLVANIA  *(6)*
people  *(2)*
percent  *(1)*
permissible  *(2)*
permitted  *(2)*
person  *(13)*
personal  *(1)*
personally  *(1)*
personnel  *(3)*
pertaining  *(1)*
pertains  *(1)*
PHILADELPHIA
  *(10)*
photograph  *(2)*
photographed  *(2)*
photographs  *(1)*
photos  *(2)*
physically  *(1)*
pictures  *(1)*
pieces  *(3)*
place  *(3)*
plaintiff  *(2)*
Plaintiffs  *(5)*
Plaintiff's  *(2)*
plant  *(1)*
plate  *(1)*
platform  *(1)*
player  *(1)*
please  *(1)*
point  *(17)*
points  *(3)*
Police  *(41)*
policies  *(3)*
policy  *(10)*
poorly  *(1)*
popping  *(1)*

portion  *(11)*
portions  *(2)*
positions  *(1)*
possibility  *(1)*
possibly  *(2)*
posting  *(1)*
postings  *(4)*
post-marked  *(1)*
potential  *(3)*
potentially  *(1)*
preceded  *(1)*
precision  *(1)*
preparation  *(3)*
prepare  *(1)*
prepared  *(2)*
preparing  *(1)*
pre-patrol  *(1)*
present  *(1)*
pretty  *(18)*
previously  *(4)*
prior  *(1)*
probably  *(1)*
probe  *(1)*
procedural  *(1)*
procedure  *(2)*
proceeding  *(3)*
proceedings  *(1)*
product  *(2)*
production  *(1)*
Professional  *(1)*
prohibited  *(1)*
promoted  *(2)*
prompted  *(2)*
pronounced  *(1)*
proper  *(1)*
property  *(1)*
provide  *(3)*
provided  *(5)*
Public  *(4)*
pull  *(1)*
pulled  *(2)*
pulling  *(2)*
pulls  *(2)*
purpose  *(1)*
purposes  *(1)*
pursuing  *(4)*
pursuit  *(30)*
pursuits  *(4)*
pursuit's  *(1)*

push  *(1)*
put  *(2)*
puts  *(1)*
putting  *(1)*

**< Q >**
quarter  *(1)*
question  *(11)*
questions  *(10)*
quite  *(1)*

**< R >**
radio  *(6)*
raise  *(1)*
raised  *(1)*
rank  *(1)*
rarely  *(1)*
reach  *(1)*
reaches  *(1)*
reaction  *(1)*
reading  *(4)*
read-through  *(1)*
realized  *(1)*
really  *(6)*
rear  *(6)*
reason  *(6)*
reasonable  *(1)*
recall  *(3)*
recognized  *(2)*
recollection  *(3)*
record  *(6)*
recorded  *(3)*
recording  *(1)*
recovered  *(3)*
refer  *(1)*
REFERENCED  *(1)*
referred  *(1)*
referring  *(8)*
reflected  *(1)*
Refused  *(1)*
regard  *(1)*
regarding  *(2)*
regurgitation  *(1)*
relate  *(2)*
related  *(1)*
relates  *(4)*
relative  *(3)*
relied  *(1)*
remained  *(1)*

remember  *(8)*
remotely  *(1)*
repeat  *(1)*
rephrase  *(1)*
report  *(15)*
Reporter  *(3)*
reporting  *(1)*
represent  *(1)*
Representing  *(3)*
request  *(1)*
requests  *(1)*
require  *(1)*
requirements  *(1)*
reserved  *(1)*
residential  *(1)*
resolution  *(2)*
respect  *(1)*
respective  *(1)*
respects  *(1)*
respond  *(3)*
responded  *(1)*
responsibility  *(1)*
rest  *(1)*
result  *(2)*
review  *(7)*
reviewed  *(8)*
rider  *(4)*
riders  *(1)*
right  *(95)*
right-hand  *(4)*
risk  *(6)*
risks  *(1)*
roadway  *(1)*
Robert  *(1)*
roughly  *(1)*
roundabout  *(1)*
routine  *(2)*
RPC  *(2)*
rules  *(1)*
run  *(5)*
runs  *(2)*
RYAN  *(2)*

**< S >**
safety  *(1)*
sat  *(1)*
saw  *(13)*
saying  *(3)*
says  *(9)*

Deposition of Lt. James Clough     Neal Miller and Donna Miller v. City of Philadelphia, et al.

**Scattergood** *(10)*
**scene** *(2)*
**Scheffield** *(3)*
**scooter** *(82)*
**scooter's** *(1)*
**score** *(1)*
**scrape** *(1)*
**scratches** *(1)*
**Screen** *(9)*
**screenshot** *(1)*
**scuff** *(1)*
**sealing** *(1)*
**second** *(2)*
**secondary** *(1)*
**seconds** *(2)*
**section** *(4)*
**security** *(1)*
**sedan** *(1)*
**see** *(23)*
**seeing** *(5)*
**seen** *(8)*
**sees** *(3)*
**segment** *(1)*
**sense** *(6)*
**sent** *(1)*
**sentence** *(1)*
**September** *(1)*
**sequence** *(9)*
**sequences** *(1)*
**sequential** *(1)*
**sergeant** *(2)*
**series** *(2)*
**serious** *(2)*
**service** *(2)*
**setting** *(1)*
**seventh** *(1)*
**severe** *(1)*
**sharp** *(1)*
**sharply** *(3)*
**shift** *(2)*
**shirt** *(3)*
**shortly** *(2)*
**shot** *(1)*
**Shots** *(1)*
**show** *(3)*
**showed** *(5)*
**showing** *(1)*
**shown** *(1)*
**shows** *(6)*

**side** *(6)*
**sidewalk** *(1)*
**sight** *(1)*
**sign** *(1)*
**signal** *(2)*
**signature** *(3)*
**signed** *(5)*
**signing** *(1)*
**signs** *(1)*
**silver** *(5)*
**Simon** *(1)*
**single** *(1)*
**sir** *(2)*
**siren** *(2)*
**sirens** *(5)*
**sit** *(1)*
**sitting** *(2)*
**situation** *(1)*
**six** *(1)*
**sixth** *(1)*
**skip** *(2)*
**slightly** *(1)*
**small** *(2)*
**smaller** *(1)*
**smears** *(1)*
**smudges** *(1)*
**social** *(6)*
**solo** *(1)*
**somebody** *(1)*
**sorry** *(1)*
**sort** *(24)*
**sound** *(2)*
**sounds** *(5)*
**sources** *(1)*
**south** *(1)*
**southbound** *(13)*
**speak** *(2)*
**speaking** *(1)*
**specific** *(5)*
**specifically** *(3)*
**Speculation** *(2)*
**sped** *(1)*
**speeds** *(1)*
**spit** *(1)*
**spoke** *(1)*
**staff** *(1)*
**stamp** *(1)*
**start** *(1)*
**started** *(3)*

**Starting** *(2)*
**starts** *(2)*
**state** *(1)*
**stated** *(3)*
**statement** *(22)*
**statements** *(3)*
**STATES** *(3)*
**stenographically** *(1)*
**step** *(1)*
**STIPULATED** *(1)*
**stolen** *(1)*
**stop** *(14)*
**stopped** *(2)*
**stopping** *(1)*
**stops** *(1)*
**storage** *(2)*
**story** *(3)*
**straight** *(1)*
**Street** *(45)*
**stress** *(1)*
**strike** *(1)*
**stuff** *(4)*
**subject** *(1)*
**submitted** *(1)*
**subsequent** *(1)*
**subsequently** *(2)*
**substance** *(6)*
**substantial** *(1)*
**substantive** *(1)*
**suddenly** *(1)*
**suicidal** *(3)*
**Suite** *(1)*
**summarize** *(2)*
**summarized** *(2)*
**summary** *(1)*
**superiors** *(1)*
**supervisor** *(2)*
**supplied** *(1)*
**support** *(1)*
**supporting** *(1)*
**supposed** *(8)*
**Sure** *(5)*
**sure,engaged** *(1)*
**surprised** *(1)*
**surroundings** *(1)*
**surveillance** *(1)*
**sustained** *(1)*
**SUV** *(22)*
**SUVs** *(2)*

**SWAT** *(1)*
**sworn** *(2)*
**synopsis** *(1)*

**< T >**
**Tacony** *(18)*
**tag** *(1)*
**take** *(5)*
**taken** *(1)*
**takes** *(1)*
**talk** *(4)*
**talked** *(3)*
**talking** *(4)*
**talks** *(1)*
**Tauruses** *(1)*
**team** *(1)*
**technique** *(1)*
**tell** *(7)*
**tells** *(2)*
**terms** *(2)*
**testified** *(1)*
**testify** *(4)*
**testimony** *(6)*
**thank** *(2)*
**thing** *(5)*
**things** *(6)*
**think** *(14)*
**thinks** *(1)*
**third** *(1)*
**thought** *(1)*
**threat** *(1)*
**time** *(16)*
**Timeline** *(2)*
**times** *(1)*
**title** *(1)*
**today** *(3)*
**told** *(13)*
**top** *(1)*
**touch** *(1)*
**touched** *(1)*
**tow** *(1)*
**tractor** *(2)*
**traffic** *(11)*
**trailer** *(2)*
**trained** *(1)*
**transcribed** *(2)*
**transcript** *(2)*
**transcription** *(2)*
**transferred** *(1)*

travel *(2)*
traveled *(1)*
traveling *(7)*
tree *(1)*
Trevose *(1)*
trial *(1)*
tried *(3)*
tries *(3)*
triggered *(1)*
truck *(2)*
true *(1)*
truth *(1)*
try *(6)*
trying *(8)*
Tuesday *(1)*
turn *(7)*
turned *(5)*
turning *(6)*
turns *(5)*
two *(7)*
two-wheeled *(3)*
type *(6)*
types *(1)*
typical *(2)*

**< U >**
Ultimately *(8)*
unaware *(1)*
uncovered *(1)*
understand *(4)*
understanding *(6)*
understood *(1)*
uniformly *(1)*
UNITED *(1)*
units *(1)*
updating *(1)*
use *(3)*
utilize *(1)*
utilizes *(1)*
U-turn *(3)*

**< V >**
Vaguely *(1)*
Vales *(1)*
vans *(1)*
variables *(1)*
various *(11)*
veer *(1)*
veering *(2)*

veers *(3)*
vehicle *(46)*
vehicles *(11)*
vehicle's *(1)*
vehicular *(2)*
versus *(1)*
vice-versa *(2)*
vicinity *(1)*
video *(35)*
videos *(5)*
violated *(5)*
violation *(4)*
violations *(4)*
violent *(1)*
vs *(1)*
vulnerable *(2)*

**< W >**
waived *(1)*
want *(3)*
wanted *(4)*
wants *(1)*
warn *(2)*
warranted *(1)*
Watson *(1)*
way *(7)*
ways *(1)*
Wednesday *(2)*
Well *(19)*
went *(7)*
we're *(12)*
west *(1)*
westbound *(2)*
we've *(5)*
whatsoever *(1)*
white *(2)*
wish *(1)*
WITNESS *(62)*
witnessed *(2)*
Wolk *(50)*
Wolk's *(8)*
word *(2)*
words *(1)*
work *(4)*
working *(3)*
works *(1)*
Worksheet *(1)*
write *(1)*
written *(1)*

wrong *(2)*

**< Y >**
yeah *(9)*
year *(2)*
years *(3)*

**< Z >**
Zoom *(1)*