August 18, 2023


Mr. Michael Levin, Esq.
Flager & Associates, PC
1210 Northbrook Dr.
Suite 280
Trevose, PA 19053

RE: Neal Miller and Donna Miller, Administrators of the Estate of Ryan Miller v. Police Officer
Joseph Wolk / Case 2:20-cv-06301-ER
United States District Court of the Eastern District of Pennsylvania
Interim Report by Craig Allen
Pursuant to Rule 26(a)(2)(B)


Dear Mr. Levin,

Thank you for the kind invitation to work on this case.  I have reviewed and considered the
following materials:

Items received on March 29, 2023, through submittal of report:

1. 2251 Fraley Video File
    a. ch08_20190507191500
    b. ch08_20190507191621
    c. ch08_20190507191648
    d. ch08_20190507191827
    e. ch08_20190507191910
    f. ch08_20190507192114
    g. ch08_20190507192139
    h. ch08_20190507192310
    i. ch08_20190507192424
    j. ch08_20190507192525
    k. ch08_20190507192542
    l. ch08_20190507192618
    m. ch08_20190507192659
    n. ch08_20190507192741
    o. ch08_20190507192832
    p. ch08_20190507192906
    q. ch08_20190507193129
    r. ch08_20190507193244
    s. ch08_20190507193415
    t. ch08_20190507193439

     u.  ch13_20190507191500
     v.  ch13_20190507191619
     w. ch13_20190507191647
     x.  ch13_20190507191817
     y.  ch13_20190507191909
     z.  ch13_20190507192037
     aa. ch13_20190507192206
     bb. ch13_20190507192235
     cc. ch13_20190507192314
     dd. ch13_20190507192406
     ee. ch13_20190507192509
     ff.  ch13_20190507192545
     gg. ch13_20190507192622
     hh. ch13_20190507192708
     ii.  ch13_20190507192740
     jj.  ch13_20190507192829
     kk. ch13_20190507192903
     ll.  ch13_20190507193126
     mm.  ch13_20190507193229
     nn. ch13_20190507193303
     oo. ch13_20190507193410
     pp. ch13_20190507193447

2. 5343 Eadom Video File
     a.  1220-2448-recfile_-190507-060000-065959-00001500
3. 5400 Eadom Video File
     a.  Camera 3_20190507_192300.exe
     b.  Camera 3_20190507_192400.mov
     c.  NSAlley5719.mp4
4. Def Answer to 2nd Amended Complaint
5. Mr. William Neale Investigation Report
6. Video / Alley_7_25PM starts at 7-27.mp4
7. Ashley Zehnder unsigned statement
8. Charles Bentham CV
9. City Initial Disclosures
10. FILED Second Amended Complaint Exhibits
11. FILED Second Amended Complaint
12. City Initial Production - Miller - Defense 000001-149
13. FELTMAN INTERVIEW
14. Gary Bove Statement from AID Report
15. Gary_Bove Lexis Search witness per Police
16. Luis Rosario Witness Statement
17. Phila Claim Form Description of Incident
18. Report fm Ciprano Investigation
19. ROSARIO INTERVIEW - Scene Photo 7-18-2019

20. ROSARIO INTERVIEW 7-18-2019
21. Statements from Cipriani
22. Steven Mattos Statement
23. Video footage 5-7-19 (provided by Ahsley Zehnder)
24. Video footage 5-7-19 (provided by Ashley Zehnder 2)
25. Video footage 5-7-19(provided by Ashley Zehnder) (2)
26. Video Jul 12, 3 51 18 PM witness Dawn Brooks
27. Video Jul 12, 3 58 13 PM 2nd video Dawn Brooks
28. Video Jul 15, 10 19 30 AM Denise House
29. Video Jul 15, 10 23 26 AM PARKING LOT 1
30. Lt. James Clough-Depo
31. IA Investigation / Lt. Clough 100919
32. Lt. Louis Higginson-Depo
33. Officer Christopher Savino-Depo
34. Officer Joseph Wolk-Depo
35. IAD Memo from Commanding Officer IAD 092519
36. IAD Video Timeline Def #000057
37. Accident Investigation Interview Record (Wolk Exhibit 4)
38. Statement of P/O Wolk 090419 Interviewed by Lt. Clough
39. Philadelphia Police Pursuit Policy Dir 9.4
40. Wolk Performance Report 020398, 031503, 040611, 040913


**INTRODUCTION AND QUALIFICATIONS**

My name is Craig Allen and I have been a Police Officer for 30 years, 29 of which have been with the Hillsboro, Oregon Police Department.  I retired from Hillsboro Police in May 2023.  My last attained rank was Police Commander overseeing the Patrol and Training Divisions.  I have held positions within the police department ranging from Patrol Officer, Field Training Officer, SWAT, Narcotics Investigator, Detective, Patrol Sergeant, Training Sergeant, Lieutenant of Internal Affairs, Training Lieutenant, and Patrol Lieutenant.

Currently I am employed full time as the Director of Training and Senior Instructor with the Force Science Institute, Bloomington Minnesota (duties outlined below).

I hold formal certifications in:

- Firearms Instructor, (handgun, patrol rifle, shotgun and specialty weapons)
- SWAT Officer/Instructor
- Field Training Officer
- Defensive Tactics Instructor
- Scenario Based (SBT) Instructor
- Confrontational Simulations Instructor
- Integrated Public Safety Response to Mass Casualty Events
- Taser / ECD Instructor

- Less-Lethal Munitions Instructor
- High Risk Traffic Stops
- Weapons Armorer
- Diversionary Device Instructor
- Patrol Tactics Instructor
- Use of Force Instructor
- Advanced Force Control Instructor
- Pepper Spray (OC) Instructor
- Impact Weapons Instructor
- Force Science Institutes, Force Analyst Certification
- Force Science Institutes, Advanced Force Specialist Certification
- National Level Instructor / Force Science Institute
- Crime Scene Management
- Crisis Intervention Certification
- Internal Affairs Investigations
- De-escalation Tactics and Techniques
- Interview and Interrogation
- Basic, Intermediate, Advanced, Supervisory, and Mid-Management certification through Oregon Department of Public Safety Standards and Training

 I was assigned to our agency's Tactical Services Unit, (SWAT) for 11 years and served as assistant team leader in conjunction while serving on the Washington County Oregon, Interagency Tactical Negotiations Team, (SWAT) for eight years.  During my tenure in SWAT, I instructed in the areas of high risk warrant service, building search, hostage rescue, active shooter, and search warrant planning and preparation.  I have instructed at the Oregon Basic SWAT School and received my SWAT certification through the U.S. Department of Defense (SWAT operator's course) and the Oregon Tactical Officers Association.

I am a former certified instructor at the Oregon Police Academy, (Department of Public Safety Standards and Training) instructing in the areas of building search, survival skills, and high-risk vehicle stops.  Throughout my tenure as a Police Officer, I have accumulated over 6,500 hours of certified police training.

I developed our agency's Force and Tactics Instructor (FTI), program.  While overseeing our Training Division (2007-2014), I concurrently lead the FTI team while acting in the capacity as lead Force and Tactics Instructor for our agency.  The responsibility of the Force and Tactics Team is comprehensive in scope.  The team is responsible for all curriculum development and agency instruction encompassing police force response.  Instructional topics include all aspects of firearms training and specialty weapons, Taser/ECD, less lethal munitions, pepper spray, collapsible baton, diversionary devises, defensive tactics, custody control techniques, patrol intervention tactics, and the legal justification and agency certification surrounding these applications.  The team is also responsible for instruction on individual and team tactics, including active shooter response, high risk vehicle stops, barricade subjects, crisis exigent entry, crisis

intervention techniques to include other critical responses common to police emergency services.

The Force and Tactics Team also develops and oversees a wide spectrum of scenario-based training.  A significant portion of this training includes the implementation and analysis of the human performance factors associated with deadly and non-deadly force encounters.  Primarily these associative factors pertain to the psychological, physiological and environmental causes influencing officer performance, threat recognition, and situational awareness under normal and simulated duress situations.  I am advisor for the FTI team and continue to provide agency instruction in these areas to include research and development related to high liability areas such as police use of force and crisis decision making.

I have offered testimony in state and federal courts, in civil, criminal, and administrative proceedings as an expert witness and I am routinely consulted regarding these matters.  Below is a list of cases I have offered testimony and/or sworn affidavits as an expert witness in the area of police use of force, tactics, and training:

- **State of Oregon v. Paul Padilla, October 2005**
  - State court / testified UOF expert on behalf of officer / focus blows
- **Michael Burke v. Josephine County Sheriffs Association (OR), April 2008**
  - Arbitration hearing / report in favor of city on termination hearing / unlawful arrest
- **State of Oregon v. James Orr, June 2008**
  - State court / testified UOF expert on behalf of officer; tactics surrounding OIS
- **State of Oregon v. Flores-Haro, March 2012**
  - State court / Grand Jury / testified UOF expert on behalf of officer on tactics focus blows
- **Makarowsky v. Lobdell, (Washington Fed) August 2012**
  - Rule 26 and Deposition / testified on behalf of officer OIS / perception, weapon manipulation, timing of shots, and external ballistics
- **Lookabill v. City of Vancouver (Washington Fed)  November 2013**
  - Rule 26 and Deposition / testified on behalf of officer OIS / UOF
- **Theoharis v. Washington State Department of Corrections, April 2014**
  - Rule 26 / written report on behalf of officer OIS / UOF
- **Andison v. Clark County Washington, July 2015**
  - Rule 26 and Deposition / testified on behalf of officer OIS / UOF and tactics
- **Rhoads v. City of Hillsboro (OR), October 2016**
  - State court / testified UOF expert on behalf of officer; handcuffing and control holds
- **Johnson v. Officer Benjamin Kelly (WA), January 2017**
  - Rule 26 / written report on behalf of officer OIS / UOF / struggle over weapon, close contact shots
- **Jacques v. City of Bend (OR), February 2017**
  - Consult on OIS / no report
- **Altabef v. Stayton Oregon Police Department, June 2018**
  - Arbitration hearing / testified as UOF expert / excessive force by officer / termination hearing
- **Agency Use of Force Review / Eugene Oregon Police / OIS / January 2020**

- o   Review of agency OIS & written report / requested by agency for independent UOF council / timing of shots, shot cadence, perception and reaction
- **McKenna v. Wolk / Eastern District of Pennsylvania / Pursuit / January 2020**
  - o   Rule 26 / written report on behalf of plaintiff / excessive force by officer in pursuit
- **Agency Use of Force Review (Sherriff's Association ) / Lyon County, Nevada / March 2020**
  - o   Review of agency OIS & written report / requested by agency for independent UOF council / timing of shots, shot cadence, perception and reaction
- **Arbiters Report:  University of Oregon Police Department / May 2020**
  - o    Retained on behalf of the agency, termination case / excessive use of force (June 2020)
- **Yearick v. Maricopa County (Arizona Fed Dist) / OIS / April 2020**
  - o   Retained on behalf of Maricopa County; police practices and tactics, pending Rule 26
- **State of Louisiana v. Crystal Alexander / criminal defense / July 2020**
  - o   Report issued for defense; shot cadence and crime scene investigation
- **Alexander v. City of Seattle / Washington Fed / August 2020**
  - o   State created danger / case ongoing
- **Benbo v. Clark County / Clackamas, Oregon Cir Court / Sept 2000**
  - o   General Use of Force / Requested on behalf of the State / case settled
- **Retained by City of Santa Fe, NM (Feb 2022) OIS / Currently no suit filed.**
  - o   Action, perception reaction dynamics and shooting cadence of fire related to OIS.
- **Estate of William Abbe v. City of Vancouver / Western District of Washington / Mar 2022**
  - o   Retained by City of Vancouver / OIS / Action, perception dynamics and general UOF / No report filled, case settled.
- **State of Oregon v. Matthew McAdoo / Washington Co. Cir. Court, Hillsboro / June 2022**
  - o   Retained by prosecution, testified at trial / Murder case / Time to draw and fire and action, perception dynamics.
- **Estate of Douglas Diamond v. City of Sandy / US District Court, Oregon / OIS / Oct 2022**
  - o   Retained by Clackamas County for Defendant / Case in prelim stages, no report. Police procedures and tactics dealing with suicidal subjects.
- **Estate of Ryan Miller v. Police Officer Joseph Wolk / Eastern Dis. Of Pennsylvania / July 2022**
  - o   Rule 26 / Retained by plaintiff / excessive force / pursuit
- **Dezsanne Jones v. City of Riverside / Central District of California / Feb 2023**
  - o   Retained by City of Riverside / Case pending / no report issued.
- **Eric H. Saldivar v. Evan Wright and Abel Soria / Central District of California / Feb 2003**
  - o   Retained by City of Riverside / Case pending / no report issued.
- **Jason White v. City of Riverside, Devin Hill / Central District of California / Feb 2003**
  - o   Retained by City of Riverside / Case pending / no report issued.

I have provided instruction on the justification and application of police use of force to our agency to include 40 additional law enforcement agencies in Oregon, Washington and California.  I have also instructed K-9 application of use of force at the Oregon Police Canine Association yearly conference.

I have assisted with curriculum development with respect to our agency's Tactical Communication and Crisis Intervention training modules.  I have been consulted by and provided course material to Retired Chief Ron Louie, Hillsboro Oregon, regarding his curriculum and for his

accredited Crisis Intervention class taught at Portland State University, Portland Oregon, and Portland Community College.

In 2009, I was selected by Attorney Randy Means (one of the managing attorneys for the landmark United States Supreme Court case Graham v, Connor and co-founder of ABLE  (Allied to Benefit Law Enforcement)), to participate on a National  Advisory Board on Police Officer Safety Training and currently remain a board trainer/consultant with ABLE.  I have submitted papers to the publisher of ABLE on officer safety and survival.  My contributive article was selected to be a part of a national training module on police officer safety training and survival.

I have co-authored additional articles, both in print and web-based media, pursuant to police active shooter response in Law in Order Magazine, Oct 2013, and American Cop, August 2013.

In 2010 and 2012, I was the recipient of the Police Chief's Award for my continual work towards officer safety training and scenario development.  In 2006 and 2012, I received the Hillsboro Police Officer of the Year Award for my dedication to the profession and continual growth in police training.  I have received two Distinguished Service Awards for involvement in hazardous situations, two Medals of Valor for circumstances involving extreme hazard, one Life Saving Award, (Oregon Police Officer Association) one Police Services Award for project/community involvement and two Meritorious Service Awards for complex projects and coordination.  In 2011, I received the Hillsboro Optimist Clubs award for innovative methods in police training.  In 2012, I received a Meritorious Service Award from the Oregon Police Officers Association for integrating public safety agencies (police and fire) in response to active shooter incidents.  In 2014, I received the Hillsboro, Oregon Chamber of Leadership Public Safety Award for instituting innovative methods in police training and practices.

In 2015, I received the National Police Trainer of the Year Award from the International Law Enforcement and Educators Trainers Association, (ILEETA).

From 2009 through 2015, I was the primary instructor at the Portland Oregon Metropolitan Sergeants Academy instructing Tactical Supervision to supervisors in Oregon.  My curriculum has been taught to over 190 sergeants from 19 jurisdictions and encompasses the tactical and strategic aspects of police deployment in critical incidents.   In addition, I also instructed Supervisor Responsibility in Use of Force Incidents.

I am a member of the International Association of Law Enforcement Educators and Trainers Association, the International Association of Law Enforcement Firearms Instructors, the National Tactical Officers Association, the Oregon Tactical Officers Association, the California Tactical Officers Association, the Police Policy Studies Council, and the Force Science Research Center.  I was a member of the International Wound Ballistics Association for six years while it existed and have studied and observed the causative factors in the injuring and killing of humans associated with this.  Each of these organizations is devoted to promoting the latest methods of producing positive results in officers under stressful and dynamic conditions.

I have drawn upon my experience as a police officer, coupled with additional training, education, and experience I have received in my professional career, including experiences in my personal life, to better understand, educate and train police officers on the aspects associated with human violence, crisis decision making and corresponding force responses.

I have been tasked numerous times by the Washington County, Oregon, District Attorney's Office, the City of Vancouver, Washington, Prosecuting Attorney's Office, and the Seattle, Washington, District Attorney's Office to conduct research and test fire on weapons pending litigation.  Prior to my law enforcement career, I was in the United States Marine Corps, trained in part as a machine gunner and weapons armorer.  Through these experiences, I have gained extensive knowledge in the functionality, capability, ballistics, and field application of a wide variety of weapons.

I have studied the effects of numerous calibers of bullets, with respects to spalling, fragmentation and deformation when shot through various mediums to include human tissue, bone, ballistic gelatin, wood, wall board, sheet metal, clothing, glass, sand, and masonry.  My knowledge and expertise in this area comes from my physical inspection of bullets, discussions with technicians from Federal, Remington, and Winchester Manufacturing Corporation, the Oregon State Crime Lab, Federal Bureau of Investigation Firearms Training Unit, to include on-site demonstrations of bullet ballistic and penetration characteristic, shooting recreations and through academic research.

A considerable portion of my professional career has involved the study and analysis of the conduct of peace officers with respects to their use of force and tactics, including the legal and liability issues that surround these encounters.  I have studied, been trained in, researched, and have conducted training to officers and the instructors of officers in physical skills, learning theory (including reaction times), physiological and psychological reactions to physical, emotional, and life-threatening stress. This training also includes the evaluation of physical actions in combative environments, including what is required to create effective human combative responses and decision-making under stress.

I currently hold certifications from the Force Science Institute as a Force Analyst and an Advanced Force Specialist.  The advanced training and subsequent certification I received centers around the psychological, physiological, and biomechanical aspects of lethal force encounters.  Specific human performance areas in which I have received additional training in, are within the fields of human motor skills / action and reaction times; human cognition, memory and recall capabilities and the subsequent psychological and physiological factors that have influence on these processes; human performance and decision making while under emotional or environmental stress; visual, perceptual and cogitative distortions with respects to selective attention; inattentional and change blindness; neuroanatomy and physiological aspects of fear and arousal; and the focal and ambient visuo-motor systems of human vision.

In 2018, I was selected as an instructor with the Force Science Institute.  My instructorship encompasses teaching a section of the curriculum for the Force Science Certification Course

nationally.  This curriculum covers an overview of the Institutes cutting edge research into the dynamics of human behavior during life-threatening encounters.  The course explores the aspects and applications of unbiased scientific principles and processes in repetitive physical experiments designed to determine the true nature of suspect provocation and officer response (action-perception-reaction dynamics), human perception limitations and motor learning and performance.  The goal of the program is to encourage law enforcement professionals to apply the important concepts revealed in this research when investigating, reconstructing, recalling or otherwise analyzing a use of force incident.

In May 2023, I became the Director of Training for Force Science and currently work full time in that capacity.

I have a Bachelor of Science degree from Portland State University in Criminal Justice.  I currently possess a Police Officer Basic, Intermediate, Advanced and Mid-Management Certificates from the Oregon Department of Public Safety Standards and Training and have approximately 7000 hours of formal police training and instruction.

## REPORT

**PURPOSE**

I was asked by attorney Mr. Michael Levin to utilize my expertise in police use of force and analyze the pursuit of City of Philadelphia Police Department Police Officer Joseph Wolk, which occurred on May 7, 2019.  My opinions, and conclusions in this matter are reliably supported by my over 25 years of professional police experience in teaching, instructing, and analyzing police tactics, training, and procedures.  I was asked to offer opinions regarding the application and tactics used during the pursuit, specifically Officer Wolk's decision to engage in what can best be described as a clandestine, out of policy pursuit of Mr. Ryan Miller for a minor traffic violation, which ultimately resulted in Mr. Miller colliding with a semi-truck causing his death.

**SUMMARY OF PURSUIT**

This tragic incident occurred on May 7, 2019, in Philadelphia, Pennsylvania sometime between 7:15 p.m. and 7:25 p.m., whereby the decedent, Mr. Ryan Miller, was operating a motorized scooter on Tacony Street, heading northbound, when Officer Joseph Wolk noticed that scooter did not have a license plate.[1]  Officer Wolk decided to initiate a traffic stop on the scooter and according to Officer Wolk he initially activated his emergency lights.  Mr. Miller failed to yield and continued to operate his motor scooter northbound on Tacony Street.  Officer Wolk then deactivated his emergency equipment and continued to pursue Mr. Miller through a residential

---

[1] Pennsylvania law, 75 Pa.C.S. §1332, requires vehicles to display their license plates at all times on public highways, and a violation of that statute is punishable as a summary offense pursuant to 75 Pa.C.S. §1332(c), with the penalty being a $100 fine.

neighborhood in violation of Philadelphia Police Department Pursuit policy, Directive 9.4.[2]  During the pursuit, Officer Wolk was joined by a civilian acquaintance, Mr. Gary Bove, who assisted Officer Wolk in pursuing Mr. Miller in his personal vehicle.

During one period of the pursuit, Officer Wolk is observed overtaking Mr. Miller (to Miller's left) while turning his police vehicle into Mr. Miller forcing him out of his lane of travel into a parking lot creating a near collision between the two.  Moments later in a separate period of the pursuit, Officer Wolk is seen driving along side (within feet of Mr. Miller), and at the last moment abruptly swerves in front of Mr. Miller instigating a second near collision between them.  Immediately following, Officer Wolk exits his patrol car and physically grabs Mr. Miller but was unsuccessful in his attempts to restrain him as Mr. Miller drove away.

The pursuit continued now with Mr. Bove taking the lead with Officer Wolk following.  Officer Wolk participated with Mr. Bove in pursing Mr. Miller, who at this point has almost been run over by a police SUV twice.  Ultimately the chase proceeded down Fraley Street with Mr. Miller entering the intersection of Fraley Street and Tacony Street against a red light as a tractor-trailer was crossing through.  This resulted in Mr. Miller colliding with the trailer portion of the semi-truck and suffering fatal injuries.[3]

**GENERAL CONCLUSION**

It is my opinion and general conclusion that Officer Joseph Wolk engaged in an excessive and egregious out of policy, clandestine, and reckless pursuit of Mr. Ryan Miller, a non-violent traffic offender, who was riding his motor scooter on Philadelphia streets without an affixed license plate.  The egregious and excessive pursuit tactics undertaken by Officer Wolk are totally contrary to police practice, policy, and law and had direct influence in causing the death of Mr. Miller.

Officer Wolk was not responding to an emergency, nor was he pursuing a dangerous suspect. Officer Wolk was not tasked with making split second decisions requiring him to problem solve under ambiguous circumstances.  Officer Wolk chose to intentionally pursue a teenager on motor scooter for a non-violent violation, discarding his years of training and knowledge of policy and law.  Officer Wolk engaged in the pursuit, reaching speeds double that allowed in a residential neighborhood, with numerous people walking about with no emergency equipment activated.[4]

---

[2] Officer Wolk was found to have violated (5) sections of the Philadelphia Police Department Pursuit Policy 9.4 sections: 1-B-2 (strictly prohibits vehicular pursuit for traffic violation); 3-P (prohibits all police vehicles other than marked radio patrol cars from engaging in any vehicular pursuit absent exigent circumstances); 3-J (patrol units engaged in pursuit must have emergency equipment activated continuously throughout the pursuit); 4-A-2 (requires officers initiating a pursuit to immediately inform dispatch); 3-T (failure to submit a pursuit memorandum).

[3] The pursuit lasted several minutes and covered a distance of approximately .54 of a mile.

[4] Feltman interview pg. 31 "I just don't think that the cop should have been going that fast chasing after that kid, because there's kids all over the place playing."

At two separate junctures during the pursuit Officer Wolk forcefully used his patrol vehicle to haphazardly cutoff or otherwise force Mr. Miller off the roadway.  Officer Wolk essentially violated every substantive section of the Philadelphia pursuit policy in his desire to enforce a simple violation.  The egregiousness of the circumstances surrounding Officer Wolk's pursuit of Mr. Miller are shocking.

During the pursuit Officer Wolk allowed a personal acquaintance he knew to engage in and continue the pursuit of Mr. Miller in his personal vehicle.  Officer Wolk made no attempt to disengage and stop his friend from participating, in fact he encouraged this act by allowing it. This was a troublesome addition to the circumstances entirely created and exacerbated by Officer Wolk.

Throughout the pursuit Officer Wolk engaged in obvious and intentional conduct that not only created an undue risk of harm to Mr. Miller but to the numerous citizens in and around the pursuits path.  The very fact that Mr. Miller was on a motor scooter not protected by the structural confinements of a vehicle, increased this risk of harm to Mr. Miller.  The pursuit tragically ended when Mr. Miller collided with the semi-truck.

**OPINIONS**

1. Officer Wolk employed various reckless tactics throughout the pursuit.  Officer Wolk chose to not utilize his emergency equipment, which in part is designed to warn the surrounding public of police activity.  Officer Wolk states in his deposition that his lights and sirens were on when he initiated the pursuit and his emergency equipment remained on when he tuned onto James Street soon thereafter.[5]  Video evidence contradicts this assertion by Officer Wolk that his emergency equipment was on[6]  In fact, at no time during the pursuit did any of the various video surveillance cameras show that Officer Wolk's emergency equipment was activated.  Several witnesses also described that Officer Wolk was chasing Mr. Miller without his emergency equipment on.[7]  Clearly Officer Wolk would have heard his siren if it were activated.  When Officer Wolk exited his patrol vehicle on Scattergood Street in attempts to grab Mr. Miller, as Officer Wolk returned to his vehicle he would have clearly seen that his lights and sirens were not on (also captured via video surveillance).  Officer Wolk asserts that maybe his emergency equipment malfunctioned however at the beginning of his shift he checked his emergency equipment, and all systems were working.[8]  Officer Wolk asserts that maybe he inadvertently bumped his siren / light control console and bumped them off, or something may have accidently fell onto the console and knocked them off.[9]  It is my opinion the siren control knob, and light activation switch are stiff and robust in a Ford PIU patrol vehicle and it is highly unlikely

---

[5] Wolk deposition, pg. 30
[6] Expert report and video evidence included by Mr. William Neale
[7] Report submitted, to include witness statements by Ciprano Investigation
[8] Wolk deposition, pg. 64
[9] Wolk deposition, pg. 64

these would be inadvertently turned off by bumping the knobs or by something hitting them. Again, by the mere fact that Officer Wolk would have very clearly heard his sirens on or off are a clear indication they were never on. This is also supported by video surveillance evidence and witness statements, most notably the fact that Officer Wolk exited his car and would have seen his lights were off, nonetheless he continued the pursuit.

2. Officer Wolk allowed a citizen to become involved in the pursuit in his personal vehicle exacerbating the risk of harm to all persons in and around the pursuit. Officer Wolk knew this person and allowed him to become involved in the pursuit up until the fatal crash. Officer Wolk made no efforts to intervene and stop this acquaintance from engaging in the pursuit. It is my opinion Officer Wolk encouraged and allowed this egregious involvement on behalf of an acquaintance he knew to participate in the pursuit by the fact he made to efforts to stop, pull over, terminate the pursuit, or call over the radio this new development. One can only imagine the perspective from Mr. Miller, who was now being pursued by two vehicles, one unmarked and both with no emergency equipment activated. It is my opinion, viewing these sets of circumstances through the lens of Mr. Miller, it is unlikely that Mr. Miller would have wanted to yield to the police when he presumably could clearly see that his pursuers were acting outside the law. And if he (Mr. Miller) were to stop, what other unlawful or egregious conduct may follow.

3. Officer Wolk never called out over the radio his initial traffic stop, nor did Officer Wolk ever broadcast that he was in pursuit or being joined in the pursuit by a citizen. This entire event was silent on the radio from inception to the fatal crash. It is my opinion this calls into question the underlying motives of Officer Wolk and his desire to conduct this police intervention / pursuit in a covert and clandestine manner knowing his conduct violated policy and law. It is my opinion a hypothetical reasonable police officer, facing these same circumstances would have clearly known their conduct was egregious and reckless and thereby continuing to engage as Officer Wolk did would clearly indicate intentional behavior in violation of policy and law to effect capture.

4. Officer Wolk intentionally employed three reckless and overt maneuvers in his desire to capture Mr. Miller. First, Officer Wolk at various points during the pursuit was traveling within mere feet of Mr. Miller, which is also prohibited by agency pursuit policy.[10] This fact alone clearly created an undue risk of harm to Mr. Miller if contact were to be made between the vehicles resulting in Mr. Miller losing control of his motor scooter and becoming entangled in Officer Wolk's police vehicle.

---

[10] Philadelphia Pursuit Policy, 9.4 sec I

Secondly, Officer Wolk intentionally tried to force Mr. Miller off the road compressing the distances in which Mr. Miller could maneuver forcing Mr. Miller to take evasive action and turn into a parking lot.[11]

Third, Officer Wolk drove alongside Mr. Miller within feet then quickly accelerated and cut in front of Mr. Miller nearly causing a second collision.[12]  These reckless and overt maneuvers initiated by Officer Wolk would be properly categorized as an application of a ramming technique and/or a hastily applied roadblock, both of which are expressly prohibited by agency policy.

Officer Wolk acknowledged in his deposition that a police officer cannot use excessive force during the apprehension of a citizen for a violation of the Motor Vehicle Code.[13]  Officer Wolk acknowledged that using his police vehicle as a ramming instrument to apprehend a citizen would be an application of excessive force.[14]  Officer Wolk acknowledged that the use of a roadblock would be considered excessive force, and he knew that on the day of this incident.[15]  Officer Wolk in his deposition acknowledged that a person on a motor scooter, if they were to collide with a vehicle would likely suffer serious injuries.[16]  Officer Wolk acknowledged that using his vehicle as a barricade to apprehend a citizen riding on a motor scooter would be an application of excessive force as it could result in a high likelihood of death or serious physical injury.[17]

It is my opinion that Officer Wolk did all of the above and these actions are clearly supported by video surveillance evidence and the report submitted by retained plaintiff's expert, Mr. William Neale. In addition, a reasonable well trained police officer would have known that applying the tactics that Officer Wolk did here, under these circumstances, would be excessive and clearly increase the likelihood of death or serious physical injury. In addition, this was exacerbated by the fact that Mr. Miller was not wearing a helmet.

5. Officer Wolk discussed in his deposition his actions on Eadom Street.[18]
   a. **"I wouldn't force my vehicle into a motorcycle or a motor scooter**. I turned into the parking lot as he (Miller) turned into the parking lot".

---

[11] The maneuver undertaken by Officer Wolk on Eadom street would be categorized as an attempted application of a ramming technique defined by Pursuit Policy, 9.4 sec O 2 "Ramming - The deliberate act of hitting a fleeing vehicle with a police vehicle for the purpose of forcing the fleeing vehicle off the road or into a fixed object."  This act in expressing prohibited in policy.

[12]  The maneuver undertaken by Officer Wolk on Scattergood Street would be categorized as an attempted application of a ramming technique, or possibly a hastily employed roadblock (policy 9.4 sec O 3).  Both techniques are expressly prohibited in agency policy.

[13] Wolk deposition, pg. 49

[14] Wolk deposition, pg. 49

[15] Wolk deposition, pg. 50

[16] Wolk deposition, pg. 44

[17] Wolk deposition, pg. 52

[18] Wolk deposition, pg. 48

    **b.**  "He turned into the parking lot which I turned also in. **I would not put my vehicle in front of a moving scooter like that."** (Q)  And why not?  **(A) "It would cause serious bodily injury".**

Officer Wolk acknowledged that he would not undertake this reckless maneuver and he understood the risks of significant inquiry to a person on a motor scooter should he engage in this, however this is precisely the maneuver Officer Wolk applied on Scattergood Street.

It is my opinion the manner in which Officer Wolk aggressively engaged Mr. Miller on his motor scooter, in close proximity in an apparent attempt to cause a collision, indicates Officer Wolk intended to cause injury unrelated to any legitimate police objective. Bolstering my opinion are Officer Wolk's own statements, supported by video surveillance evidence, whereby Officer Wolk explained his subjective awareness that such an overt act would almost certainly cause serious bodily injury.[19] [20] [21]

6.   This is not the first time Officer Wolk has engaged in a clandestine pursuit of a non-violent traffic offender, completely forgoing the pursuit policy of Philadelphia Police Department, which resulted in the death of a motorcyclist in 2016[22].  Officer Wolk knew and was well acquainted with the parameters of policy 9.4.[23] in the earlier incident, Officer Wolk used some of the same out-of-policy tactics, i.e., intentional blocking without his emergency equipment activated as readily observed in this case.  It is my opinion that Officer Wolk deliberately and intentionally chose to pursue Mr. Miller and created the circumstances that resulted in Mr. Miller's death.

7.   Officer Wolk intentionally omitted the fact he was involved in the pursuit when questioned by accident investigators at the scene.[24]  Officer Wolk stated he did not see the actual crash he just saw Mr. Miller's scooter laying in the road and that is what drew his attention to the accident scene.  Mr. Bove was directly behind Mr. Miller prior to the crash, and behind Mr. Bove was Officer Wolk.[25]  Initially Mr. Bove left the scene and was called on the phone by Officer Wolk and asked to return to provide a statement to the accident investigators.  When Mr. Bove was questioned by accident investigators at the scene, he stated he only saw Mr. Miller running the red light colliding with the semitruck. Officer Wolk omitted the fact that he knew Mr. Bove and made no mention to investigators that Mr. Bove was also involved in the pursuit.  It in my opinion that Officer

---

[19] Wolk deposition, pg. 48

[20] Video / 5400 Eadom_NSAlley5719.mp4

[21] Referenced in opinion #6, Officer Wolk engaged in almost identical conduct (McKenna v. Wolk) which caused the death of Mr. McKenna.

[22] On November 14, 2016, Officer Wolk engaged in the same general clandestine pursuit tactics resulting in the death of Mr. Bailey McKenna / McKenna v. Wolk, et al., United States District Court, Eastern District of Pennsylvania, case No. 2:18-cv-03746.

[23] Wolk deposition, pg. 61

[24] Wolk deposition, pg. 87

[25] For timing and distances associated, see plaintiff's expert Mr. William Neale report

Wolk omitted clear and pertinent details in his rendition of the events to the on scene accident investigators, sanitizing the event and portraying his involvement as minimally involved, which I believe calls into question Officer Wolk's veracity.  The undisputed fact that Officer Wolk intentionally chose to engage in this event with complete radio silence, forgoing even the most basic task of calling out on the radio the initial traffic stop raises more questions than answers.

8.  Officer Wolk stated he felt Mr. Miller may have been suicidal or driving under the influence of intoxicants.[26]  There is nothing in the record that reasonably indicates or infers these factors were at issue.  Even if Officer Wolk had probable cause to believe Mr. Miller was either suicidal or intoxicated, neither circumstance are justifiable reasons to pursue per agency policy.[27]  Regardless, under either circumstance it would be unlikely and careless at best, that a police officer would want to race ahead of the subject under a desire to act as a warning beacon *per-se* for the forthcoming problem.

Under nationally accepted police training, policy, and best practices on police pursuits, your first priority would be to broadcast on the radio the initial reasons for the pursuit, the pertinent environmental factors having influence, and other pursuit characteristics that would aid responding units, and supervisors, in their understanding of the events. Secondly would be the allocation of resources and coordination of the pursuit.  Third, applying relevant pursuit mitigation tactics that would lessen the danger to the public and aid in apprehension.[28] [29]

A fundamentally important mitigation tactic that is widely utilized nationally is to "back off" or create more distance between the pursuing officer and the violator where you can still observe but not pressure the subject to flee faster and more erratically.  For an officer to pass a violator would likely encourage the person to flee faster and more aggressively to keep their own distance to lessen their feelings of impending capture.  Secondly the actual act of passing, especially under these circumstances, clearly increases the risk of a collision between either the motor-scooter and police vehicle or another vehicle, person, object in the area.

The video evidence in the record clearly shows Officer Wolk within feet of Mr. Miller, racing around corners and at times paralleling Mr. Miller and swerving either towards him or cutting in front of him.  It is my opinion, these aggressive pursuit tactics, especially when the Officer Wolk has no emergency equipment activated, contributed to Mr. Miller

---

[26] Wolk deposition, pg. 27
[27] Philadelphia Police Department Policy / Vehicular Pursuits, 9.4
[28] IACP Law Enforcement Policy Center, Vehicular Pursuits
 https://www.theiacp.org/sites/default/files/2019-12/Vehicular%20Pursuits%20-%202019.pdf
"Pursuit Policy" Tops Lexipol's 2019 Law Enforcement Training Topics
https://www.lexipol.com/resources/blog/pursuit-policy-tops-lexipols-2019-law-enforcement-training-topics/
FBI Law Enforcement Journal / Evidence-Based Decisions on Police Pursuits
https://leb.fbi.gov/articles/featured-articles/evidence-based-decisions-on-police-pursuits-the-officers-perspective
[29] It is my opinion that the Philadelphia Police Department have a well-articulated and justifiable pursuit policy in line with national standards

continued flight and exceeding his own driving limits and capabilities.  The added fact that Mr. Miller was on a motor scooter, exposed to the environment, without a helmet on would also increase the chance of serious injury or death should a collision occur.

**CONCLUSION**

It is my opinion Officer Joseph Wolk engaged in an egregious out of policy pursuit, knowing full well the risk of harm the pursuit created for Mr. Ryan Miller and the general public.  Tragically the outcome of this pursuit was the death of Mr. Ryan Miller.  The degree to which Officer Wolk deliberately violated essentially every applicable section of the Philadelphia Police Department pursuit policy was shocking.  Officer Wolk's overzealous desire to engage in the manner he did, discounting the plainly obvious risks associated with the pursuit, had direct cause on the outcome of this incident.

Officer Wolk was not pursuing a dangerous criminal or felon; he was not forced to make split second decisions in a chaotic environment, nor was he dealing with an emergency requiring immediate problem solving and response.  Officer Wolk intentionally chose to engage in the pursuit, which he knew was outside of policy and knew the dangers his evasive blocking and ramming techniques posed to Mr. Miller.  This was all done with no radio communication, no emergency equipment activated, and allowing a citizen acquaintance to join the pursuit.  The egregious and excessive pursuit tactics undertaken by Officer Wolk are totally contrary to police practice, policy, and law and had direct influence in causing the death of Mr. Miller.

I reserve the option to modify, amend, and change the opinions expressed in this document at any time, including at trial, should further information, testimony, analysis, or data be provided affecting my understanding of the fact patterns in this case

Dated this ___18___ day of August, in Sherwood, Oregon.

_____
Declarant Craig Allen

///

///

# Fees for Expert Witness Services

## Craig Allen

**File Review & Case Preparation, Preparation for Court or Deposition Testimony**

► $185 per hour, billed per quarter hour

**Deposition and Court Testimony**

► $1500 for deposition testimony, pre-paid by the requesting party

► $1500 for trial testimony, paid by the requesting party to include applicable travel expenses.

**Other charges related to expert witness services / travel and per diem**

► Travel fees ................................................................... $50.00/hour
► Airfare ......................................................................... Paid for/reimbursed by client
► Mileage ....................................................................... $0.65/mile
► Hotel ........................................................................... Paid for/reimbursed by client
► Rental Car ................................................................... Paid for/reimbursed by client
► Parking ........................................................................ Paid for/reimbursed by client
► Meals / Incidentals ...................................................... GSA per-diem rate

Receipts will be provided for associated costs for case-related research