**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **NEAL MILLER and DONNA MILLER**, individually and as Administrators of the Estate of Ryan Miller, a minor, deceased.<br><br>     **v.**<br><br>**POLICE OFFICER JOSEPH WOLK, et al.** | **CIVIL ACTION**<br><br>**NO. 20-6301** |

<u>**MEMORANDUM RE: MOTION FOR SUMMARY JUDGMENT**</u>

Baylson, J.                                                                                    April 12, 2024

      Plaintiffs Neal and Donna Miller bring a claim under 42 U.S.C. § 1983 against Defendant Police Officer Joseph Wolk.  Ryan Miller, Plaintiffs' fifteen-year-old son, died tragically in a car crash while fleeing from Wolk, who, while driving on patrol, had noticed Miller driving a motor scooter without a helmet and without a license plate, after which Wolk attempted to pull Miller over.  Miller refused to stop, and Wolk gave chase.  Wolk twice overtook Miller, both times obstructing his path.  The second time, Wolk physically exited his SUV and grabbed Miller.  Yet, Miller broke free again and continued to flee.  At that point, Gary Bove, a civilian onlooker, continued to chase Miller.  For the remainder of the chase, Wolk trailed several hundred feet behind both Bove and Miller.  Miller eventually ran a red light and perished in a collision with a tractor-trailer.

      Plaintiffs assert that "Wolk's actions in pursuing Miller and causing or contributing to his death constitute an abuse of executive power so clearly unjustified by any legitimate objective of law enforcement as to be barred by the Fourteenth Amendment."  ECF 65-3 at 6.

      Presently before this Court is Wolk's Motion for Summary Judgment.  ECF 64.  For the reasons explained below, Wolk's motion is **GRANTED**.

# I.    FACTUAL BACKGROUND

While the relevant events here are largely undisputed, the parties vehemently disagree on several key inflection points. Thus, in summarizing the facts, the Court highlights those points of dispute, recognizing that it must ultimately "view the evidence presented on the motion in the light most favorable to the [nonmoving party]." Escalet v. Canada Dry Potomac Corp., 2024 WL 1163539, at *8 (E.D. Pa. Mar. 18, 2024) (Baylson, J.).

## A.  Wolk Gives Chase

On May 7, 2019—Wolk, while on patrol in Philadelphia in a marked police SUV—saw Miller operating a motorized scooter.  ECF 64-1 at ¶ 17; ECF 65-1 at ¶ 15.  Miller was driving without a license plate and without a helmet, in violation of Pennsylvania law.  ECF 64-1 at ¶¶ 17-18; ECF 65-1 at ¶ 15.  Thus, Wolk turned on his emergency lights and sirens and began to follow Miller.  ECF 64-1 at ¶¶ 19-22; ECF 64, Ex. H; ECF 65-1 at ¶ 22.  Wolk did not, however, initially notify police radio.[1]  Wolk has testified that he failed to do so because he was "solo and it happened so quickly."  ECF 64-1 at ¶ 21; ECF 65-1 at ¶ 21.[2]

## B.  Wolk Overtakes Miller

Despite Wolk's pursuit, Miller did not stop.  ECF 64-1 at ¶¶ 22, 25; ECF 65-1 at ¶ 22.  To the contrary, Miller "sped up and entered [oncoming] travel lanes."  ECF 64-1 at ¶ 25; ECF

---

[1] Likewise, a subsequent Internal Affairs investigation revealed that—contrary to Philadelphia Police Department policy—Wolk did not keep his emergency lights and sirens activated throughout the entirety of this pursuit.  ECF 65-1 at ¶ 22.

[2] While Plaintiffs admit that Wolk testified as such, they assert "[t]his was objectively false" because "Wolk had in excess of 20 seconds while the vehicles were still on Tacony Street to call in the stop and/or pursuit, as shown by the length of time between the two times the vehicles can be seen on video on Tacony Street."  ECF 65-1 at ¶ 21.  Further, Plaintiffs note that "police procedure expert Craig Allen has opined that 'Wolk was not pursuing a dangerous criminal or felon nor was he forced to make split second decisions in a chaotic environment. . . . Officer Wolk intentionally chose to engage in the pursuit, which he knew was outside of policy and knew the dangers his evasive blocking and ramming techniques posed to Mr. Miller.'"  Id.

65-1 at ¶ 25.[3]  According to Wolk, Miller began "approaching a blind turn, in the wrong lane of traffic."  Id.  As a result, Wolk "spe[d] up and passed the scooter" in an attempt to beat Miller to "the blind curve," as Wolk "wanted to avoid a collision."  Id.  At this point, Wolk claims, he believed Miller may have been "suicidal or DUI," and therefore "wanted to alert oncoming traffic of the scooter approaching."  Id.  This forced Miller to U-turn and head back in the opposite direction.  Id.

### C.  Parking Lot U-Turn

Wolk continued to pursue Miller, and eventually surpassed him again.  ECF 64-1 ¶¶ 26-35; ECF 64, Ex. L; ECF 65-1 at ¶¶ 26-35.  This time, Wolk came to a stop, intentionally blocking Miller's path forward.  Id.  Yet, Miller still did not relent.  Id.  Instead, Miller turned into a parking lot, drove over a median into a neighboring parking lot, and then cut in front of a moving sedan to escape in the opposite direction.  Id.

### D.  The Chase Ensues and Gary Bove Enters

Over multiple residential streets and around a few tight corners, Wolk continued to give chase.  ECF 64 at ¶¶ 36-40; ECF 64, Ex. K; ECF 65-1 at ¶¶ 36-40.  Throughout, Wolk remained neck and neck with Miller, with both parties consistently traveling above the applicable speed limit.  Id.

Eventually, Wolk and Miller turned onto James Street, where Gary Bove was already driving his sedan.  Id.  Bove—a tow truck driver who was friendly with Wolk and numerous

---

[3] While Plaintiffs deny that "Wolk's statement is necessarily accurate in any material respect," they counter only that this is "only one of four shifting and inconsistent versions of this incident he has given." ECF 65-1 at ¶ 25. Yet, Plaintiffs offer no alternative version of events or any evidence to actually contradict Wolk's statement.

other police officers—slowed his pace as Wolk and Miller approached.[4]  Id.  At one point, after all three parties had turned onto Scattergood Street, Wolk and Miller both actively navigated around Bove, who had come to a full stop.  ECF 64, Exs. K, N.

### E.  Wolk Stops and Grabs Miller

Immediately after Wolk and Miller had maneuvered around Bove, Wolk again managed to overtake Miller, bringing Miller to a second stop.[5]  Id.  While one eyewitness testified that "Miller's vehicle actually did make contact with Wolk's SUV at this point," ECF 65-1 at ¶ 37, all others (along with Plaintiffs' expert), suggest that no contact occurred, ECF 64-1 at ¶¶ 38-44; ECF 64-18 at 1.  Wolk likewise asserts that "[a]t no point in his pursuit of Miller did [Wolk's] vehicle contact Miller."  ECF 71-1 at ¶ 24.  Plaintiffs even admit that "[r]econstruction data did not establish an impact, however, and no impact is apparent on video of this portion of the pursuit."  ECF 65-3 at 4.

After cutting Miller off, Wolk "then got out of his police vehicle to physically grab and restrain Miller," only for Miller to "wrest himself from Wolk's grasp and pull away on the scooter."  ECF 64-1 at ¶ 42 (quoting Second Amended Complaint); ECF 65-1 at ¶ 52.  In the process, "Miller's shirt was ripped," and Wolk supposedly warned Miller to "stop" because Miller was "gonna get hurt."  ECF 64-1 at ¶ 46.

---

[4] As discussed infra, Plaintiffs assert that Bove's movements at this point suggest that Bove was reacting to the chase before he could physically see it, thus indicating coordination between Bove and Wolk.  ECF 65-1 at ¶ 37.

[5] Plaintiffs' expert frames both this and the first temporary stoppage quite differently, attempting to highlight the dangerousness of Wolk's actions.  In relevant part, Plaintiffs' expert states that "Officer Wolk rapidly accelerated past Mr. Miller and then intentionally applied hard braking and swerving to again, position his vehicle into the direct travel path of Mr. Miller. Had Officer Wolk applied slightly harder braking and swerving he would have lost control of his vehicle due to loss of traction on the roadway."  ECF 64-11 at 20.

### F.  Bove Takes the Lead

The parties dispute exactly what happened next.  After Miller fled, Wolk ran back to his vehicle to continue his pursuit.  ECF 64, Ex. N.  Before he could do so, however, video evidence shows Bove's sedan pulling in front of Wolk's SUV.  Id.  According to Plaintiffs, that same video evidence shows "Wolk briefly stop in front of Bove's vehicle, where he looks directly at Bove for a moment before returning to his vehicle."  ECF 65-2 at ¶ 38.  Plaintiffs rely on this moment—along with allegations regarding Bove's sedan's earlier movements—to assert that Wolk coordinated with Bove and "condoned and ratified" Bove's decision to get involved.  ECF 65-3 at 9.  Plaintiffs also suggest that Bove and Wolk may have been using "burner" phones to communicate, based on the fact that "[f]ollowing Wolk's deposition, subpoenas were issued both for the telephone number provided by Wolk at his deposition and for Gary Bove's cell phone activity. Both service providers' responses indicated that the records sought were not retained since both were pre-paid phones."  ECF 65-2 at ¶ 52.

Wolk strongly disputes this point, asserting that the "referenced video shows Officer Wolk walk straight back to his vehicle after Millers flees, and it is unclear what Plaintiffs are referring to when they allege Wolk 'looks directly at Bove for a moment.'"  ECF 71-1 at ¶ 38.  Likewise, Wolk further contends that "[t]here is no evidence of coordination between Officer Wolk and Bove."  ECF 71 at 5.  Indeed, when asked by Internal Affairs whether Wolk had requested assistance from Bove, Wolk unequivocally and repeatedly replied "no."  ECF 65-2 at ¶ 48; ECF 71-1 at ¶ 48.

### G.  Bove Gives Chase

For the remainder of the chase, Bove's sedan was positioned between Miller's motor scooter and Wolk's SUV.  ECF 64-1 at ¶ 54; ECF 65-1 at ¶ 54.  More precisely, the record

reflects that Bove pursued Miller from about forty-five feet behind, whereas Wolk trailed Miller by "at least 150-160 feet."   ECF 64-1 at ¶ 56; ECF 65-1 at ¶ 56.   In accordance with those distances, Wolk has testified that the last time he saw Miller alive was immediately before Bove began his pursuit.  ECF 64-1 at ¶ 53; ECF 65-1 at ¶ 53.[6]

Robert Mattos, an eyewitness, likewise testified that he "thought the police suv gave up on the chase and let the silver car take the chase," and thus "figured that [] maybe the silver car was chasing the motorcycle because it was and the police car was an suv. The silver car was aggressive like he was a police officer."  ECF 64-18 at 1; ECF 68-2 at 5.   Similarly, Mattos described a "big gap" between Bove and Wolk for the remainder of the chase.  ECF 68-2 at 6.

### H.  Miller Runs a Red Light and Perishes

With Bove shortly behind Miller and Wolk trailing further behind, the chase continued for another thirty-one seconds.  ECF 64-1 at ¶ 54; ECF 64, Ex. R.; ECF 65-1 at ¶ 54.  Ultimately, Miller sped under a highway overpass and drove through a red light at a busy intersection.  ECF 64-1 at ¶ 61; ECF 65-1 at ¶ 61.  At this intersection, Miller collided with a tractor-trailer, which tragically resulted in his untimely death.  Id.

### I.  Immediate Aftermath

Plaintiffs make much of Wolk's actions immediately following the crash.  They assert, for instance, that when Wolk provided his statement to the Accident Investigation Division ("AID") on the evening of the incident, he omitted significant portions of the pursuit.  ECF 65-2 at ¶¶ 13, 26, 44.  Specifically, Plaintiffs note that Wolk omitted any mention of his close vehicle interactions with Miller, along with any mention of Bove.  Id.

---

[6] Plaintiffs admit that Wolk testified as much, but nonetheless contend it is inaccurate because Wolk allegedly sped up after returning to his car.  ECF 65-1 at ¶ 53.

Plaintiffs also contend that video evidence indicates Wolk considered fleeing the scene. In relevant part, they state: "With Miller's dead body lying in the roadway, visible to both of them, both Bove and Wolk can be seen on video turning their vehicles away []. After a moment, Wolk apparently reconsiders, and can be seen driving towards the scene of the collision."  ECF 65-2 at ¶ 43.

Wolk heavily disputes this as well, noting that he himself called Bove after the accident to ask: "Where did you go? You have to come back and make a statement….," ECF 64-1 at ¶ 76, which Bove immediately did.  Wolk further asserts that "[i]t is unclear what statement Plaintiffs are alleging was recanted" in between Wolk's various incident interviews, as "it is undisputed that [] Wolk's first recorded statement about the accident, taken the evening of the accident on May 7, 2019, makes clear that he was in pursuit of Miller and that Miller refused to stop."  ECF 71-1 at ¶ 6.  As for Bove, Wolk admits that he "did not discuss Bove in his [initial] statement to AID," but counters that "he was not asked any questions about Bove in that interview."  ECF 71-1 at ¶ 18.  Wolk has repeatedly reiterated that he called Bove and instructed him to return to the scene to give a statement, which contradicts the notion that Wolk was attempting to conceal Bove's involvement.

### J.  Internal Affairs Investigation

An Internal Affairs Investigation ("IA") ensued. ECF 65-2 at ¶¶ 14-15.  Based on the initial witness statements collected by AID, video evidence, and additional witness statements taken during this subsequent investigation, IA concluded that Wolk had violated several Police Department Directives.  Id.  Specifically, IA found that (1) Wolk did not have his emergency lights and sirens activated throughout the pursuit, (2) marked Police SUVs, like Wolk's, should not initiate vehicle pursuits, (3) Wolk had failed to notify Police Radio that he initiated a

vehicular pursuit, and (4) Wolk failed to complete the necessary paperwork within three days of the pursuit.  ECF 65-2 at ¶¶ 53-59.

At his deposition in this case, Wolk maintained that he "wasn't departing from policy," but instead "stopping [Miller's] actions to know what was going on, suicidal or DUI, before something happened to him."  ECF 68-1 at 36.  Wolk further stated that he "wishes [he] would have tackled him so all this would have never happened."  Id.[7]

## II.    PROCEDURAL HISTORY

Plaintiffs initiated this matter on December 15, 2020, naming the City of Philadelphia, the City of Philadelphia Police Department, Joseph Wolk, Gary Bove, and Police Officer John and Jane Does as Defendants.  See ECF 1.

The City of Philadelphia and Wolk answered the original Complaint on January 6, 2021. ECF 5.  They then filed a Motion for Judgment on the Pleadings on March 11, 2021, eventually seeking, among other things, to dismiss Plaintiffs' Monell claim for failure to state a claim.  ECF 14.

Judge Robreno, from whom the undersigned received this case in July 2023, ECF 45, granted this Motion for Judgment on the Pleadings while also granting Plaintiffs leave to file an Amended Complaint.  ECF 23.

Plaintiffs filed a First Amended Complaint on November 29, 2021.  ECF 24.  Shortly thereafter, the City of Philadelphia and Wolk filed a Motion to Dismiss this Amended Complaint for failure to state a claim.  ECF 25.  Judge Robreno granted in part and denied in part this motion, also granting Plaintiffs leave to file a Second Amended Complaint.  ECF  33.

---

[7] Plaintiffs further note that Wolk also testified he would "not put [his] vehicle in front of a moving scooter" because "it would cause serious bodily injury."  ECF 68-1 at 37.

Plaintiffs filed a Second Amended Complaint on July 19, 2022, this time naming only Wolk and Bove as Defendants.  ECF 34.

In this operative Second Amended Complaint, Plaintiffs asserted a claim against Wolk under 42 U.S.C. § 1983.  Id. at ¶¶ 133-136.  Specifically, Plaintiffs alleged that Wolk had violated Ryan Miller's constitutional rights to substantive and procedural due process as guaranteed by the Fourteenth Amendment, as well as Miller's right to be free from unreasonable seizure and the use of excessive force as guaranteed by the Fourth and Fourteenth Amendments. Id.

Plaintiffs also asserted a negligence claim against Bove for "recklessly engaging in a police vehicular pursuit, . . . bearing down on the Decedent's motorbike while utterly and knowingly disregarding the clear risk of bodily injury or death, and actively placing the Decedent in mortal fear for his life with the aggressiveness of his inexplicable pursuit."  Id. at ¶ 143.

Judge Robreno eventually dismissed Plaintiffs' claim against Bove due to lack of prosecution, leaving Wolk as the sole remaining Defendant.  ECF 41.

Significant discovery ensued, and on February 1, 2024, Wolk moved for summary judgment on all remaining counts.  ECF 64.

Plaintiffs responded on February 16, 2024.  ECF 65.  In so doing, however, Plaintiff conceded that "[a]lthough the Second Amended Complaint raises a claim under the Fourth Amendment, discovery has confirmed that this case is more appropriately asserted as a Fourteenth Amendment claim. Since the two claims cannot coexist in any event, Plaintiffs stipulate to the dismissal of their Fourth Amendment claim."  ECF 65-3 at 22.

Thus, presently before this Court is Wolk's Motion for Summary Judgment on Plaintiffs' only remaining claim: an alleged violation of Miller's substantive due process under the Fourteenth Amendment.

On April 10, 2024, this Court held oral argument pursuant to written questions the Court had sent to counsel in advance of argument.

### III.   STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325. After the moving party has met its initial burden, the adverse party's response must, by "citing particular parts of materials in the record," show that a fact is "genuinely disputed." Fed. R. Civ. P. 56(c)(1). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Under

Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party.  <u>Anderson</u>, 477 U.S. at 255.

## IV.   PARTY CONTENTIONS

### A.  Wolk's Motion for Summary Judgment

Wolk challenges Plaintiffs' substantive due process claim on three grounds.  ECF 64. First, he asserts that Plaintiffs cannot prove that Wolk engaged in this pursuit with an intent to harm Miller, as Wolk contends is required for prima facie liability here.  <u>Id.</u> at 4.

Second, Wolk argues Plaintiffs cannot prove that Wolk was the proximate cause of Miller's death.  <u>Id.</u>  More precisely, Wolk contends that "[w]hen Miller fatally ran the redlight, Officer Wolk was over a block away from him . . . [a]nd there was a third party present between Officer Wolk and Miller when Miller suffered his harm."  <u>Id.</u> at 14.  The "danger at issue," Wolk asserts, was "created [by] Miller by his own actions and choices, not by Officer Wolk."  <u>Id.</u>

Third, Wolk argues he is entitled to qualified immunity here because (1) "Plaintiffs cannot establish on the record evidence that [Wolk] violated Miller's Fourteenth Amendment rights or Fourth Amendment rights," and (2) there is "no precedential law that clearly establishes that it is unconstitutional to engage in a pursuit, under any standard of culpability, where the fleeing plaintiff gets away from the pursuing officer and causes his own harm through reckless driving."  <u>Id.</u> at 16.

### B.  Plaintiffs' Response

Relying on the Third Circuit's decision in <u>Sauers v. Borough of Nesquehoning</u>, 905 F.3d 711 (3d Cir. 2018), Plaintiffs first counter that Wolk incorrectly invokes the "intent to harm" standard, as initially set forth in <u>County of Sacramento v. Lewis</u>, 523 U.S. 833 (1998).  ECF 65-3 at 8.  Plaintiffs instead contend that where, as here, an "officer has time to engage in 'hurried

deliberation', liability can be found when the officer's conduct exhibits a 'conscious disregard of a great risk of serious.'" Id. at 8 (citing to Sauers, 905 F.3d at 717-18).

According to Plaintiffs, the application of the intent to harm standard in this case would "subvert the clear intent of the Third Circuit in Sauers," erroneously creating a bright-line rule that "in every case where flight occurs, a plaintiff must prove intent to harm." Id. at 11. Plaintiffs argue it would be particularly egregious to do so here because "there was no compelling justification for Wolk's initiation of pursuit," or even "a permissible justification under applicable police department policies." Id. at 12.

Plaintiffs further contend that—even if this Court were to require Plaintiffs to prove an "intent to harm"— the record nonetheless enables Plaintiffs to survive summary judgment. Id. at 13. In particular, Plaintiffs note that eyewitness Robert Mattos expressly testified that Wolk intended to cause a collision. Id. Likewise, Plaintiffs' "accident reconstructionist" expert opined that "Wolk intentionally blocked Mr. Miller's path of travel, creating an immediate hazard that Mr. Miller only avoided by performing above average levels of braking and swerving." Id. Similarly, Plaintiffs' police procedure expert opined that "the manner in which Officer Wolk aggressively engaged Mr. Miller on his motor scooter, in close proximity in an apparent attempt to cause a collision, indicates Officer Wolk intended to cause injury unrelated to any legitimate police objective."   ECF 69-3 at 14. These pieces of evidence and opinions, Plaintiffs assert, provide "a sufficient basis from which intent to harm could be inferred." ECF 65-3 at 14.

Plaintiffs also argue, somewhat tangentially, that "[t]here is also a non-trivial chance that Wolk and Bove were acting in a clandestine vigilante manner in an attempt to punish - or at a minimum scare - Miller for [a] knifepoint sexual assault' he was falsely accused of, and which Wolk continues to believe he committed." Id. at 17.

Further, in contesting Wolk's proximate cause argument, Plaintiffs assert that "it was anything but unforeseeable that a collision with another vehicle could result from Wolk's decision to pursue a person on a motor scooter." Id. at 20.

Lastly, Plaintiffs contend that Wolk is not entitled to qualified immunity in this case because "[f]ollowing Sauers, police officers within the Third Circuit were on notice that if they initiated a high speed pursuit without compelling justification, liability could arise for conduct demonstrating a conscious disregard of the risk of serious harm, analogous to the tort concept of recklessness." Id. at 24. And here, Plaintiffs assert, Wolk knew "full well that a traffic violation was not an authorized basis for a pursuit under Directive 9.4," yet nonetheless "engaged in a prohibited pursuit anyway." Id. As Plaintiffs construe the record, Wolk's conduct here clearly evidences a shocking degree of disregard for the serious risk of harm associate with a potential crash. In relevant part, Plaintiffs frame this record as Wolk having

> deactivated his emergency equipment. He exceeded the speed limit on every straightaway. He engaged in the pursuit in a vehicle not authorized to participate in pursuits. He failed to call in the pursuit and maintain radio contact as required to do by Directive 9.4. He took turns so aggressively that they pushed the performance and operational capabilities of his SUV to their absolute limit, risking loss of control and serious potential harm that could ensue. He crossed over into opposing lanes without emergency equipment to overtake Miller's vehicle. He twice attempted to use his vehicle to cause a collision between it and Miller's person in order to effectuate a stop, with the subjective knowledge that he could cause serious injury or death doing so. He allowed and condoned a civilian's participation in the pursuit, and significant evidence points to him actively coordinating with that civilian. When he first saw Miller's body, he actually turned away, indicating that he considered abandoning the scene entirely to conceal what had transpired.

Id. at 25. In so arguing, Plaintiffs also note that Wolk was previously a defendant in McKenna v. Wolk, et al., No. 18-cv-3746. Id. at 26. That case involved "Wolk pursuing dirt bike riders, and ultimately maneuvering his vehicle in such a way as to place it directly in the path of one of the riders, causing an unavoidable collision that killed a rider." Id. Plaintiffs suggest the McKenna

Court's denial of summary judgment is "highly relevant baggage," as it should have put Wolk on notice of the dangers of pursuing Miller here.  Id. at 26-27.

### C.  Wolk's Reply

Wolk counters that Sauers should not "determine the standard of culpability applied here" because that case "addressed a situation where the suspect was not fleeing."  ECF 71 at 2 (emphasis added).  By contrast, Wolk contends, Lewis makes clear that "[w]hen a police officer is pursuing an actively fleeing suspect, a police officer can only be constitutionally liable under the Fourteenth Amendment for any harm suffered by the suspect (or a third-party) if the officer's actions in pursuing the suspect exhibited an 'intent to harm.'"  Id. (citing to Lewis, 523 U.S. at 844). And here, Wolk argues, the record—at most—shows that "Wolk created an 'immediate hazard' that Miller was forced to respond to or risk injury," which is insufficient to demonstrate an intent to harm.  Id. at 2-3.  According to Wolk, without more, there is simply "no evidence that [his actions] were for anything but apprehending Miller."  Id. at 3.

Wolk also argues that McKenna is distinguishable, given that in this case (1) "Plaintiffs' own expert admits that Officer Wolk never made contact with Miller in his attempts to apprehend him," and (2) "when Miller finally did stop, the surveillance video shows Officer Wolk elected to leave his vehicle to grab Miller with his hands, evidencing that Officer Wolk's intent was to apprehend Miller and do his job as a law enforcement officer."  Id.  Likewise, Wolk notes that the McKenna Court expressly credited the fact that, unlike here, "McKenna was not even fleeing at the time of the alleged seizure."  ECF 65-3 at 22.

Wolk further counters that he "cannot be responsible for the actions of Bove" because there "is no evidence in the record to allow a reasonable jury to find that [he] coordinated with Bove to bring about any of the events at issue in this case."  Id. at 5.

Finally, Wolk reiterates that proximate cause independently undermines Plaintiffs' claim here, as "Miller's decision to flee was his own, and this breaks the necessary causality Plaintiffs need to prove a state-created danger claim." Id. at 6.

## V.    DISCUSSION

To state a claim under 42 U.S.C. § 1983, "a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was

committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988).

Here, Miller was struck and killed by a third party.  Thus, the Court construes Plaintiffs' substantive due process claim as asserted under the state-created danger doctrine.  Indeed, the "case law is clear that this . . .  framework for analysis applies to police-pursuit cases" such as this one.  Sauers, 905 F.3d at 717 (citing to Brown v. Pa. Dep't of Health & Emergency Med. Servs. Training Inst., 318 F.3d 473, 480 (3d Cir. 2003); cf. Kedra v. Schroeter, 876 F.3d 424, 432, 448 (3d Cir. 2017)).

The state-created danger doctrine embodies the principle that the government has an obligation under the Fourteenth Amendment's Due Process Clause "to protect individuals against dangers that the government itself creates."  Haberle v. Troxell, 885 F.3d 170, 176 (3d Cir. 2018).  To succeed on such a claim, Plaintiffs must prove the following four elements:

1)  [t]he harm ultimately caused was foreseeable and fairly direct;

2)  a state actor acted with a degree of culpability that shocks the conscience;

3)  a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and

    4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

Sauers, 905 F.3d at 717 (citing to Haberle, 885 F.3d at 176-77).

**A. The Intent to Harm Standard Applies Here**

Here, a threshold dispute exists as to the nature of the relevant secured right, and thus whether Wolk's conduct might "shock the conscience" in potentially violating that right. This dispute turns almost entirely on each party's reading of Sauers, and so the Court begins there.

In Sauers, the Third Circuit went to great lengths to precisely define the constitutional right at issue. 905 F.3d 716-17. Specifically, the Sauers Court explained that citizens have a constitutional right "not to be injured or killed as a result of a police officer's reckless pursuit of an individual suspected of a summary traffic offense when there is no pending emergency and when the suspect is not actively fleeing the police." Id. at 717.

In so doing, however, the Court clarified that "[t]he level of culpability required 'to shock the contemporary conscience'"—i.e., the second element of a prima facie state-created danger claim—"falls along a spectrum dictated by the circumstances of each case." Id. at 17 (citations omitted). More precisely, the Court explained that there "three distinct categories of culpability depending on how much time a police officer has to make a decision." Id. First, "actions taken in a 'hyperpressurized environment' . . . will not be held to shock the conscience unless the officer has 'an intent to cause harm.'" Id. Second, "actions taken within a time frame that allows an officer to engage in 'hurried deliberation'" need only "reveal a conscious disregard of a great risk of serious harm." Id. Third, "actions undertaken with 'unhurried judgments,' with time for 'careful deliberation,'" will only shock the conscience if they are "done with deliberate indifference.'" Id. (citation omitted).

Specifically at issue in <u>Sauers</u> was the conduct of a defendant police officer who witnessed a Dodge Neon committing a "summary traffic offense." <u>Id.</u> at 715.  The officer radioed ahead to a neighboring jurisdiction to pull over the Dodge when it crossed into its territory.  <u>Id</u>.  Rather than wait, however, the officer-defendant decided to catch up to the Dodge. <u>Id</u>.  To do so, the officer drove recklessly and at speeds of over one hundred miles-per-hour, eventually crashing and killing the plaintiff, an innocent driver of a different vehicle.  <u>Id</u>.

Ultimately, the <u>Sauers</u> Court concluded that because the defendant officer "had at least some time to deliberate" on whether and how to pursue the traffic offender, the Court would analyze the "fact-pattern [under] the second category of culpability." <u>Id.</u> at 718.  This decision, the <u>Sauers</u> Court further explained, was supported by (1) the allegation the officer "had time to call the neighboring police department as he was contemplating his actions," and (2) the "obvious inference from the nature of the Dodge driver's mild provocation: there was no emergency arising from a simple traffic violation." <u>Id</u>.

Critical here, however, the <u>Sauers</u> Court made clear its decision turned on the "[t]he particular factual allegations," given that <u>Sauers</u> involved only "a police pursuit of a <u>non-fleeing</u> summary traffic offender." <u>Id.</u> at 719 (emphasis added).  Indeed, the Court actively contrasted its facts from a situation in which an officer "pursue[s] an actively fleeing suspect who is endangering the public welfare," as the Court expressly indicated that such a scenario "may [] be a reasonable justification" for pursuit that triggers the "intent to harm" standard. <u>Id.</u> at 718.

More recently, in <u>Donahue v. Borough of Collingdale</u>, this Court had occasion to analyze just such a fact pattern.  2024 WL 387455, at *1 (E.D. Pa. Feb. 1, 2024).  There, a plaintiff-bystander was struck and killed by a vehicle fleeing from the police.  <u>Id</u>.  In analyzing the plaintiff-bystander's suit against the pursuing police officers, this Court explained that "[u]nder

binding precedent, high-speed police chases are hyper-pressurized environments requiring a snap judgment."  Id. at *3 (quoting Johnson v. City of Philadelphia, 975 F.3d 394, 401 (3d Cir. 2020) (citations omitted)).  As both the Supreme Court and Third Circuit have made clear, "a balancing of the need to stop a suspect's flight from the law against the threat a high-speed chase poses to others demand an officer's instant judgment."  Id. (citing to Davis v. Twp. of Hillside, 190 F.3d, 167, 170 (3d Cir. 1999); Lewis, 523 U.S. at 834).  That is why "[i]n the circumstances of a high-speed chase aimed at apprehending a suspected offender . . . only a purpose to cause harm unrelated to the legitimate object of arrest will" shock the conscience.  Id. at *3 (quoting Lewis, 523 U.S. at 851) (emphasis added).

Of particular note, this Court's opinion in Donahue expressly undercut Plaintiffs' primary argument in this case.  Indeed, this Court explained that Sauers—which did not involve a fleeing suspect—did "not change [the] rule" that an "intent to harm," rather than a "disregard of great risk," applies to high-speed chases where a suspect flees.  Id. at *6; see also Lewis, 523 U.S. at 853–54; Fagan v. City of Vineland, 22 F.3d 1296, 1306–07 (3d Cir. 1994) (en banc).  Instead, this Court explained the "Sauers test is conjunctive" because it applies to a "reckless pursuit of an individual suspected of a summary traffic offense [1] when there is no pending emergency and [2] when the suspect is **not** actively fleeing police."  Donahue, 2024 WL 387455, at *6 (quoting Sauers, 905 F.3d at 717) (bold and emphasis added); see also Sauers, 905 at 722 n.8 (reiterating that Sauers more narrowly addressed "the proper standard by which to judge whether an officer's conduct shocks the conscience in police pursuits that involve neither an emergency nor a fleeing suspect") (emphasis added).  It is therefore inapplicable when "only one prong" is met.  Donahue, 2024 WL 387455, at *6.  Otherwise stated, if an officer engages in a high-speed

pursuit where [1] there <u>is</u> a pending emergency or [2] a suspect <u>does</u> actively flee, this Court must instead revert to <u>Lewis</u>'s intent to harm standard.  <u>Lewis</u>, 523 U.S. at 834.

And this case more closely resembles <u>Donahue</u> than it does <u>Sauers</u>.  Simply put, unlike <u>Sauers</u>, Miller actively fled from Wolk.  Indeed, nothing in the record contradicts Wolk's contemporaneous witness statement and his subsequent deposition testimony that "Miller failed to stop when [Wolk] turned on his lights and sirens," and that Miller "instead maneuvered into opposing lanes of travel."  ECF 65-2 at ¶ 9 (citing ECF 66-3 at 27) (emphasis added); cf <u>Johnson v. Baltimore Police Dep't</u>, 452 F. Supp. 3d 283, 301-02 (D. Md. 2020) (noting that officer defendants pursued fleeing suspect "without <u>ever</u> activating their vehicles' emergency equipment") (emphasis added).[8]  Likewise, video evidence unequivocally demonstrates that Miller (1) impermissibly hopped over a parking lot median, (2) cut off at least one other pedestrian car while attempting to evade Wolk, and (3) "exceeded the speed limit along every straight segment" during the chase.  <u>See, e.g.</u>, ECF 64, Exs. K, L, N; ECF 64-11 at 17.

As such, the Court must conclude there is no genuine dispute that Miller was "actively fleeing the police in a dangerous manner."  <u>Sauers</u>, 905 F.3d at 711; <u>Lewis</u>, 523 U.S. at 836; cf <u>Clark v. Merrell</u>, 2021 WL 288791, at *5 (E.D. Pa. Jan. 28, 2021) (noting that there was "no

---

[8] As noted above, Plaintiffs counter only that Wolk has offered inconsistent statements on this latter point, but do not actually challenge its veracity.  Further, the Court is not persuaded that Wolk's statements on this point are actually inconsistent.  At best, Plaintiffs might say Wolk's later statements were more fulsome than those given immediately after the crash.  Regardless, in view of the further video evidence showing Miller actively speeding and cutting off other vehicles, even if Plaintiffs had offered evidence contradicting Wolk's statements regarding the beginning of the chase, the record indisputably contains evidence of Miller maneuvering out of the proper lane at multiple points throughout.

urgency to pursue" and that officer defendant was "specifically ordered not to pursue"). This, in turn, triggers <u>Lewis</u>'s "intent to harm" standard.[9]

### B. Plaintiffs Fail to Raise a Genuine Dispute that Wolk Intended to Harm Miller

Which brings us to Wolk. The dispositive question thus becomes—at least for the "shocks the conscience" element of Plaintiffs' state-created danger claim at summary judgment—whether a "reasonable jury could return a verdict" that Wolk intended to harm Miller. <u>Debiec v. Cabot Corp.</u>, 352 F.3d 117, 128 n.3 (3d Cir. 2003).

As described above, Plaintiffs essentially rely on three pieces of evidence to demonstrate the requisite intent. First, Plaintiffs note that Robert Mattos, an eyewitness, testified that Wolk appeared to have intended to cause a collision. ECF 68-2 at 12-13.

Second, Plaintiffs' accident reconstructionist expert opined—with regard to both of Wolk's attempts to stop Miller's progress—that "Wolk intentionally blocked Mr. Miller's path of travel, creating an immediate hazard that Mr. Miller only avoided by performing above average levels of braking and swerving." ECF 68-6 at 19. Likewise, Craig Allen, a retired policer officer and Plaintiffs' "police procedure" expert, opined that "the manner in which Officer Wolk aggressively engaged Mr. Miller on his motor scooter, in close proximity in an apparent attempt to cause a collision, <u>indicates Officer Wolk intended to cause injury unrelated to any legitimate police objective</u>." ECF 69-3 at 17 (emphasis added).[10]

---

[9] In so holding, this Court does not preclude the possibility that there may be other instances in which a suspect who flees does not do so in a "dangerous manner." <u>Sauers</u>, 905 F.3d at 711. In such a scenario, it may be appropriate to analyze an officer's pursuit under the "conscious disregard" standard. But that is simply not this case.

[10] As noted above, Allen further opined that "Wolk was not pursuing a dangerous criminal or felon nor was he forced to make split-second decisions in a chaotic environment….. Officer Wolk intentionally chose to engage in the pursuit, which he knew was outside of policy and knew the dangers his evasive blocking and ramming techniques posed to Mr. Miller. This was all done with no radio communication, no emergency equipment activated, and allowing a citizen

Third, Plaintiffs argue that Wolk's "two attempts represent the same basic modus operandi Wolk employed to lethal effect in the McKenna case," an earlier incident where "Wolk brought his SUV directly into the path of a motorcycle in such a manner as to cause an unavoidable collision, which resulted in the motorcycle rider sustaining injuries resulting in death after months on life support."  ECF 65-3 at 14.

Unfortunately for Plaintiffs, the Court is simply not persuaded this evidence creates a genuine question as to whether Wolk intended to harm Miller.  Indeed, the Third Circuit expressly addressed this very issue in Davis.  There, a "chase ended when the pursuing police car bumped into the rear of [fleeing suspect's] car, causing him to lose control of the car, which led to the collision in which plaintiff was injured."  Davis, 190 F.3d at 171.  Like here, the Davis "plaintiff argue[d] that the deliberate ramming of [a fleeing suspect's] car by the police vehicle amounted to use of a deadly weapon, which permits the drawing of an inference that the police acted with the intent to cause physical injury."  Id.

Yet, the Davis Court flatly rejected this argument, explaining that "Lewis does not permit an inference of intent to harm simply because a chase eventuates in deliberate physical contact causing injury. Rather, it is conduct intended to injure in some way unjustifiable by any government interest [that] is the sort of official action most likely to rise to the conscience-shocking level."  Id. (citation and quotations omitted).

The Davis Court further explained it is "foreseeable" that "physical contact of some sort between the pursued and pursuing vehicles might occur in the course of a high-speed chase, particularly at its conclusion," and so "it would undermine Lewis' premise to limit liability to

_____

acquaintance to join the pursuit. The egregious and excessive pursuit tactics undertaken by Officer Wolk are totally contrary to police practice, policy, and law and had direct influence in causing the death of Mr. Miller."  ECF 65-1 at ¶ 29.  But for the reasoned already explained, the Court cannot agree.

conscience-shocking conduct if courts were to segment a high-speed chase and examine elements in isolation from each other." Id.

Here, the entirety of the record—with the lone exception of one equivocating statement from a single witness—indicates that Wolk's SUV did not bump Miller. Particularly in view of the video evidence in this case, Scott v. Harris, 550 U.S. 372, 380-81 (2007), the Court concludes that no such contact occurred. Thus, at best, Plaintiffs might argue that Wolk's two attempts to cut off Miller somehow evinced an intent to harm.[11] But Wolk "testified that he was only ever trying to stop Miller because he believed that was necessary to Miller's safety," and the Court agrees the record contains "no evidence to the contrary." ECF 64 at 11. Indeed, the Court is highly persuaded by the video evidence itself, ECF 64, Ex. N, along with the fact that Wolk actually exited his own vehicle and physically grabbed Miller. Both strongly suggest to the Court that Wolk intended only to apprehend him. Id.[12]

Moreover, even if the Court accepts as true Plaintiffs' assertion that "Wolk twice attempted to cause a collision between his vehicle and Miller's"—which the Court does not—Davis makes clear that such "physical contact of some sort between the pursued and pursuing vehicles," without more, is simply not enough.[13] Davis, 190 F.3d at 171.

---

[11] Indeed, given that the key inquiry here is on Wolk's intent, whether any such slight contact actually occurred is largely irrelevant. There is little dispute about the maneuvers Wolk actually employed in cutting off Miller.

[12] In reaching this result, the Court assigns minimal weight to the portion of Plaintiffs' experts' reports opining that "Officer Wolk intended to cause injury unrelated to any legitimate police objective," ECF 69-3 at 14. As the Third Circuit made clear in M.S. by & through Hall v. Susquehanna Twp. Sch. Dist., "an expert cannot testify to the legal conclusion of whether appropriate people had" the requisite mens rea. 969 F.3d 120, 129 (3d Cir. 2020); see also Advo, Inc. v. Philadelphia Newspapers, Inc., 51 F.3d 1191, 1201 (3d Cir. 1995) (opting to ignore "the bald assertions of its expert, that are without factual significance").

[13] Likewise, while Plaintiffs highlight that Wolk's chase occurred in violation of several Philadelphia Police Department directives, Wolk is correct that "intent to harm cannot be inferred an officer's violation of police directives." As the Third Circuit explained in Davis,

If anything, this set of facts presents a weaker inference of "intent to harm" than <u>Davis,</u> <u>Lewis,</u> or <u>Mckenna</u>.   In <u>Davis</u>, for instance, the police utilized a "bump procedure" to intentionally hit the rear of the driver's vehicle with a police cruiser.  <u>Davis</u>, 190 F.3d at 169; cf <u>Wilson v. Doe</u>, 2020 WL 1701709, at *5-6 (E.D. Pa. Apr. 8, 2020).  In <u>Lewis</u>, "[t]he motorcycle and patrol car reached speeds up to 100 miles an hour, with [the officer] following at a distance as short as 100 feet; at that speed, his car would have required 650 feet to stop."  <u>Lewis</u>, 523 U.S. at 837.  In <u>McKenna</u>, while many of the facts are analogous, Judge Goldberg expressly noted that "McKenna was not even fleeing at the time of the alleged seizure."  ECF at 10-11.

By contrast, the video evidence here shows that Wolk swerved <u>in front</u> of a fleeing Miller.  In other words, unlike a purposeful bump or leaving insufficient space to avoid a collision, Wolk's method for apprehending Miller did not automatically involve car-to-motor scooter contact.  Wolk attempted to and did stop Miller's progress without actually hitting him, a physical impossibility in both <u>Davis</u> or <u>Lewis</u>.  Had Wolk side-swiped or attempted to side-swipe Miller from behind, it is entirely possible that a reasonable jury could have drawn a different set of inferences.  But that is not this case.

As such, Plaintiffs cannot demonstrate that a reasonable jury might find Wolk intended to harm Miller.  For this reason alone, Plaintiffs' substantive due process claim fails.

### C.  Plaintiffs also Fail to Demonstrate a Genuine Dispute on Proximate Cause

Moreover, even if this Court were to instead assume that Wolk's conduct here shocked the conscience—which it does not—Plaintiffs still cannot establish that Wolk proximately caused Miller's death.  To be sure, "the presence of the requisite causation is normally a question

---

"<u>Lewis</u> [] squarely refutes [the] contention that the officers' violation of police department regulations, which might be probative of recklessness or conscious disregard of plaintiff's safety, suffices to meet the shocks-the-conscience test under the due process clause." <u>Davis</u>, 190 F.3d at 170.

of fact for the jury." <u>Rivas v. City of Passaic</u>, 365 F.3d 181, 194 (3d Cir. 2004).  And Plaintiffs are undoubtedly correct that it is foreseeable that a high-speed chase may result in bodily harm. 65-3 at 20 (citing to <u>Fagan v. City of Vineland</u>, 22 F. 3d 1296 (3d Cir. 1994); <u>Davis</u>, 190 F. 3d at 171; <u>Jones v. Chieffo</u>, 833 F. Supp. 498 (E.D. Pa. 1993); <u>Davenport v. Borough of Homestead</u>, 870 F. 3d 273 (3d Cir. 2017)).

Yet, "if the relevant facts are not in dispute and the remoteness of the causal connection between the defendant's [misconduct] and the plaintiff's injury clearly appears, the question becomes one of law." <u>Jewell v. Ridley Twp.</u>, 2011 WL 5524260, at *11 (E.D. Pa. Nov. 10, 2011), <u>aff'd</u>, 497 F. App'x 182 (3d Cir. 2012) (citations omitted).

Indeed, "[t]he Supreme Court has held on multiple occasions that the decision to engage in flight and to ignore police warnings to stop causing risk to innocent bystanders results, not from the pursuit by law enforcement, but <u>from the fleeing suspect</u> intentionally placing himself and others in danger by unlawfully engaging in reckless flight." <u>Koreny v. Smith</u>, 2018 WL 1141513, at *8 (W.D. Pa. Mar. 2, 2018) (citing to <u>Lewis</u>, 523 U.S. at 855; <u>Scott</u>, 550 U.S. at 384; <u>Plumhoff v. Rickard</u>, 134 S. Ct. 2012 (2014)) (emphasis in original).  In <u>Lewis</u> itself, for example, the Supreme Court concluded that liability is improper where an officer has "<u>done nothing to cause</u> [a fleeing suspect's] high-speed driving in the first place, nothing to excuse his flouting of the commonly understood law enforcement authority to control traffic, and nothing (beyond a refusal to call off the chase) to encourage him to race through traffic at breakneck speed forcing other drivers out of their travel lanes." <u>Lewis</u>, 523 U.S. at 855 (emphasis added).

Again, this Court's recent decision in <u>Donahue</u> is instructive.  Midway through that chase, the fleeing suspect pulled into a McDonald's parking lot.  <u>Donahue</u>, 2024 WL 387455, at *4.  Unbeknownst to both the instigating officer and the suspect himself, a second officer had

24

driven into the McDonald's drive-through exit to physically prevent the suspect from exiting the parking lot.  Id.  The fleeing suspect bumped this second car while exiting the lot, after which other officers continued to give chase.  Id.  Critically though, this second officer's "participation was limited to the McDonalds parking."  Id. at *7 n.17.  As such, this Court granted that officer's motion for summary judgment, concluding that "[h]is action, plausibly stated as blocking the exit and remaining in the parking lot, is too tenuously related to the terminal crash over a mile away to satisfy causation."  Id.

Here too, "a superseding cause [broke] the chain of proximate causation.'"  Lamont v. New Jersey, 637 F.3d 177, 186 (3d Cir. 2011).  Indeed, the record unequivocally shows that after Miller escaped Wolk's physical grasp, Wolk's role in the chase effectively ended.  Instead, Bove quite literally "superseded" Wolk and began to pursue Miller.  True, Wolk continued to follow Miller from a distance, potentially distinguishing Wolk from the parking lot-bound officer in Donahue.[14]  But given the uncontradicted testimony and Plaintiffs' own expert's evidence that Wolk (1) remained at least one hundred and fifty feet away from Miller, and (2) was out of sight for at least thirty seconds before Miller's accident, Wolk's later actions cannot save Plaintiffs' claim.  To the contrary, the Court notes that Robert Mattos—an eyewitness to this portion of the chase—expressly testified that he "thought the police suv gave up on the chase and let the silver car take the chase."  ECF 64-18 at 1; ECF 68-2 at 5.

---

[14] Indeed, certain evidence suggests that Wolk "[re-]accelerated to 45 mph" during this portion of the chase.  ECF 65-1 at ¶ 53; ECF 64, Ex. K.

Thus—absent a material dispute over whether Wolk somehow enabled Bove (discussed below)—it is difficult to see how Wolk's initial pursuit proximately caused Miller's eventual death.[15]

### D.  Facts Concerning Bove's Involvement Do Not Preclude Summary Judgment

That brings us to the final, extraordinary wrinkle in this case.  As explained above, following Wolk's second stoppage of Miller, Gary Bove somewhat inexplicably began to pursue Miller.  If Bove did so unilaterally, this would not alter the Court's above conclusions. By contrast, if a reasonable jury could find that Wolk "coordinated," "condoned[,] and ratified" Bove's actions, as Plaintiffs assert, ECF 65-3 at 19, this Court would be required to further consider how, if at all, such coordination affects the "shocks the conscience" inquiry.

For the following reasons however, the Court concludes that (1) the record does not reasonably support a jury finding that Wolk "condoned and ratified" Bove's behavior, and (2) even if it did, such ratification would still not evince an "intent to harm" in this hyper-pressurized situation.

---

[15] One might alternatively rely on the fact that—at some point during this chase—the record indicates that Wolk turned <u>off</u> his sirens and emergency lights, even if Wolk has testified that he continued to blow his airhorn throughout the chase.  Given that Bove, in his civilian vehicle, similarly lacked headlights or a siren, one might reasonably find this may have confused Miller and led him to believe Bove was also law enforcement.  This, in turn, might have prompted Miller to continue his flight rather than slow his pace.  And perhaps, from that perspective, one might contend that Wolk's allegedly erroneously decision to turn off his siren and emergency lights caused Miller to continue fleeing.  Nonetheless, the very speculative nature of such a chain reinforces that Wolk's conduct was ultimately not a "substantial factor causing" Miller's death. <u>Jewell</u>, 2011 WL 5524260, at *11.

       i.       <u>The Record Does Not Reasonable Show Coordination or Ratification</u>

The threshold question here, as just noted, is whether the record reasonably supports a jury finding that Wolk coordinated with Bove or otherwise sanctioned his conduct.  To recap, Plaintiffs direct the Court to the following portions of the record to establish such coordination:

- The reconstruction animation of the pursuit, which shows "that as soon as Miller's motor scooter turned onto Kennedy Street, Bove's vehicle on James Street began to slow down significantly. <u>Notably, Bove would not have been able to see Miller at this time, as rowhomes would obscure his view.  Therefore, he appears to be reacting to something other than a visual cue</u>.  Since Bove began to slow down at a time when he could only know Miller's location on Kennedy Street through Wolk, and slowed to a crawl until he was able to ensure that Miller could not turn off James Street before reaching Scattergood, <u>there is strong circumstantial evidence of real-time communication and coordination between Wolk and Bove during the pursuit</u>."  ECF 65-1 at ¶ 37 (emphasis added).

- "[Bove's] actions immediately prior to pulling over on Scattergood Street," which Plaintiffs assert shows that "Bove was lying in wait for the pursuit to catch up to him."  ECF 65-1 at 38.

- The moment after Miller frees himself from Wolk's grasp, as Plaintiffs contend "[t]here appears to be a moment when Wolk stops directly in front of Bove's vehicle," during which Wolk allegedly "<u>looks directly at Bove for a moment before returning to his vehicle</u>."  ECF 65-1 at ¶ 49 (emphasis added).

- Wolk's allegedly inconsistent statements regarding the nature and extent of his association with Bove, as Plaintiffs highlight that "Wolk did not mention Bove in either his initial report where he claimed he had merely found Miller's body or in his later statement to AID investigators, where he completely omitted the portion of the pursuit Bove participated in. . . . .  Eventually, after video of Bove participating in the pursuit surfaced, he told IAD investigators that he recognized Gary as a tow truck operator who operates in the Northeast.  At his deposition, however, Wolk disclosed what appears to be a more than incidental association, testifying that he knew Bove for several years, had his telephone number in his phone, and had telephone conversations with him in the past, generally with Bove calling him about personal issues. Wolk also testified that after Miller's fatal collision with the truck, Wolk called Bove to tell him to return to the scene to give a statement to investigators."  ECF 65-1 at ¶ 51.

- Bove's statement to police after the chase, which was allegedly "patently false, stating that he (Bove) was 'not involved' in the pursuit of Miller, and that Wolk 'pulled up behind [him] and told [him] to move.'"  <u>Id</u>. (citing to ECF 66-3 at 19-21).

- Following Wolk's deposition, subpoenas were issued both for the telephone number provided by Wolk at his deposition and for Gary Bove's cell phone activity. Both service providers' responses indicated that the records sought were not retained since both were pre-paid phones. ECF 65-2 at ¶ 52.

Distilled, Plaintiffs assert that (1) Bove's supposed awareness of the chase before it entered his sightline, (2) an alleged look of approval from Wolk, (3) the possible use of burner phones, and (4) Wolk's and Bove's after-the-fact supposedly inconsistent statements, are sufficient to establish coordination between Wolk and Bove for the purposes of summary judgment. The Court cannot agree.

First, Plaintiffs' claim that Bove "appears to be reacting to something other than a visual cue" simply ignores that Plaintiffs' expert's own recreation shows that (1) Bove was approaching a turn onto Scattergood Street when he began to slow, and (2) in the midst of Bove's slowing down, Miller and Wolk turned on James Street, thus becoming visible to Bove. ECF 64, Ex. K. Moreover, Plaintiff ignore Wolk's entirely uncontradicted testimony that he had no communication with Bove until after the accident. See, e.g., ECF 68-1 at 25.[16]

While this Court must view the evidence in the light most favorable to Plaintiffs, it need not draw "unreasonable inferences," InterVest, Inc. v. Bloomberg, L.P., 340 F.3d 144, 163 (3d Cir. 2003) or accept "bald assertions" as true, Advo, Inc. v. Philadelphia Newspapers, Inc., 51 F.3d 1191, 1201 (3d Cir. 1995); see also Caban Hernandez v. Philip Morris USA, Inc., 486 F.3d 1, 8 (1st Cir. 2007) ("That does not mean, however, that we ought to draw unreasonable inferences or credit bald assertions, empty conclusions, rank conjecture, or

---

[16] In relevant part, Wolk testified that "I don't know what he was doing. He just happened to be on the block and seen me out of the vehicle, I guess. I didn't notice he was that close to me in that Ford until I seen the video and I seen the blur of his face going by." Id. Similarly, Wolk testified that he did not "have any communication or contact with him at any time in the months leading up to this incident." Id. at 24.

vitriolic invective").   And it strains credulity to suggest that Bove's slightly ambiguous car movements permit the inference that Bove and Wolk were coordinating.[17]   Indeed, such a finding would have no limiting principle.   If this Court were to so hold, that could potentially open the floodgates for all bystanders who slow down for an approaching police chase.   That result is untenable.

The same is true of Plaintiffs' "bald assertions" that Wolk and Bove communicated via burner phones.  Indeed, Wolk persuasively counters that

> Plaintiffs' description of the records not being retained because the phone at issue was a pre-paid "burner" phone is inaccurate. The hearsay letter from a T-Mobile representative Plaintiffs refer to states:
>
> > I located this under Tracking ID 4510947
> >
> > It  was an objection letter we sent to yall due to no docket number on the subpoena as well as it  being a prepaid line that is outside our normal range of retention.
>
> It is unclear what subpoena or phone number this letter refers to. However, the letter is clear that the subpoena was rejected for not having a docket number and for being a "prepaid line" that is "outside of our normal range of retention". As the official objection letter states, which is believed to relate the subpoena of Bove's call records, calls on both "prepaid" and "wholesale account" are stored for "approximately 24 months following usage." And so, no matter what type of phone plan was being used, the records at issue were no longer being stored. In addition, that objection letter, states the number at issue is "… associated with a CA, PA or DE postpaid account. SUBPOENA WITH CONSENT OR COURT ORDER REQUIRED FOR RELEASE OF RECORDS." A postpaid account would appear to be the opposite of a pre-paid account. See https://en.wikipedia.org/wiki/Postpaid_mobile_phone . In summation, there is no admissible evidence in the record to support these allegations, and in fact they appear to contradict the information Plaintiffs' rely on.

---

[17] If anything, had Wolk and Bove been coordinating at this point, one would think that Bove would have remained on James Street so as to obstruct Miller's path.

ECF 71-1 at ¶ 51; ECF 68-4 at 1.[18]   The Court is inclined to agree, particularly since—apart from Plaintiffs' unsubstantiated assertions—nothing in the record establishes (1) that Wolk or Bove actually used these phones during the chase, and (2) even if they did, what they communicated to each other.   Plaintiffs' bare assertion, without more, is again insufficient to permit a reasonable inference that Wolk and Bove were communicating via burner phones.

Likewise, the Court is not persuaded that Plaintiffs' key contention—"Wolk look[ed] directly at Bove" immediately before Bove gave chase—is accurate, or that it somehow indicates that Wolk condoned Bove's subsequent chase.   Simply put, the video evidence capturing this moment is ambiguous, at best.   As cropped from Plaintiffs' Second Amended Complaint:





---

[18] Moreover, Wolk testified at his deposition: "I think I had Simple Mobile at the time."   ECF 68-1 at 23.   That further undermines the relevance of T-Mobile's letter.

ECF 64, Ex. N. In the Court's view, this video reveals nothing more than Wolk walking back to his police vehicle. Scott, 550 U.S. at 380-81. Accordingly, the Court is again hesitant to credit Plaintiffs' version of events—even for the purposes of summary judgment—when nothing in the record actually supports that version, other than Plaintiffs' own narrative.

To be sure, the Court cannot look at each individual piece of evidence in a vacuum. And, by far, Plaintiffs' most favorable piece of evidence is that Bove did in fact begin to pursue Miller after this moment. Indeed, it is somewhat remarkable to think that a private citizen would undertake a high-speed chase without some sort of explicit or implicit direction from police. Yet, the Court struggles to identify any such evidence here.

To the contrary, Wolk expressly testified that he did not (1) request any help from, or (2) communicate at all with Bove during the pursuit. ECF 71-1 at 11. As Wolk tells it, after the fact, Bove informed Wolk that Bove had "**seen** [Wolk] trying to stop the male on the motorcycle and struggle with the male," and thus began pursuing Miller because "he was trying to keep an eye on him." Id. (emphasis added). Bove's contemporaneous statements match, as Bove likewise told the police that he "**saw a** P/O grabbing a white male on a bike pulling. The male on the bike pulled away and took of the bike," which is why Bove "made both turns behind" Miller after he fled from Wolk. ECF 66-3 at 20 (emphasis and bold added).[19] Those are both far more reasonable explanations than Plaintiffs' coordination theory, even if Bove's actual decision to pursue may have been unreasonable.

While such testimony is undoubtedly self-serving, it nonetheless remains uncontradicted. And "[t]he fact is that in considering a motion for summary judgment the court should

---

[19] The Court further notes that this portion of Bove's statement also undermines Plaintiffs' contention that Bove somehow hid his involvement in the chase when providing a statement to the police.

believe uncontradicted testimony unless it is inherently implausible even if the testimony is that of an interested witness*."* Lauren W. v. DeFlaminis*, 480 F.3d 259, 272 (3d Cir.2007).

True, eyewitness Mattos said he "thought the police suv gave up on the chase and let the silver car take the chase." ECF 64-18 at 1; ECF 68-2 at 5 (emphasis added). But that lone statement, in the Court's view, is not enough for a rational juror here to find the degree of coordination that Plaintiffs have alleged.

ii.    <u>Even with Coordination, There Remains No Intent to Harm</u>

Further, even if a reasonable jury could find that Wolk somehow deputized Bove—which a jury could not—Wolk nonetheless would have done so within a "hyperpressurized environment." Sauers, 905 F.3d at 718. Thus, Plaintiffs would still be required to demonstrate that Wolk's "snap judgment" evinced an intent to harm.

Again, the record is barren. Bove's pursuit essentially served as a continuation of Wolk's. Indeed, Bove' self-stated purpose was "keeping an eye on" Miller, given that Wolk himself lagged behind. ECF 71-1 at ¶ 48. That simply does not evince an intent harm. If anything, that further undermines the notion that Wolk imputed some type of "malicious motive" onto Bove. Lewis, 523 U.S. at 855. Unlike Wolk—who twice engaged in a risky maneuver to bring Miller to a stop—Bove did no such thing. Bove simply tailed Miller, albeit doing so above the applicable speed limits.

As Miller's terrible tragedy occurred only after running a redlight and colliding with a third-party vehicle, the Court cannot reasonably ascribe that eventual crash to Bove's (or Wolk's) intent.[20]

---

[20] The Court also concludes that Plaintiffs' alternative theory that Wolk and Bove were somehow connected to or motivated by Miller's unrelated alleged sexual assault of a young girl is entirely unsubstantiated. Plaintiffs merely assert, but do not explain, that there was "a non-trivial chance

To be sure, there will undoubtedly be instances where "officers utilizing a civilian to assist" in the apprehending of a suspect will "demonstrate a conscious disregard of a great risk of harm." Kohuth v. Borough of W. Chester, 2013 WL 1809431, at *6 (E.D. Pa. Apr. 29, 2013). For instance, in Kohuth, Judge Goldberg denied summary judgment against a police officer who "directed a group of inebriated college students to engage in a 'sting operation' late at night, where obvious criminal activity was unfolding," and where that officer "did not provide them with proper instruction." Id.

But again, the level of deference a Court must afford police officers turns on "how much time" that "officer has to make a decision." Sauers, 905 at 717. Indeed, Judge Goldberg expressly concluded that Kohuth was not a hyper-pressurized situation, explaining that "[w]hile [police officer defendant] was informed of on-going criminal conduct, and likely felt pressured to act quickly, he also had several minutes to deliberate the best course of action." Id. at *5 (emphasis added); see also Walter v. Pike County, Pa., 544 F.3d 182, 193 (3d Cir.2008) (requiring only "deliberate indifference" for the extended planning and effecting of a suspect's arrest); Matican v. City of New York, 524 F.3d 151, 159 (2d Cir 2008) (similar).

---

that Wolk and Bove were acting in a clandestine vigilante manner in an attempt to punish - or at a minimum scare - Miller for the 'knifepoint sexual assault' he was falsely accused of, and which Wolk continues to believe he committed." ECF 65-3 at 17. Again, the Court need not credit such "bald assertions." Advo, Inc., 51 F.3d at 1201. Plaintiffs' only argument is that Wolk's testimony as to his understanding of the allegations against Miller in this separate sexual assault case makes it "likely that Wolk heard of the allegations against Miller *before* he engaged in the pursuit on May 7, 2019 despite his testimony to the contrary." ECF 65-1 at ¶ 37. But this does nothing to change the Court's conclusion. Even if Plaintiffs' circumspect theory could reasonably permit the inference that Wolk knew of Miller's allegations ex ante—which it does not—this theory certainly does not permit the further inferential leap that Wolk (1) pursued Miller because of those allegations and (2) spoken with Bove about them.

Wolk had no such opportunity for reflection here, and so even his actions and decisions with respect to Bove must be analyzed under intent to harm standard. Yet, as just explained, the record does not allow Plaintiffs to succeed under that framework.

To be clear, this Court does not intend to suggest that police officers are regularly free to deputize civilians to engage in high-speed chases. To the contrary, in essentially any other conceivable scenario, the Court believes that enlisting the help of civilians would amount to an "action taken within a time frame that allows an officer to engage in 'hurried deliberation,'" thus subjecting that officer to the "conscious disregard" standard. Sauers, 905 at 717. But the "particularized facts of [this] case" make clear that—to the extent Wolk implicitly or ambiguously indicated to Bove that he should pursue Miller (which, again, the Court concludes is beyond the range of permissible inferences here)—this happenstance snap judgment occurred in the midst of an ongoing chase. Id. at 719. This sequence of events—where a civilian onlooker who happens to be familiar with a pursuing officer has a passing ambiguous interaction with the officer, mid-chase—is highly particularized and likely a very rare occurrence. As such, the Court's ruling here is limited only to these facts.

## VI.    CONCLUSION

This is a deeply unfortunate case. Ryan Miller's untimely death was nothing short of a tragedy. But the Supreme Court and Third Circuit have made clear that police officers are entitled to considerable protections when they pursue a fleeing suspect that poses a danger to themselves or others. This Court is bound by that precedent. And here, because this Court simply cannot say that a reasonable jury might find that (1) Wolk's actions shocked the

conscience or (2) served as the proximate cause of Miller's death, the Court will **GRANT**

Wolk's motion for summary judgment.[21]

O:\CIVIL 20\20-6301 Miller v Wolk\20cv6301 - MSJ Memo.docx

---

[21] Moreover, because the Court concludes that no prima facie constitutional violation occurred, it need not further consider whether Wolk would be entitled to qualified immunity here.